UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Maxine M. Chesney, Judge

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| VS. | ) **NO. CR 18-00465 MMC** |
| | ) |
| UNITED MICROELECTRONICS | ) |
| CORPORATION, INC.; FUJIAN | ) |
| JINHUA INTEGRATED CIRCUIT CO., | ) |
| LTD.; CHEN ZHENGKUN, a.k.a. | ) |
| STEPHEN CHEN; HE JIANTING, | ) |
| a.k.a. J.T. HO; and WANG | ) |
| YUNGMING, a.k.a. KENNY WANG, | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

San Francisco, California
Wednesday, August 7, 2019

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:
DAVID L. ANDERSON
United States Attorney
450 Golden Gate Avenue
San Francisco, California   94102
BY:  **JOHN H. HEMANN**
**ASSISTANT UNITED STATES ATTORNEY**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Ana M. Dub, RDR, CRR, CCRR, CRG, CCG
Official Reporter, CSR No. 7445

**APPEARANCES**:  (CONTINUED)


For Defendant United Microelectronics Corporation, Inc.:

                    Latham & Watkins LLP
                    505 Montgomery Street, Suite 2000
                    San Francisco, California  94111
          **BY:  LESLIE R. CALDWELL, ATTORNEY AT LAW**


For Defendant Fujian Jinhua Integrated Circuit Co., Ltd.:

                    Morrison & Foerster LLP
                    425 Market Street
                    San Francisco, California  94105
          **BY:  CHRISTINE WONG, ATTORNEY AT LAW**

Wednesday - August 7, 2019                    2:25 p.m.

P R O C E E D I N G S

---o0o---

THE CLERK:  Calling Criminal Case Number 18-465,

United States of America versus United Microelectronics and

Fujian Jinhua Integrated Circuit.

THE COURT:  All right.  State your appearances,

please, Counsel.

MR. HEMANN:  Good afternoon, Your Honor.  John Hemann

for the United States.

THE COURT:  Mr. Hemann.

MS. WONG:  Good afternoon, Your Honor.  Christine Wong

for Fujian Jinhua Integrated Circuit Company Limited.

THE COURT:  Good afternoon, Ms. Wong.

MS. CALDWELL:  Your Honor, Leslie Caldwell for United

Microelectronics Corporation.

THE COURT:  And Ms. Caldwell.

Yes.  Well, here you are again.  And what would you like

to say about the status of the criminal case at this point?

MR. HEMANN:  So, Your Honor, there is -- we remain in

discussions about the protective order, which has been complex

in this case, maybe more complex than usual because of the

civil case and the criminal case and the location of the

evidence and things like that.

We've gotten to the point where we have two issues, maybe

 1    three -- two and a half, I would say -- that are probably going

 2    to need to be resolved by the Court.  And they're fairly

 3    discrete issues -- they're very discrete issues that have to do

 4    with whether the evidence that is deemed to be protected under

 5    the trade -- under the protective order can be reviewed in

 6    Hong Kong and can be reviewed by co-counsel for the --

 7    non-U.S. co-counsel for the defense counsel in this case.

 8            **THE COURT:**  Exclusively, or along with?

 9            **MR. HEMANN:**  Along with.  Along with.

10        The victim in the case and the owner, in our view, of the

11    intellectual property that is at issue, Micron, has strong and,

12    I believe, good faith and valid positions with regard to this.

13    The defense -- the defendants in this case obviously have a

14    need to look at the information, and have some logistical

15    issues that also are valid and are positions that are taken in

16    good faith.

17        And we believe that under the circumstances, the best

18    thing to do is to submit to the Court a couple of briefs

19    limited to these points and ask the Court to make the

20    determination as to how -- how information is handled with

21    regard to these two discrete points.

22            **THE COURT:**  If I understand -- and then I'll confirm

23    with defendant's counsel but -- it sounds like the Government

24    is not opposing an "Attorneys' Eyes Only" order that would

25    allow Ms. Wong and Ms. Caldwell --

1    **MR. HEMANN:** Certainly not.

2    **THE COURT:** -- to review the material.

3   And essentially, everybody's familiar with them and

4 they're responsible members of the professional community.

5   Is the concern that people don't know the lawyers who are

6 not local, or is it that they do know them and they have a bad

7 reputation in some way?

8    **MR. HEMANN:** So the concern is not with lawyers

9 subject to the jurisdiction of this Court at all.

10    **THE COURT:** No, no. I understand that we're talking

11 about --

12    **MR. HEMANN:** Either these or other U.S. lawyers.

13    **THE COURT:** All right. We're talking about the

14 lawyers in Hong Kong?

