UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Maxine M. Chesney, Judge

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | **NO. CR 18-00465 MMC** |
| | ) | |
| UNITED MICROELECTRONICS | ) | |
| CORPORATION; FUJIAN JINHUA | ) | |
| INTEGRATED CIRCUIT, CO. LTD.; | ) | |
| CHEN ZHENGKUN also known as | ) | |
| STEPHEN CHEN; HE JIANTING also | ) | |
| known as J.T. HO; and WANG | ) | |
| YUNGMING also known as KENNY | ) | |
| WANG, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

San Francisco, California
Wednesday, October 23, 2019

## TRANSCRIPT OF PROCEEDINGS

**APPEARANCES:**
For Plaintiff:

        DAVID L. ANDERSON
        United States Attorney
        450 Golden Gate Avenue
        San Francisco, California 94102
  BY: **JOHN H. HEMANN**
      **ASSISTANT UNITED STATES ATTORNEY**

For Defendant United Microelectronics Corporation:
        LATHAM & WATKINS
        505 Montgomery Street - Suite 1900
        San Francisco, CA 94111
  BY: **LESLIE R. CALDWELL**
      **ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY: Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
             Official Reporter

**APPEARANCES**:  (CONTINUED)

For Defendant Fujian Jinhua Integrated Circuit, Co. Ltd.:
                         MORRISON & FOERSTER
                         425 Market Street
                         San Francisco, CA  94105-2482
                 BY:  **CHRISTINE Y.  WONG**
                         **ATTORNEY AT LAW**

For Victim Micron Technology, Inc.:
                         JONES DAY
                         1755 Embarcadero Road
                         Palo Alto, California  94303
                 BY:  **NEAL J. STEPHENS**
                         **ATTORNEY AT LAW**

| | |
|---|---|
| 1 | **Wednesday - October 23, 2019**                 **2:43 p.m.** |

1    **Wednesday - October 23, 2019**                    **2:43 p.m.**

2                         **P R O C E E D I N G S**

3                            ---oOo---

4        **THE CLERK:**  Calling Criminal Case Number 18-465,

5    United States of America versus United Microelectronics and

6    Fujian Jinhau Integrated.

7        Will counsel please step forward and state your

8    appearances for the record.

9        **MR. HEMANN:**  Good afternoon, Your Honor.  John Hemann

10   for the United States.

11        **THE COURT:**  Mr. Hemann.

12        **MS. WONG:**  Good afternoon, Your Honor.  Christine Wong

13   for Fujian Jinhau Integrated Circuit.

14        **THE COURT:**  Thank you.

15        **MS. CALDWELL:**  Your Honor, good afternoon.  Leslie

16   Caldwell for United Microelectronics.

17        **THE COURT:**  Very good.

18        **MR. STEPHENS:**  And, Your Honor, I apologize.

19        **THE COURT:**  I'm sorry.

20        **MR. STEPHENS:**  Good afternoon.  Good to see you.  It's

21   Neal Stephens on behalf of nonparty and victim Micron.

22        **THE COURT:**  I'm just going to add you on here for a

23   moment.

24              (Pause in proceedings.)

25        **THE COURT:**  All right.  Ms. Geiger, I want to hand you

the file on Mr. Lott's case back just so I don't commingle them.

All right.  What we have here is a dispute over what would be the proper conduct of a protective order in this case regarding alleged trade secrets and how they can be observed, copied, et cetera, by various participants in the proceedings.

I generally understand what the parties' respective positions are in this matter so I'm not too sure where to start.

I have a number of questions.  I also tried to write down a schedule of how long it takes to get from here to there and wherever, and was going to confirm with counsel if those various times are in accord with what they understand as travel times because one of the concerns the defendant is raising is "It's really hard for us to all get together if we all have to be running around the globe."

There are questions about, then, whether that interest, of course, outweighs whatever the Government and Micron's interest is in protecting their trade secrets and whether there are any alternatives, and so we'll just explore all this and see where we come out.

Let me just put all this aside for a minute because I have a lot of papers.

Okay.  As it stands now, the Government and the defendants are essentially in accord with all of the terms of a protective

order with one exception; and that exception is whether in
viewing and having access, I guess you would say, to the
proprietary information that's claimed here, that that material
can be viewed in Hong Kong as opposed to simply the U.S.A.,
Singapore, Tokyo, or Taiwan.

But the agreed-upon venues would be U.S.A., Singapore,
Tokyo, and Taiwan; correct?  Everybody agrees?  Yeah, I'm
getting nods from Mr. Hemann.  Okay.

**MR. HEMANN:**  Yes.  Yes, Your Honor.

**THE COURT:**  Okay.  There's no demurrer to that.

Okay.  So the question is whether Hong Kong should be put
in the mix or not.  The Government has expressed their own
concerns and those of Micron, and then Micron has added some
further conditions that they would like to see on top of what
the Government and the defendants had agreed to with the
exception of the location which, of course, they don't want to
go to Hong Kong.

All right.  Just one minute.  I'm signing the surrender
order.

(Pause in proceedings.)

**THE COURT:**  Then returning to the instant case, I just
want to make sure I've got everybody in the right place as far
as who's where.

Okay.  It's my understanding that counsel for the
defendants, which would be Latham & Watkins and

1   Morrison & Foerster, both have offices in Hong Kong.  That --
2   I'm sorry.  Latham also has offices in Singapore and Tokyo.
3        And does MoFo or Morrison & Foerster also have offices in
4   Singapore and Tokyo?
5             **MS. WONG:**  Yes, we do, Your Honor.
6        **THE COURT:**  Okay.  According to the defendants, the
7   defendant Jinhau, says they have crucial members of the Defense
8   teams in Hong Kong and war rooms in Hong Kong and majority of
9   the Defense teams are in Hong Kong.
10       I want to ask you about the plural in a minute.
11       And from Latham & Watkins' standpoint, they say one of
12  their lead attorneys is in Hong Kong.
13       So let me ask Ms. Caldwell.  Where's the other one?
14            **MS. CALDWELL:**  Here, standing in front of you.
15            **THE COURT:**  Oh, that's you.  Okay.
16            **MS. CALDWELL:**  But we also have some colleagues in
17  Shanghai who are working on the matter.
18            **THE COURT:**  Okay.  And are there -- if I could then
19  ask counsel for Jinhau, when you were using the plurals in your
20  papers, are you talking about there are maybe firms other than
21  Morrison & Foerster that are part of the Defense team or have
22  war rooms in their own offices, or anything like that?
23            **MS. WONG:**  I think when we were referring to the
24  plural, we meant both us and counsel for our co-defendant as
25  opposed to --

1    **THE COURT:**  Oh, okay.

2    **MS. WONG:**  -- Defense team for Jinhau.

3    **THE COURT:**  Okay.  All right.  So essentially just

4    arguing about the two firms that are here.

5    **MS. WONG:**  Correct.

6    **THE COURT:**  Okay.  Got it.

7        All right.  The defendants themselves, Jinhau is located

8    in Fujian Province in China?

