# EXHIBIT D

## Expert Disclosure of Professor Jiang Ying

### I. Introduction

Defendant Fujian Jinhua Integrated Circuit Co., Ltd. (hereafter "Defendant" or "Jinhua") hereby provides notice of its intent to introduce expert testimony at trial from Professor JIANG Ying under Rules 702, 703, and 705 of the Federal Rules of Evidence. This disclosure is made pursuant to Rule 16(b)(1)(C)(i) of the Federal Rules of Criminal Procedure.

Defendant asked Professor Jiang to opine on the following two questions: (1) under Chinese law, what factors are considered in determining whether an employment relationship exists between a company and an individual? (2) Based on the facts and circumstances described to Professor Jiang, was J.T. Ho an employee of Jinhua during the relevant time period?

### II. Professor Jiang's Qualifications

Professor Jiang is an expert on Chinese labor law. She is a professor at China University of Labor Relations. She is also the vice president of the China Society of Sociological Jurisprudence, the executive vice president and secretary-general of the Labor Law Branch of the China Society of Sociological Jurisprudence, a member of the Legal Advisory Committee of the All-China Federation of Trade Unions, an expert engaged by the Chinese Ministry of Justice and the Ministry of Human Resources and Social Security, and a member of the Expert Advisory Committee of the Haidian Primary People's Court, Beijing.

Professor Jiang focuses her research and scholarship on Chinese labor law. Due to this experience, she has been invited by various legislative and administrative agencies to serve as an expert in the discussion of several draft labor laws and administrative regulations, including the Labor Contract Law of the People's Republic of China (the "PRC Labor Contract Law"). Professor Jiang has authored (solely or jointly) and edited more than a dozen books, has published over 70 journal papers, and has presided over 10 research projects about Chinese labor law and related subjects.

Professor Jiang's curriculum vitae is attached as Exhibit 1. Defendant compensated Professor Jiang for her time at a rate of $692/hour (exchange rate used: USD 1= RMB 6.5).

### III. Materials Considered

Defendant provided Professor Jiang a number of documents related to this case including copies of agreements between JT Ho and others, on one hand, and Jinhua, on the other. Professor

Jiang was also provided with facts and other background orally by counsel, which for purposes of her testimony, she will assume are true.

## IV.     Summary of Expert Opinions

Professor Jiang will testify about the types of employment relationships that exist under Chinese law and the criteria used to determine which type of employment relationship, if any, exists. To begin with, under Chinese law, there are generally two types of employment relationships: (1) a "labor relationship" and a "labor service relationship." The labor relationship, which is governed by the PRC Labor Contract Law, is a more formal employment relationship characterized by stronger features of subordination, stricter criteria to arrive at a determination that a labor relationship exists, and greater legal protections for the worker. In contrast, the labor service relationship, governed by civil laws such as the Civil Code of the People's Republic of China, is an employment relationship in a broader sense, characterized by weaker subordination features and less strict criteria to arrive at a determination that a labor service relationship exists, under which the employee can provide service in more flexible forms.

J.T. Ho and Jinhua entered into an agreement titled "Labor Contract." Professor Jiang will first explain the key factors considered in determining whether a labor relationship exists under Chinese law. Next, based on her review of this agreement, and her understanding of the facts, Professor Jiang will opine on whether J.T. Ho and Jinhua had a labor relationship or a labor service relationship. Finally, Professor Jiang will testify that, based on the relevant facts and circumstances she understands about this case, J.T. Ho and Jinhua had neither a labor relationship nor a labor service relationship under Chinese law. Professor Jiang will therefore testify that J.T. Ho was not an employee of Jinhua under Chinese law.

1. How to Determine Whether a Labor Relationship Exists under Chinese Law?

Under Chinese law and practice, a labor relationship refers to the bundle of rights and obligations under which a hiring entity (employer) hires a worker (employee), and under which the worker provides paid labor under the management of the hiring entity.[1] Three key criteria must be met before a court can find a labor relationship: (1) the worker and the hiring entity must have the prerequisite "subject qualifications"; (2) there must be "actual employment"; and (3) the worker must be "subordinate" to the hiring entity, personally, organizationally and economically. These three factors are explained and discussed in more detail below.

---

[1] Article 3 of the Labor Contract Law of the People's Republic of China (Draft) (2006) published by the Standing Committee of National People's Congress of China.

