# EXHIBIT L

Xin Bei Shi Diao Chu          Zhen 005612
　Chief Procurator 106.02.17 Illegible

| Investigation Record | | | | | | | February 14, 2017 |
|---|---|---|---|---|---|---|---|
| | | | | | | | Tainan Investigation Office, Investigation Bureau, Ministry of Justice, Taiwan |
| Nature of case | Suspected of violating the Business Secrets Act by Wang X | | | | | | |
| Q | Name | Nickname | Gender | Date of birth | Place of birth | Occupation (professional title) | National Identity Card Uniform Number |
| A | Ho Chien-ting | | Male | November 5, 1964 | Taichung | Engineer | B121163317 |
| Q | Addresses | | | Contact information | Family economic status | | Education background |
| A | Registered place: No. 129 Heyan Street, Xitun District, Taichung Residence: No. 6 Dashun 6th Road, Xinshi District, Tainan | | | (0) 0965-280938 0910-411131 | Well-to-do | | Institute of Applied Mechanics, National Taiwan University |

Q: New Taipei Investigation Office (hereinafter referred to as the "Investigation Office") hereby interview with you since you are suspected of violating Item 1 and Item 2 of Article 13 of the Business Secrets Act, Article 359 of the Criminal Law and others. The investigation begins at 20:23 on February 14, 2017 after you had dinner and a rest. During the investigation, you are entitled to the following rights: (1) keeping silent, without making any expressions in violation of your own will; (2) appointing a defender. Those who have low or low-middle income, aborigines, have disturbance of intelligence and others can apply for legal aid in accordance with the law; and (3) requesting for investigating favorable evidence. Have you got it?

A: Yes.

Q: Are you a person having low or low-middle income, an aborigine, a person having disturbance of intelligence and others that can apply for legal aid in accordance with the law?

A: No.

Q: Do you agree to accept the night inquiry since it is late at night?

A: Yes.

Q: Do you need a defender?

A: Yes, I have chosen JIA Chun-yi as my defender. He is on his way here.

Q: Do you agree to accept the inquiry before the defender is present?

A: No.

Q: The Investigation Office suspends the inquiry at 20:38 until the lawyer you appointe is present. However, if after 4 hours, your lawyer does not arrive, we can inquire directly according to the law. Do you understand?

A: Yes.

Q: We will start the inquiry at 22:01 since your lawyer JIA Chun-yi is present?

A: Yes.

Q: Do you have any prior convictions?

A: No.

Q: the Investigation Office searched your PM2 personal office at Section 2 Professional Technology, New Business Development Center of United Microelectronics Corporation ("UMC") at No.57 South Kesan Road, Xinshi District, Tainan, today (14th) by dint of a search warrant Sheng Sou Zi [2017] No.000421 issued by Taiwan Taichung District Court. Were you at present? Is there any objection to the search process?

A: I have been present all the time and have no objections to the search process.

Q: Is there any supplement to the transcripts that you made on February 7, 2017?

A: Yes, I didn't tell you when I made the last transcript. I was with Micron and when working in UMC, I referred the business information, including the written documents and the USB flash drive bearing the relevant files generated during my employment with Micron. In addition, ten more minutes prior to the very afternoon when the Investigation Office came to the PM2 office for search, assistant manager Rong Le-tien told me to prepare for the upcoming search. After I heard it, I took out the USB containing the file of Micron from my desk (also including the information of Rexchip and Luzim). At that moment, Wang Yong-ming also being notified of the search by Rong Le-tien was handing his private materials over to HUANG Shu-han, who was sitting at the right rear of him, so I also handed over my portable discs and written documents to her. Shortly afterwards, your staff came in. HUANG Shu-han put some of the data in her cabinet, and took some away from the PM2 office, including Wang Yong-ming's cell phone.

Q: What is the so-called private information mentioned by Rong Le-tien for the upcoming search?

A: I know his meaning and it refers to the information taken from my previous employer, Micron.

Q: How did Rong Le-tien notify Wang Yong-ming of the upcoming search by the prosecutor and our staff?

A: I don't know. I forgot whether I just took out and gave the above-mentioned flash drive and written documents to HUANG Shu-han, or I asked Wang Yong-ming to whom the documents are handed over.

Q: According to Wang Yong-ming when he was interrogated by the prosecutor on February 8, 2017: "...When the searchers came to search yesterday, Rong Le-tien told me and HO Chien-ting to put away Micron data; as I know, he should also have some data from Micron; I told him to put the data away; they happen at the same time in my memory; are they true?

A: what Wang Yong-ming said is different from my impression. Rong Le-tien really told me about the upcoming search and told me to hand over data about Micron. But it seems that the data includes data brought from Micron. Wang Yong-ming did know that I had Micron materials and therefore call me to his office. Because I was busy, he directly told me about the upcoming search. I did not see how Rong Le-tien notifies Wang Yong-ming since Rong Le-tien did not notify us at the same time.

Q: Why does Wang Yong-ming know that you brought Micron materials to UMC?

A: Because I mentioned it when chatting with Wang Yong-ming, and I also requested to CHEN Cheng-kun (English name: Stephen) for a public computer that can read USB, so that I can read personal information in the Investigation Office. He also borrowed this public computer for use.

Q: Does Wang Yong-ming also use the public computer to read the relevant files he brought from Micron?

A: I know that Wang Yong-ming also has relevant business data from Micron. He uses the public computer to read his personal data, since our official computers have not permissions to read USB. We must apply for a public computer. However, I cannot figure out whether he has used the public computer to read the files he brought from Micron.

Q: As you mentioned, you and Wang Yong-ming handed over some written documents to HUANG Shu-han before our search on February 7, 2017. Where are those documents at present?

A: After the prosecutor's inquiry on February 8, 2017, I returned to my office at around 17:00 or 18:00 pm. The legal staff said that I had to hand over all documents to the prosecutor that I gave to HUANG Shu-han for safekeeping via Wang Yong-ming. So they should be kept by the prosecutor.

Q: (Reminder: list of seized articles issued by Taiwan Taichung District Prosecutors Office and seized articles) The articles mentioned were detained by staff of Taiwan Taichung District Prosecutors Office from HUANG Shu-han to which, you and Wang Yong-ming gave data on February 9, 2017. Please check which is yours and Wang Yongming's?

A: (After check) a laptop computer numbered 1, a small black flash drive in plastic bag numbered 2, 2~8 and 10~15 in paper data numbered 3, the Elpida-Rexchip Houli Technology R&D Center's operation plan numbered 5 (13 pieces in total) were given by me to HUANG Shu-han at that time; as for other things, they should be Wang Yong-ming's.

Q: After the laptop numbered 1 is turned on, there are 3 user accounts, "00046294", "00046324" and "itoaservice". Who are the three users? What are the passwords?

A: "00046294" is my job number at UMC, so this user account is mine and the password is "ASDf1234"; "00046324" should be the job number of LI Fu-che at UMC, and therefore, the user account of 00046324 should be LI Fu-che's since he can also log into the public computer; as for "itoase" user account, it should be a default for others to create a new account.

D-0000203

Q: Is there any data copied by you and Wang Yong-ming from Micron in the laptop?

A: I use this public computer to read the black USB flash drive (numbered 2) recording business data that I copied from Micron. Sometimes I directly edited on the USB and sometimes via the computer. But after a period of time, I save the valuable files back in the USB flash drive and delete them directly. Now this public computer should store no Micron's data since they are stored in the USB mentioned above. When Wang Yong-ming borrowed computer from me, he log in with my user account and password. After I log onto with my user account, I saw and deleted data of Micro brought by Wang Yong-ming since only he use my user account and password.

Q: Now, it is 23:35. Do you need to suspend the inquiry for a rest?

A: No.

Q: Why does LI Fu-che also have a user account on this laptop? For what?

A: LI Fu-che and I joined UMC almost at the same time. At about the beginning of 2016, when we talked about UMC's memory plan, we need to read some personal information, so we applied to CHEN Cheng-kun for a public computer with USB permission. So we both used this public computer. I ever asked LI Fu-che the reason, LI Fu-che told me that he use for reference.

Q: (Reminder: on February 7, 2017, number of the seized article: A-6; the seized article: Wang Yong-ming's mobile phone, recording chatting record with HO Chien-ting). As mentioned in the said phone, on June 30, 2016, Wang Yong-ming asked you: "can I read documents by using LI Fu-che's computer?"; you replied: "Fu-che's was taken away by Stephen", "you can use mine on top of my desk"'; "Passwor Qwer1234"; Wang Yong-ming responded: "3Q", "I will be careful". Can you explain it?

A: (After check) when LI Fu-che and I respectively applied to CHEN Cheng-kun for a public computer, it was Wang Yong-ming who asked me where LI Fu-che's public computer was since he wanted to use it to read the data. However, LI Fu-che's public computer was taken by Stephen, CHEN Cheng-kun, so he borrowed my public computer as mentioned above. The password at the time was Qwer1234; however, the password will be changed at time to time. Wang Yong-ming said he would be careful since reading private data in UMC violates UMC's provisions.

Q: did you and LI Fu-che get the computer after you applied to CHEN Cheng-kun for reading personal data?

A: We made a request to CHEN Cheng-kun. After CHEN Cheng-kun agreed, he instructed the secretary of the Hsinchu office, Luisa (I don't remember clearly) to deal with the issue, and then the UMC IT staff set up two public computers and delivered them to me and LI Fu-che.

Q: Since your use of the public computers has been approved by CHEN Cheng-kun and the computers are set by the UMC IT staff, why do you say that "it did not comply with the rules to access private information at UMC, so Wang Yong-ming finally said he would use it carefully?" Does it mean he uses it to read file from Taiwan's Micron Company, and he will use it carefully?

