STEPHANIE M. HINDS (CABN 154284)
Acting United States Attorney

TOM COLTHURST (CABN 99493)
Chief, Criminal Division

LAURA VARTAIN HORN (CABN 258485)
NICHOLAS WALSH (CABN 314290)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    Laura.Vartain@usdoj.gov
    Nicholas.Walsh@usdoj.gov

NICHOLAS O. HUNTER (DCBN 1022355)
STEPHEN MARZEN (NYBN 2007094)
Trial Attorneys, National Security Division

    950 Pennsylvania Ave., NW
    Washington, DC 20530
    Tel: (202) 353-3434
    Fax: (202) 233-2146
    Nicholas.Hunter@usdoj.gov
    Stephen.Marzen@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>FUJIAN JINHUA INTEGRATED CIRCUIT CO., LTD,<br><br>    Defendant. | CASE NO. 18-CR-00465 MMC<br><br>UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION IN LIMINE NO. 6 TO EXCLUDE HEARSAY STATEMENTS OF PURPORTED CO-CONSPIRATORS AND PURPORTED EMPLOYEES<br><br>The Honorable Maxine M. Chesney<br>Pretrial Conf: January 18, 2022, at 10:00 am<br>Courtroom 7, 19th Floor |

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................................1

BACKGROUND .................................................................................................................................1

    I.     The Statements at Issue...............................................................................................1

    II.    The Conspiracy Evidence ..........................................................................................2

           A.    UMC and Jinhua Engaged in a Common Plan to Develop DRAM Under the Name "Project M"..................................................................2

           B.    Key Members of Project M Engaged in a Criminal Conspiracy to Possess Trade Secrets Stolen from Micron to Develop a DRAM Manufacturing Process..........................................................................3

           C.    Stephen Chen Operated Jinhua ......................................................................4

           D.    J.T. Ho Was an Employee and / or Agent of Jinhua........................................5

ARGUMENT .......................................................................................................................................6

    I.     Statements by UMC Employees about the DRAM Project will be Admissible as Co-Conspirator Statements......................................................................6

    II.    Statements by UMC Employees about the DRAM Project will be Admissible as Employee/Agent Statements Under Fed. R. Evid. 801(d)(2)(D) .....................9

CONCLUSION....................................................................................................................................9

**INTRODUCTION**

The Court should deny Jinhua's motion to categorically exclude statements the United States noticed as co-conspirator or employee/agent statements and defer the issue until trial. The purpose of the deferral is for the Court to hear evidence at trial of the conspiracy, defendant's role in it, and particular individual's agent/employment status and then—prior to submission of any co-conspirator or agent statements—determine whether statements are admissible under Fed. R. Evid. 801(d)(2)(D) or (E).

Nonetheless, to aid in furthering the Court's assessment when the issue is ripe, the United States provides an overarching discussion of relevant fact and law below.

**BACKGROUND**

**I.   The Statements at Issue**

On November 1, 2021, the United States noticed statements that it might seek to introduce pursuant to Fed. R. Evid. 801(d)(2)(E), and on other grounds. Jinhua has moved to exclude them broadly. Certain of the statements are not addressed here, because the United States filed a motion *in limine* to admit them under Fed. R. Evid. 801(d)(2)(D). *See* Dkt. 236. For purposes of this Opposition, the United States is addressing the following categories of noticed statements, about which it may seek admission at trial.

Category one: LINE chats (a messaging software program) between Kenny Wang and J.T. Ho. Here, the declarants are the named defendants Wang and Ho. In their LINE chats, Wang and Ho discuss, among other things, Project M, use of laptops at UMC, Stephen Chen, Wang's decision to leave Micron, and DRAM technical parameters.

Category two: documents, including emails related to Project M and sent or authored by any director, employee, contractor, consultants or agent of UMC or Jinhua. Here, the United States noticed specific declarants comprising persons working on the development of DRAM on behalf of UMC and/or Jinhua but did not notice specific statements due to the large volume of email correspondence on Project M. The vast majority of the email correspondence are routine business emails and are admissible under numerous grounds, including agent statements under Fed. R. Evid. 801(d)(2)(D), co-conspirator

statements under Fed. R. Evid. 801(d)(2)(E), and as business records under Rule 803(6). Moreover, much of the email correspondence will not be admissible for its truth and, therefore, is not hearsay.