15    **MR. HEMANN:** Both the lawyers in Hong Kong that are

16 colleagues who work for other law firms, but also, the ability

17 of the defendants to share information with their clients in

18 Hong Kong, to actually bring --

19    **THE COURT:** By the defendants?

20    **MR. HEMANN:** By defense counsel.

21    **THE COURT:** Counsel.

22    **MR. HEMANN:** Counsel, yes.

23    **THE COURT:** Yes.

24    **MR. HEMANN:** -- to bring the information into

25 Hong Kong.

 1    We've made a -- we've agreed, through the protective

 2  order, that clients and experts and things like that will be

 3  able to look at the information to assist defense counsel.

 4    We have a location issue, which is, defense counsel wishes

 5  to show information to their clients in Hong Kong.  Micron is

 6  opposed to bringing the information, protected information,

 7  into Hong Kong at all.

 8         **THE COURT:**  Okay.  So --

 9         **MS. WONG:**  And if I might add, our reason for wanting

10  the discovery to be in Hong Kong is not only to show our

11  client, but because part of our team, U.S.-barred lawyers who

12  are partners at Morrison & Foerster and associates of

13  Morrison & Foerster, are working in Hong Kong on this matter.

14  And according to what Micron would want, our lawyers in

15  Hong Kong would not be able to access that information either.

16         **MS. CALDWELL:**  And we share the same concern,

17  Your Honor.  Our Latham partners and associates in Hong Kong

18  are also working on this matter, and it's important for them to

19  be able to access the materials.

20         **THE COURT:**  All right.  So there's a group of lawyers

21  who happen to be based out of --

22         **MS. CALDWELL:**  Hong Kong.

23         **THE COURT:**  -- the Bay Area.

24    They're in Hong Kong.  They are either partners or

25  associates in the respective defense law firms.

1    If I might just -- I'm trying to avoid having to come

2 back.  And there's no other case on our calendar, is there?

3 No, for now.

4    Okay.  What's the concern about them?

5        MR. HEMANN:  So the concern is not about them.

6        THE COURT:  But where they want to look at it?

7        MR. HEMANN:  The concern is about bringing the

8 information into Hong Kong.

9        THE COURT:  Hold on.

10    All right.  So it's not the people, as far as the U.S. law

11 firms and their members are concerned.  It is that location.

12    Micron is telling your office they don't want to bring the

13 stuff into -- they don't want to take it out of the country.

14 Is there a reason for that?

15        MR. HEMANN:  And first let me say, the attorneys from

16 Jones Day who represent Micron are here in the courtroom, and I

17 would ask the Court to give them leave to speak for themselves.

18        THE COURT:  Well, but they are --

19        MR. HEMANN:  It is their information that we're

20 concerned about.

21        THE COURT:  Well, they're your clients, in a way.

22 Maybe not clients but -- all right.  You're here --

23        MR. HEMANN:  Not so much clients.

24        THE COURT:  All right.  You're the point person for

25 the moment.

# PROCEEDINGS

1    **MR. HEMANN:**  And I'll do the best I can.

2    **THE COURT:**  Okay.  Let me just --

3    **MR. HEMANN:**  And I'll say this.

4    **THE COURT:**  Didn't they tell you why they don't want

5  to bring the stuff out of the country?

6    **MR. HEMANN:**  Yes.  And --

7    **THE COURT:**  I assume they're not afraid of TSA

8  screening it in some way.

9    **MR. HEMANN:**  Well, that's -- and that's a very good

10  point.  They're not afraid of TSA screening.

11    **THE COURT:**  Okay.

12    **MR. HEMANN:**  They're afraid of whatever the Chinese

13  version of TSA screening is.  And they're, frankly, worried, as

14  they should be, validly, worried about information security in

15  Hong Kong --

16    **THE COURT:**  Okay.

17    **MR. HEMANN:**  -- because Hong Kong is part of China.

18  And as recent events have illustrated, the Chinese very

19  much believe that Hong Kong is part of China and treat

20  Hong Kong as part of China.

21  And so they are worried, validly, that if we bring this --

22  if anybody were to bring this information into China, that the,

23  sort of, ability of the Chinese government to look at the

24  laptops and computer devices of people who are in Hong Kong is

25  not something that either we can control or they can control or

1    the Court can control.

2             **THE COURT:**  Okay.  All right.

3             **MR. HEMANN:**  And these are all true things.

4             **THE COURT:**  You're just getting past me a little bit,

5    though.

6             **MR. HEMANN:**  Okay.

7             **THE COURT:**  All right.  You get through security here.

8       And how are they going to transport this?  Electronically,

9    just on their various devices?

10             **MR. HEMANN:**  And correct me if I have this wrong.