9    **MS. WONG:**  That is correct.

10   **THE COURT:**  Okay.  And UMC is in Taiwan?

11   **MS. CALDWELL:**  Correct.

12   **THE COURT:**  Okay.  So somebody's going to have to go

13   somewhere unless -- well, pretty much somebody has to go

14   somewhere.  Everybody isn't starting in the same place; but I'd

15   like to ask the defendants -- I'll just start with Ms. Wong --

16   is there a reason that the Defense team is based in Hong Kong

17   as opposed to, let's say, here where you are?

18   **MS. WONG:**  I would say the Defense team is based both

19   here where I am and important members of our team are in

20   Hong Kong as well, and they're located there mainly because we

21   have expertise there, its proximity to the client, it is a

22   reasonable place for us to be in order to best service our

23   client.  And so in order for that team to be able to access the

24   discovery while having all their materials in front of them,

25   the ease of being in their own offices, that would require them

1  to be able to review the discovery in Hong Kong.

2       **THE COURT:**  Okay.  Ms. Caldwell, it's pretty much the

3  same question.

4       **MS. CALDWELL:**  Pretty much the same thing.  I would

5  say that our client is in Taiwan, and it's much easier for my

6  partner in Hong Kong to travel a one-hour flight to Taiwan than

7  it is for me to take a 13-hour flight to Taiwan.  So she also

8  has relevant experience.  She's a very experienced white-collar

9  lawyer who's done trade secrets matters before.

10       **THE COURT:**  Now, we're not really talking about people

11  being able to meet with the client just in general but actually

12  looking at the stuff, whatever it is.  I'm not sure I

13  understand what it is.  I may ask somebody over here on the

14  other side to explain it a little more.  But are they going to

15  have to get together with the client a lot to look at this

16  stuff whatever it is?

17       **MS. WONG:**  I think that is certainly a possibility and

18  something that we are trying to prepare for to make sure that

19  we are in a position that if we do need to meet with our

20  client -- and, of course, it would be under the circumstances

21  that are set forth in the protective order for the client reps

22  to actually review the evidence in question -- that they are in

23  a place where it is convenient to both our Defense counsel in

24  Hong Kong and the client to meet, which, as Ms. Caldwell says,

25  is far simpler for the client to travel to Hong Kong than the

other options.

          THE COURT:  This wasn't clear that you were going to
have to get together with the material and the client all that
frequently.  In other words, there's an allegation they already
know what it is so I don't know if there's any extra stuff.
Apparently nobody is objecting that a couple of employees from
both of the companies can look at this material.

     Now, there are all kinds of concerns about whether members
of the bar can look at it and whatever, and the alleged thieves
are essentially being allowed to look at it.  They have to be
vetted I guess in some way.  So that kind of caught my
attention because everybody was so worried about other people
and yet the parties themselves were at least given some access.

     Okay.  I want to go just back for a minute to Micron's
additional restrictions that they would propose.  One was they
didn't want the experts to copy anything.  Right now the
attorneys that are designated can make copies, but where are
the experts located?  Are they over there?  Are they here?
Where are these people?

          MS. CALDWELL:  So UMC has not yet retained experts --

          THE COURT:  Okay.

          MS. CALDWELL:  -- but we anticipate that if this case
goes to the next stages, we will do that, and I don't know
where they would be at this point.

          THE COURT:  What about from the Jinhau's standpoint?

1          **MS. WONG:**  Same for Jinhau.

2          **THE COURT:**  So if they couldn't have their own copies

3    in hand, so to speak, then what would they do?  Have to come to

4    your offices to look at it?  Is that the idea?

5          **MS. CALDWELL:**  Presumably.

6       I should note too, Your Honor, that there is a civil case,

7    as you're aware because it's pending before Your Honor, in

8    which the protective order does not contain restrictions of

9    copying by experts.

10         **THE COURT:**  So they're going to get to do it one way

11   or the other at some point.

12         **MS. CALDWELL:**  Well, we're not party to that

13   protective order so we don't have the same access that the

14   civil parties do.

15         **THE COURT:**  I see.  I understand.

16      Okay.  Well, are there going to be different experts in

17   the two cases?

18         **MS. CALDWELL:**  I think they may well be, Your Honor.

19         **THE COURT:**  Really?  Okay.

20      All right.  We don't know how hard it would be for, like,

21   the experts to come to somebody's office because we don't know

22   where they're going to be and what have you.

23      Okay.  Then the other question -- I mean, it would be

24   harder if they had to run around and look at things somewhere

25   other than their own, I guess, offices but, okay.

1    Then there's a distinction between, quote/unquote, "other

2  Defense counsel" and "Defense counsel," "other Defense counsel"

3  being -- well, let's start with "Defense counsel."  Are

4  "Defense counsel" intended to mean not just everybody at Latham

5  or Morrison & Foerster, but the attorneys who are appearing as

6  a matter of record in this case, or just anybody at either of

7  those firms?

8      MS. WONG:  I had actually thought it to mean anybody

9  at these firms, but perhaps that's --

10      THE COURT:  I don't want to end up with, like,

11 fighting over what --

12      MS. WONG:  The specific members of the Defense team of

13 Morrison & Foerster and Latham & Watkins?

14      THE COURT:  Well, what the agreement means once we get

15 whatever we get on file.

16      MS. CALDWELL:  I assume that it meant lawyers from

17 other firms, but I --

18      THE COURT:  Well, no.  That's the other Defense

19 lawyers.

20      MS. CALDWELL:  Oh, I'm sorry.

21      THE COURT:  I just want to first go to Defense counsel

22 because we're distinguishing "Defense counsel" and "other

23 Defense counsel," if "Defense counsel" means Latham,

24 Morrison & Foerster and "others" means other firms.

25    Okay.  And then I don't know whether you want to take

1  this, Mr. Hemann or Mr. Stephens, explain why he's worried

2  about "other Defense counsel."

3      My question is:  Why is it so worrisome given that under

4  the agreement they all have to be checked out and approved

5  first by the Government before they're allowed to see anything?

6      **MR. HEMANN:**  I'll let Mr. Stephens --

7      **THE COURT:**  Okay.

8      **MR. STEPHENS:**  Sure.

9      Your Honor, we were just trying to clarify.  It's our

10 understanding that, at least as to Jinhau, they know who some

11 of these people are.  They haven't been identified to us yet so

12 if they know who some of them are now, identify them, we can

13 vet them now, and see if we can work it out.

14     **THE COURT:**  All right.  You just want to get some of

15 this out of the way upfront rather than sort of have it

16 straggling in in some fashion.

17     **MR. STEPHENS:**  And then they'll also be put in a

18 position where it's assumed downstream that we had agreed to

19 anything because we don't know who they are, we don't know what

20 firm they're with, we don't know where they are, we don't know

21 where they sit.