A. Subject Qualifications

First, in order to establish a labor relationship, the worker and the hiring entity must have the required subject qualifications, respectively. This requirement is reflected in article 1 of the "Notice on Issues relating to Confirmation of Labor Relationship" issued by the then Labor and Social Security Ministry[2] in 2005, which provides, "where a hiring entity did not enter into a written labor contract with a worker, a labor relationship shall be found under the following circumstances: (1) the hiring entity and the worker are qualified subjects under laws and regulations …"[3]

The subject qualifications for the hiring entity are that it must be established in accordance with the law, legally existing, and qualified as a hiring entity under the Labor Law of the People's Republic of China ("PRC Labor Law") and the PRC Labor Contract Law, Hiring entities may include, companies, individual economic organizations, government offices, public service institutions, social organizations, private non-corporation institutions, and others.

This "subject qualification" of the worker means that a worker must be a natural person who meets the minimum age requirement (16 years old) under the PRC Labor Law and has the capacity to work.

Additionally, foreign workers or workers from Hong Kong, Macao, or Taiwan must also obtain certain administrative approval, such as work permits required for working in mainland China, before they are eligible to sign labor contracts and be legally employed.[4] Article 14 of the "Interpretations of the Supreme People's Court of PRC on Several Issues Relating to Laws Applicable for Trial of Labor Dispute Cases (IV)" (2013)[5] provides, "where a foreigner or a stateless person fails to obtain a work permit pursuant to the law before entering into a labor contract with a hiring entity within the territory of China, or a resident from the Hong Kong Special Administrative Region, Macao Special Administrative Region or Taiwan fails to obtain a work permit pursuant to the law before entering into a labor contract with a hiring entity of mainland China, and the concerned person requests confirmation of a labor relationship with the hiring entity, the court shall not approve such request."

---

[2] It later became the Human Resources and Social Security Ministry.

[3] Lao She Bu Fa (2005) 12.

[4] Article 4 of the *Regulations on Employment of Taiwan, Hong Kong and Macao Residents in Mainland China* (repealed on August 23, 2018), "A work permit system shall be implemented for residents of Taiwan, Hong Kong and Macao to work in mainland China. Hiring entities who intend to employ Taiwan, Hong Kong and Macao residents directly or receive them on secondment shall apply for the 'Work Permit for Taiwan, Hong Kong and Macao Personnel' for them."

[5] It was repealed on January 1, 2021, but was effective during the relevant time period of this case.

3

In *Zeng Yuzhe v. Human Resources and Social Security Bureau of Xinhui District of Jiangmen City*, the court did not find that a labor relationship was established because the worker did not obtain a work permit. The court quoted Article 4(1) of the Regulations on Employment of Taiwan, Hong Kong and Macao Residents in Mainland China:

> A work permit system shall be implemented for residents of Taiwan, Hong Kong and Macao to work in mainland China. Hiring entities who intend to employ Taiwan, Hong Kong and Macao residents directly or receive them on secondment shall apply for the "Work Permit for Taiwan, Hong Kong and Macao Personnel" for them. [("Work Permit")]. Hong Kong and Macao residents engaging in self-employed business in mainland China shall apply for their own work permits. Taiwan, Hong Kong and Macao residents, who are approved and have work permits, shall be protected by the law in respect of their employment in mainland China.

The court in *Zeng Yuzhe* case also quoted Article 14 of the "Interpretations of The Supreme People's Court of PRC on Several Issues relating to Laws Applicable for Trial of Labor Dispute Cases (IV)," and eventually ruled that, "[p]ursuant to the abovementioned provisions, the court of first instance found that the Appellant, Zeng Yuzhe [('Zeng')], a Taiwanese resident, did not apply for and receive the Work Permit for Taiwan, Hong Kong, and Macao Personnel in accordance with the law during his work period at Jiangmen Dingfeng Company [('Dingfeng')] in China. *The PRC Labor Law does not apply to Zeng and Dingfeng … Zeng's compensatory claim also lacks a factual and legal basis. The court of first instance did not err in rejecting Zeng's claims upon trial, and its ruling is hereby affirmed.*"[6] (Emphasis added).

B. Actual Employment

Another key criterion to determine the existence of a labor relationship is that the hiring entity must actually employ the worker, and the worker must actually provide labor. A publication of the "Latest Interpretation and Cases of the Labor Contract Law of the People's Republic of China," issued by the Economic Law Office, Commission of Legislative Affairs of the Standing Committee of the National People's Congress, states that, "the establishment of a labor relationship is not determined by the conclusion of a written labor contract, but by the actual provision of labor by workers and the actual employment by hiring entities." Article 7 of the PRC Labor Contract Law provides, "a hiring entity shall be deemed to have established a labor relationship with a worker from the date of commencement of work."