A: The public computer is originally available for us to access the USB file data, which is in line with the regulations. So when Wang Yong-ming said that he would use it carefully, he should refer to the file copied from Taiwan Micron Company. However, when Wang Yong-ming borrowed the public computer from me, I did not ask him about the purpose.

Q: Did CHEN Cheng-kun know that you and Wang Yong-ming use this public computer to access the files that have been copied from Micron, or when you asked CHEN Cheng-kun for a public computer, was your purpose to access the files that have been copied from Micron?

A: As Micron did not ban or restrict employees from taking the business files home from work before 2015, I think it was a normal practice for Micron's employees to copy work-related files to the USB flash drive, and as the space of hard disk allocated by Micron was not enough, the employees had also purchased USB flash drives through group buying. The USB flash drive that HUANG Shu-han handed over to the prosecutor for seizure was also bought by me together with my colleagues in Taiwan Micron through group buying. When I and Wang Yong-ming requested CHEN Cheng-kun for the distribution of public computers, we did not indicate that we will access the information of Micron, but I don't know how CHEN Cheng-kun's thoughts. In addition, CHEN Cheng-kun did not know that Wang Yong-ming is also using this public computer.

Q: Where is the other public computer used by LI Fu-che?

A: I have asked LI Fu-che. He said that after the search conducted by your staff on February 7, 2017, he has already returned the public computer he used for safekeeping to the company.

Q: Before the search of our staff on February 7, 2017, Rong Le-tien told you and Wang Yong-ming to take away the so-called private data, and LI Fu-che returned the public computer that he kept in custody to the company after the search. Does it mean that there is evidence of infringement of Micron's business secrets in these private data or public computer files?

A: Rong Le-tien may think that some of new employees who have joined UMC's memory program will have information about the former employer. I cannot determine whether the public computer used by LI Fu-che stores the information of Micron.

Q: It is 00:52 on February 15, 2017 at present. The recording will resume after the battery is changed at 00:54 after the recording stopped due to the poor power contact of the recording device. Do you agree?

A: Yes.

Q: It is 00:55 now. As you take the initiative to ask for a break, we therefore suspend the inquiry. Is this understood?

A: Understood.

Q: Now at 01:13, you have taken a break. We will continue the inquiry. Is this understood?

A: Understood.

Q: Please check the 13 paper documents marked with 2 to 8 and 10 to 15 in the paper materials numbered 3 as mentioned above. Please explain them and tell us whether they are the business secret information and materials about Micron?

A: The files marked with 4, 5, and 7 are the manufacturing process materials obtained during my work at Powerchip. As they are the best-performing manufacturing process that has been proved, they should also be regarded as the business secret of Powerchip; the files marked with 3, 6 and 12 include the manufacturing process data obtained during my work at Rexchip, which should also be the business secret of Rexchip; the files marked with 11 and 14 are the manufacturing process materials regarding the mass production of Rexchip during the period. During the period, Rexchip was renamed as Taiwan Micron because of the merger conducted by Micron. Therefore, these manufacturing process materials were later owned by Micron and should also be the business secret of Micron; the paper file marked with 2 is the newcomer education training material that I produced, which include content of process integration ABC, that is, the introductory materials for further explanation as well as some of my opinions and insights after the integration of the aforementioned manufacturing process materials. The file is actually kind of a note of my own. I am not sure if it is a business secret. The file marked with 13 is an introduction to the process integration made by the technical director YU Pin-yuan of the integration department of Rexchip. I got this file during class and kept it after class. YU Pin-yuan should now be a department manager of Micron. The information is relatively shallow, I don't know whether it is a business secret; the file marked with 10 is the classification code of Rexchip's test DRAM wafer. I don't know if it is a business secret. The file marked with 15 includes the miscellaneous information when I worked at Pexchip. It should not be a business secret. The file marked with 8 includes three documents; the first one is the product introduction (DATA SIffiET) that I downloaded from the Internet, which was not a business secret. The second is material obtained from the process-related conference of DRAM 1X Nano when I was working at Micron, and the third one was the introduction to Micron's DRAM 20 nm yield. I am not sure whether these two materials belong to the business secrets of Taiwan Micron.

Q: What is the content of the operation plan of the Elpida - Rexchip Houli Technology R&D Center numbered 5 as mentioned above? Is it the business secret information of Rexchip?

A: This is the operating plan written by Rexchip in December 2010 for the purpose of applying for the subsidy of project research plan to the Ministry of Economic Affairs. At that time, Rexchip was a subsidiary of Elpida, which holds about 50% of the shares, and this plan was written in order to apply for subsidy from the government. Although it was not written by me, I kept it after I saw it for future reference. I think it is not a business secret.

Q: If the operation plan of the Elpida- Rexchip Houli Technology R&D Center remarked with 5 is not the business secret information of Rexchip, why is it marked with "confidential" in the upper right corner of the cover of the plan? Why did you bring this confidential document out of Rexchip?

A: Although this document is marked as confidential, it would be announced at the shareholders' meeting or the financial report. Therefore, I don't think this is a real confidential document. I just habitually bring materials with reference in work.

Q: Do you know CHEN Yi-ling? Do you have any grievances against or money lending relationships with CHEN Yi-ling?

A: I know CHEN Yi-ling. He is my colleague when I worked at TSMC, Rexchip and Micron. I have no grievances against or money lending relationships with CHEN Yi-ling.

Q: According to CHEN Yi-ling when CHEN Yi-ling was interrogated by the prosecutor on February 13, 2017, CHEN Yi-ling stated with respect to the above-mentioned small black portable remarked with 2: "……in addition, when I reviewed the JOB DATA folder in the flash drive in a relatively small appearance and with the label KINGSTONE, I found that the content inside was the same as the file in the hard disk that HO Chien-ting automatically proposed as I reviewed initially." "HO Chien-ting resigned in October 2015, but the time of access to the file of Micron in the folder was January 2016, when HO Chien-ting had left Micron, so it could prove that he was reviewing these files. The files were placed in the same directory folder as the UMC step naming files he wanted to created, so I think the related process of UMC is based on Micron's file, and he might have referred to Micron's current process when deciding how to proceed." The confession shows that after you left Micron, its archives were brought to UMC for use. How do you see that?

A: The files I have used during my work in various companies were all saved in the JOB DATA folder in the flash drive. On February 8, 2017, I was accompanied by your staff to return to the UMC dormitory. After I agreed, the portable discs were provided to your staff for seizure. The files inside the discs and the JOB DATA folder in the flash drive were almost the same. When I was at UMC, I did access the data file of Micron at work. I used it for personal study purpose, so as to increase knowledge and help me make judgment on work. My cognition at the time was that UMC's memory development plan follows Samsung's technology trajectory instead of copying Micron's technology. Therefore, without directly using Micron's technology, there would be no leakage of business secrets. However, after your staff asked me about the issue last week, I went back to search the relevant information on the internet and also asked the company's legal staff about it, I got to know that in addition to the risk of illegal obtaining, I also faced the risk of illegal using by accessing the file of Micron, my former employer. This is what I have only recently learned.

D-0000208

Q: Now, at 2:24 am, we are suspending the inquiry and giving you a break and serving meals to you. Are these understood?

A: Understood.

Q: Now, at 2:32, you finish your meal and had taken a break, we will continue to make the inquiry, are these understood?

A: Understood.

Q: Do you know CHEN Si-sian? Do you have any grievances against or money lending relationships with CHEN Si-sian?

A: I know CHEN Si-sian. He is a legal person in Taiwan. I have no grievances against or money lending relationships with him.

Q: According to CHEN Si-sian's confession during the interrogation by the prosecutor on February 13, 2017, "In the process of examining the evidence of seizure today, I found that there was information related to IX nano, which is the most advanced process of Micron. In theory, HO Chien-ting should not access the file", and according to CHEN Yi-ling's confession: "HO Chien-ting has participated in the IX nano related project. He was the head of process integration. The file I checked today was taken away by HO Chien-ting when he resigned. At that time, Micron has developed the first version of the IX nano process." Their confession showed that the second document remarked with 8, that is, the related process material obtained when you participated in the DRAM IX nano conference during your work at Micron was advanced business secret of Micron. Why did you take this information when you resigned and use it in UMC?

A: When I left Micron, Micron was still developing the process of IX Nano. The yield was still zero. I was used to taking away reference materials that might be used in the future. The second document remarked with 8, namely, AM IX Nano's process-related conference materials was only a relatively brief introduction. I was not sure if it was a business secret, but the black flash drive and mobile hard disk seized by the prosecutor and your staff did include more in-depth information about the IX nano-process, and I admit that they were business secrets of Micron.

Q: (Reminder: the number of seizure on February 14, 2017: 2B-2. The name of the seizure: 1 letter from Micron). The information shows that Micron sent a letter (105) Mei Guang Zi No.0040 to you HO Chien-ting on April 19, 2016. What was the content of this letter and how about the reason?

A: (After check) This letter is a reminder from Micron that I signed an employment contract with it on February 14, 2014 and a contract of confidentiality and intellectual property. Therefore, after leaving the company, I should still abide by the regulations regarding non-solicitation and confidentiality, and a copy of the two contracts we signed previously is attached. I am not sure if this is the standard practice of Micron.