Category three: Board of Directors' documents for Jinhua and UMC, as well as statements by the state-owned shareholders of Jinhua. These are primarily admissible in many instances as non-hearsay, and in others, as statements of the defendant, pursuant to Fed. R. Evid. 801(d)(2)(A), or under Fed. R. Evid. 801(d)(2)(D) and (E), as discussed further below.

## II. The Conspiracy Evidence

The evidence at trial will show that Stephen Chen, J.T. Ho, Neil Lee, and others conspired to develop DRAM process technology with trade secrets stolen from Micron and possessed by them. Each of these individuals worked on behalf of both UMC and Jinhua.

### A. UMC and Jinhua Engaged in a Common Plan to Develop DRAM Under the Name "Project M"

As described in the United States' Motion *in Limine* Number 1, UMC and Jinhua engaged in a joint development of DRAM technology. *See* Dkt. 236. Pursuant to their Technology Cooperation Agreement ("TCA"), UMC and Jinhua agreed to perform research and development related to DRAM process technology cooperatively, with the ultimate goal of "transferring" that technology to Jinhua for mass production of DRAM in mainland China. *See id.* at 4-6 (describing terms of the TCA); Dkt. 236-3 (Ex. C: Technology Cooperation Agreement). UMC and Jinhua agreed to jointly own the technology developed by Project M.

UMC and Jinhua worked toward that goal for over two years as a going concern, until the Department of Commerce embargoed Jinhua. UMC completed its first "transfer" of technology to Jinhua in September 2018. UMC records reflect that over 300 UMC employees worked on the project in 2017. Records obtained from UMC also reflect that Jinhua employed roughly 50 dedicated employees (i.e., employees not also employed by UMC) at the beginning of 2017. Since Jinhua's sole purpose was to mass produce DRAM for Project M, each of its employees was necessarily part of Project M.

UNITED STATES' OPP.
TO DEF.'S MOT. IN LIMINE NO. 6
18-CR-00465 MMC                         2

### B. Key Members of Project M Engaged in a Criminal Conspiracy to Possess Trade Secrets Stolen from Micron to Develop a DRAM Manufacturing Process

At trial, the evidence will show multiple individuals' possession of Micron's trade secrets and use those trade secrets to develop DRAM for Project M. Significant evidence of that agreement arises from the proliferation of trade secrets across devices seized at UMC and owned by persons supervised by Stephen Chen. One of those persons—J.T. Ho—was also employed by Jinhua beginning in mid-2016.

At trial, the United States will show that in or around December 2015, Stephen Chen, J.T. Ho, Neil Lee, and other key members of Project M met over a period of weeks to "create" a manufacturing process flow for DRAM. One of the participants in that meeting kept day-by-day meeting minutes. Those meeting minutes included exact copies of multiple versions of Micron's trade-secret process flow for manufacturing DRAM. The United States DRAM process expert—Dr. Thomas Dyer—analyzed the meeting minutes and other contemporaneous documents to determine how Project M engineers developed DRAM. He found that Project M started with Micron's trade-secret manufacturing process and attempted to improve upon it or otherwise alter it to work with manufacturing tools that UMC already had. They did not develop a new manufacturing process. Such an effort would have taken an enormous investment of people, money, and time, as opposed to a handful of people in a UMC conference room for a couple weeks. *See* Dyer Report at 20 (Jinhua MIL No. 1, Ex. A) (Dkt 243-2).

In addition to the meeting minutes with an exact copy of Micron's process flow, the United States has email communications describing the lead-up to the meeting, what the participants expected to accomplish at the meeting, the measures they took to avoid creating a record of their Micron copying, and the measures they took to create a false record of an independent development.