11       The understanding that we have, the agreement that we have

12    is that, were information to be taken out of the United States,

13    it would stay on stand-alone computer devices.  It would not be

14    hooked up to the Internet, for example.

15             **THE COURT:**  Okay.

16             **MR. HEMANN:**  So --

17             **THE COURT:**  Downloaded, essentially.

18             **MR. HEMANN:**  These are -- and I'm going to butcher up

19    the technical terms, but these are going to be on stand-alone

20    computer devices that cannot be hooked up, either here or

21    there, to the Internet while they are being used to review this

22    evidence.

23             **THE COURT:**  And it consists of -- without going into

24    the secret part of it, just generically, this would be?

25             **MR. HEMANN:**  It would consist of trade secrets

1    belonging to Micron regarding memory, computer memory.

2        **THE COURT:**  Are these the secrets they say that they

3    already have?

4        **MR. HEMANN:**  These are some of the secrets that they

5    say they already -- there's a very long answer to what is a

6    very good question.  And I think that we don't know what --

7    what "they," meaning the Chinese in China, actually, have.

8    These are trade secrets that have been, for the most part, in

9    Taiwan previously.

10        **THE COURT:**  They are secrets that Micron is concerned

11    the defendants may have access to, in part, and some maybe they

12    know or they're prepared to say they have access to.  But to

13    give complete discovery, they need to do both.

14        **MR. HEMANN:**  Yes.

15        **THE COURT:**  Okay.  I understand that.  All right.

16        Now, all right.  So they get through security here, and

17    now they're in Hong Kong.  I have not flown to Hong Kong.  I

18    don't know what happens there.  They're clutching their

19    devices.  Okay?  Do they just walk out through some kind of

20    customs line and get their baggage and get in an Uber or

21    something, or what do they do there?

22        **MR. HEMANN:**  So what they do probably -- there's

23    probably a lot of things they can do.  But if you walk in with

24    devices on your -- say this is a laptop.  As you're going

25    through security, just like if you're coming to the

# PROCEEDINGS

1 United States, the security services in Hong Kong can take your

2 laptop and plug something in and download the whole thing.

3      **THE COURT:**  I've not had that happen here.  But let's

4 assume they -- in other words, you're talking about inbound

5 into Hong Kong?

6      **MR. HEMANN:**  Inbound to Hong Kong.

7      **THE COURT:**  Not when they have to get out again?

8      **MR. HEMANN:**  Not worrying about -- right.

9      **THE COURT:**  Okay.

10      **MR. HEMANN:**  Although they can do the same thing

11 coming out.  Again, these are all things that are the same as

12 in the United States.  At the border, the authorities in

13 Hong Kong are permitted, without restriction, and do on

14 occasion, plug into people's laptops and phones and other

15 computer devices and download the contents.  There is --

16      **THE COURT:**  As I say, I've not had that experience;

17 but at the moment, I'll take your word for it.  Nobody's

18 jumping up and down here saying, "No, no, it doesn't happen."

19      All right.  So you've got a concern about some complicity

20 on the part of Chinese authorities.  And assuming for a moment

21 they weren't in on this and had no idea what they were looking

22 at, if they looked at it, or what they were looking for, if

23 they then saw this material, is it in a form that someone who

24 is not knowledgeable could understand was important stuff?  Not

25 sure?

1    **MR. HEMANN:** I don't -- I don't know. But I think

2  there are a number of assumptions that are packed into

3  the Court's questions that I would challenge, which is that the

4  evidence over the last ten years has shown -- and this is all

5  sort of open source evidence -- has shown that the Chinese

6  government -- the government of the People's Republic of China

7  is involved in corporate economic espionage.

8    **THE COURT:** I'm not saying they aren't. That's one

9  concern, though.

10    **MR. HEMANN:** Right. And we're not worried about a

11  random border stop.

12    **THE COURT:** Okay.

13    **MR. HEMANN:** We are worried about a purposeful effort

14  to obtain information.

15    **THE COURT:** All right. And that somehow, whoever

16  would be in a position to do it and had the appropriate state

17  of mind would be able to identify whoever was moving this stuff

18  and would know to look for it.

19    **MR. HEMANN:** Sure.

20    **THE COURT:** Okay. Now, I'm not sure how likely that

21  would be or wouldn't be. So I'm just -- okay.

22    **MR. HEMANN:** And I don't want to pretend like I can

23  assess -- either the United States or Micron can assess the

24  likelihood of this.

25    **THE COURT:** Okay. But if we can't, essentially,

1  arrive at some kind of an accord here, now, then these are

2  questions that could come up, and then --

3      **MR. HEMANN:**  Yes.

4      **THE COURT:**  -- you can confer with counsel and anybody

5  else who's familiar with what goes on over there to fill in

6  some of the blanks.