22     **THE COURT:**  Well, I don't think anybody has yet,

23 assuming anybody's agreed to, because there has to be an

24 official stamp of approval.  I don't know if you trust

25 Mr. Hemann, but he's the one who's holding the stamp.

1       And so -- okay.  I mean, I understand what you're saying.

2   It does seem like they built in a protection.  It isn't like

3   they just hand this stuff out to anybody who's walking around,

4   you know, with a bar card.

5       Okay.

6           **MR. STEPHENS:**  And, Your Honor, just to clarify.

7           **THE COURT:**  Sure.

8           **MR. STEPHENS:**  On the expert copying --

9           **THE COURT:**  Yeah.  Let's go back to that.

10          **MR. STEPHENS:**  -- it's the fact that the experts can't

11  burn copies of what they receive from trial counsel.  It was

12  just to narrow it so the folks who could make a copy for their

13  teams would be the trial lawyers here that are in front of you.

14  So there's not additional copies of this stuff lying around

15  that the experts have made.

16          **THE COURT:**  Okay.  So what you're saying is that what

17  you don't object to is, let's say, Ms. Wong or Ms. Caldwell

18  making a copy and then we've got expert X or Y and they hand it

19  to them, but what they shouldn't be able to do is then make

20  another copy.

21          **MR. STEPHENS:**  Or any other copies, that's correct,

22  Your Honor, and that's assuming that the expert --

23          **THE COURT:**  Oh, I see.

24          **MR. STEPHENS:**  -- is approved through the protective

25  order process that you've just laid out.

1          **THE COURT:**  Okay.  They can have copies.  They can

2    work on them at their offices.  What they can't do is sort of

3    make more and distribute them is what you're afraid of.

4          **MR. STEPHENS:**  They could have a copy and they could

5    review it in one of the accepted geographies.

6          **THE COURT:**  Okay.  Did you understand that that was --

7    I think I misunderstood.  Did you understand it as it's just

8    been explained, Ms. Wong?

9          **MS. WONG:**  That is not how I understood it.

10          **THE COURT:**  Okay.  What about yourself?

11          **MS. CALDWELL:**  Likewise, Your Honor.  I interpreted it

12    as they were not allowed to take copies --

13          **THE COURT:**  Period.

14          **MS. CALDWELL:**  -- and review them in their own

15    offices.

16          **THE COURT:**  Yeah.  In other words, "You can't have

17    one.  You know, come here and look at ours but you can't have

18    it."

19          Well, that might be a little bit less onerous.  I can kind

20    of see how Micron would like to have some idea about who's in a

21    position to distribute, if you will.

22          Okay.  By the way, do you have -- either one of you can

23    take this question.  Do you know who some of these other

24    Defense counsel are at this point?

25          **MS. WONG:**  Frankly, I think that issue applies only to

1    Jinhau.

2           **THE COURT:**  Okay.  Do you happen to know?

3           **MS. WONG:**  We do know who they are, and the reason why

4    we were pushing forward to have this protective order taken

5    care of now was we didn't want it to be held up -- the

6    production overall to be held up by this one issue of approving

7    the other Defense counsel.

8           **THE COURT:**  See, I don't know if it would hold it up.

9    In other words, let's say that in an effort -- if I wanted to

10   say, "Okay, Defense counsel can see things if they're

11   approved."

12         Okay.  And to somewhat reassure Micron in that regard,

13   because we don't want to get down the road and say, "No Defense

14   counsel can ever look at this necessarily," if you could let

15   Mr. Stephens know, you can do it on the record, I mean, you can

16   let him know in advance so that it's still whether -- it can't

17   hold it up.  All it can do is hold up those people, but the

18   agreement can go forward either way with whatever orders I make

19   in connection with it.  He'd just like to have a little bit of

20   an idea who are you thinking about.  He would feel better about

21   it.

22         So if you know, I don't know if you can say it now or if

23   you've got it back at your office, but let me ask you that

24   first.

25         **MS. WONG:**  Unfortunately, I don't have the names right

1 here with me.  I'm happy to provide those names after this

2 appearance.

3      **THE COURT:**  Okay.

4      **MS. WONG:**  I can tell counsel and the Court that these

5 are all members of a U.S. State Bar and they are all members --

6 or practice with King, Wood & Mallesons, which is an

7 established firm -- established global law firm.

8      **THE COURT:**  All right.  And I think also don't they

9 have to sign the protective order or agree to be covered by it?

10      **MS. WONG:**  They have to sign a -- there is a form at

11 the end --

12      **THE COURT:**  Right.

13      **MS. WONG:**  -- stating that they have to agree to it.

14      **THE COURT:**  Right.  So it's not like someone, if they

15 did do something that was in violation of the order, even

16 though it looked upfront like they were going to be okay and

17 they were approved and, heaven forbid, they did something

18 someone didn't like, it isn't like they would not be subject to

19 whatever contempt powers the Court has under the agreement.

20 Okay.

21      **MS. WONG:**  And I might add also that we narrowed that

22 list to U.S.-admitted lawyers --

23      **THE COURT:**  Okay.

24      **MS. WONG:**  -- to be sure that they were subject to

25 some jurisdiction of the courts in the U.S.

**THE COURT:** Okay. Very good.

Okay. So -- all right. I actually had two separate pages -- not pages -- pads where I wrote things. First I wrote them all scribbly, and then I thought maybe before I come here I ought to neaten it up, but I actually kind of like the scribbly format so I've got them both here. I just want to make sure I don't leave anything out in some of the preliminary questions that I wanted to ask.

So are any of the -- is there any firm that's going to be working on the case that has offices, for example, other than yourselves, in, like, Tokyo or Singapore?

Nobody appears to be at the moment in Taiwan of the two firms here, but I'll ask you about Taiwan in a minute. Are there other -- or do any of these other law offices who may be working on the case also have offices in Singapore, Tokyo? If you know.

**MS. WONG:** Do you mean the other Defense counsel that I was just referring to?

**THE COURT:** Yes. Whoever they may be, yes.

**MS. WONG:** Like King, Wood & Mallesons firm? I actually don't know where their other offices are.

**THE COURT:** Anybody else in Taiwan? See, neither of these firms -- nobody is in Taiwan actually except UMC. Neither of the law firms have an office there.

Okay. Given where you have things kind of organized at

the moment, would it be difficult to set up kind of a whole operation other than in Hong Kong?

    **MS. WONG:** Yes, and I would say yes because it would require those individuals on the team now in Hong Kong to travel to another city to set up their files, their notes, the information that they rely on in this other city and have to travel there in order to review the evidence in totality with the other information that they have.

    **THE COURT:** I'm assuming you're going to say the same thing, Ms. Caldwell?

    **MS. CALDWELL:** Yes. I think, in addition, it would require lawyers who are very busy, and not only on this matter but on other matters, to interrupt their work and go to either Singapore or Tokyo taking a four-hour international flight, going through customs, et cetera, to review the materials in this case.

    **THE COURT:** Okay. I tried to figure out about how long it would take to get from place to place. Here's a map also that I printed out so I could just get a good feel for where all these locations are.