---

[6] *Zeng Yuzhe v. Human Resources and Social Security Bureau of Xinhui District of Jiangmen City*, Guangdong Province High People's Court, (2019) Yue Xing Zhong No.479.

4

Article 5 of the "Guidance on Elements of Trial in Labor Disputes by the Shanghai Municipality High People's Court, No.1" (2013) similarly stated that:

> [W]here the worker did not enter into a written labor contract with the hiring entity, but nevertheless argues that the parties had a labor relationship, he or she shall generally provide evidence to prove the following factual elements: (1) the worker and the hiring entity agreed to establish a labor relationship; (2) *the worker and the hiring entity have had actual employment (with the worker providing labor and the hiring entity paying compensation)*; and (3) the legal relationship between the worker and the hiring entity met the essential characteristics of a labor relationship.

(Emphasis added).

For example, in *Gao Youcheng v. Wuxi Jincheng Auto & Trailer Service Co., Ltd.*, Gao Youcheng ("Gao") was hired by Wuxi Jincheng Auto & Trailer Service Co., Ltd. ("Jincheng") as a trailer driver on November 2, 2018. Jincheng signed a labor service contract with Gao, effective from November 2, 2018 until November 1, 2019. On December 1, 2019, Gao signed a labor contract with Xiyun Auto Repair Factory ("Xiyun"), effective from December 1, 2019 until November 30, 2020. Xiyun paid social security premiums for Gao. On March 2, 2020, Gao transferred back to Jincheng from Xiyun, and Jincheng paid Gao's social security premiums. One of the disputes in the case was whether Gao and Xiyun established a lawful and effective labor relationship.

The court of second instance found that, based on the statements of both parties and an assessment of Gao's work responsibilities and compensation, during the period from December 1, 2019 to May 10, 2020 (which was covered by the labor contract between Gao and Xiyun), Gao continued to perform the specific work tasks per his previous labor service contract (with Jincheng), and his work location, work responsibilities and compensation remained the same. Therefore, "the labor contract signed by Gao and Xiyun was not in fact performed, and both parties confirmed that the purpose of signing said labor contract was to pay social security premiums … It shall be concluded that Gao and Xiyun did not have an agreement to enter into a labor relationship."[7] The Court held that, despite having a written labor contract and despite Xiyun paying social security for Gao, there was no labor relationship between Gao and Xiyun, because Gao did not provide labor to Xiyun pursuant to the contact.

C. Subordination

---

[7] *Gao Youcheng v. Wuxi Jincheng Auto & Trailer Service Co., Ltd.*, Wuxi Intermediate People's Court, Jiangsu Province, (2021) Su 02 Min Zhong No.2236.

The last key criterion is subordination, which is generally considered by legal experts and courts to be the core characteristic in a labor relationship. The existence of subordination between the hiring entity and the worker is the most critical element in finding that a labor relationship exists. Courts examine whether the worker owes personal, organizational, and economic subordination to the hiring entity.[8] These three types of subordination are discussed in more detail below.

In *Pan Genhua v. Wuhan Shengyuan Automobile Passenger Transport Co., Ltd.,* the Hubei Province High People's Court engaged in the following analysis on the subordination criterion:

> 1. Personal subordination. Unlike in the labor relationship where the worker provides labor to the hiring entity through employment, Pan Genhua [("Pan")] obtained the taxi operation right from Wuhan Shengyuan Automobile Passenger Transport Co., Ltd. [("Shengyuan")] through capital contribution and engaged in the business. There was no delivery of labor between the two parties.
>
> 2. Economic subordination. Pan did not depend on Shengyuan economically. His labor earning was from his own operation revenue after deducting contracting charges and operating costs. He was self-sufficient. Therefore, there was no consideration whereunder Pan provided labor and Shengyuan paid the compensation.
>
> 3. Organizational subordination. Pan carried out business independently through driving a vehicle. There was no division of work or cooperation with other drivers,