Q: According to Article 1.2 of the confidential and intellectual property contract signed by you with Micron: "I agree to take reasonable precautions to protect confidential information, including but not limited to: (1) storing all files, drawings, writing documents and materials of any form containing confidential information in a safe place...", Article 1.3: "When I terminate my employment relationship with Micron or when requested by Micron, I will submit all files, records, notebooks or other items available for storing confidential information that I own or control at the time to Micron, including information on the copies in paper form and electronic forms, whether they are made by me or others, and I shall not retain any copy of them in any form. If I store confidential information on non-Micron's property, including but not limited to personal computers, telephones, tablet computers, personal email or file sharing accounts or other devices or databases, I will immediately return such confidential information to Micron, destroy any duplicates owned or controlled by me and make a guarantee for the return and destruction to Micron", and the second statement of the aforementioned letter reaffirms that "in accordance with Article 9.4.3 of the employment contract, your confidentiality obligation on the confidential information you contacts, knows or holds during the period of serving the company shall still be obeyed after leaving the company, and the confidential information must not be disclosed to others, including but not limited to enabling your new employer or third party to obtain, utilize these materials and other illegal acts in direct or indirect ways." It shows that during your tenure at Micron, you have agreed to keep Micro's business secrets." You must not reproduce Micro's confidential information without authorization, and you may not use the confidential information without permission after you resign. Do you have any views?

A: No.

D-0000210

Q: (Note: the number of seizure on February 14, 2017: 2B-3. The name of the seizure: a copy of the labor contract) The information is the labor contract signed by Fujian JHICC with you. What is the content of the contract and how about the reason?

A: (After check) This contract was signed between October and November of 2016. The contract stipulates that JHICC will provide me with a project bonus, starting from July 1, 2016 and ending on June 30, 2021. The amount of bonus after deducting the tax is about NTD 1.5 million (the same below) per year, which will be granted to me in five years. JHICC remitted the bonus to my account in Xiamen Bank on a monthly basis. This contract was signed because CHEN Cheng-kun was looking for talents to join the UMC storage plan in order to attract outsiders from DRAM related companies with better salary conditions. Therefore, CHEN Cheng-kun tried to get the development bonus from JHICC and specified several members that he believed to have relatively good performance and are worthy of encouragement to open an account at Xiamen Bank to receive the bonus after signing a contract with JHICC. As far as I know, these employees include LI Fu-che, KUO Feng-ming and me. However, after signing the contract, we can no longer receive UMC's dividends, quarterly bonuses and additional signing bonuses. I know that the employees at and above the level of department leader can generally receive dividends, quarterly bonuses and additional signing bonuses.

Q: Did Wang Yong-ming, Rong Le-tien and CHEN Cheng-kun sign the aforementioned labor contract with JHICC?

A: I belong to the first batch of people who signed labor contracts with JHICC. Wang Yong-ming was one of the second batch. Now the program has not been completed yet, so JHICC did not grant any project bonus. As for whether Rong Le-tien and CHEN Cheng-kun have signed labor contracts with JHICC, I am not sure.

Q: At 3:48, now, as recording was suspended due to the running out of battery of recording device's battery, we've replaced a recorder and continue recording. Are these understood?

A: Understood.

Q: According to your investigation record on February 7, 2017: "When I entered UMC in November 2015, my annual salary was about NTD 1.9 million. Between February and March 2016, as CHEN Cheng-kun thought that if the salary was lower than that of Micron, it is not easy to recruit other people. Therefore, after actively helping me strive for the bonus, my salary was adjusted to about NTD 2.2 million to NTD 2.3 million." What is your total annual salary after you get the yearly project fund of NTD 1.5 million from JHICC from July 1, 2016?

D-0000211

A: The annual salary I mentioned last time included the initial signing bonus. The salary on July 1, 2016 was about NTD 1.9 million as I couldn't receive the dividend, the quarterly bonus and the additional signing bonus. The total annual salary was about NTD 3.4 million if JHICC's project bonus of 1.5 million NTD was added.

Q: As mentioned above, your annual salary during your tenure with Micron was about NTD 2.2 million to NTD 2.4 million. After you work with UMC, your annual salary has increased to NTD 3.4 million. Was it because this that you left Micron and bring Micron's business secret information to UMC?

A: No, when I left Micron for UMC, UMC had not started cooperation with JHICC yet. JHICC had also not yet been established. At that time, my annual salary at UMC was lower than that in Micron. Later, after CHEN Cheng-kun helped me make the first adjustment in February and March 2016, my salary was close to that offered by Micron. I signed the labor contract with JHICC in 2016, and I did not receive the annual salary of NTD 3.4 million until July 1, 2016. I brought the business information of Micron to UMC because I wanted to continue study and making research. I did not consider that although UMC was taking the technical track of Samsung. However, the fact that I accessed the confidential information of Micron at UMC still constituted a risk of illegal use.

Q: Now at 4:05, can you support yourself for the following inquiry?

A: I hope to finish as soon as possible.

Q: Why did UMC employees, including you, need to open an account at Xiamen Bank before signing the above-mentioned labor contract with JHICC?

A: I don't know. It was CHEN Cheng-kun who asked us to open an account with Xiamen Bank before or after we signed the contract. LI Fu-che, KUO Feng-ming and me were flying to Xiamen together. After we arrived at Xiamen Airport, JHICC's staff took us to the Xiamen Bank to open an account and we immediately returned to Taiwan by plane after the account-opening.

Q: Did LI Fu-che, KUO Feng-ming and you meet the director of JHICC?

A: Yes, JHICC employees took us to open the account and after that, we had dinner together. At the dinner, there was a Taiwanese director of JHICC, WU Kun-Jung, who was at present.

Q: Did WU Kun-Jung or other JHICC employees talk about the development of a storage plan by UMC with LI Fu-che, KUO Feng-ming and you?

A: No, we were just having dinner at the time.

Q: When did Wang Yong-ming know that he can also sign a contract with JHICC and receive a project bonus of about NTD 1.5 million per year after he joined UMC?

A: I remember that Wang Yong-ming got to know it about 1 month before I signed a labor contract with JHICC.

Q: (Reminder: the No.A-6 article seized on February 7, 2017. The name of the seized article: a dialogue conducted via LINE communication software extracted from Wang Yong-ming's mobile phone) Wang Yong-ming said to you on August 25, 2016: "Today big S said we had to sign a contract of four years to get the extra bonus from China. Considering my current situation, I really don't know if I can hold it for four years." "The boss said that Rong sir has recommended me..."Was the dialogue regarding Wang Yong-ming's upcoming signing with JHICC? What are the details?

A: (After check) Yes, Big S and Boss refer to CHEN Cheng-kun, and it was CHEN Cheng-kun who talked with Wang Yong-ming about issues related to JHICC's employment contract; Mr. Rong is Rong Le-tien, and it was Rong Le-tien who recommended Wang Yong-ming to serve as the department manager from the original position of division leader.

Q: At 4:40, now, you request for a rest. We now suspend the inquiry. Are these understood?

A: Understood.

Q: At 4:50, now, you have taken a rest, and we will continue. Are these understood?

A: Understood.

Q: According to the dialogue via the LINE communication software extracted from Wang Yong-ming's mobile phone, Wang Yong-ming said to you on March 22, 2016: "It's okay! It's similar to the current salary." "Does UMC give us a bonus in the salary?" "Sandy only told me the number," and you said: "There should be incentive bonuses if we can realize it." What are the details?

D-0000213

A: Wang Yong-ming discussed with me about his salary after he works in UMC. Excluding dividends, the salary offered by UMC was similar to the salary offer to him by Micron. In addition, I mentioned with Wang Yong-ming that CHEN Cheng-kun was fighting for an incentive bonus, which would be granted if the DRAM products could be successfully made.

Q: As you mentioned, CHEN Cheng-kun was fighting for an additional incentive bonus. Does this bonus relate to your employment contract with JHICC?

A: At that time, CHEN Cheng-kun wanted to motivate the R&D personnel who would participate in the memory plan. Therefore, he proposed the idea of providing an extra bonus after successfully producing the DRAM products. Later, CHEN Cheng-kun won an opportunity to sign employment contract with JHICC. I think they are different things, because the incentive bonus has not been determined yet.

Q: In PM2 you belong to, what is the division of labor between the integration department 1 and the integration department 2? Who is the department manager of the latter?

A: We divided the manufacturing process of UMC's R&D DRAM F32 into 6 segments. The integration department 1 is responsible for the No. 1, 4, and 5 segments, and the integration department 2 is responsible for the No.2, 3, and 6 segments. In addition, there is a division in the integration department 2 that is responsible for coordinating the tap-out issues as well as the design rule of the DRAM logic circuit. The manager of integration department 2 is WEI Ming-te.

Q: It is 5:20 at present. Our staff suspend recording for replacing the video disc, and will continue at 5:22. Are these understood?

A: Understood.

Q: What are the respective meanings of layout and design rule? Is there any difference between the two?

A: Layout is the top view of the entire DRAM product, that is, the product plan from the top down, while the design rule is the layout design specification of the DRAM logic circuit. At UMC, the division responsible for the tapeout and design rule under the integration department 2 coordinated with the outsourced IC design manufacturer. The original principle should be that UMC set the rule according to its own capabilities, such as the allowable range for the maximum or minimum distance between the two wires. Then, IC design manufacturers design the circuit layout according to the rule (but now it may be that the IC design manufacturer requires us to do the required rules based on the existing design layout), then UMC combines the circuit layout with DRAM's memory cell to create the top view of the product, namely, the complete layout.