The evidence will prove that Stephen Chen had direct knowledge of his co-conspirators possession and use of Micron's trade secrets. In late 2015, UMC's information technology department provided Chen with notice that his only two direct reports at the time—J.T. Ho and Neil Lee—were using USB devices to access Micron files immediately after they began work at UMC. Chen responded

to that notice by approving two off-network, USB-enabled laptops for Ho and Lee to use to continue accessing Micron's trade secrets, but without detection or further logging by UMC's information technology department. The evidence will show that other UMC employees, including Chen himself, used the secret laptops.

The evidence will show that the conspiracy to possess and utilize Micron's trade secrets continued throughout the Project M development. UMC hired defendant Kenny Wang in April 2016. The evidence shows that Wang copied DRAM design rules he stole from Micron for Project M's design rule. He did that based on his perception that a Project M Manager named L.T. Rong asked him to use information Wang had from Micron. Forensic evidence from digital devices seized in Taiwan shows that both J.T. Ho and Kenny Wang frequently accessed Micron's trade secrets up until the time Taiwan law enforcement seized their storage devices. Forensic computer evidence shows that J.T. Ho accessed Micron's trade secrets first while he was solely a UMC employee and also after he signed a labor contract with Jinhua and formally became a joint employee of both UMC and Jinhua. As discussed in the United States' motion *in limine* No. 1, Stephen Chen and another UMC employee, Sandy Kuo, worked with Jinhua to develop the joint employment arrangements.

### C.   Stephen Chen Operated Jinhua

Stephen Chen worked to build Jinhua from the ground up. UMC announced that Chen would be the chief executive of Jinhua at the outset of the project. The first thing a brand-new high-technology business needs is experienced people. The evidence will show that Chen was responsible for hiring engineers and other talent at Jinhua. Among many other hires, he recruited and hired Jinhua's Chief Operating Officer—Albert Wu—the highest ranking and highest paid member on a Jinhua employee roster circulated in January 2017. Chen attended a recruiting fair for Jinhua in October 2016 and spoke on behalf of Jinhua. Chen visited DRAM tool vendors in the United States in the same month and encouraged them to do business with Jinhua, and held himself out as Jinhua's leader. Chen attended Jinhua board meetings as a supervisory member. Chen reviewed and approved even the most mundane aspects of Jinhua's affairs having nothing to do with the manufacturing-process technology UMC

worked on.  The evidence will therefore show that Chen was a *de facto* officer of Jinhua from the moment it came into existence in or around February 2016.

The evidence disproves Jinhua's repeated assertion that "Stephen Chen did not even arguably become an employee of Jinhua until February 2017." Jinhua Mot. at 16.  Jinhua's own board documents reveal that Chen was formally the Chief Executive Officer of Jinhua as early as December 2016.  In December 2016, for example, Chen formally delegated authority over certain—but not all—executive decisions to Albert Wu.  Chen could not delegate authority he did not possess.

### D.  J.T. Ho Was an Employee and / or Agent of Jinhua

J.T. Ho was one of the primary co-conspirators in this case.  He was Stephen Chen's first hire to UMC.  He brought a tremendous volume of Micron's trade secrets to UMC on his digital devices.  He accessed those trade secrets in December 2015—when engineers met to "create" the Project M process flow—and throughout his time working on Project M (at least until Taiwan authorities seized his devices).  He admitted that he had Micron's trade secrets, that he accessed them while working for Project M, and that he used the secret laptop authorized by Chen to do so.

Like a number of other co-conspirators, J.T. Ho eventually became a joint employee of UMC and Jinhua.  At the encouragement of Chen, he executed a "labor contract" that made him a Jinhua employee.  Pursuant to the contract, Ho became the "Director of Technological Research and Development" at Jinhua for a period of five years, with a primary work location of Tainan, Taiwan. Jinhua agreed to pay him an annual salary of RMB 450,000 yuan with an additional bonus of RMB 50,000 yuan.  Jinhua required J.T. Ho to "regularly report to [Jinhua] via email, written files, and other forms on the work situation" and that his "quality of service . . . shall conform to the assessment requirements of [Jinhua] and United Microelectronics Corporation."  The contract acknowledged J.T. Ho's unique status as a joint employee of UMC and Jinhua, stating  "[Jinhua] is aware and agrees that . . . [J.T. Ho] can simultaneously hold a position and received a salary from Taiwan United Microelectronics Corporation; however, [J.T. Ho's] employment at the above organization shall not

influence [J.T. Ho's] completion of work tasks for [Jinhua]." The contract referred to J.T. Ho as an "employee," and references rules and regulations in a "legally valid employee handbook."