7      I'm not assuming anything.  All right?  I was only asking

8  what the point was.  Was it that it was that they were

9  essentially complicit or just somehow somebody might come

10  across something?  And that's a little different.

11      And then the question is:  If some guy who's the

12  equivalent of TSA looked in the computer, what could they see

13  or tell?  I don't know because I don't know what this stuff

14  looks like.

15      **MR. HEMANN:**  The concern is the former, not the

16  latter.

17      **THE COURT:**  Okay.  All right.  So we got that squared

18  away.

19      As far as -- just one moment, Ms. Wong.

20      Are there other people -- in other words, we've got the

21  two law firms here that have got people over in Hong Kong.  If

22  they were here, nobody would care if they looked at it too.  Is

23  there another group of people you understand the defendants

24  want to share the information or want to have look at it first,

25  before we talk about who can give it to whom?

**PROCEEDINGS**

1    MR. HEMANN:  So my understanding is that Ms. Wong

2  has -- that Morrison & Foerster and Ms. Wong have co-counsel --

3  that may be the right word -- effectively, co-counsel on this

4  matter that are Hong Kong-based, non-U.S. attorneys that

5  Ms. Wong and Morrison Foerster would like to have to share the

6  information with --

7            THE COURT:  Okay.

8            MR. HEMANN:  -- in Hong Kong.

9            THE COURT:  It's separate firms?

10           MR. HEMANN:  At a separate firm.

11           THE COURT:  Different firm?

12           MR. HEMANN:  Different firm, yes.

13           THE COURT:  Okay.  So, all right.  So we have:  Should

14  it go out of the country, or should the Morrison & Foerster and

15  other U.S. firm lawyers who are in Hong Kong get on a plane and

16  come over here and look at it.

17           MR. HEMANN:  And I will say, Your Honor --

18           THE COURT:  Right?

19           MR. HEMANN:  -- not just -- just to Hong Kong.

20      We are comfortable with it going to other places in

21  Southeast Asia.

22           THE COURT:  Oh.

23           MR. HEMANN:  So Taiwan, Singapore, close.

24           THE COURT:  Okay.

25           MR. HEMANN:  But it's really just the Hong Kong issue

1  that's --

2     **THE COURT:**  All right.

3     **MR. HEMANN:**  -- the issue.

4     **THE COURT:**  All right.  So someplace closer if they

5  didn't want to have to go too far afield in looking at it.

6     Okay.  But we have:  Should it be delivered to Hong Kong?

7  Should lawyers based in Hong Kong in firms that are not U.S.

8  firms, as I understand it, not even -- in other words, not

9  these two firms, but not any U.S. firm -- they're Hong Kong

10  firms -- be allowed to look at it?

11     And then whoever gets to look at it, the next question is

12  who do they get to give it to, or what the people who get it

13  can do with it.  There was some downstream idea here too,

14  I think.

15     **MR. HEMANN:**  So the understanding is that the lawyers

16  will maintain control, physical control, of the information.

17     **THE COURT:**  And make copies?

18     **MR. HEMANN:**  Well, there's a copying part of this, but

19  let's not let the tail wag the dog right now.

20     **THE COURT:**  Okay.

21     **MR. HEMANN:**  Let's not worry about the copying part of

22  it right now.

23     **THE COURT:**  Sorry I mentioned it.

24     **MR. HEMANN:**  But the idea is that the lawyers will

25  maintain control of any electronic or paper documents and they

1    won't leave the possession of the lawyers.

2        But obviously, the purpose of bringing the documents to --

3    and when I say "documents," I mean both electronic and paper --

4    to Hong Kong or anywhere else is so that the lawyers can show

5    it to a knowledgeable person and have the knowledgeable person

6    explain to the lawyers what it's all about.

7        So the understanding is, lawyers maintain control; other

8    people look at the material and help educate the lawyers to --

9        **THE COURT:**  Yes.

10       **MR. HEMANN:**  -- to mount the defense.

11       **THE COURT:**  Can that --

12       **MR. HEMANN:**  And we're fine with that.  But, again,

13   it's just, what we're saying -- what my friends at Micron are

14   saying is that they are just -- they are not comfortable,

15   validly, with that process happening in Hong Kong because they

16   might lose control -- the lawyers might lose control of the

17   information.

18       **THE COURT:**  All right.  Hong Kong as a location is a

19   major problem here that, if solved, could resolve at least some

20   of the related concerns, and then we could figure out what's

21   left.

22       Okay.  I want to turn to Ms. Wong and Ms. Caldwell, then.

23   Who wants to go first?

24       **MS. WONG:**  Sure.  Your Honor, there's actually one

25   issue that I think is fairly easy to resolve, and that's this

1  issue of the other counsel that are not counsel of record, who

2  are not U.S. lawyers.