    Okay. Latham & Watkins said that for counsel who are in Hong Kong to get to Singapore or Tokyo, it's about four hours either way.

    **MS. CALDWELL:** That's my understanding, Your Honor.

    **THE COURT:** Okay. I, then, sort of trying to check

1    this out in some kind of judicial noticeable way -- and I'm

2    going to ask you about it to confirm this one way or another --

3    to get, for example, from Fujian -- they're in Jinjang; is that

4    where they are?  Is that how you pronounce it?

5              **MS. WONG:**  That's right.

6              **THE COURT:**  Okay.

7         -- to Tokyo looks like maybe a little less than four hours

8    and a little more to get to Singapore.  Does that sound about

9    right?

10             **MS. WONG:**  That sounds about right.

11             **THE COURT:**  And then for UMC, who's in Taiwan, to get

12   to Tokyo, it was a little less, maybe three hours but then it

13   looked like four to Singapore.

14             **MS. CALDWELL:**  And I don't think UMC, candidly,

15   Your Honor, would have to travel to either of those

16   jurisdictions because when we need to meet with our client, we

17   can travel to Taiwan from Hong Kong, but it's really for the

18   convenience of the legal team that's working on the materials

19   and needs access to the documents.

20             **THE COURT:**  Okay.  All right.

21        If we look primarily at the legal teams that are in

22   Hong Kong, it only takes -- well, if your clients are coming to

23   you, if that were the case, then it only takes the clients

24   about an hour, I think, or less to get to Hong Kong --

25             **MS. CALDWELL:**  Correct.

**THE COURT:**   -- from where they are.

If you were going to the clients, it would take around an hour to get to Taiwan, and UMC it wouldn't take any time because they're already there, and it would take around, you know, an hour for Jinhau, I guess.

Based on my map, Taiwan and -- well, Hong Kong and Fujian Province, Taipei, they're all fairly close.  When you start getting to Tokyo, you start getting much farther away.  Singapore likewise just going in a different direction.  And U.S.A. of course, very far away, although there are very able lawyers here.

So all right.  Now, I can see the difficulties, to a certain extent, presented.  I mean, everybody doesn't have to start out in Hong Kong, but apparently you're established there, you have good size offices there, and it fit to put this case in Hong Kong.  It isn't like -- from what I gather, it isn't like you got the case and then set everything up in Hong Kong, but I could be wrong about that.

**MS. CALDWELL:**   Your Honor, one of the main reasons why we've been using our Hong Kong resources is because our Hong Kong partner has some technical expertise and she has been the one who's been designated to be the point person on the very technical issues.  So she's the one who's traveled to Taiwan quite frequently to interview engineers and other people and is very steeped in that information, and that's, of course,

1      what the trade secrets would be relevant to.

2          **THE COURT:** Okay.

3        All right. So if the firms had to go to Taiwan to turn

4      material over, let's say, and have a client look at it and

5      have -- they can't go to Mainland China. So if they can't go

6      to Hong Kong, then it looks like Taiwan is the closest, but the

7      trouble is they don't have any offices there. So even though

8      UMC is there and even if they maybe have conference rooms or

9      something, Jinhau doesn't even have anybody there. I don't

10      know. You'd have to go rent space or something so that --

11        Taiwan is as close as Hong Kong for people to get to it

12      but it's not set up as well. That's kind of what I finally

13      figured out. I hadn't been that familiar with that part of the

14      world and just was trying to get the relationship.

15          **MS. CALDWELL:** Your Honor, just one other thing on

16      Taiwan. While UMC does have an office in Taipei, most of its

17      facilities are much further south in Taiwan, and it takes --

18          **THE COURT:** Oh, really?

19          **MS. CALDWELL:** Yeah. So it takes a little while to

20      get there.

21          **THE COURT:** So it's a little farther away?

22          **MS. CALDWELL:** Yes.

23          **THE COURT:** No airport to that one or is there one?

24          **MS. CALDWELL:** There's -- from -- I don't actually

25      know the answer to that one, if you can fly from Hong Kong to

1  southern Taiwan.

2  　　　　THE COURT:  Okay.

3  　　　　MR. HEMANN:  It's a very pleasant 90-minute bullet

4  train ride from the airport.

5  　　　　MS. CALDWELL:  From the Taipei Airport.

6  　　　　MR. HEMANN:  From the Taipei Airport.

7  　　　　THE COURT:  Okay.  You did that, Mr. Hemann?

8  　　　　MR. HEMANN:  Masa Maos (phonetic), yes.

9  　　　　THE COURT:  You did that, Mr. Hemann?  Okay.

10 　　　　MR. HEMANN:  I've gotten close.

11 　　　　THE COURT:  I didn't ask how hard it is for you to get

12 anywhere --

13 　　　　MR. HEMANN:  Nobody cares.

14 　　　　THE COURT:  -- and you didn't have to meet with the

15 clients.

16 　　　All right.  So it seemed to me that as far as convenience

17 goes, that Singapore and Tokyo really aren't convenient for

18 anyone.  The U.S. could be but not necessarily for the client.

19 　　　There are three people, I guess, that would have to go

20 to -- or, you know, three groups of people that would have to

21 go to Taiwan, only two, the clients would have to go to

22 Hong Kong or vice versa, so, okay, if you're going to go where

23 they are.

24 　　　So, in fact, Hong Kong is probably the most convenient

25 place for the defendants to try to marshal whatever defense

they're going to have to these charges.

So we should then turn to, at this point, the Government and Micron to see if one can say, nevertheless, the risks are significant enough that it's just not appropriate to have this material available there.

I'm not sure where you want to start. I do want to say that I didn't think the words "may be necessary" in the statute were really dispositive. I thought that was more a turn of phrase, so to speak, not really the difference between the Court finding something is necessary and, gee, there's a slight possibility it might be. I think it's just a way of talking in statutory language; but if you had anything more to say on that, that would be fine.

MR. HEMANN: Well, nevertheless, it is the statutory language --

THE COURT: Yes, I know.

MR. HEMANN: -- and the natural reading of it is as it says. I don't think there's an alternative reading other than treating the word "may" out of the statute and replacing it with "shall." And clearly the purpose behind this particular statute is to provide broadly prophylactic protection in this circumstance.

And, you know, there's no way to debate. This is a very close question as exemplified by the fact that it is the one part of this that we could not come to an agreement on. It is

a close question.  It comes down to protection versus convenience, and I'm not belittling the notion of convenience as I say that, but that's what the issue is.

There's no doubt in this case, although the Defense do not need to and are not right now admitting it, the trade secrets at issue and the information at issue in this case was stolen from Micron.  It's not what -- this case is not going to be about whether or not information was stolen from Micron.  It indisputably was.  It will be about whether that information is a trade secret, which under the statute the Court must presume that it was at this point in the discussions.

So what we have is trade secrets presumptively, indisputably stolen, and then the question is risk versus convenience; and it comes down to, then -- we sort of circle back to where this is.  If it's not "may" in a hypothetically possible, if that's not what "may" means, but it must mean something short of "shall," where does the risk come in?