---

[8] Lin Jia, Chief Editor, *Labor Law and Social Security Law*, China Renmin University Press, 2013, pp. 60 ("No matter how it is stipulated, there is a common standard in determining the status of the worker, i.e. the 'subordination' standard. *Internationally, the 'subordination' standard is mainly the common expression in the labor laws of civil law countries, while the labor laws of common law countries generally adopt the 'control' standard, but the meaning of the two is roughly the same.* According to prevailing views, 'the essence of the employment relationship is that the employee must obey the employer, and employers have the right to supervise the work of the employee.' Therefore, the 'subordination' standard is the most important standard in distinguishing the status of the worker from subjects of other legal relationships (especially civil subjects). To be more specific, its concept mainly includes (1) Personal Subordination. Personal subordination means that the worker must be incorporated into the organizational system of the hiring entity, as a member thereof, to provide labor under the command, order and management of the hiring entity, and the hiring entity has extensive right of direction over the worker. … Accordingly, in the connotation of personal subordination, 'organizational subordination' is the most important component. (2) Economic Subordination. Economic subordination means that the worker must provide labor to others, and there is an economic dependence between the worker and the hiring entity…. When applying the subordination standard to determine the status of the worker, 'a combination of personal subordination and economic subordination' standard should be adopted, among which the personal subordination should be the primary standard and the economic subordination should be an auxiliary standard. This position has been accepted in China's labor law legislation. For example, Article 1 of the "Notice on Issues relating to Confirmation of the Labor Relationship" (issued by the Ministry of Labor and Social Security on May 25, 2005) stipulates that 'where a hiring entity does not enter into a written labor contract with a worker, a labor relationship shall be found under the following circumstances: (1) the hiring entity and the worker are qualified subjects under laws and regulations; (2) the various labor rules and policies established by the hiring entity pursuant to the law apply to the worker, and the worker is subject to the management of the hiring entity and engages in paid work arranged by the hiring entity; and (3) the work provided by the worker is a component of the hiring entity's business.' Sections (2) and (3) of this Article undoubtedly adopted the theory of 'subordination standard.'"). (Emphasis added).

and he was, for the most part, not subject to the management, command, and supervision of Shengyuan. Therefore, Pan and Shengyuan did not have the personal, economic and organizational subordination that can be found between the worker and the hiring entity under labor law."[9]

The court ruled that there was no factual basis to find a labor relationship existed between the two parties after the expiration of the "Wuhan Passenger Taxi Operation Contract."

(1) **Personal Subordination**

Personal subordination means that the worker is under the command, order and supervision of the hiring entity while working. The hiring entity can instruct and determine the worker's working hours, the location, quantity, and intensity of work, and has the right to control and discipline the worker. The worker, in turn, must obey the directions and instructions of the hiring entity, follow the work arrangements of the hiring entity while working, and observe the management and labor hierarchy of the hiring entity.

In general, the following five elements can be considered in determining personal subordination[10]:

- Whether the hiring entity has specific rules and policies, such as an "Employee Handbook," whether the individual is aware of such rules and policies, and whether the individual must strictly follow these policies in daily work.

- Whether the individual has autonomy in work arrangements, whether the working hours, location, content, methods and other arrangements are designated by the hiring entity or require its approval, and whether the individual obeys the hiring entity's management directions with respect to work arrangements.

- Whether the hiring entity implements regular performance evaluations, and whether it gives rewards or punishments based on the individual's work performance and evaluation results.

- Whether the individual is required to accept the hiring entity's attendance policies (e.g. clocking in and out), whether the attendance results are directly and closely related to

---

[9] *Pan Genhua v. Wuhan Shengyuan Automobile Passenger Transport Co., Ltd.,* Hubei Province High People's Court, (2017) E Min Shen No. 3178.

[10] See "Key Points and Thoughts on Trial in Cases concerning Confirmation of Labor Relationships," issued by the Shanghai First Intermediate People's Court in 2019.

7

> the individual's salary, and whether the hiring entity has relevant leave policies which are binding on the individual.

- Whether the hiring entity supervises, manages and controls the entire work process of the individual, with the labor relationship focusing on the *process* of providing labor. Other similar relationships, such as work-for-hire relationships ("承揽关系"), pay more attention to the *output* of the labor service, and not the *process* of how it was achieved.

The above factors are not exhaustive. Some courts may also consider other factors (e.g., whether the labor is directly delivered to the hiring entity by the worker, whether the worker needs to report to the hiring entity regularly) in determining whether personal subordination exists.