Q: According to Wang Yong-ming's confession during the interrogation by the prosecutor on February 8, 2016: "He (Rong Le-tien) is my supervisor. During

our discussions, he asked me if I had the specifications of Micron. As he was the person interviewing me, he knew that I was coming from Micron. He hoped that I could offer some assistance to help improve the scope of the entire DRAM design specification of UMC F32." "If I didn't download the file, my modification may not be that perfect." That means Rong Le-tien instructed Wang Yong-ming to assist in the DRAM application specification of UMC F32 according to the business secrets of Micron. If Wang Yong-ming did not download the documents from Micron, he would not be able to make satisfactory revisions of the design specifications of UMC. Have you ever discussed the related matters with Wang Yong-ming and Rong Letian?

A: Wang Yong-ming once complained to me that Rong Le-tien asked him to do some comparisons between the design rules of Micron and UMC, but I didn't know the details. Also, I didn't know if Wang Yong-ming had helped Rong Le-tien do so. I think WEI Ming-te's team has the ability to finish the work without referring to the design rule of Micron.

Q: Was it because Wang Yong-ming assisted in the comparison of the design rules of Taiwan Micron and UMC as per the instructions of Mr. Rong Le-tien that Rong Le-tien recommended Wang Yong-ming to serve as the department manager from the original post of division leader? Or was it because of the same reason that Wang Yong-ming signed an employment contract with JHICC and received the project bonus paid by JHICC?

A: I don't think so, because the design rule is not the business that Wang Yong-ming was responsible for, and the reason why he was promoted to the department manager from the original post was that he was outstanding in his core business. As for the employment contract with JHICC, it was arranged by CHEN Cheng-kun, and not only Wang Yong-ming signed the employment contract. However, I am not sure whether or not Wang Yong-ming finally arranged the signing of the contract.

Q: We would like to confirm with you again that whether the business information of Micron stored in the portable hard disk that was provided by you to the office for seizure and the USB flash drive seized by the prosecutor was copied and brought out of Micron after you signed the employment contract and the confidential and intellectual property contract with Micron on February 14, 2014.

A: Before and after signing the employment contract with Micron, I always copied data of Micron to the portable hard disk and USB flash drive.

Q: Among the business secrets of Micron as mentioned in this investigation record, which was copied and taken away after you signed the contract on February 14, 2014?

A: I am sure that the information that was copied and taken away after I signed a contract with Micron on February 14, 2014 mainly included the processing-related conference materials of the aforementioned Micron DRAM 1X Nano, and the introduction of yield of DRAM 20nm, and the files related to manufacturing process and stored in the portable hard drive and USB flash drive. Most of the other data was copied before that day.

Q: It is 7:10 now. We suspend the inquiry and allow you to take a rest. Are these understood?

A: Understood.

Q: It is 7:45, now. You have taken a rest and we will continue. Are these understood?

A: Understood.

Q: Do you agree that the staff of the Investigation Office log in to your personal email address at jengting.tw@yahoo.com.tw and jengting.tw@gmai1.com to download the information?

A: Yes, the passwords of both email addresses are "jthobb3317". Please input the account name and password to download information.

Q: It is 8:29, now. The Investigation Office suspends the inquiry for you to take a rest and meals. Are these understood?

A: Understood.

Q: It is 9:15, now. You have taken a rest and finished your meal; we will continue. Are these understood?

Q: Why cannot we log in to your email address at jengting.tw@yahoo.com.tw with the aforementioned account password?

A: As yahoo's mailbox now requires two-stage authentication. I used to log in with my mobile phone. I haven't used a laptop to log in it for a long time. Your staff can also use my mobile phone that was detained today to log in.

Q: On February 13, 2017, CHEN Yi-ling inspected the portable hard disk that you took the initiative to deliver to the Investigation office when he was inquired thereby. CHEN Yi-ling said: "The folders under the D data of the potable hard disk named 3DI, BKE, F16data, F23 1xnm110s, F28 20m, F28 20nm100s, F32 25nm, F32 25nm90s, F38 30nm, F45 40nm, F45 40nm2g3c, F54, F63, F68, F72 and so on are internal confidential information of Micron, which may not be disclosed to customers or competitors without the permission of Micron. These data are copied directly from Micron, and even the file names are exactly the

same without any change." "Folders named F23 1xnm110s, F28 20nm, F28 20nm100s, F32 25nm, F32 25nm90s and so on are with regard to products that Micron is currently manufacturing.", "the three documents of Flow\dram_110_series_(1xnm)_traveler_(z11a)-2015 Jan.pdf, dram_comparison_workshop_100-110_series.pdf and iRDL Intro Feb25 2015.pptx under the F23 1xnm110s folder  are 1X nano (refer to 10 nm to 20 Nano) process technology; The documents of DRAM_100_series_(20nm)_trave1er_(v00h)150730.pdf and F11 data\F11 transfer Doc\TRD\Etch\F15_F11_DRAM_DE_AMAT eMax_CUOA102_TRD.xlsx under the F28 20nm100s folder are technical information related to 20nm process; the documents of 2E0F (mobile LP3) \flow\Fab15 25nm 4G3D&4GLP3 Process Flow_20131206.xlsx and 4G3D (V90B) &2G3F\flow\25nm Process Flow Rev.02.pdf under the F32 25nm90s folder are technical information about 25 nano process technology. These data include more than a thousand production processes for DRAM products, various process parameters, as well as technical generations for different products. These materials were Micron's achievements over the past 10 years and were Micron's important business secrets. If competitors obtain such data, they can speed up the process of producing and launching the DRAM products." "Under F16 data, the PLM folder contains schedule data for all products that Micron expects to produce in the future, and the MPUP folder contains the mass production plans for all products of Micron from the end of 2013 to the end of December 2016. Their disclosure will allow competitors to know about Micron's mass production products, and then determine their own operating strategy, so these data is definitely the business secrets of Micron." Do you have any opinion on CHEN Yi-ling's statement?

A: Regarding the statements of CHEN Yi-ling, I disagree with the viewpoint about the mass production plan of Micron in the PLM folder under F16 data, because the validity of the data was from the end of 2013 to the end of 2016, which was outdated. In addition, on one hand, Micron always announced the generation transfer plan on its planned mass production scheme, and on the other hand, the actual execution was often different with the plan. Therefore, CHEN Yi-ling's

statement that these plans, if known by competitors, will determine their operational strategy needs to be investigated furthermore. I basically agree with the other parts he said, but I think it should be handed over to a third-party impartial unit to identify which data are the business secrets of Micron.

Q: CHEN Yi-ling said after checking the paper documents that you handed over to HUANG Shu-han before our staff searched on February 7, 2017, which was then handed by HUANG Shu-han to the prosecutor for inspection: "The No.2 process integration ABC (F68) is Rexchip's 68nm process data, and if this data is provided to some low-end DRAM manufacturers in the mainland, they can be engaged in the production of low-end DRAM products; the No. 3 PROD GROUP: 2GDDR3 04C file include data for 40 nm process; the No.4 file is the process data of 72 nm; the data of files from No. 5 to No. 14 were process data of different DRAM products, all of which were internal confidential documents of Micron; one document in the folder numbered 15 with the title of ELPIDA ECD-DPB-1111 include technical data and also the exposure data of the process of DRAM products. The aforementioned process materials are the business secrets of Micron. "Do you have any opinion on this statement?

A: I don't think CHEN Yi-ling's statements were completely correct. As I mentioned above, among paper files numbered 3, documents remarked with 4, 5 and 7 were the manufacturing process data obtained during my work in Powerchip, which was not owned by Micron; the paperwork remarked with 2 was indeed the training materials for newcomers regarding Powerchip's nano process technology. However, it was only CHEN Yi-ling's personal opinion that the provision of the materials to low-end DMM manufacturers in mainland China would make those plants being able to producing low-end DRAM products. I don't agree with such opinion, as the generations were too backward and it was not cost-effective; the document remarked with 9 is not mine; those remarked with 6, 8, and 10 to 14 are all from Micron. Among them, those remarked with 6, 10, 11, 12, and 14 are the secret data of Micron, but the volume remarked with 8 contains three documents, among which one document was publicly available on the Internet, and the other two were the business secrets of Micron. I have no opposite opinions on these statements. However, as to whether the document remarked with 13 was business secret, I think there was still a dispute and should be further determined by an impartial unit. The ELPIDA ECD-DPB-1111 file in the folder numbered 15 is the relevant information about Elpida's 72 nm technology transfer to Powerchip. It was not owned by Micron and there was also a mark of PSC on the document, which was the abbreviation for Powerchip.

Q: (criminal summon issued by Taiwan Taichung District Prosecutors Office is served) Are you willing to be accompanied by our staff to accept the prosecutor's second interrogation?

A: Yes.

Q: Is there any additional comments?

A: The data I copied and brought out from Micron was only used for personal research and reference purposes. In addition, UMC's memory plan finally adopted the technical track of Samsung, instead of that of Micron. Therefore, before your staff contacted and interviewed me, I always thought that as long as I did not use the information of Micron that I brought out, there would be no legal problems, but now I know that it will be illegal for me to even possess the business secrets. I hope that the prosecution faculty can consider the fact that I am not knowingly guilty and allow me to be lightly sentenced. In addition, I would like to emphasize that before 2015, Micron did not prohibit or restrict employees from using USB flash drives, cloud drives or emails to copy, download or forward business files, and Micron even encouraged employees to take files home to work.

Q: Are the above statements true?

A: All of them are true.