Jinhua's Human Resources Division Manager, Jeff You, all but admitted J.T. Ho was a Jinhua employee when Taiwan prosecutors interrogated him. Mr. You described a purported distinction between UMC employees who signed "labor contracts" with Jinhua and those who signed "consultant agreements." According to Mr. You, "those who signed labor contracts were formal employees of Jinhua Co., while those who signed consultant agreements just served in consultant positions at Jinhua Co." You apparently thought J.T. Ho had signed a "consultant agreement." But the face of the document shows otherwise. J.T. Ho signed a "labor contract," that Jinhua's HR director acknowledged was for formal employees.[1]

**ARGUMENT**

**I.    Statements by UMC Employees about the DRAM Project will be Admissible as Co-Conspirator Statements**

Statements of a co-conspirator qualify as nonhearsay if they were made during and in furtherance of a conspiracy. Fed. R. Evid. 801(d)(2)(E).

In order to establish whether the declarants were members of a conspiracy, the Court applies a preponderance of the evidence test. *See United States v. Layton,* 855 F.2d 1388 (9th Cir. 1988); *United States v. AU Optronics Corp.*, 2012 WL 12036080 (N.D. Cal. Jan. 11, 2012). "In this Circuit, the prosecution need only show slight evidence connecting the defendant to the conspiracy, and this evidence may be circumstantial." *United States v. Mason*, 658 F.2d 1263, 1269 (9th Cir. 1981) (internal citation omitted); *see also United States v. Reed,* 575 F.3d 900, 924 (9th Cir. 2009).

Under Rule 104(a), the court is not bound by evidence rules (except privilege) in determining if evidence is admissible. The Court may consider the co-conspirator statements together with other evidence of the existence of a conspiracy to establish its existence. *See Bourjaily v. United States*, 483 U.S. 171 (1987) (co-conspirator statements can be probative of the existence of a conspiracy and the

---

[1] Regardless of whether J.T. Ho signed a "labor contract" or a "consultant agreement," he was an agent of Jinhua, as discussed at Dkt. 236.

UNITED STATES' OPP.
TO DEF.'S MOT. IN LIMINE NO. 6
18-CR-00465 MMC                                6

participation of the defendant in it); *United States v. Gordon*, 844 F.2d 1, 3 (9th Cir. 1988) (court weighs proof in addition to the co-conspirator statements to determine whether defendant knew and participate in the conspiracy).

Statements may be in furtherance of a conspiracy where they are in furtherance of a common enterprise that is "factually intertwined" with the charged conspiracy. *Layton*, 855 F.2d at 1398; *United States v. Everidge*, 488 F.2d 1, 32 (9th Cir. 1973) ("S. Rep. No 93-1277, 93d Cong., 2d Sess. 24 (1974), ("while the rule refers to a coconspirator, it is this committee's understanding that the rule is meant to carry forward the universally accepted doctrine that a joint venturer is considered as a coconspirator for the purposes of this rule even though no conspiracy has been charged."). Further, "the common enterprise or joint venture on which admission of a coventurer's statement is based need to be the same as the as the charged conspiracy, if any." *Layton,* 855 F.2d at 1398. *Id.* The joint venture does not need to be illicit. *Layton,* 855 F.2d at 1398; *see also United States v. Nelson*, 732 F.3d 504, 516 (5th Cir. 2013) ("A conspiracy may be shown 'merely by engaging in a joint plan . . . that was non-criminal in nature.").