3  So there actually is a provision in the proposed

4  protective order to deal with it now, which is that there's a

5  procedure where we will provide the names of those individuals

6  to the Government in advance.  The Government will review and

7  let us know if there are any problems with those individuals.

8  I understand that Micron's concern is not so much with the

9  procedure but, rather, if we know the names ahead of time,

10  let's get this approval squared away.

11  The reason why I would prefer to have it as it's set out

12  in the proposed order is, frankly, I think it's more broad and

13  allows for more flexibility.  So at this point, you know, once

14  this order is entered, we will send the names that we know of

15  to the Government; they will review.  In the future, if

16  something comes up, we will follow the same procedure to submit

17  additional names to the Government for approval.

18  So I don't think there's actually any real disagreement

19  about the procedure that is set forth in the order.  It's only

20  whether or not we need to have those initial names agreed upon

21  now.

22  **THE COURT:**  Oh, okay.  But, for example, if you

23  followed your procedure and provided the names, as you have

24  them now, to Micron, they could reject those?

25  **MS. WONG:**  I would provide them to the Government.

1    I believe that's what --

2              **THE COURT:**  All right.

3              **MS. WONG:**  -- the order says.

4              **THE COURT:**  Okay.

5              **MS. WONG:**  The Government would then --

6              **THE COURT:**  Fine.

7              **MR. HEMANN:**  -- get Micron's approval, or not, or

8    solicit comments from them, and then we could discuss further.

9              **THE COURT:**  All right.

10             **MS. WONG:**  And I understand from our discussions that

11   Micron is less concerned -- Micron and the Government are less

12   concerned with U.S.-barred lawyers, over whom the Court

13   presumably has jurisdiction.

14             **THE COURT:**  Sure.

15             **MS. WONG:**  And so with those comments in mind, we

16   could think about how that list should be proposed to

17   the Government.

18             **THE COURT:**  All right.  So let me ask.  Mr. Hemann,

19   have counsel from Micron or anybody else on behalf of Micron,

20   or yourself, do you have some reason why you wanted to get the

21   first batch of names in an agreement that would be in a signed

22   order up-front as opposed to, I guess, having some subsequent

23   document that would have to be -- no.  Sure, it's cleaner if

24   you could talk about it now and agree upon it and put it in

25   your protective order.

1      "Only these other people can see it."

2      But if you use the procedure, how much more complex would

3 it be or --

4      And then I'm going to ask Ms. Wong why you can't just give

5 them the names up-front before you sign the thing.

6      **MR. HEMANN:**  It's not the seeing it that I think is

7 the issue.  It's the having it; that we're --

8      **THE COURT:**  No, we're not talking about the protected

9 material at this point.  I'm just talking about -- you've got a

10 proposed protective agreement.  And one part of it says, as

11 proposed by the defendants, as I understand it:  We will

12 provide you with the names of whoever we would like to have be

13 able to have -- to see the material and do whatever you're

14 going to say you agree they can do with it.

15      All right.  And then Micron would say whether they have

16 any objection to one more or all of those people.

17      And then I guess her idea is, you then talk about it in

18 some way; and if you couldn't agree, then you're going to end

19 up on my doorstep or something.  If you did agree, then you

20 would have to file some other document indicating what that

21 agreement is.

22      She understands that Micron wants to get the names in

23 advance of signing, work out whether you can agree on it, and

24 then put that as a done deal in your actual signed order, which

25 is kind of tidier.

1    If that's your reason, okay.

2    And I would just ask Ms. Wong why you can't do it orally

3 first, come to an accord, and write it out in your agreement.

4    **MS. WONG:**  And my response to that was that as the

5 case progresses, there may be additional names that we would

6 want to add, people we want to take out.  And so the procedure

7 now, as set forth in the proposed order, sets out a procedure

8 for us to do this.  We don't need to have all this agreement in

9 advance.

10    And to the extent that there's back-and-forth about which

11 individuals the Government and Micron would agree to, we could

12 set that to the side; the rest of the protective order is

13 entered into; and at least defense counsel on record can start

14 to get the discovery.

15    **THE COURT:**  All right.  So part of that, I think, is

16 not perhaps a good reason to have to do it the way you propose.

17 The second part is, you want to get everything rolling.  I

18 understand that.