And, you know, there's also little risk given the authorities that are cited by the parties in the briefs that security professionals find Hong Kong to be at least somewhat risky, and I think that the evidence points to the fact that it is increasingly risky given recent events.

If at some point in the past before the PRC government began to take the active interest in Hong Kong that it is currently showing, it wasn't dangerous for information.  Many

knowledgeable security professionals find it to be dangerous

from the perspective of intellectual property theft now for the

same reason that Mainland China is dangerous from the

perspective of intellectual property theft.

So as we -- you know, if we begin from the point that this

is a close question, in the situation where there's a close

question under 1835, our view is that the close question should

be resolved in favor of making sure that the victim's trade

secret intellectual property rights are protected.

So once we get to close question, our view is that amongst

the reasonable compromises we've made, on this particular issue

being a close question, the Court should fall on the side of

protecting the victim's intellectual property rights.

And I think that that's really the essence of what the

Government's position is here now.  It's not this is easy or

this is clear.  It's protecting the victim versus legitimate

arguments with regard to -- you know, legitimate arguments

about protecting the victim versus legitimate arguments about

the convenience of the lawyers.  In this case, under 1835 the

way it is written, you've got to protect the victim.  That's

our view.

**THE COURT:**  Okay.  I'm not sure, just getting back to

the "may" and "shall," I don't know that "shall" fits in there.

If you were going to substitute a word, you could say instead

of "may be," "is."  All right?  But then that just means the

1   Court has to decide it is necessary or and the Court may find

2   necessary, you know.

3       So it sounds to me sort of the same, but I understand the

4   main point that you're making, which is that the first question

5   is protection.  All right.  If -- and we're not dealing with --

6   and just to point out kind of along with what you're saying,

7   though, we aren't dealing with not giving the information to

8   the defendant.  There are times that one can say "Gee, we can't

9   really defend against this case.  You won't give us" fill in

10   the blank.

11       Here the Defense will have the information so it's really

12   a question of how much and what I'm calling inconvenience, but

13   it can rise to the level of difficulty in defending and then

14   you get into some problems.

15       And so I don't -- you know, we don't want to set up

16   barriers to people that make it so hard for them to be able to

17   actually effectively represent their client, but the first

18   point is, perhaps, do we need this protection; and then we'll

19   look and see if you do, is there any really strong argument as

20   to why, nevertheless, it shouldn't be afforded.

21       Okay.  So the defendants will get the information.  It may

22   be harder for them to work with it and use it if they can't get

23   everything together in Hong Kong.  There's -- this is kind of

24   interesting.

25       Well, the defendants have pointed out, by the way, that

there are all kinds of companies that are doing business in Hong Kong and Mainland China and they've got secrets all over the place.

And my understanding from the Government was, well, those are secrets different than our secrets; but the point is that people trust secrets to be worked with in those two locations. I don't think it matters whether it's process technology or design or whatever some of these other words are that were used to describe different aspects of how you finally get something to market.

I mean, I think the idea was lots of people have secret information and yet they're working in these locations. Now, maybe they're taking a risk.

MR. HEMANN: But they're also making their own decision.

THE COURT: No, no. I understand.

MR. HEMANN: The owner of the information --

THE COURT: Yes.

MR. HEMANN: -- is making a decision --

THE COURT: Yes. Just a minute.

MR. HEMANN: -- to bring the information over.

THE COURT: Don't interrupt for a minute.

MR. HEMANN: Oh, I'm sorry.

THE COURT: I understand what you're saying, but -- okay. They are taking the risk upon themselves, but an awful

lot of people have found that it's okay to do it.

Now, they're making a profit along with the risk. Micron is not getting anything out of it. I understand that.

Okay. But at least there's some suggestion these people aren't all nuts who are risking losing all of their valuable information in these places.

Okay. The other --

**MR. HEMANN:** Can I add one -- Sorry.

**THE COURT:** Not yet.

**MR. HEMANN:** Okay.

**THE COURT:** Okay. The other point that the defendants have raised is that the information that the Government has provided by way of articles or writings about the risks in China have been pretty clearly focusing on Mainland China but they really aren't talking about Hong Kong if you read the commentary in context. It sounds like they're talking about Mainland China.

And although you're arguing that, yeah, Mainland China is getting into this more and more and is having a greater influence or intruding more into Hong Kong either politics or what have you, there wasn't a lot of support for that in the record that I have. They may be.

I'll tell you, they're everywhere. Okay? I mean, I have another case that I got where there's a question about a security breach amongst a whole bunch of major hotel chains

that have a reservation system, and the thought is Mainland China has somehow hacked into it here in the U.S.  So it doesn't look like it can be super-protected no matter where you are.

The main -- one thing I do want to say is that the thefts that are alleged here are not high tech.  The material may be but the means is the plain old traditional, pick it up and move it out.

The allegation is that people who worked for Micron took with them what they had access to and converted it to their own use and that of the defendants.  It isn't like they hacked into something, as far as I understand it, that was being protected.  They were trusted employees.  I'm sure there's a concern that that trust was violated and people would feel strongly about that, but it's old-fashioned theft.  It's not new-tech theft.

Okay.  You wanted to add something, though.  I don't want you to forget it.

**MR. HEMANN:**  Well, I guess the one -- it is a follow-on to the point that, yes, some companies -- many companies and law firms allow some of or all of or a portion of their secrets to go into Hong Kong, but they make that decision and they make the cuts where they choose to make them based on the risks and benefits.

The largest employer in the United States does not allow me to bring my cell phone into Hong Kong because of the risk

that the cell phone will be compromised so that is -- I mean,
that's a fact and it's a judgment, and does allow me to bring
my cell phone into other countries because that decision has
been made.

Now, is that dispositive?  No.  But it certainly does,
again, say that different employers make the cut at different
places.  And here -- you know, I also think, and Mr. Stephens
can elaborate on this much more than I can, you know, Micron
has a fraught relationship with the government of China at this
point in time arising out of the circumstances of this case and
the theft involved in this case.

And there's been all manner of litigation, and so that the
profile of Micron and these secrets in China and the interest
in it by the Chinese government is not the same as it was when
a couple of employees uploaded from their Micron computers
these trade secrets and moved them around as they did.

So the ground has shifted a little bit, and I don't think
that just because that is the way it happened, that is
necessarily what the interest would be on this day.

But, again, you know, nobody's suggesting that the Court
can or should make a finding that intellectual property
definitely will be stolen if it is brought into Hong Kong.  We
don't know that that will happen.  We suspect that it could
happen, and that's what the position is.

**THE COURT:**  Why don't we hear from Mr. Stephens on

1  the -- maybe if he wants to elaborate on what this increasing

2  animosity is of some sort between Micron and the Chinese

3  government.

4      **MR. STEPHENS:** I think that what Mr. Hemann is

5  referring to is just events that have happened since the case

6  has broken. There is civil litigation here in the

7  United States. There's civil and I understand regulatory

8  actions in China. There's this case.