In *Beijing Lin Brothers Culture Co., Ltd. v. Nie Meilan*, the worker (Nie Meilan) and the hiring entity (Complainant, Beijing Lin Brothers Culture Co., Ltd. ("Lin Brothers")) had signed an "Agreement on Cooperative Establishment of Tea Business Projects." The court found that the agreement was entered into voluntarily, did not violate any mandatory laws and regulations, and was a valid contract. However, the two parties disagreed over the specific nature of the executed agreement. The Beijing Municipality High People's Court held that:

> [T]he nature of the contract should be determined based on the legal relationship involved in the contract, that is, the rights and obligations established by the parties to the contract. The typical feature of the "cooperative operation" contract is joint capital contribution and shared risks. The contract in this case did not stipulate Nie Meilan's capital contribution ratio or her shared risks, which was inconsistent with a cooperative operation contract. Based on the evidence in this case, Nie Meilan accepted the management of Lin Brothers, reported attendance, allocation of funds, expenditure, sales, work plans, and reserve fund application on a monthly basis, and the salary received was closely related to the attendance days. *The relationship established by the two parties during the performance of the contract satisfies the characteristics of personal subordination and economic subordination under a labor contract. Therefore, the lower court did not err in finding the labor relationship between the Complainant and the Respondent.* [11]

(Emphasis added).

---

[11] *Beijing Lin Brothers Culture Co., Ltd. v. Nie Meilan*, Beijing Municipality High People's Court, (2019) Jing Min Shen No.986.

(2) **Organizational Subordination**

The assessment of organizational subordination, in judicial practice, mainly considers whether the worker's hours are controlled and restricted by the hiring entity, whether the worker accepts and abides by the hiring entity's management, and whether the worker follows the hiring entity's attendance requirements, etc. It is similar to, and overlaps with, the personal subordination assessment. Some courts consider these factors together.

In *Huimin County Xuqiang Industry and Trade Co., Ltd. v. Liu Chengjun*, the Shandong Province Binzhou City Intermediate People's Court held that, "in terms of organizational subordination, Liu Chengjun's work hours were flexible, free and at his own discretion. He was not restricted by the Appellant's work hours. Therefore, there was no organizational subordination as is required for a labor relationship."[12]

Again, in *Zhou Hongzhong v. Hubei Mingzhu Transportation Group Co., Ltd.*, the Hubei Province High People's Court held that there was no organizational subordination:

"Organizational Subordination: Zhou Hongzhong [("Zhou")] conducted business through driving a car independently, there was no division of work or cooperation with other drivers, and he was, for the most part, not subject to the management, command, and supervision of the Hubei Mingzhu Transportation Group Co., Ltd. [("Mingzhu Company")]. The [Mingzhu Company] undertakes the necessary management over the drivers and the operating vehicles, not for the purpose of labor management under a subordination relationship, but instead due to the public interest nature of the taxi sector in providing transportation services to the public, as well as the industry management needs to ensure safe operation. [Zhou]'s work location was at his own discretion within the bounds of operational needs, his work hours were relatively free, and he was not restricted by start and leave times. Thus, [Zhou] and the [Mingzhu Company] did not have the personal, economic, and organizational subordination between the worker and the hiring entity under the labor law. Therefore, [Zhou]'s request for confirming a labor relationship with the [Mingzhu Company] is invalid. The original judgment did not err in rejecting his request."[13]

---

[12] *Huimin County Xuqiang Industry and Trade Co., Ltd. v. Liu Chengjun,* Binzhou Intermediate People's Court, Shandong Province, (2020) Lu 16 Min Zhong No.1753.

[13] *Zhou Hongzhong v. Hubei Mingzhu Transportation Group Co., Ltd.,* Hubei Province High People's Court, (2019) E Min Shen No.129.

(3) **Economic Subordination**

Economic subordination means that the worker is completely included in the economic organization and production structure of the hiring entity. The key is to look at whether the worker is subordinate to the hiring entity and works for the business purposes of the hiring entity. The worker receives income mainly or solely from the hiring entity, and the hiring entity bears the operational risks.

In general, the following four factors can be considered in determining whether economic subordination exists[14]:

- Whether the individual's salary is stable, and whether he or she participates in the profit distribution of the hiring entity. In a labor relationship, the business risks are borne by the hiring entity, and the remuneration the hiring entity pays for the worker's labor is not a result of profit distribution.

- Whether the individual's work constitutes an integral part of the hiring entity's business, and whether the individual holds him or herself out as an employee of the hiring entity when conducting work externally. In the labor relationship, the worker's provision of labor is an act of duty. It is carried out more often in the name of the hiring entity than in the name of the individual. By contrast, in a cooperative relationship, both parties perform corresponding obligations for their own interest.