The above transcripts totaled 20 pages and were completed at 11:40 on February 15, 2017. After being confirmed by the parties concerned, they signed their names and attached fingerprints thereon:

The interrogated: [signature]

Defender: [signature]

The interrogator: [signature]

Note taker: [signature]

D-0000219

[Handwritten] *This investigation record can be cited for reference since the version of Ho Chien-ting dated February 15, 2017 omitted.*

| Investigation Record | | | | | February 14, 2017 | | |
|---|---|---|---|---|---|---|---|
| | | | | | Tainan Investigation Office, Investigation Bureau, Ministry of Justice, Taiwan | | |
| Nature of case | Suspected of violating the Business Secrets Act by Wang X | | | | | | |
| Q | Name | Nickname | Gender | Date of birth | Place of birth | Occupation (professional title) | National Identity Card Uniform Number |
| A | Ho Chien-ting | | Male | November 5, 1964 | Taichung | Engineer | B121163317 |
| Q | Addresses | | | Contact information | Family economic status | | Education background |
| A | Registered place: No. 129 Heyan Street, Xitun District, Taichung Residence: No. 6 Dashun 6th Road, Xinshi District, Tainan | | | (0) 0965-280938 0910-4111 31 | Well-to-do | | Institute of Applied Mechanics, National Taiwan University |

Q: New Taipei Investigation Office (hereinafter referred to as the "Investigation Office") hereby interview with you since you are suspected of violating Item 1 and Item 2 of Article 13 of the Business Secrets Act, Article 359 of the Criminal Law and others. You arrived at us at 19:15 February 14, 2017. The investigation begins at 20:23 on February 14, 2017 after you had dinner and a rest. During the investigation, you are entitled to the following rights: (1) keeping silent, without making any expressions in violation of your own will; (2) appointing a defender. Those who have low or low-middle income, aborigines, have disturbance of intelligence and others can apply for legal aid in accordance with the law; and (3) requesting for investigating favorable evidence. Have you got it?

A: understood.

Q: are you a person having low or low-middle income, an aborigine, a person having disturbance of intelligence and others that can apply for legal aid in accordance with the law?

A: No.

Q: do you agree to accept the night inquiry since it is late at night?

A: Yes.

Q: Do you need a defender?

A: Yes, I have chosen JIA Chun-yi as my defender. He is on his way here.

Q: do you agree to accept the inquiry before the defender is present?

D-0000221

A: No.

Q: the Investigation Office suspends the inquiry at 20:38 until the lawyer you appointed is present. However, if after 4 hours, your lawyer does not arrive, we can inquire directly according to the law. Do you understand?

A: Yes.

Q: we will start the inquiry at 22:01 since your lawyer JIA Chun-yi is present?

A: Yes.

Q: Do you have any prior convictions?

A: No.

Q: the Investigation Office searched your PM2 personal office at Section 2 Professional Technology, New Business Development Center of United Microelectronics Corporation ("UMC") at No.57 South Kesan Road, Xinshi District, Tainan, today (14th) by dint of a search warrant Sheng Sou Zi [2017] No.000421 issued by Taiwan Taichung District Court. Were you at present? Is there any objection to the search process?

A: I have been present all the time and have no objections to the search process.

Q: Is there any supplement to the transcripts that you made on February 7, 2017?

A: Yes, I didn't tell you when I made the last transcript. I was with Micron and when working in UMC, I referred the business information, including the written documents and the USB flash drive bearing the relevant files generated during my employment with Micron. In addition, ten more minutes prior to the very afternoon when the Investigation Office came to the PM2 office for search, assistant manager Rong Le-tien told me to prepare for the upcoming search. After I heard it, I took out the USB containing the file of Micron from my desk (also including the information of Rexchip and Luzim). At that moment, Wang Yong-ming also being notified of the search by Rong Le-tien was handing his private materials over to HUANG Shu-han, who was sitting at the right rear of him, so I also handed over my portable discs and written documents to her. Shortly afterwards, your staff came in. HUANG Shu-han put some of the data in her cabinet, and took some away from the PM2 office, including Wang Yong-ming's cell phone.

D-0000223

Q: What is the so-called private information mentioned by Rong Le-tien for the upcoming search?

A: I know his meaning and it refers to the information taken from my previous employer, Micron.

Q: How did Rong Le-tien notify Wang Yong-ming of the upcoming search by the prosecutor and our staff?

A: I don't know. I forgot whether I just took out and gave the above-mentioned flash drive and written documents to HUANG Shu-han, or I asked Wang Yong-ming to whom the documents are handed over.

Q: According to Wang Yong-ming when he was interrogated by the prosecutor on February 8, 2017: "...When the searchers came to search yesterday, Rong Le-tien told me and HO Chien-ting to put away Micron data; as I know, he should also have some data from Micron; I told him to put the data away; they happen at the same time in my memory; are they true?

A: what Wang Yong-ming said is different from my impression. Rong Le-tien really told me about the upcoming search and told me to hand over data about Micron. But it seems that the data includes data brought from Micron. Wang Yong-ming did know that I had Micron materials and therefore call me to his office. Because I was busy, he directly told me about the upcoming search. I did not see how Rong Le-tien notifies Wang Yong-ming since Rong Le-tien did not notify us at the same time.

D-0000224

Q: Why does Wang Yong-ming know that you brought Micron materials to UMC?

A: Because I mentioned it when chatting with Wang Yong-ming, and I also requested to CHEN Cheng-kun (English name: Stephen) for a public computer that can read USB, so that I can read personal information in the Investigation Office. He also borrowed this public computer for use.

Q: Does Wang Yong-ming also use the public computer to read the relevant files he brought from Micron?

A: I know that Wang Yong-ming also has relevant business data from Micron. He uses the public computer to read his personal data, since our official computers have not permissions to read USB. We must apply for a public computer. However, I cannot figure out whether he has used the public computer to read the files he brought from Micron.

D-0000225

Q: As you mentioned, you and Wang Yong-ming handed over some written documents to HUANG Shu-han before our search on February 7, 2017. Where are those documents at present?

A: After the prosecutor's inquiry on February 8, 2017, I returned to my office at around 17:00 or 18:00 pm. The legal staff said that I had to hand over all documents to the prosecutor that I gave to HUANG Shu-han for safekeeping via Wang Yong-ming. So they should be kept by the prosecutor.

Q: (Reminder: list of seized articles issued by Taiwan Taichung District Prosecutors Office and seized articles) The articles mentioned were detained by staff of Taiwan Taichung District Prosecutors Office from HUANG Shu-han to which, you and Wang Yong-ming gave data on February 9, 2017. Please check which is yours and Wang Yongming's?

A: (After check) a laptop computer numbered 1, a small black flash drive in plastic bag numbered 2, 2~8 and 10~15 in paper data numbered 3, the Elpida-Rexchip Houli Technology R&D Center's operation plan numbered 5 (13 pieces in total) were given by me to HUANG Shu-han at that time; as for other things, they should be Wang Yong-ming's.

Q: After the laptop numbered 1 is turned on, there are 3 user accounts, "00046294", "00046324" and "itoaservice". Who are the three users? What are the passwords?

A: "00046294" is my job number at UMC, so this user account is mine and the password is "ASDf1234"; "00046324" should be the job number of LI Fu-che at UMC, and therefore, the user account of 00046324 should be LI Fu-che's since he can also log into the public computer; as for "itoase" user account, it should be a default for others to create a new account.

Q: Is there any data copied by you and Wang Yong-ming from Micron in the laptop?
A: I use this public computer to read the black USB flash drive (numbered 2) recording business data that I copied from Micron. Sometimes I directly edited on the USB and sometimes via the computer. But after a period of time, I save the valuable files back in the USB flash drive and delete them directly. Now this public computer should store no Micron's data since they are stored in the USB mentioned above. When Wang Yong-ming borrowed computer from me, he log in with my user account and password. After I log onto with my user account, I saw and deleted data of Micro brought by Wang Yong-ming since only he use my user account and password.
Q: Now, it is 23:35. Do you need to suspend the inquiry for a rest?
A: No.

D-0000227

Q: Why does LI Fu-che also have a user account on this laptop? For what?

A: LI Fu-che and I joined UMC almost at the same time. At about the beginning of 2016, when we talked about UMC's memory plan, we need to read some personal information, so we applied to CHEN Cheng-kun for a public computer with USB permission. So we both used this public computer. I ever asked LI Fu-che the reason, LI Fu-che told me that he use for reference.

Q: (Reminder: on February 7, 2017, number of the seized article: A-6; the seized article: Wang Yong-ming's mobile phone, recording chatting record with HO Chien-ting). As mentioned in the said phone, on June 30, 2016, Wang Yong-ming asked you: "can I read documents by using LI Fu-che's computer?"; you replied: "Fu-che's was taken away by Stephen", "you can use mine on top of my desk'"; "Passwor Qwer1234"; Wang Yong-ming responded: "3Q", "I will be careful". Can you explain it?

A: (After check) when LI Fu-che and I respectively applied to CHEN Cheng-kun for a public computer, it was Wang Yong-ming who asked me where LI Fu-che's public computer was since he wanted to use it to read the data. However, LI Fu-che's public computer was taken by Stephen, CHEN Cheng-kun, so he borrowed my public computer as mentioned above. The password at the time was Qwer1234; however, the password will be changed at time to time. Wang Yong-ming said he would be careful since reading private data in UMC violates UMC's provisions.

D-0000228

Q: did you and LI Fu-che get the computer after you applied to CHEN Cheng-kun for reading personal data?

A: We made a request to CHEN Cheng-kun. After CHEN Cheng-kun agreed, he instructed the secretary of the Hsinchu office, Luisa (I don't remember clearly) to deal with the issue, and then the UMC IT staff set up two public computers and delivered them to me and LI Fu-che.

Q: Since your use of the public computers has been approved by CHEN Cheng-kun and the computers are set by the UMC IT staff, why do you say that "it did not comply with the rules to access private information at UMC, so Wang Yong-ming finally said he would use it carefully?" Does it mean he uses it to read file from Taiwan's Micron Company, and he will use it carefully?