In *Layton,* the Ninth Circuit explained the rationale for the rule that coconspirators statements are admissible as being based in the law of agency. *Id.* The Ninth Circuit recognized the same in *United States v. Fuentes*, 283 F.2d 537, 539-40 (9th Cir 1960). In *Layton*, the Ninth Circuit approved of and quoted from Judge Learned Hand's discussion of this point in *United States v. Olweiss*, 138 F.2d 798, 800 (2d Cir. 1943)

> The notion that the competency of the declarations of a confederate is confined to prosecutions for conspiracy has not the slightest basis; their admission does not depend upon the indictment, but is merely an incident of the general principle of agency that the acts of any agent, within the scope of his authority, are competent against his principal.

*Layton,* 855 at F.2d 1398.

Jinhua acts through its agents and employees, and here, the actions—and knowledge—of its agents establish Jinhua's role in the conspiracy in the ways discussed above. Critically, much of the evidence does not depend on any statements: for example, the seized devices show trade secrets

UNITED STATES' OPP.
TO DEF.'S MOT. IN LIMINE NO. 6
18-CR-00465 MMC                    7

possessed by multiple members of Project M, including J.T. Ho, who was a joint employee of UMC and Jinhua. *See* Dkt. 236.

The United States has not asked for a pretrial ruling from the Court about specific emails about Project M work between UMC employees or between UMC and Jinhua employees, because such emails are generally admissible for other reasons. In certain exhibits, and as the United States further hones the exhibits to be offered at trial, the United States may seek to admit the documents under Fed. R. Evid. 801(d)(2)(D) and/or (E), and it will not do that prior to asking the Court for permission to do so. *See e.g.*, *AU Optronics,* 2012 WL 12036080 at *1 (taking up co-conspirator statements prior to direct examination).

As background, the types of emails that the United States may seek to admit as co-conspirator statements include emails among UMC employees working on DRAM at UMC as early as November 2015. It will be permissible to do so, because the United States will show, through the evidence presented in the case that there was a conspiracy and that Jinhua joined the conspiracy by virtue of J.T. Ho and Stephen Chen. Once the conspiracy is established, the statements prior to the late joining conspirator are admissible. *See United States v. Anderson*, 532 F.2d 1218, 1230 (9th Cir. 1976); *United States v. Cerna*, Case No. 08-0730 WHA, 2011 WL 500229 at *8 (Feb. 9, 2011).

The nature of the emails will concern routine work in the course of DRAM development at UMC and its work under the Technology Cooperation Agreement, once that was signed.[2] This type of business communication furthering work on the project satisfies the Circuit's broad construction of conspiracy under *Layton*, because the declarants—all UMC employees working on the DRAM development and Technology Cooperation Agreement—were working on a common enterprise. Further, any communications the United States offers under this rule will be in furtherance because they will be made to advance the work of the joint venture. *See Layton*, 855 F.2d at 1398.

---

[2] Largely these emails should be admissible on other bases, including Fed. R. Evid. 803(6).

UNITED STATES' OPP.
TO DEF.'S MOT. IN LIMINE NO. 6
18-CR-00465 MMC                         8

## II. Statements by UMC Employees about the DRAM Project will be Admissible as Employee/Agent Statements Under Fed. R. Evid. 801(d)(2)(D)

The Court should also defer ruling whether particular statements are made by employees or agents of Jinhua under Fed. R. Evid. 801(d)(2)(D). As with the other statements, the United States will present evidence that individuals such as J.T. Ho and Stephen Chen were Jinhua's employees or agents. It will also present evidence establishing that UMC and Jinhua were part of a joint venture. Employees of either company working on Project M were employees of that joint venture, whose statements are admissible against Jinhua under Fed. R. Evid. 801(d)(2)(D).

## CONCLUSION

The Court should deny Jinhua's motion without prejudice and defer ruling unless and until specific statements are at issue at trial. Such an approach allows the Court the greatest amount of information available to make its adjudication about the admissibility of each particular statement offered.

Dated: December 22, 2021          Respectfully Submitted,

STEPHANIE M. HINDS
Acting United States Attorney


          /s/
LAURA VARTAIN HORN
NICHOLAS WALSH
Assistant United States Attorneys

NICHOLAS O. HUNTER
STEPHEN MARZEN
Trial Attorneys, National Security Division