19    Going back to the first part, there wouldn't be any reason

20 why you couldn't agree in advance, if you can, on whoever the

21 identified people are, whatever that list is -- you,

22 Ms. Caldwell, whoever else -- and then possibly some of these

23 lawyers based in Hong Kong, perhaps preferably with U.S. firms,

24 if possible, but, in any event, you agree on that and you put

25 in the provision:  If we want to add or subtract, we will then

1    agree or will talk about it.  And you'll give the names, and

2    they'll tell you -- in other words, the same thing you want to

3    do now, except at least you have a group in place which could

4    get things rolling but give you the flexibility of modifying in

5    whatever reasonable way you want to articulate that.  And that

6    could cover that particular concern maybe from both sides.

7        The second part is, if you can't come to some agreement --

8    and I don't know how much you've been talking about this but --

9    if you can't, then everything is on hold, which you're

10   concerned time is going by; you don't get the discovery,

11   et cetera.

12       So, okay.  I don't know.  I mean, these are valid

13   considerations on both sides.  But I'm sensitive to what Micron

14   is concerned about in not disclosing.  But right now, we're not

15   talking about a dispute as to who gets to see it, but just how

16   we're going to figure out who's going to get to see it and

17   record that.  That shouldn't be a real stumbling block.

18       Then we can talk about what's nearby.  You know, we're in

19   a big country here.  It sounds like somebody could get pretty

20   close to Hong Kong without necessarily being in Hong Kong.

21       So somebody could say, "Okay.  We won't meet in

22   San Francisco; we'll meet in Seattle."

23       All right.  You might have the equivalent there.  There's

24   a perfectly good country nobody's worried about.  It's not part

25   of the PRC, whatever.

1      **MS. CALDWELL:**  I'm sorry to interrupt.

2      **THE COURT:**  No.  That's all right.  He's thinking.  If

3  you want to talk and not interrupt his thought, that's okay.

4      **MS. CALDWELL:**  So I think our concern is not so much

5  with other counsel, because we currently don't have counsel

6  in -- other counsel in Asia who are co-counsel.  It's more with

7  our Latham lawyers in Hong Kong being able to access the

8  materials, frankly, on a daily basis.

9      And my understanding is -- and I'm certainly not a

10  technical expert but -- that there should be a way technically

11  for them -- if the concern is the Chinese are surveilling every

12  Internet in Hong Kong and they're going to snatch this off the

13  Internet, there should be a way to enable review without that

14  surveillance capability being able to kick in.

15      **THE COURT:**  According to Mr. Hemann, if I understand

16  this, that these documents won't be available on the Internet,

17  but they will be the equivalent of written down on a piece of

18  paper that somebody could look at when you come into China.

19  And that's what he's expressing.  I mean, it's electronically

20  recorded, but it's the same as somebody having a piece of paper

21  that they wrote all this stuff out on.  It's not on the

22  Internet, but people could read it, see it, grab it, do

23  whatever they want.  And in this instance, he's afraid they'll

24  stick some device in and download it.  So there you go.

25      **MS. WONG:**  Your Honor, if I could just add to that.

1    The agreement also requires us to transport the

2    information in an encrypted, secure way.  And, of course,

3    there's no such thing as a hundred percent encryption, but at

4    least the piece of paper is going to be written in code.  It's

5    not just a, you know, plain piece of paper in clear

6    handwriting.

7          **THE COURT:**  Well, okay.  It does seem to me -- how

8    long -- let me ask you another question here.  Okay.  How long

9    do you think it's going to take to do the kind of review of the

10   documents -- in other words, you say the lawyers would like to

11   have it in Hong Kong because that's where they are and that's

12   where their client is; and they just want to be able to meet

13   with them, I guess, whenever they want, sporadically or what

14   have you.  There's no fixed time frame around this particular

15   process.

16         **MS. WONG:**  I think that it would depend on the volume

17   of information.  But I think it would be difficult to set a

18   fixed time frame.  It would essentially have to be the length

19   of this matter.

20         And one thing I would add further is, we think we're

21   already making a concession by having to go to Hong Kong.  I

22   mean, our client is actually in China; and we actually have

23   offices in China where that would be, frankly, the easiest way

24   for us to work on defending this matter.

25         But in light of the various concerns, the compromise that

1   we're offering is Hong Kong; and frankly, that's where our

2   lawyers who are working day to day, as Ms. Caldwell said are

3   working on this matter, are based in Hong Kong.

4        THE COURT:  Okay.  The bottom line here, then, as I

5   sort of get it at the moment, is that the reason the defendants

6   want the material available where they are and where their

7   lawyers are is so that they can go over it whenever they sort

8   of feel like it and an issue comes up, as opposed to something

9   where maybe it would take a week to go through the material and

10  everybody goes somewhere like the equivalent of Las Vegas or

11  something, sits by the pool and looks at it.

12       Okay.  And so that will be in part, I think, in weighing

13  the two concerns, because it's certainly legitimate to be able

14  to have reasonable communication with your client.