9      And, Your Honor, you're sitting on trade secrets that are

10 worth billions of dollars; right? There's a lot on the line

11 for the victim that stands in front of you here today.

12     And I would like to actually go back to the statute real

13 quick to make sure that the use of "shall" in the statute is

14 that the Court "shall enter a protective order." And it's

15 "shall enter a protective order" to protect the victim's trade

16 secrets in a matter just like this. Then it is whether it may

17 be necessary. What we're arguing is that it may be necessary

18 to keep this out of Hong Kong to protect those trade secrets.

19     **THE COURT:** Okay. Good point.

20     **MR. STEPHENS:** And the other --

21     **THE COURT:** Basically the Court is required to protect

22 your secrets and right now we have a starting point for doing

23 that. In other words, there's a protective order that the

24 defendants say is not quite -- it goes beyond what's necessary,

25 and the Government and Micron are arguing, no, that's

1    necessary.

2    And so that's what I'm -- you know, that's what I'm trying

3    to deal with.  I have to issue orders.  I am required to

4    protect the secrets and not gamble with your client's secrets.

5    No, I understand that.

6    So, okay.  By the way, what about the recent riots in

7    Hong Kong?  What effect does any of that have here?  It's in

8    the paper every day.

9    **MS. WONG:**  Your Honor, it's in the paper every day but

10   besides some vague statement that this somehow affects security

11   in Hong Kong, there's no specific reason why it would affect

12   the trade secrets in this case.

13   And when counsel argues that the Court shall enter a

14   protective order, certainly no one here is arguing no

15   protective order is required at all; but, rather, we need to

16   look at what are the trade secrets that are being protected and

17   from what.  And your question just now about the riots goes to

18   the second point, from what are we protecting the trade

19   secrets.

20   And the Government -- you know, we disagree about the

21   exact legal standard, but the Government's reply stated that

22   they must demonstrate a reasonable risk to trade secret

23   information.  And even under that standard, they talk about

24   recent events in Hong Kong, it affects security in Hong Kong,

25   the PRC security and Intelligence Services that are active in

Hong Kong; but they go on to say in those same papers, and as
Your Honor has recognized, those same services are active all
over the world.

     So, in other words, the argument both fails to make any
specific nonspeculative demonstration of the threat in
Hong Kong and also proves too much about the existence of these
services.

     Now, going back to my first point about that we need to
actually look at what the actual trade secrets are, as
Your Honor recalls from the Indictment, we're talking about
trade secrets from alleged conduct in 2015 and 2016, which even
at that time were well on their way into receding and to
pass -- into the past product life cycle.

     So for the Government's argument to succeed about how
interested the Chinese government is and the changing landscape
given the relations between Micron and the Chinese government,
it would suggest that the Chinese government is keenly
interested in these particular trade secrets.

     And I would argue that these trade secrets are, in fact,
so old and were able to be obtained through, as Your Honor has
stated, the old-fashioned theft way, that there's no need for
the sort of cyber theft, high-tech theft that we are trying to
ward against through preventing these trade secrets from being
in Hong Kong.

     And, in fact, the very terms of the protective order,

which are not light, already protect the trade secrets, the alleged trade secrets, sufficiently.

     **THE COURT:** Let me ask a question just in terms of the vehicle this is being brought to my attention by.

    All right. So I have a motion for protective order, which is asking me to order that the agreement, to the extent that it's approved by the Government and the defendants, be the protective order. Micron is asking that I add some further protections and then joins otherwise in the Government's motion.

    The defendants are asking that I find that Hong Kong be added as an appropriate venue for -- what would you fill in the blank with at that point?

    **MS. CALDWELL:** For our attorneys, the people who are on our team, to be able to review whatever these trade secrets are in their offices in Hong Kong.

    **THE COURT:** In Hong Kong.

    **MS. WONG:** So in the same provision in the protective order that states that the discovery can be produced in Japan --

    **THE COURT:** Okay.

    **MS. WONG:** -- we would add Hong Kong.

    **THE COURT:** And then there's -- of course, there's a reply responding to the arguments made by the defendants.

    If I were to rule and essentially grant the motion, then I

would -- I'm saying this will be your protective order; and if I deny the motion and essentially say it's going to be your protective order plus the other location, Hong Kong, to be treated in the same way as Taiwan, Singapore, and Tokyo and the U.S., and then I would have to add also whatever I'm going to add about Micron; right? But I guess you're asking me to make an order as to what your protective order should read as.

MR. HEMANN: Yeah. I mean it's just --

THE COURT: Okay.

MR. HEMANN: I think like we would do -- like we frequently do with proposed orders of all sorts, we submit a proposed order and the Court -- I think we're inviting the Court to grant the order as modified if the Court feels a modification is appropriate.

THE COURT: Okay. But you're asking to not modify.

MR. HEMANN: Well, yeah. We're asking --

THE COURT: Micron is asking for a modification going more strict and the defendants are asking for a modification to be more lenient essentially in terms of what can be produced or observed and where.

MR. HEMANN: But we all want a protective order so that we can move on with our situations --

THE COURT: Yes.

MR. HEMANN: -- one way or the other.

THE COURT: All right.

1    **MS. WONG:**  And, Your Honor, we're happy to present a

2    proposed draft with our additions of Hong Kong if Your Honor

3    were to rule that Hong Kong should be added.

4        **THE COURT:**  All right.  Or if I were to add any of the

5    conditions that Mr. Stephens' client is asking for too.

6        **MR. STEPHENS:**  Yes.

7        And, Your Honor, in response to counsel's comments on your

8    last point, I do want to make clear, I don't want the victim in

9    this scenario to be punished for being reasonable in that it

10   was willing to agree to the United -- we started with the

11   United States.  Our preference is that the trade secrets get

12   reviewed in Mr. Hemann's office here in San Francisco and

13   that's it.  Right?

14       Over the course of time, we tried to make sure we were

15   being reasonable.  I understand that there's a need to move the

16   case along, but we shouldn't then put Hong Kong on the table

17   because we were reasonable about Singapore, Taiwan, and Japan;

18   and I'm concerned about the way that the tenor of the argument

19   has gone that it suggests that might be the case.  That is not

20   the case.

21       **THE COURT:**  I mean, in choosing, by the way, I mean,

22   you could have picked Australia, Denmark.  All right.  In other

23   words, I assume you picked these other locations because

24   someone could argue that it would be easier to get to than

25   coming here or convenient for some reason?

1          **MR. HEMANN:**  Yes.  Those are viable, relatively

2     convenient locations.

3          **THE COURT:**  Okay.

4          **MR. STEPHENS:**  And, Your Honor, if you were going to

5     have a heat mat index on that map, Hong Kong would be off the

6     charts as far as what our concerns would be about whether or

7     not a Chinese foreign agent could have access to those trade

8     secrets.

9          **THE COURT:**  Okay.

10         All right.  Now, it's the Government's motion.  Do you

11    have anything that you want to add to the record?