- Whether the tools for the individual's work are provided by the hiring entity, particularly those necessary for carrying out the work (e.g., electric motorcycles and mobile phones for food and package delivery personnel, cleaning implements and supplies for cleaners, and forms of identification such as uniforms and employee badges).

- Whether the individual receives income mainly or entirely from the hiring entity. This is the most straightforward indicator of economic subordination.

In *Zhou Fangping v. Guangzhou Yiguang Decoration Design Engineering Co., Ltd.*, the court found there was no economic subordination in the following circumstance:

---

[14] See "Main Points and Thoughts of Trial in Cases concerning Confirmation of the Labor Relationship," issued by the Shanghai First Intermediate People's Court in 2019.

10

> [U]pon investigation, the Court is of the opinion that the key dispute in this case is whether there was a labor relationship between Zhou Fangping [("Zhou")] and the Guangzhou Yiguang Decoration Design Engineering Co., Ltd. [("Company")]. The burden of proof should be borne by Zhou in proving the labor relationship. To confirm the worker's status, the elements of personal and economic subordination must be met. The former means that the worker must be incorporated into the organizational system of the hiring entity, become a member thereof, and provide labor under the command, order, and management of the hiring entity. *The latter means that the worker must provide labor to the hiring entity in exchange for remuneration, be economically dependent on the hiring entity, and have the hiring entity's remuneration and other benefits as his or her main source of income.*[15]

(Emphasis added).

In short, Professor Jiang will testify that subordination is the most critical characteristic when it comes to distinguishing the labor relationship from other legal relationships under Chinese law. When determining whether a labor relationship is formed between a worker and a hiring entity, one should consider whether there is actual employment between the parties and focus on whether the actual performance is consistent with the subordination characteristics required for there to be a labor relationship.

D.  Labor Contract as a Formality

Professor Jiang will testify that, although Article 16 of the PRC Labor Law stipulates that "a labor contract shall be concluded to establish a labor relationship," a labor contract is neither a sufficient nor a necessary condition for the establishment of the labor relationship. In practice, the existence of a written labor contract alone is not sufficient to find the labor relationship between the parties. Likewise, where there is no labor contract, but there is actual employment and the subordination standard is met, courts are inclined to find that a labor relationship exists. But where there is only a labor contract and no actual employment is found, courts will not find that a labor relationship exists.

*Tan Fuqing v. Liaoning Good Nurse Pharmaceutical (Group) Co., Ltd.* demonstrates the comprehensive nature of the analysis to be conducted in determining whether a labor relationship exists. In that case, the court found that the plaintiff, Tan Fuqing, was the cousin of Tan Fuquan, who was a regional sales manager in Nantong City. Since 2006, Tan Fuqing had engaged in pharmaceutical sales in Nantong City. Tan Fuquan paid her salary. Between 2008 and 2018, the

---

[15] *Zhou Fangping v. Guangzhou Yiping Decoration Design Engineering Co., Ltd.*, Chongqing Municipality High People's Court, (2020) Yu Min Shen No. 2399.

11

defendant Liaoning Good Nurse Pharmaceutical (Group) Co., Ltd. ("Good Nurse") entered into a labor contract with Tan Fuqing, and paid for her social security premiums, which had been paid by Tan Fuquan. According to Tan Fuquan, after Tan Fuqing left Nantong, Tan Fuquan no longer paid social security premiums for her. The purpose of the labor contract between Tan Fuqing and Good Nurse was to allow Good Nurse to pay Tan Fuqing's social security premiums. Good Nurse does not conduct performance evaluation over Tan Fuqing's sales work.[16]

The court ruled that "in this case, to determine whether a labor relationship existed between the parties, the substantive elements thereof shall be analyzed, including salary, personnel management, work arrangement, etc. Although the parties signed a labor contract, Tan Fuqing's salary was paid by Tan Fuquan (the manager of Nantong region) based on sales volume. The parties lacked substantive personal, economic and organizational subordination. Overall, there was no actual labor relationship between Tan Fuqing and Good Nurse. Therefore, this court rejects Tan Fuqing's request for appeal."[17] On appeal, the Liaoning Province High People's Court upheld the judgment of the lower court.

Thus, Professor Jiang will testify that a labor relationship cannot be inferred solely from the execution of a labor contract and/or payment of social security. Ultimately, the determination must be made based on a comprehensive analysis of actual employment, subordination and other substantive elements set forth above.