A: The public computer is originally available for us to access the USB file data, which is in line with the regulations. So when Wang Yong-ming said that he would use it carefully, he should refer to the file copied from Taiwan Micron Company. However, when Wang Yong-ming borrowed the public computer from me, I did not ask him about the purpose.

Q: Did CHEN Cheng-kun know that you and Wang Yong-ming use this public computer to access the files that have been copied from Micron, or when you asked CHEN Cheng-kun for a public computer, was your purpose to access the files that have been copied from Micron?

A: As Micron did not ban or restrict employees from taking the business files home from work before 2015, I think it was a normal practice for Micron's employees to copy work-related files to the USB flash drive, and as the space of hard disk allocated by Micron was not enough, the employees had also purchased USB flash drives through group buying. The USB flash drive that HUANG Shu-han handed over to the prosecutor for seizure was also bought by me together with my colleagues in Taiwan Micron through group buying. When I and Wang Yong-ming requested CHEN Cheng-kun for the distribution of public computers, we did not indicate that we will access the information of Micron, but I don't know how CHEN Cheng-kun's thoughts. In addition, CHEN Cheng-kun did not know that Wang Yong-ming is also using this public computer.

Q: Where is the other public computer used by LI Fu-che?

A: I have asked LI Fu-che. He said that after the search conducted by your staff on February 7, 2017, he has already returned the public computer he used for safekeeping to the company.

Q: Before the search of our staff on February 7, 2017, Rong Le-tien told you and Wang Yong-ming to take away the so-called private data, and LI Fu-che returned the public computer that he kept in custody to the company after the search. Does it mean that there is evidence of infringement of Micron's business secrets in these private data or public computer files?

D-0000230

A: Rong Le-tien may think that some of new employees who have joined UMC's memory program will have information about the former employer. I cannot determine whether the public computer used by LI Fu-che stores the information of Micron.

Q: It is 00:52 on February 15, 2017 at present. The recording will resume after the battery is changed at 00:54 after the recording stopped due to the poor power contact of the recording device. Do you agree?

A: Yes.

Q: It is 00:55 now. As you take the initiative to ask for a break, we therefore suspend the inquiry. Is this understood?

A: Understood.

Q: Now at 01:13, you have taken a break. We will continue the inquiry. Is this understood?

A: Understood.

Q: Please check the 13 paper documents marked with 2 to 8 and 10 to 15 in the paper materials numbered 3 as mentioned above. Please explain them and tell us whether they are the business secret information and materials about Micron?

A: The files marked with 4, 5, and 7 are the manufacturing process materials obtained during my work at Powerchip. As they are the best-performing manufacturing process that has been proved, they should also be regarded as the business secret of Powerchip; the files marked with 3, 6 and 12 include the manufacturing process data obtained during my work at Rexchip, which should also be the business secret of Rexchip; the files marked with 11 and 14 are the manufacturing process materials regarding the mass production of Rexchip during the period. During the period, Rexchip was renamed as Taiwan Micron because of the merger conducted by Micron. Therefore, these manufacturing process materials were later owned by Micron and should also be the business secret of Micron; the paper file marked with 2 is the newcomer education training material that I produced, which include content of process integration ABC, that is, the introductory materials for further explanation as well as some of my opinions and insights after the integration of the aforementioned manufacturing process materials. The file is actually kind of a note of my own. I am not sure if it is a business secret. The file marked with 13 is an introduction to the process integration made by the technical director YU Pin-yuan of the integration department of Rexchip. I got this file during class and kept it after class. YU Pin-yuan should now be a department manager of Micron. The information is relatively shallow, I don't know whether it is a business secret; the file marked with 10 is the classification code of Rexchip's test DRAM wafer. I don't know if it is a business secret. The file marked with 15 includes the miscellaneous information when I worked at Pexchip. It should not be a business secret. The file marked with 8 includes three documents; the first one is the product introduction (DATA SIffiET) that I downloaded from the Internet, which was not a business secret. The second is material obtained from the process-related conference of DRAM 1X Nano when I was working at Micron, and the third one was the introduction to Micron's DRAM 20 nm yield. I am not sure whether these two materials belong to the business secrets of Taiwan Micron.

Q: What is the content of the operation plan of the Elpida - Rexchip Houli Technology R&D Center numbered 5 as mentioned above? Is it the business secret information of Rexchip?

A: This is the operating plan written by Rexchip in December 2010 for the purpose of applying for the subsidy of project research plan to the Ministry of Economic Affairs. At that time, Rexchip was a subsidiary of Elpida, which holds about 50% of the shares, and this plan was written in order to apply for subsidy from the government. Although it was not written by me, I kept it after I saw it for future reference. I think it is not a business secret.

Q: If the operation plan of the Elpida- Rexchip Houli Technology R&D Center remarked with 5 is not the business secret information of Rexchip, why is it marked with "confidential" in the upper right corner of the cover of the plan? Why did you bring this confidential document out of Rexchip?

A: Although this document is marked as confidential, it would be announced at the shareholders' meeting or the financial report. Therefore, I don't think this is a real confidential document. I just habitually bring materials with reference in work.

Q: Do you know CHEN Yi-ling? Do you have any grievances against or money lending relationships with CHEN Yi-ling?

A: I know CHEN Yi-ling. He is my colleague when I worked at TSMC, Rexchip and Micron. I have no grievances against or money lending relationships with CHEN Yi-ling.

D-0000233

Q: According to CHEN Yi-ling when CHEN Yi-ling was interrogated by the prosecutor on February 13, 2017, CHEN Yi-ling stated with respect to the above-mentioned small black portable remarked with 2: "……in addition, when I reviewed the JOB DATA folder in the flash drive in a relatively small appearance and with the label KINGSTONE, I found that the content inside was the same as the file in the hard disk that HO Chien-ting automatically proposed as I reviewed initially." "HO Chien-ting resigned in October 2015, but the time of access to the file of Micron in the folder was January 2016, when HO Chien-ting had left Micron, so it could prove that he was reviewing these files. The files were placed in the same directory folder as the UMC step naming files he wanted to created, so I think the related process of UMC is based on Micron's file, and he might have referred to Micron's current process when deciding how to proceed." The confession shows that after you left Micron, its archives were brought to UMC for use. How do you see that?

A: The files I have used during my work in various companies were all saved in the JOB DATA folder in the flash drive. On February 8, 2017, I was accompanied by your staff to return to the UMC dormitory. After I agreed, the portable discs were provided to your staff for seizure. The files inside the discs and the JOB DATA folder in the flash drive were almost the same. When I was at UMC, I did access the data file of Micron at work. I used it for personal study purpose, so as to increase knowledge and help me make judgment on work. My cognition at the time was that UMC's memory development plan follows Samsung's technology trajectory instead of copying Micron's technology. Therefore, without directly using Micron's technology, there would be no leakage of business secrets. However, after your staff asked me about the issue last week, I went back to search the relevant information on the internet and also asked the company's legal staff about it, I got to know that in addition to the risk of illegal obtaining, I also faced the risk of illegal using by accessing the file of Micron, my former employer. This is what I have only recently learned.

Q: Now, at 2:24 am, we are suspending the inquiry and giving you a break and serving meals to you. Are these understood?

A: Understood.

Q: Now, at 2:32, you finish your meal and had taken a break, we will continue to make the inquiry, are these understood?

A: Understood.

Q: Do you know CHEN Si-sian? Do you have any grievances against or money lending relationships with CHEN Si-sian?

A: I know CHEN Si-sian. He is a legal person in Taiwan. I have no grievances against or money lending relationships with him.

Q: According to CHEN Si-sian's confession during the interrogation by the prosecutor on February 13, 2017, "In the process of examining the evidence of seizure today, I

found that there was information related to IX nano, which is the most advanced process of Micron. In theory, HO Chien-ting should not access the file", and according to CHEN Yi-ling's confession: "HO Chien-ting has participated in the IX nano related project. He was the head of process integration. The file I checked today was taken away by HO Chien-ting when he resigned. At that time, Micron has developed the first version of the IX nano process." Their confession showed that the second document remarked with 8, that is, the related process material obtained when you participated in the DRAM IX nano conference during your work at Micron was advanced business secret of Micron. Why did you take this information when you resigned and use it in UMC?

A: When I left Micron, Micron was still developing the process of IX Nano. The yield was still zero. I was used to taking away reference materials that might be used in the future. The second document remarked with 8, namely, AM IX Nano's process-related conference materials was only a relatively brief introduction. I was not sure if it was a business secret, but the black flash drive and mobile hard disk seized by the prosecutor and your staff did include more in-depth information about the IX nano-process, and I admit that they were business secrets of Micron.

Q: (Reminder: the number of seizure on February 14, 2017: 2B-2. The name of the seizure: 1 letter from Micron). The information shows that Micron sent a letter (105) Mei Guang Zi No.0040 to you HO Chien-ting on April 19, 2016. What was the content of this letter and how about the reason?

D-0000236

A: (After check) This letter is a reminder from Micron that I signed an employment contract with it on February 14, 2014 and a contract of confidentiality and intellectual property. Therefore, after leaving the company, I should still abide by the regulations regarding non-solicitation and confidentiality, and a copy of the two contracts we signed previously is attached. I am not sure if this is the standard practice of Micron.