15       Nobody's over here?  Is that it?  Everybody's over there

16  in China?  Nobody's in the States, essentially?

17       MS. CALDWELL:  The clients are over there.  Our client

18  is in Taiwan.

19       THE COURT:  All of them.

20       MS. WONG:  And our client is in China.

21       THE COURT:  Now, you have Taiwan.

22       MS. CALDWELL:  We have Taiwan.  And frankly, when we

23  show the documents to our client, it would likely be in Taiwan.

24  But it's very important for our Latham lawyers who are based in

25  Hong Kong to be able to sit at their desks and review this very

1  complicated and detailed material that I, at least, have to

2  usually read 10 or 15 times before I can retain it.

3      **THE COURT:**  Well, okay.  My suggestion is that you --

4  I don't know if there's anything else that the Micron counsel

5  would want to add to your presentation.  If there was something

6  in particular, I could hear from them, but I'm not ruling on it

7  right now.

8      My thought is that -- I get the two concerns.  And the

9  concern about securing the information is certainly legitimate.

10  I don't know all the ins and outs of what goes on over in

11  Hong Kong, Mainland China, or elsewhere.  I guess there's

12  nothing right over the border that anybody thinks would be

13  close enough that they could all do the same thing with a short

14  trip.

15      So it may be that the defendants, if this has to be

16  brought back in formal fashion -- and it may have to be -- your

17  focus would have to be, I think, on why things can be

18  protected -- how, rather, not why -- how they can be protected.

19      And then the plaintiffs will have to say why it isn't

20  secure enough.  And they, of course, can start with why they

21  don't think it's secure enough, if they're going to take the

22  laboring oar in this.

23      Whoever goes first, the other side's going to have

24  whatever counter they have to it, and we'll see.

25      You've mentioned encryption.  We have non-Internet.

1    The theft here was not really described, at least from

2  what I know of the case, as some kind of high-level tech theft.

3  I mean, it was like people put stuff in a bag and walked out

4  with it, is essentially the allegation here.  You were there,

5  you had it in your hand, and you walked out with it.

6    So I don't know enough about whether this higher level of

7  theft is likely to happen.  And we know it is a criminal case;

8  so there's some certain amount of rights here.

9    And if you think there's another way, Mr. Hemann, to deal

10 with their "We need to have access to it so we can work on it

11 at our desk when we need to and get our client in and show it

12 to them without everybody having to get on an airplane and go

13 somewhere," think about what you could propose in that regard.

14    **MR. HEMANN:**  And my suggestion, logistically,

15 Your Honor, is -- and I feel bad that we can't work this --

16 that we have not yet been able to work this out.

17    **THE COURT:**  Well, I know, because everybody's, like,

18 here.  They're all very professional, frankly nice people and

19 trustworthy, as far as I can tell.

20    **MR. HEMANN:**  Even Mr. Stephens is nice.

21    **THE COURT:**  They seem very nice too.

22    **MR. HEMANN:**  They're very nice too.

23    And everybody's gotten along very well and tried to -- and

24 everybody has compromised.

25    **THE COURT:**  I understand.  I get the feel of that.

**PROCEEDINGS**

1    **MR. HEMANN:** So what I would recommend or suggest,

2    Your Honor, is that if -- your comments have given me a couple

3    of ideas for how to propose a resolution.

4        If we can't get there, I would suggest that you allow the

5    parties to submit short simultaneous -- the Court understands

6    the issues -- short simultaneous letter briefs in advance of

7    the next status conference.

8        **THE COURT:** Don't do letter briefs. Okay?

9        **MR. HEMANN:** In whatever form you like, Your Honor.

10       **THE COURT:** And I'm not sure if simultaneous is a good

11   idea, because then we'd still have to have some kind of

12   simultaneous reply probably, because too often I've seen, when

13   you get things being shot out simultaneously, they tend to run

14   out in parallel; they don't always intersect where people are

15   actually engaged.

16       **MR. HEMANN:** Whatever Your Honor would like to have.

17       **THE COURT:** Whoever wants to start, whether it's a

18   motion to compel, some kind of request for a protective order,

19   whatever it is, that person starts -- that party starts. The

20   other parties respond in whatever way they feel appropriate.

21   We might have a reply or not. You might agree. But I'm

22   thinking staggered is -- all I'm saying is staggered seems

23   better than simultaneous.

24       **MR. HEMANN:** Okay.

25       **THE COURT:** And I'd rather not be your pen pal.

1     **MR. HEMANN:** Okay.

2     **THE COURT:** I'd just as soon have it be an actual

3 named motion of some sort.