12         **MR. HEMANN:**  No, Your Honor.

13         **THE COURT:**  Any last comments from respondents here?

14         **MS. CALDWELL:**  I think, Your Honor, the only comment I

15    would make is that there are two things.  One is, in addition

16    to all the literature that has been presented to the Court

17    about why Hong Kong is a good place to do business and why

18    global companies do business there, Latham and

19    Morrison & Foerster also have an attorney-client privilege

20    obligation.  I think that's something that the Court shouldn't

21    lose sight of.  So we have an obligation to keep materials

22    confidential, which we, both firms, I'm sure, just as Jones

23    Day, take very seriously.

24         And the second point is, as Ms. Wong noted, these trade

25    secrets, if they were trade secrets at the time, are quite old

1  at this point given the life cycle of the technology in this;

2  and I realize these issues are not currently before you and

3  haven't been briefed or presented, but I think it's not

4  irrelevant to the Court's decision that Micron has very

5  significant ongoing current operations, including a R&D

6  facility, in China, is investing very heavily in China as per

7  their own CEO's public statements, has a very major customer in

8  Huawei, which has been deemed by the U.S. government to be a

9  national security threat.

10      I think those are relevant considerations because those

11  are -- if the Chinese can get these old trade secrets in

12  Hong Kong if they were motivated to get those, I would think

13  they would be even more motivated to get current R&D activity

14  information again.  I don't know what that is from a technical

15  perspective, but I'm assuming whatever is happening in 2019 is

16  more advanced than what was happening in 2015.

17      **THE COURT:**  I guess the response would be, again,

18  "Well, we have a calculated decision to make money in China and

19  we're willing to take that risk, but we're not willing to take

20  it when we don't get anything back for it."

21      **MR. STEPHENS:**  It's a little bit different than that,

22  Your Honor, and it's addressed in the Government's reply brief,

23  and basically it's apples and oranges as it goes to the

24  technology.  The technologies at issue here relate to process

25  trade secrets, which deal with converting the raw silicon

wafers into a functioning memory chip.  A lot of what's done in China is back-end assembly where it's not involving the trade secrets that are at issue.

**THE COURT:**  Any trade secrets or just not the ones we have here?

**MR. STEPHENS:**  The ones in front of the Court --

**THE COURT:**  Right.

**MR. STEPHENS:**  -- those deal with the process.

**THE COURT:**  The trade secrets.  I think the argument is being made that you have exposed voluntarily your own trade secrets.  Not these.  It's not like they're arguing, "You've already given them every chance and they didn't do anything yet."  The argument is that you have exposed your own trade secrets that are valuable.

And it's been argued by Mr. Hemann earlier when other companies were pointed to, not just Micron, but the binder that I hauled out here of companies doing business, that they wanted to support their assertions about the companies, firms, banks, essentially everybody is in China.

Okay.

**MR. HEMANN:**  But all --

**THE COURT:**  Excuse me.

Mr. Hemann then said, "Well, that's their choice.  They made that business decision and that's not what we're dealing with here.  It's a different scenario," and I recognize that.

1    Okay.  Did you want to say anything else before I take

2    it --

3         **MR. HEMANN:**  But all trade secrets are not the same,

4    and I think the distinction that Mr. Stephens is making is that

5    process trade secrets are particularly valuable because they

6    teach how the thing is -- how the widget is built.  And, you

7    know, the higher the technology -- the higher the value of the

8    trade secret, the more restrictions that a company has.  The

9    lower the value, how you glue two widgets together may be a

10   trade secret because it's --

11        **THE COURT:**  Oh, I see what you're saying.

12        **MR. HEMANN:**  -- like the kind of glue you're using is

13   a company's trade secret.  But the company is going to say,

14   "Yeah, the cost of doing business in China is so much less that

15   if they steal the kind of glue that we're using, we'll live

16   with it; but we don't want them to know how we made the two

17   widgets that were going together in China."

18    Is that -- am I stating that right?

19        **MR. STEPHENS:**  Yes.  I agree with that.

20        **THE COURT:**  That's a fair point.  The idea is not just

21   they're different but they are at different levels of

22   sophistication.  That, I didn't get from the papers but, okay.

23   And not, frankly, knowing why design would be any less valuable

24   than process, and I'm not sure it is, but it looked to me like

25   everything was kind of on the same level of trade secrets.

People are doing work there that could expose them to being hacked in some way.

MR. HEMANN: And on some level that's what this whole case is about, what we're arguing about right now; and Ms. Caldwell and Ms. Wong totally disagree with most of what I just said and they have their arguments as to why they disagree. And, you know, Mr. Stephens probably thinks I didn't go far enough in what I said.

And that's what the trial in this case ultimately will be about, is the value of these trade secrets, but that's why --

THE COURT: Right.

MR. HEMANN: -- you know, that's why in this unsettled circumstance we suggest falling in favor of more protection rather than less.

MR. STEPHENS: And, Your Honor, just one more comment, just so it's on the record.

THE COURT: This is the last comment, otherwise I have to keep giving other people equal time and you-all keep thinking of new things to say or emphasize. I don't want to cut you off. I know it's important to you.

MR. STEPHENS: Yes. And I'm not interjecting a new point. I'm just -- simply, so the Court knows, Micron disagrees with Defense counsel's position that these trade secrets are older and stale. It's the way that Mr. Hemann described it. They build on each other from generation of

product to generation of product.

      **THE COURT:** Okay. Fair enough.

    Now, I don't think the age of the secrets is a point that would be determinative here; in other words, I'm perfectly happy to accept that somebody would find them valuable. Whether they're the most current technology, whether there's something that you need to then develop the new technology, whatever, somebody thought at least earlier they were worth taking, according to the allegation.

    So, no, I would find that what we're dealing with is something that could have value, yes, to another country and the question, then, is what we're going to do.

    So I'm deeming the matter submitted, and I'm going to rule. You want to get going here in one fashion or another with the case.

    Okay. I can't -- you know, I don't find, frankly, and I can be happy with this part, but I really can't find that Hong Kong is in the same category as Mainland China. And I understand why you're particularly concerned about Mainland China, and they certainly do have a reputation for being interested in trade secrets around the world; but Hong Kong is in a little different situation, historically they were and even currently, and I don't know that there's been enough of a showing that they've been essentially absorbed in some way by Mainland China.

I don't think the unrest that's going on there now really bears on this particular issue, and the complaints that are being made there by students is different than what we're really dealing with here.

We have two very reputable law firms here -- I mean, all the firms are -- Jones Day, Latham & Watkins, Morrison & Foerster -- that have some credibility at least in the sense historically of standing by their word and also the lawyers who are involved in the case directly.  So I think that goes a ways too.

The protective order as proposed to this point or agreed upon, we'll say, to this point by three of the players here is pretty restrictive.  In other words, there are various safeguards that have been put into place and that really all the people that would have their hands on the material are, to a certain extent, a narrow group and they are professionals who have a certain obligation to the Court.