2. Did Jinhua and J.T. Ho Have a Labor Relationship?

Professor Jiang will testify that, based on her training, research and experience, as well as the documents she has reviewed, and her understanding of the facts and circumstances, Jinhua and J.T. Ho did not have a labor relationship.

A. Ho didn't obtain the work permit required for employment in mainland China. Thus, Ho lacked the prerequisite "subject qualification," and could not establish a lawful labor relationship with Jinhua.

Jinhua is a company incorporated in China. Ho is a resident of Taiwan. As stated above, pursuant to then applicable regulations, "[h]iring entities who intend to employ Taiwan, Hong Kong

---

[16] *Tan Fuqing v. Liaoning Good Nurse Pharmaceutical (Group) Co., Ltd.*, Benxi Intermediate People's Court, Liaoning Province, (2019) Liao 05 Min Zhong No. 1285.

[17] *Id.*

12

and Macau residents directly or receive them on secondment shall apply for the 'Work Permit for Taiwan, Hong Kong and Macao Personnel' for them."[18]

The "Labor Contract" executed by Jinhua and Ho also stated that, "during the term of this contract, the parties shall apply for and obtain documents required for Party B's working at Party A, including foreigner work permit, work visa, employment permit, residence permit, Work Permit for Taiwan, Hong Kong and Macao Personnel; if the aforementioned documents cannot be obtained or expire within the term of the contract, this contract will not take effect or will terminate early."

Professor Jiang will testify that because Jinhua never applied for or obtained a "Work Permit for Taiwan, Hong Kong and Macao Personnel" for Ho, Ho did not have the qualification to work at Jinhua, a mainland China company. Professor Jiang will further testify that Ho could not establish a lawful labor relationship with Jinhua, and the "Labor Contract" they executed did not take effect.

B. Jinhua and Ho did not engage in the actual employment that is required to establish a labor relationship.

Although Ho and Jinhua executed a "Labor Contract," Professor Jiang will testify that, based on her understanding of the facts, including facts that counsel instructed her to assume, there is no evidence that either party treated Ho as an employee of Jinhua. After executing the "Labor Contract," Ho continued to engage in his usual full-time work at United Microelectronics Corporation ("UMC"). Nothing in Ho's work responsibilities or duties changed after signing the contract. Ho did not render any labor or deliver any work product to Jinhua. Ho's name never appeared in Jinhua's employee roster. He had no employee number, employee card, or attendance record, he was not assigned a department or supervisor in Jinhua, and he never reported his work to anyone at Jinhua.

In the *Gao Youcheng* case discussed above, after the worker, Gao, entered into a labor contract with the second company, he continued to perform the contract he signed with the first company. His work tasks, work location, work responsibilities and compensation did not change. The purpose of signing the second contract was only to pay social security premiums for him. The court held that Gao's contract with the second company did not create a labor relationship because the relationship between Gao and the second company did not have any of the hallmarks of a labor relationship.

---

[18] Article 4 of the "Regulations on Employment of Taiwan, Hong Kong and Macao Residents in the Mainland" (repealed on August 23, 2018).

13

Professor Jiang will testify that she finds the instant case very similar to the *Gao Youcheng* case. Professor Jiang understands that after Ho executed the contract with Jinhua, he continued to perform his original job at UMC in Taiwan. His work tasks, work location and work responsibilities did not change. Ho's work tasks were still assigned by UMC, and his work product was also delivered to UMC. Professor Jiang will testify that she understands that the purpose of executing this contract was to arrange for Jinhua to pay a supplementary stipend to Ho, in addition to his regular salary, so that his overall compensation would be more competitive in the market.

Because no part of the contract between Ho and Jinhua was performed, other than the payment, Professor Jiang is of the opinion that there was no actual employment, as is required to establish a labor relationship.

C. Ho owed no subordination to Jinhua.

As discussed above, when determining whether a labor relationship exists between a worker and a hiring entity, one should not rely on a written contract alone. Instead, one should determine whether the worker has personal, organizational and economic subordination to the hiring entity based on actual performance. Given the relevant facts of this case, Professor Jiang will testify that Ho was not subordinate to Jinhua.