Q: According to Article 1.2 of the confidential and intellectual property contract signed by you with Micron: "I agree to take reasonable precautions to protect confidential information, including but not limited to: (1) storing all files, drawings, writing documents and materials of any form containing confidential information in a safe place...", Article 1.3: "When I terminate my employment relationship with Micron or when requested by Micron, I will submit all files, records, notebooks or other items available for storing confidential information that I own or control at the time to Micron, including information on the copies in paper form and electronic forms, whether they are made by me or others, and I shall not retain any copy of them in any form. If I store confidential information on non-Micron's property, including but not limited to personal computers, telephones, tablet computers, personal email or file sharing accounts or other devices or databases, I will immediately return such confidential information to Micron, destroy any duplicates owned or controlled by me and make a guarantee for the return and destruction to Micron", and the second statement of the aforementioned letter reaffirms that "in accordance with Article 9.4.3 of the employment contract, your confidentiality obligation on the confidential information you contacts, knows or holds during the period of serving the company shall still be obeyed after leaving the company, and the confidential information must not be disclosed to others, including but not limited to enabling your new employer or third party to obtain, utilize these materials and other illegal acts in direct or indirect ways." It shows that during your tenure at Micron, you have agreed to keep Micro's business secrets." You must not reproduce Micro's confidential information without authorization, and you may not use the confidential information without permission after you resign. Do you have any views?

D-0000237

A: No.

Q: (Note: the number of seizure on February 14, 2017: 2B-3. The name of the seizure: a copy of the labor contract) The information is the labor contract signed by Fujian JHICC with you. What is the content of the contract and how about the reason?

A: (After check) This contract was signed between October and November of 2016. The contract stipulates that JHICC will provide me with a project bonus, starting from July 1, 2016 and ending on June 30, 2021. The amount of bonus after deducting the tax is about NTD 1.5 million (the same below) per year, which will be granted to me in five years. JHICC remitted the bonus to my account in Xiamen Bank on a monthly basis. This contract was signed because CHEN Cheng-kun was looking for talents to join the UMC storage plan in order to attract outsiders from DRAM related companies with better salary conditions. Therefore, CHEN Cheng-kun tried to get the development bonus from JHICC and specified several members that he believed to have relatively good performance and are worthy of encouragement to open an account at Xiamen Bank to receive the bonus after signing a contract with JHICC. As far as I know, these employees include LI Fu-che, KUO Feng-ming and me. However, after signing the contract, we can no longer receive UMC's dividends, quarterly bonuses and additional signing bonuses. I know that the employees at and above the level of department leader can generally receive dividends, quarterly bonuses and additional signing bonuses.

D-0000238

Q: Did Wang Yong-ming, Rong Le-tien and CHEN Cheng-kun sign the aforementioned labor contract with JHICC?

A: I belong to the first batch of people who signed labor contracts with JHICC. Wang Yong-ming was one of the second batch. Now the program has not been completed yet, so JHICC did not grant any project bonus. As for whether Rong Le-tien and CHEN Cheng-kun have signed labor contracts with JHICC, I am not sure.

Q: At 3:48, now, as recording was suspended due to the running out of battery of recording device's battery, we've replaced a recorder and continue recording. Are these understood?

A: Understood.

Q: According to your investigation record on February 7, 2017: "When I entered UMC in November 2015, my annual salary was about NTD 1.9 million. Between February and March 2016, as CHEN Cheng-kun thought that if the salary was lower than that of Micron, it is not easy to recruit other people. Therefore, after actively helping me strive for the bonus, my salary was adjusted to about NTD 2.2 million to NTD 2.3 million." What is your total annual salary after you get the yearly project fund of NTD 1.5 million from JHICC from July 1, 2016?

D-0000239

A: The annual salary I mentioned last time included the initial signing bonus. The salary on July 1, 2016 was about NTD 1.9 million as I couldn't receive the dividend, the quarterly bonus and the additional signing bonus. The total annual salary was about NTD 3.4 million if JHICC's project bonus of 1.5 million NTD was added.

Q: As mentioned above, your annual salary during your tenure with Micron was about NTD 2.2 million to NTD 2.4 million. After you work with UMC, your annual salary has increased to NTD 3.4 million. Was it because this that you left Micron and bring Micron's business secret information to UMC?

A: No, when I left Micron for UMC, UMC had not started cooperation with JHICC yet. JHICC had also not yet been established. At that time, my annual salary at UMC was lower than that in Micron. Later, after CHEN Cheng-kun helped me make the first adjustment in February and March 2016, my salary was close to that offered by Micron. I signed the labor contract with JHICC in 2016, and I did not receive the annual salary of NTD 3.4 million until July 1, 2016. I brought the business information of Micron to UMC because I wanted to continue study and making research. I did not consider that although UMC was taking the technical track of Samsung. However, the fact that I accessed the confidential information of Micron at UMC still constituted a risk of illegal use.

Q: Now at 4:05, can you support yourself for the following inquiry?

A: I hope to finish as soon as possible.

Q: Why did UMC employees, including you, need to open an account at Xiamen Bank before signing the above-mentioned labor contract with JHICC?

D-0000240

A: I don't know. It was CHEN Cheng-kun who asked us to open an account with Xiamen Bank before or after we signed the contract. LI Fu-che, KUO Feng-ming and me were flying to Xiamen together. After we arrived at Xiamen Airport, JHICC's staff took us to the Xiamen Bank to open an account and we immediately returned to Taiwan by plane after the account-opening.

Q: Did LI Fu-che, KUO Feng-ming and you meet the director of JHICC?

A: Yes, JHICC employees took us to open the account and after that, we had dinner together. At the dinner, there was a Taiwanese director of JHICC, WU Kun-Jung, who was at present.

Q: Did WU Kun-Jung or other JHICC employees talk about the development of a storage plan by UMC with LI Fu-che, KUO Feng-ming and you?

A: No, we were just having dinner at the time.

Q: When did Wang Yong-ming know that he can also sign a contract with JHICC and receive a project bonus of about NTD 1.5 million per year after he joined UMC?

A: I remember that Wang Yong-ming got to know it about 1 month before I signed a labor contract with JHICC.

D-0000241

Q: (Reminder: the No.A-6 article seized on February 7, 2017. The name of the seized article: a dialogue conducted via LINE communication software extracted from Wang Yong-ming's mobile phone) Wang Yong-ming said to you on August 25, 2016: "Today big S said we had to sign a contract of four years to get the extra bonus from China. Considering my current situation, I really don't know if I can hold it for four years." "The boss said that Rong sir has recommended me..."Was the dialogue regarding Wang Yong-ming's upcoming signing with JHICC? What are the details?

A: (After check) Yes, Big S and Boss refer to CHEN Cheng-kun, and it was CHEN Cheng-kun who talked with Wang Yong-ming about issues related to JHICC's employment contract; Mr. Rong is Rong Le-tien, and it was Rong Le-tien who recommended Wang Yong-ming to serve as the department manager from the original position of division leader.

Q: At 4:40, now, you request for a rest. We now suspend the inquiry. Are these understood?

A: Understood.

Q: At 4:50, now, you have taken a rest, and we will continue. Are these understood?

A: Understood.

Q: According to the dialogue via the LINE communication software extracted from Wang Yong-ming's mobile phone, Wang Yong-ming said to you on March 22, 2016: "It's okay! It's similar to the current salary." "Does UMC give us a bonus in the salary?" "Sandy only told me the number," and you said: "There should be incentive bonuses if we can realize it." What are the details?

A: Wang Yong-ming discussed with me about his salary after he works in UMC. Excluding dividends, the salary offered by UMC was similar to the salary offer to him by Micron. In addition, I mentioned with Wang Yong-ming that CHEN Cheng-kun was fighting for an incentive bonus, which would be granted if the DRAM products could be successfully made.

Q: As you mentioned, CHEN Cheng-kun was fighting for an additional incentive bonus. Does this bonus relate to your employment contract with JHICC?

A: At that time, CHEN Cheng-kun wanted to motivate the R&D personnel who would participate in the memory plan. Therefore, he proposed the idea of providing an extra bonus after successfully producing the DRAM products. Later, CHEN Cheng-kun won an opportunity to sign employment contract with JHICC. I think they are different things, because the incentive bonus has not been determined yet.

Q: In PM2 you belong to, what is the division of labor between the integration department 1 and the integration department 2? Who is the department manager of the latter?

A: We divided the manufacturing process of UMC's R&D DRAM F32 into 6 segments. The integration department 1 is responsible for the No. 1, 4, and 5 segments, and the integration department 2 is responsible for the No.2, 3, and 6 segments. In addition, there is a division in the integration department 2 that is responsible for coordinating the tap-out issues as well as the design rule of the DRAM logic circuit. The manager of integration department 2 is WEI Ming-te.

Q: It is 5:20 at present. Our staff suspend recording for replacing the video disc, and will continue at 5:22. Are these understood?

D-0000243

A: Understood.

Q: What are the respective meanings of layout and design rule? Is there any difference between the two?

A: Layout is the top view of the entire DRAM product, that is, the product plan from the top down, while the design rule is the layout design specification of the DRAM logic circuit. At UMC, the division responsible for the tapeout and design rule under the integration department 2 coordinated with the outsourced IC design manufacturer. The original principle should be that UMC set the rule according to its own capabilities, such as the allowable range for the maximum or minimum distance between the two wires. Then, IC design manufacturers design the circuit layout according to the rule (but now it may be that the IC design manufacturer requires us to do the required rules based on the existing design layout), then UMC combines the circuit layout with DRAM's memory cell to create the top view of the product, namely, the complete layout.