4     And I know, for example, the magistrate judges in typical

5 discovery matters in civil cases usually ask the parties to

6 give, like, a joint letter and do various things. When I have

7 had to look at some of those, I'm not sure how helpful they

8 are. I think I'd rather just get regular papers and deal with

9 them. It seems -- I don't know -- more organized, more orderly

10 perhaps.

11     **MR. HEMANN:** So along those lines, maybe I would

12 suggest that if we can't work it out, that the defendants take

13 the first shot and ask the Court to approve language that we've

14 been working with that would allow them to do the things they'd

15 like to do; the Government and/or Micron can file something in

16 response to that; and then the defendants can file some sort of

17 reply.

18     **THE COURT:** You want to go first?

19     **MS. CALDWELL:** Well, I think it would likely make more

20 sense, Your Honor, for the Government/Micron to go first,

21 because it seems like the central point is, documents in

22 Hong Kong are not safe because it's under the control of China.

23     **THE COURT:** Okay.

24     **MR. HEMANN:** I was trying to be courteous. I'm happy

25 to go first.

1    **THE COURT:** All right. You go first.

2    **MR. HEMANN:** I'm happy to go first. I was holding the

3 door.

4    **THE COURT:** All right. If there's a reply, then you

5 get it. And then we'd still have a hearing to hash it out.

6    But given that at least today's appearance has given you

7 some ideas about possible compromise -- of course, you've got

8 to run them by Micron in case they just came to you

9 unilaterally here. But if they look like they might fly, maybe

10 you'll come up with something. I mean, there's a lot of

11 creative minds here.

12    And since nobody is saying that the other side's interests

13 are not legitimate, but just how that they can be accommodated

14 and still not do damage to their own side, I'm hoping you can

15 come up with something. That's, I guess, all I can say at the

16 moment.

17    All right. So what should we do? You want to put this

18 over? What do you want to do?

19    **MR. HEMANN:** We talked about putting it over to the

20 end of September.

21    **THE COURT:** Okay.

22    **MR. HEMANN:** And we're making -- everybody's working

23 on the case, and it's a complex case. And so we would like you

24 to give us -- did we say the 25th?

25    **MS. WONG:** 25th.

1        **MR. HEMANN:**  -- of September, if that's available to

2   Your Honor.

3        **THE COURT:**  The only -- when are we doing the -- is

4   that during the court retreat?

5        **THE CLERK:**  No.

6        **THE COURT:**  Okay.  Usually, we have a court retreat in

7   October, but they couldn't get reservations.  Anyway, it's in

8   September sometime, and I don't remember when.

9        **THE CLERK:**  It's the week before.

10        **THE COURT:**  Week before.  So -- all right.  So we're

11   talking about -- did you say the 25th?

12        **MR. HEMANN:**  25th.

13        **THE COURT:**  That's a Wednesday.  It's certainly okay

14   with me.  I think we'd have to exclude time again.

15        **MR. HEMANN:**  That would be our request, Your Honor.

16        **THE COURT:**  Do counsel for the two defendants feel

17   that for effective preparation, that an exclusion through the

18   25th would be appropriate?

19        **MS. CALDWELL:**  Yes, Your Honor.

20        **MS. WONG:**  Yes, Your Honor.

21        **THE COURT:**  All right.  Well, returning to, at this

22   point, something of a mantra, I'm going to exclude time through

23   September 25th for effective preparation of counsel.  Needless

24   to say, that interest is in each of the defendants' best

25   interests and, from what I've heard, I think in the

Government's as well, and that those interests outweigh any

other interest either of the defendants or the public would

have in moving forward somewhat apace and without this

exclusion.  So that's the order.

And I will see you back on the 25th.  If for some reason

that date turns out to be too -- well, if it turns out to be

premature for some reason, rather than have to come in, if

you're all in accord, you could give me a stipulation to push

it back --

**MR. HEMANN:**  We'll do so, Your Honor.

**THE COURT:**  -- just to save everybody a little money.

**MR. HEMANN:**  Great.

**THE COURT:**  Okay.

**MR. HEMANN:**  Thank you so much, Your Honor.

**MS. CALDWELL:**  Thank you, Your Honor.

**MS. WONG:**  Thank you, Your Honor.

**THE COURT:**  All right.  Thank you very much.  That

concludes this case and, I believe, our calendar.

Hearing no demurrer, we're in recess.

**MR. HEMANN:**  Thank you, Your Honor.

**MS. WONG:**  Thank you, Your Honor.

**THE CLERK:**  Court is in recess.

(Proceedings adjourned at 3:04 p.m.)

---o0o---

## CERTIFICATE OF REPORTER

   I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE: Monday, August 12, 2019

_____

Ana M. Dub, CSR No. 7445, RDR, CRR, CCRR, CRG, CCG
Official Reporter, U.S. District Court