I understand the question about the experts, and I think that what Mr. Stephens is saying about not allowing them to make extra copies is a reasonable request.  If for some reason that would become particularly problematic in whatever is going on, somebody could call it to my attention; but at the moment I think that request, which I hadn't understood originally to be as focused as it was, is reasonable.

And I also understand his desire not to just have a

constant flow of people to be looked into and try to figure out
if it's okay for them to look at things wherever they're
looking at them, whether they're looking at it in Tokyo or
Singapore or whatever.

So I would direct -- at the moment all we know is
Ms. Wong's client, but both attorneys are advised that if at
this time they know of what fall into the category of "other
Defense counsel" who they wish to have access to the material,
that they provide that information.

Do you want to give it to the Government and have the
Government give it to Mr. Stephens?

**MS. WONG:**  Yes, Your Honor.

**THE COURT:**  Is that probably the best, maybe, way to
do it so there's just one pipeline in effect?

Then I would direct that you provide that no later than --
oh, we'll just say November 1.  That gives you an easy date to
remember.

**MS. WONG:**  Thank you, Your Honor.

**THE COURT:**  Okay.  And I am going to allow Hong Kong
to be put on the list.  I recognize what Mr. Stephens has said
about not wanting to be perceived as automatically thinking all
these other places are terrific, and certainly he would like to
keep things as close as possible to home.

In the same light, given where the events occurred, where
the people are located, and where at this point a large chunk

of the lawyers are working, I'm going to find that in the
absence of a stronger showing of risk here, that the concerns
the defendants have made weigh in favor of allowing Hong Kong.

It is a relatively close question, and I had not made up
my mind before coming out here. I wanted to explore some of
the questions I had; and some of them didn't particularly help
the defendants, others didn't particularly help the Government.
It's just a call the Court has to make.

Certainly if there are changes in whatever the dynamic is
that's underlying this protective order, the Court would want
that called to my attention. The concern of, of course, the
Government and Micron is they won't know about it; but if they
do, then they should bring it to my attention.

So I will ask -- I had an offer from Ms. Wong to produce a
protective order that adds Hong Kong to the list of approved
locales; and also, however, to make clear, as to the experts,
that they are not to make their own copies.

And where would that fit in the order? Does anybody just
quickly have a suggestion as to that? I can look too.

**MS. WONG:** I think there is a section that discusses
how the experts shall maintain the materials. So it's in --
let's see... It's paragraph 6(c), "Disclosure of Confidential
Material to Experts."

**THE COURT:** All right. What I recommend is you come
up with a proposal that you think works as to language to be

added, that you run it by the other side, let them see if they

have any concern about it reflecting or not reflecting what

I've tried to order here today; and then hopefully resolve that

and plug it in to the proposed order, and then I'll look for it

there unless somebody lets me know it's somewhere else.

As far as the names that you currently have of the other

Defense counsel, that won't go in the order.  It will just

be -- in other words, we're not naming names right now.  That

will just be a separate order that I'm making now so that

Mr. Stephens and Mr. Hemann will have a better idea of what's

coming down the pike and can be ready to either approve or not

approve those people when request is formally made.

Okay.  Anything else that anyone wants to bring up in

connection with what we're doing here today?

**MS. CALDWELL:**  No, Your Honor.

**THE COURT:**  Ms. Geiger?

**THE CLERK:**  Do you want to give them a future date?

**THE COURT:**  She says we don't have another date on the

case.

**MS. CALDWELL:**  Yes.

**MR. HEMANN:**  Here's my suggestion as to that:  Once

the protective order is signed and entered, we have some

discovery to produce.  We'll get that produced; and then once

that's done, it would probably be a good idea to come back and

set for scheduling, a scheduling proceeding.

1    **THE COURT:**  Well, do you want to just pick a date down

2    the road that just ballparks where you think that might fall?

3    And then if we're too optimistic about it, you can give me a

4    stipulation and just push it back.

5    We do have concerns.  While this motion is pending, we're

6    not running any time off the speedy trial clock, but that would

7    have to be in somewhere someplace.  I don't know.

8    **MR. HEMANN:**  So we'd suggest -- which date did you

9    think?

10    **MS. CALDWELL:**  Either December 18th or December 4th,

11    whichever is better for the Court.

12    **THE COURT:**  Okay.  Let me just take a look again.

13    **THE CLERK:**  The 18th.

14    **THE COURT:**  The 18th?

15    **THE CLERK:**  Yes.

16    **THE COURT:**  Then let's go with that.

17    **MR. HEMANN:**  Yes.  And then we'd ask to exclude time

18    between now and then under the speedy trial clock.

19    **THE COURT:**  All right.  I assume there's no opposition

20    to that.

21    **MS. CALDWELL:**  No.

22    **MS. WONG:**  No opposition.

23    **THE COURT:**  Okay.  So the matter will be continued to

24    December 18 at 2:15.  I'll exclude time from the running of the

25    speedy trial clock for effective preparation all the way

around, that those interests are in the defendants' best
interests and outweigh any other interest either defendant
would have or the public in moving the case without this
exclusion.

Okay.  Any idea when you might be able to get the order to
me, just a proposed order?

**MS. WONG:**  Today is Thursday?

**MR. HEMANN:**  Wednesday.

**MS. WONG:**  Today is Wednesday.

**THE COURT:**  Maybe within a week?  Is a week enough
time for you?

**MS. WONG:**  Plenty of time, Your Honor.

**THE COURT:**  All right.  So why don't we just say that
defendant Jinhau is to provide the Court with a proposed order.
If you run into a snag, let us know.  I'm not trying to rush
you along.  I just don't want to forget about it, frankly.

I'll tell you what.  We'll pick that same date,
November 1, then you only have one date that you have to
remember.

**MS. WONG:**  Thank you, Your Honor.

**THE COURT:**  Okay.  I don't know -- thank you for all
the work everybody did on the case and, you know --

**MR. HEMANN:**  Thank you for your -- this is -- thank
you for thinking about it so much.

**THE COURT:**  Well, I did think about it.

1      **MR. HEMANN:**  It's two legal pads' worth of thinking,

2  Your Honor, so that's --

3      **THE COURT:**  I didn't have the heat-seeking map or

4  anything but I had my own map.

5      Anyway, okay.  Yeah, just be sure you protect those

6  secrets.

7      **MS. WONG:**  Yes, Your Honor.

8      **MR. HEMANN:**  Thank you, Your Honor.

9      **MR. STEPHENS:**  Thank you, Your Honor.

10      **MS. CALDWELL:**  Thank you.

11      **THE COURT:**  We'll be in recess.  Thank you.

12          (Proceedings adjourned at 3:51 p.m.)

13                    ---oOo---

14

15              <u>**CERTIFICATE OF REPORTER**</u>

16      I certify that the foregoing is a correct transcript

17  from the record of proceedings in the above-entitled matter.

18

19  DATE:   Monday, October 28, 2019

20

21

22

23  _____

24      Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                U.S. Court Reporter

25