(1) Personal Subordination

It is Professor Jiang's understanding that Jinhua had no personal or behavioral control over Ho. Ho never worked in Jinhua's workplace. Jinhua did not provide him with the company's "Employee Manual" or other rules and policies, and never required Ho to follow any internal policies of Jinhua; Jinhua did not impose any arrangements or requirements on Ho regarding working hours, location, responsibilities or methods. Jinhua never conducted monthly, quarterly, or annual evaluation or any performance evaluation on Ho; Jinhua did not manage Ho's attendance, and he did not need to request vacation or leave of absence from Jinhua; and Jinhua did not supervise, manage or control the work process of Ho. Ho was not subject to discipline from Jinhua. Therefore, Professor Jiang is of the opinion that J.T. Ho had no personal subordination to Jinhua.

(2) Organizational Subordination

It is Professor Jiang's understanding that Ho was not interviewed by Jinhua before signing the "Labor Contract," nor was he included in Jinhua's HR management system after signing the contract. He did not have a Jinhua employee number, employee card, or office cubicle. He did not have a Jinhua company email account and could not log into Jinhua's intranet or use Jinhua's office systems. Jinhua did not provide him with any office hardware or software, including basic office

14

equipment such as computer or telephone. In addition, Ho was not affiliated with any department or supervised by anyone at Jinhua. Jinhua did not issue any work instructions to him, and Ho did not join the trade union within Jinhua. Nor did he enjoy the various benefits of Jinhua employees, like paid leave. Therefore, Professor Jiang is of the opinion that Ho had no organizational subordination to Jinhua.

### (3) Economic Subordination

With regard to economic subordination, according to the materials Professor Jiang reviewed and information she learned, a significant portion of Ho's income was from UMC. He relied on his own professional and technical capabilities to work for UMC in exchange for compensation, and UMC paid for his health insurance in Taiwan. Therefore, Ho was economically dependent on UMC. Furthermore, Ho's daily work was assigned by UMC. The work tools and equipment used in his research and development were supplied by UMC. His work was to serve the business purposes of UMC.

Professor Jiang understands that Ho received the Talent Retention Bonus from Jinhua nearly one year after he joined UMC as an income subsidy for his UMC job. Professor Jiang further understands that Jinhua agreed to pay Ho the Talent Retention Bonus because he was engaged in research and development work at UMC on the technical cooperation project. Professor Jiang also understands that there is no evidence that Ho provided Jinhua with services outside those of his original job at UMC or that he regarded himself as a Jinhua employee or conducted business in the name of Jinhua. Therefore, Professor Jiang is of the opinion that there was no economic subordination between Ho and Jinhua.

In summary, Professor Jiang will testify that, based on the evidence reported to her, there was no personal, organizational, or economic subordination between Ho and Jinhua, and thus, they did not have a labor relationship.

3. Did Jinhua and J.T. Ho have a labor service relationship?

Professor Jiang will testify that, while there are informal employment relationships other than the labor relationship (e.g. nannies, cleaners and drivers hired by individuals), collectively referred to as "labor service relationships," based on the information relayed to her, Jinhua and Ho did not have even this level of relationship. Under a labor service relationship, the two parties must have the true intention to establish a labor service relationship, the parties are equal with no subordination, and the labor service provider provides labor as agreed, while the labor service recipient pays remuneration based on the service received as agreed.

It is professor Jiang's understanding that Jinhua and Ho did not have the true intention to establish a labor service relationship. Ho did not provide services to Jinhua, and he did not deliver any work product to Jinhua. Therefore, Professor Jiang is of the opinion that Ho and Jinhua did not meet the criteria required to establish a labor service relationship because of the lack of true intention or actual provision of labor, and that they therefore did not have a labor service relationship.

There were other R&D members of UMC's New Business Development section ("NBD") who executed "Consultant Hiring Contracts" with Jinhua. Based on her understanding of the facts, Professor Jiang will further opine that these individuals did not appear to have provided labor services or work product to Jinhua. Thus, Jinhua and these "consultants" did not meet the criteria of true intention and actual provision of labor, and therefore there was no labor service relationship between them.

In fact, according to the "Consultant Hiring Contract" entered into by Jinhua and these consultants, if the R&D member resigned from UMC during the term of the contract, it was deemed a breach of the Jinhua contract, and Jinhua would not continue to pay the consultant fee.  But if these consultants were indeed Jinhua's employees, their departure from UMC would not have any effect on the performance of their contracts with Jinhua. Similar to the contract with Ho, the purpose of these contracts was to increase the competitiveness of the compensation offered by UMC for its R&D project and to attract qualified talent to join the project, not to recruit employees for Jinhua.