Q: According to Wang Yong-ming's confession during the interrogation by the prosecutor on February 8, 2016: "He (Rong Le-tien) is my supervisor. During our discussions, he asked me if I had the specifications of Micron. As he was the person interviewing me, he knew that I was coming from Micron. He hoped that I could offer some assistance to help improve the scope of the entire DRAM design specification of UMC F32." "If I didn't download the file, my modification may not be that perfect." That means Rong Le-tien instructed Wang Yong-ming to assist in the DRAM application specification of UMC F32 according to the business secrets of Micron. If Wang Yong-ming did not download the documents from Micron, he would not be able to make satisfactory revisions of the design specifications of UMC. Have you ever discussed the related matters with Wang Yong-ming and Rong Letian?

D-0000244

A: Wang Yong-ming once complained to me that Rong Le-tien asked him to do some comparisons between the design rules of Micron and UMC, but I didn't know the details. Also, I didn't know if Wang Yong-ming had helped Rong Le-tien do so. I think WEI Ming-te's team has the ability to finish the work without referring to the design rule of Micron.

Q: Was it because Wang Yong-ming assisted in the comparison of the design rules of Taiwan Micron and UMC as per the instructions of Mr. Rong Le-tien that Rong Le-tien recommended Wang Yong-ming to serve as the department manager from the original post of division leader? Or was it because of the same reason that Wang Yong-ming signed an employment contract with JHICC and received the project bonus paid by JHICC?

A: I don't think so, because the design rule is not the business that Wang Yong-ming was responsible for, and the reason why he was promoted to the department manager from the original post was that he was outstanding in his core business. As for the employment contract with JHICC, it was arranged by CHEN Cheng-kun, and not only Wang Yong-ming signed the employment contract. However, I am not sure whether or not Wang Yong-ming finally arranged the signing of the contract.

Q: We would like to confirm with you again that whether the business information of Micron stored in the portable hard disk that was provided by you to the office for seizure and the USB flash drive seized by the prosecutor was copied and brought out of Micron after you signed the employment contract and the confidential and intellectual property contract with Micron on February 14, 2014.

A: Before and after signing the employment contract with Micron, I always copied data of Micron to the portable hard disk and USB flash drive.

Q: Among the business secrets of Micron as mentioned in this investigation record, which was copied and taken away after you signed the contract on February 14, 2014?

A: I am sure that the information that was copied and taken away after I signed a contract with Micron on February 14, 2014 mainly included the processing-related conference materials of the aforementioned Micron DRAM 1X Nano, and the introduction of yield of DRAM 20nm, and the files related to manufacturing process and stored in the portable hard drive and USB flash drive. Most of the other data was copied before that day.

Q: It is 7:10 now. We suspend the inquiry and allow you to take a rest. Are these understood?

A: Understood.

Q: It is 7:45, now. You have taken a rest and we will continue. Are these understood?

A: Understood.

D-0000246

Q: Do you agree that the staff of the Investigation Office log in to your personal email address at jengting.tw@yahoo.com.tw and jengting.tw@gmai1.com to download the information?

A: Yes, the passwords of both email addresses are "jthobb3317". Please input the account name and password to download information.

Q: It is 8:29, now. The Investigation Office suspends the inquiry for you to take a rest and meals. Are these understood?

A: Understood.

Q: It is 9:15, now. You have taken a rest and finished your meal; we will continue. Are these understood?

Q: Why cannot we log in to your email address at jengting.tw@yahoo.com.tw with the aforementioned account password?

A: As yahoo's mailbox now requires two-stage authentication. I used to log in with my mobile phone. I haven't used a laptop to log in it for a long time. Your staff can also use my mobile phone that was detained today to log in.

Q: On February 13, 2017, CHEN Yi-ling inspected the portable hard disk that you took the initiative to deliver to the Investigation office when he was inquired

D-0000247

thereby. CHEN Yi-ling said: "The folders under the D data of the potable hard disk named 3DI, BKE, F16data, F23 1xnm110s, F28 20m, F28 20nm100s, F32 25nm, F32 25nm90s, F38 30nm, F45 40nm, F45 40nm2g3c, F54, F63, F68, F72 and so on are internal confidential information of Micron, which may not be disclosed to customers or competitors without the permission of Micron. These data are copied directly from Micron, and even the file names are exactly the same without any change." "Folders named F23 1xnm110s, F28 20nm, F28 20nm100s, F32 25nm, F32 25nm90s and so on are with regard to products that Micron is currently manufacturing.", "the three documents of Flow\dram_110_series_(1xnm)_traveler_(z11a)-2015 Jan.pdf, dram_comparison_workshop_100-110_series.pdf and iRDL Intro Feb25 2015.pptx under the F23 1xnm110s folder are 1X nano (refer to 10 nm to 20 Nano) process technology; The documents of DRAM_100_series_(20nm)_trave1er_(v00h)150730.pdf and F11 data\F11 transfer Doc\TRD\Etch\F15_F11_DRAM_DE_AMAT eMax_CUOA102_TRD.xlsx under the F28 20nm100s folder are technical information related to 20nm process; the documents of 2E0F (mobile LP3)\flow\Fab15 25nm 4G3D&4GLP3 Process Flow_20131206.xlsx and 4G3D (V90B) &2G3F\flow\25nm Process Flow Rev.02.pdf under the F32 25nm90s folder are technical information about 25 nano process technology.

D-0000248

These data include more than a thousand production processes for DRAM products, various process parameters, as well as technical generations for different products. These materials were Micron's achievements over the past 10 years and were Micron's important business secrets. If competitors obtain such data, they can speed up the process of producing and launching the DRAM products." "Under F16 data, the PLM folder contains schedule data for all products that Micron expects to produce in the future, and the MPUP folder contains the mass production plans for all products of Micron from the end of 2013 to the end of December 2016. Their disclosure will allow competitors to know about Micron's mass production products, and then determine their own operating strategy, so these data is definitely the business secrets of Micron." Do you have any opinion on CHEN Yi-ling's statement?

A: Regarding the statements of CHEN Yi-ling, I disagree with the viewpoint about the mass production plan of Micron in the PLM folder under F16 data, because the validity of the data was from the end of 2013 to the end of 2016, which was outdated. In addition, on one hand, Micron always announced the generation transfer plan on its planned mass production scheme, and on the other hand, the actual execution was often different with the plan. Therefore, CHEN Yi-ling's statement that these plans, if known by competitors, will determine their operational strategy needs to be investigated furthermore. I basically agree with the other parts he said, but I think it should be handed over to a third-party impartial unit to identify which data are the business secrets of Micron.

D-0000249

Q: CHEN Yi-ling said after checking the paper documents that you handed over to HUANG Shu-han before our staff searched on February 7, 2017, which was then handed by HUANG Shu-han to the prosecutor for inspection: "The No.2 process integration ABC (F68) is Rexchip's 68nm process data, and if this data is provided to some low-end DRAM manufacturers in the mainland, they can be engaged in the production of low-end DRAM products; the No. 3 PROD GROUP: 2GDDR3 04C file include data for 40 nm process; the No.4 file is the process data of 72 nm; the data of files from No. 5 to No. 14 were process data of different DRAM products, all of which were internal confidential documents of Micron; one document in the folder numbered 15 with the title of ELPIDA ECD-DPB-1111 include technical data of Micron and also the exposure data of the process of DRAM products. The aforementioned process materials are the business secrets of Micron. "Do you have any opinion on this statement?

A: I don't think CHEN Yi-ling's statements were completely correct. As I mentioned above, among paper files numbered 3, documents remarked with 4, 5 and 7 were the manufacturing process data obtained during my work in Powerchip, which was not owned by Micron; the paperwork remarked with 2 was indeed the training materials for newcomers regarding Powerchip's nano process technology. However, it was only CHEN Yi-ling's personal opinion that the provision of the materials to low-end DMM manufacturers in mainland China would make those plants being able to producing low-end DRAM products. I don't agree with such opinion, as the generations were too backward and it was not cost-effective; the document remarked with 9 is not mine; those remarked with 6, 8, and 10 to 14

D-0000250

are all from Micron. Among them, those remarked with 6, 10, 11, 12, and 14 are the secret data of Micron, but the volume remarked with 8 contains three documents, among which one document was publicly available on the Internet, and the other two were the business secrets of Micron. I have no opposite opinions on these statements. However, as to whether the document remarked with 13 was business secret, I think there was still a dispute and should be further determined by an impartial unit. The ELPIDA ECD-DPB-1111 file in the folder numbered 15 is the relevant information about Elpida's 72 nm technology transfer to Powerchip. It was not owned by Micron and there was also a mark of PSC on the document, which was the abbreviation for Powerchip.

Q: (criminal summon issued by Taiwan Taichung District Prosecutors Office is served) Are you willing to be accompanied by our staff to accept the prosecutor's second interrogation?

A: Yes.

Q: Is there any additional comments?

A: The data I copied and brought out from Micron was only used for personal research and reference purposes. In addition, UMC's memory plan finally adopted the technical track of Samsung, instead of that of Micron. Therefore, before your staff contacted and interviewed me, I always thought that as long as I did not use the information of Micron that I brought out, there would be no legal problems, but now I know that it will be illegal for me to even possess the business secrets. I hope that the prosecution faculty can consider the fact that I am not knowingly guilty and allow me to be lightly sentenced. In addition, I would like to emphasize that before 2015, Micron did not prohibit or restrict employees from using USB flash drives, cloud drives or emails to copy, download or forward business files, and Micron even encouraged employees to take files home to work.

Q: Are the above statements true?
A: All of them are true.

The above transcripts totaled 20 pages and were completed at 11:40 on February 15, 2017. After being confirmed by the parties concerned, they signed their names and attached fingerprints thereon:
The interrogated:
Defender:
The interrogator:
Note taker:

D-0000252

[Page blank in source]

D–0000253