# EXHIBIT C

**To Declaration of Matthew E. Sloan in support of Jinhua's MIL 6 [ECF 248]**

**UNREDACTED VERSION OF DOCUMENT**



TRANSLATION

]Technology Cooperation Agreement

This Technology Cooperation Agreement (hereinafter referred to as "the Agreement") is made by and between United Microelectronics Corporation, a company incorporated in accordance with laws of Taiwan with principal office located at No. 3, Lixing 2nd Rd., Hsinchu Science Park, Taiwan (hereinafter referred to as "Party A"), and Fujian Jinhua Integrated Circuit Co., Ltd., a company incorporated in accordance with laws of the People's Republic of China with principal office located in Jinjiang, Fujian (hereinafter referred to as "Party B"), on May 13, 2016 (hereinafter referred to as "Date of Execution").

Party A is leading in production and manufacturing of 12-inch semiconductor wafer and develops and owns many patent rights regarding semiconductor wafer products, trade secrets, circuit layout right for integrated circuit and other relevant intellectual property rights; at the moment, it has two running 12-inch semiconductor wafer plants and holds unique information, knowledge and methods for 12-inch semiconductor wafer plant.

Party B plans to establish two 12-inch dynamic random-access memory (DRAM) production lines in Jinjiang under Fujian of China and center on specific dynamic random-access memory (DRAM) products needed by local emerging market of China; products thereof are mainly applied to: Internet of Things, big data, cloud computing, intelligent terminals, wearable devices and the like, to firstly satisfy local customers of China.

Both parties will provide their own global resources in all respects to jointly conduct relevant technology development for 32/32S nanometer dynamic random-access memory (DRAM) process; and R&D cooperation will be carried out in a designated area of Fab12A of Party A in Tainan Science Park ("Tainan R&D base"). After Party B's production lines are established, technology results jointly researched and developed by both parties shall be fully transferred to Party B so that the premises in Jinjiang may realize mass production and Party B may continue to carry out subsequent R&D work based on existing technologies.

Thus, both parties hereby agree on the following clauses with regard to technology cooperation:

Article 1 Definition

1.1 Technologies to be jointly developed based on the Agreement are: <u>process technologies, design rules and the like for wafer of dynamic random-access memory (DRAM) arising from development of relevant process technologies of specially micro 32 nanometer (feature size, F value) dynamic random-access memory (DRAM)</u> (hereinafter referred to as "32 nanometer") and <u>32S nanometer dynamic random-access memory (DRAM)</u> (hereinafter referred to as "32S nanometer", and with 32 nanometer, collectively called as "32/32S nanometer"). See Attachment 1 for details of important parameters of the said 32/32S nanometer technologies and see Attachment 2 for details of estimated technology development time.

1.2 Intellectual property rights herein refer to: patent rights, business secrets, circuit layout rights for integrated circuit and other relevant intellectual property rights jointly obtained by both parties for joint technology development herein in the world.

Article 2 Technology Cooperation Scope

2.1 Unless Party A otherwise designates a time schedule, Party B shall purchase special R&D equipment and auxiliary facilities (hereinafter collectively called as "Special R&D Equipment") and assume additional charges thereof such as freight and installation cost, total budget amounts to about USD 300 million (tax included), and Party B shall deliver the same to the Tainan R&D base and finish installation prior to October 31 of 2016 for joint development. In case of equipment installation, Party A shall offer assistance. List of Special R&D Equipment and detailed installation time schedule shall be otherwise provided by Party A.

2.2 To ensure that wafer design of dynamic random-access memory (DRAM) is completely integrated with relevant manufacturing technologies, both parties will jointly select an appropriate design service company as consultant to finish wafer design for dynamic random-access memory (DRAM) within the shortest period to meet the technology development time. Party B is responsible for cost of wafer design (including circuit design of testing devices and products) and photomask of dynamic random-access memory (DRAM).

2.3 Within five years from Date of Execution of the Agreement or prior to technology cooperation completion (whichever is earlier), Party A shall at least report work results and progress of the technology cooperation to personnel designated by Party B in writing every two months and conduct phase summary reporting every six months, and relevant information and materials shall be copied and retained by Party B.

2.4 Within Five years from Date of Execution of the Agreement, Party A shall use Special R&D Equipment to develop jointly developed technologies herein; and jointly developed technologies herein arising from the development or Party A's provision of the technology service to Party B shall be jointly owned by both parties, and both parties have right to use the same; Party B shall be responsible for application, registration, maintenance and the like of relevant intellectual property rights to ensure both parties jointly own such intellectual property rights. In the future, in case of authorization, it shall still be jointly conducted by both parties in accordance with laws.

2.5 When Five years from Date of Execution of the Agreement expires or both parties otherwise conclude a written agreement, Party A shall cooperate with Party B and deliver Special R&D Equipment to carrier designated by Party B, and Party B shall assume relevant transport cost.

2.6 To assist Party B to realize mass production smoothly, Party A will recommend a consultancy company to provide necessary information consultancy and training services for production line establishment, planning, equipment, management and the like.

2.7 Where technologies jointly developed by both parties meet conditions in Item 7 of Appendix 1 and Item 6 of Appendix 2, technologies for 32/32S nanometer dynamic random-access memory (DRAM) products have been successfully developed. Party A shall support and help Party B gradually improve product yield thereof to 80% of the mass production level in the industry (for example: mass production level in the industry of yield is 85%, Party A shall help increase the yield to 85%*80% = 68%).

Article 3 Disclosure and Confidentiality Obligations of Technology Information and

3.1 After the Agreement is executed, Party A shall provide to Party B technical documents, parameters, data and the like regarding technologies jointly developed based on the Agreement and/or intellectual property rights in the Agreement in light of the time schedule determined by both parties, and provide Party B with all necessary technology consultancy and professional manpower for manufacturing wafer of dynamic random-access memory (DRAM) in accordance with the Agreement.

3.2 Confidential information referred to herein includes all technology information and confidential materials generated during joint development; without written consent of both parties, any party may not disclose, license, authorize, transfer to related parties thereof and/or any third-party or allow any related party and/or any third-party to have access to and/or use information and materials hereunder. Each party shall ensure that it will lay down corresponding rules and policies and inform directors, senior employees, technology personnel and other employees thereof (including related parties thereof) to strictly comply with confidentiality obligation specified in this clause.

Article 4 Fund and Tax & Dues of R&D Cooperation

4.1 <u>Fund of R&D cooperation herein totals USD Four Hundred Million (USD 400,000,000)</u>, USD Two Hundred Million (USD 200,000,000) for 32 nanometer and USD Two Hundred Million (USD 200,000,000) for 32S nanometer, which shall be paid to an account designated by Party A by Party B in installments based on the time schedule in Appendixes 1 & 2, and both parties will otherwise negotiate and define such progress details as technology cooperation and fund under the Agreement.

4.2 Amounts above paid by Party B are tax/dues-included; if there are other taxes and dues, they shall be respectively assumed by both parties based on relevant local regulations. If Party B withholds and pay any tax of Party A in accordance with laws, Party B shall provide Party A with relevant withholding/payment documents and assistance to help Party A offset the payment or apply for drawback.

4.3 In total, Party A provides a personnel number and service period scope of 60 people*month at most for 32 nanometer and 32S nanometer (for example: ten people and respective six months, specific number of people and period shall be decided by Party A). Within this scope, Party A will assign personnel to perform obligations herein at Party B's site, and relevant salaries, travel cost, additional pay, boarding and lodging cost, transport fee and the like shall be borne by Party A. For the exceeding part, Party B shall reimburse actual fees such as lodging cost and transport fees.

4.4 Prerequisite of payment: both parties agree that, Party B is only obliged to pay R&D fund based on the Agreement after Party B obtains performance compliance guarantee and definitely necessary approval of relevant competent governmental authority, and Party A needs to cooperate with Party B to provide relevant documents. If Party B needs to extend the payment period due to the approval procedures, Party A shall give understanding and cooperation, provided that, Party A is entitled to apply Article 8.1 to carry out relevant matters.

4.5 Party B will examine and accept technology results of Party A and specific examination and acceptance method shall be otherwise determined by both parties.

4.6 If necessary, Party B is allowed to engage a third-party institution to carry out special audit on use of R&D fund of Party B, and Party A shall, to the extent allowed by ordinances of Taiwan and approved by relevant competent authority, assist with the audit work.

Article 5 Guarantee

5.1 Based on the utmost good faith principle, Party A guarantees that it will fully provide relevant special technologies necessary for development cooperation hereunder it masters to the extent agreed by the Agreement and allowed by laws and regulations. Party A will not assume guaranty liability beyond the Agreement.

5.2 Any party shall follow the utmost good faith principle. If, during cooperation, it is found that technology risks obviously exist and are likely to lead to R&D failure in whole or in part, the other party shall be notified without delay and appropriate measures shall be taken to reduce loss of both parties, and both parties shall immediately consult with each other in good faith and deal with subsequent matters based on consensus reached during the consultation.

5.3 Where any part is aware that intellectual property rights herein are infringed by a third-party, it shall promptly notify the other party and consult with the other party for relevant solution.

Article 6 Improvements

6.1 Both parties shall also improve technologies jointly developed based on the Agreement and notify the other party of relevant improvement result in writing after the improvement is finished; and, all patent rights, business secrets, circuit layout rights for integrated circuit and other relevant intellectual property rights regarding such improvement result shall be jointly obtained by both parties. And, all patent rights, business secrets, layout rights for integrated circuit and other relevant intellectual property rights regarding results independently developed by Party B shall be owned by Party B.

Article 7 Authorization Period and Prerequisite

7.1 Effective term of the Agreement is in total 5 years from Date of Execution hereof.

7.2 Both parties shall notify the other party to extend the term of the Agreement within three months preceding expiry of the Agreement, and the same may be applied to periods following the extension.

7.3 Prerequisite: both parties agree that, Party A is only obliged to make performance based on the Agreement after Party A obtains all necessary approvals of relevant competent governmental authorities, and Party B needs to cooperate with Party A to provide relevant documents. If Party A's performance of obligations hereunder is suspended or delayed due to approval procedures of Taiwan and so on, both parties agree to accordingly postpone payment time of relevant fees.

Article 8 Breach and Termination

8.1 If Party B's payment of R&D cooperation fund under Article 5 is over 2 quarters in arrears, or Party B delays due to review of the Agreement on the part of relevant competent authority, or relevant competent authority of Party B revokes or terminates permit or approval obtained by Party B for the Agreement, in addition to exercising relevant rights based on Article 8.4 hereof, Party A is also allowed to suspend service referred to herein, which does not constitute breach of the Agreement.

8.2 If Party A is unable to finish 32 nanometer technology development within the period defined by Item 7 of Appendix 1 (including grace period) and based on 32 nanometer technology indicators listed in Attachment 1, Party A will provide relevant team and technology guarantee to use existing workshops and equipment to develop business, and specific content shall be otherwise negotiated and a supplementary agreement shall be signed by both parties, and both parties shall proceed based on such supplementary agreement to the extent approved by relevant competent authority in Taiwan after approval of relevant competent authority in Taiwan is obtained. If Party A is unable to finish 32S nanometer technology development within the period defined by Item 6 of Appendix 2 (including grace period) and based on 32S technology indicators listed in Attachment 1, Party A shall return Seventy percent (70%) of paid-in R&D cooperation fund for 32S nanometer technology. Party A and strategic partners hereof will not participate in re-allocation of returned R&D cooperation fund.

8.3 If Party B's delayed payment period exceeds 2 quarters, or permit or approval obtained by Party B for the Agreement is revoked or terminated, or Party B is unable to perform the Agreement due to occurrence of force majeure events such as act of God, both parties shall immediately consult with each other in good faith to the extent allowed by ordinances, and deal with subsequent matters based on legal consensus reached during the consultation, provided that, Party A only needs to return R&D cooperation fund collected based on the Agreement to Party B under conditions listed in Article 8.2.

8.4 If any party fails to perform any clause in the Agreement, and with written regular performance demand of the other party, still fails to make performance or correction, the other party may request damages and terminate the Agreement with a written notice.

8.5 If one party is insolvent, declared bankrupt, coordinate or dispose of business or main assets thereof with creditors thereof due to difficulty in settling liabilities, or treated with detention or seizure, so that performance of the Agreement is affected, the other party may notify such party in writing to immediately terminate the Agreement.

8.6 Prior to expiry of the term of the Agreement, both parties may always notify the other party in writing of its intention to terminate the Agreement in whole or in part, and with written consent of the other party, the Agreement will be terminated based on relevant termination agreement negotiated and approved in writing by both parties.

Article 9 Transfer and Amendments

9.1 The Agreement is binding on parties hereto, successors and transferees thereof.

9.2 Without prior written consent of both parties, rights and obligations of both parties hereunder may not be transferred to any third-party.

9. Without written consent of both parties, any party may not revise or supplement the Agreement at will.

Article 10 Waiver

10.1 If any party fails to exercise any right given by the Agreement, it does not constitute waiver of such right or prevent such party from exercising such right at any time.

10.2 Unless both parties hereto otherwise recognize in writing, waiver of part of rights specified by any clause in the Agreement does not constitute waiver of rights specified by the same clause or other clauses in the future.

Article 11 Governing Laws and Jurisdiction

11.1 Development cooperation of the Agreement involves respective most significant interests of both parties; thus, both parties agree to respect the most significant relationship provision of the other party, and any dispute or claim for reimbursement that arises from or is related to the Agreement shall be dealt with by an arbitration commission jointly selected by both parties through arbitration.

11.2 If any clause herein is invalid or regarded as invalid on the ground that it is in conflict with the most significant relationship provision of each party, both parties shall otherwise conclude an effective clause to replace the same, and such replacement clause shall be sufficient to represent true intention of both parties when they conclude the Agreement, and effect of the remaining clauses hereof will not be affected by such invalid clause.

Article 12 Entirety

12.1 The Agreement and relevant attachments hereto constitute the entire consensus of both parties regarding the matter agreed herein and supersede and replace all prior oral or written agreements.

12.2 The Agreement is an underlying agreement for cooperation between both parties, and for other matters not covered herein, both parties shall otherwise sign an agreement.

Article 13 The Agreement is made in sextuplicate; both parties respectively holds one copy, and the rest will be used for approval.


(The remainder is intentionally left blank.)

| | |
|---|---|
| Party A: United Microelectronics Corporation | Party B: Fujian Jinhua Integrated Circuit Co., Ltd. |
| Authorized Representative:   [signature] | Authorized Representative: [signature] |
| Date: 2016 | Date: [handwritten:] May 13, |
| [seal: illegible] | [seal: Fujian Jinhua Integrated Circuit Co., Ltd.] |

Attachment 1

Important Parameters of 32/32S Nanometer Technologies

| Process Technology | Cell | F Value (nm) | STI Pitch (nm) | Wordline Pitch (nm) | Bitline Pitch (nm) | Cylinder Pitch (nm) |
|---|---|---|---|---|---|---|
| 32 nm | 2x3, $6F^2$ | 32 | 64 | 52 | 80 | 156 |
| 32S nm | 2x3, $6F^2$ | 29 | 62 | 42 | 72 | 144 |

711
D-0000665

Attachment 2

## Estimated Technology Development Time

| | 2016 | | | | 2017 | | | | 2018 | | | | 2019 | | | | 2020 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 |
| 50 mn 32 nm | Execution | Provide a manufacturing equipment list | | RD equipment in place / Provide a manufacturing process | | Finish optical modification and lithographic blocks | Provide Design Manual/SPICE Model | | | Finish Good Electrical Die on Wafer, provide complete technology information | | Project company's chip yield/reliability reaches the success level for RD | | | | | | | | |
| | | USD 30mn | | USD 30mn | USD 30mn | | USD 20mn | | | USD 20mn | USD 20mn | | | | | | | | | |
| 32S nm | | | | | | | Provide a manufacturing equipment list | Provide a manufacturing process | | | Finish optical modification and lithographic blocks | | | Provide Design Manual/SPICE Model | | | Finish Good Electrical Die on Wafer, provide complete technology information | | Project company's chip yield/reliability reaches the success level for RD | |
| | | | | | | | USD40mn | USD40mn | | | USD 40mn | | | USD 30mn | | | USD30mn | | USD20mn | |

Appendix 1

Time Schedule for Payment of R&D Fund for 32 Nanometer Technology

|   | Terms of Payment | Temporarily Fixed Time (Note 1) | Amount (Unit: USD) | Time of Payment/Remarks |
|---|---|---|---|---|
| 1 | Both parties sign the Agreement | Q1, 2016 | 50,000,000 | To be paid in Q2, 2016 |
| 2 | Party A provides a list of manufacturing equipment for 32 nm | Q2, 2016 | 30,000,000 | To be paid within 90 days following the provision |
| 3 | Party A provides a manufacturing process for 32 nm | Q4, 2016 | 30,000,000 | To be paid within 90 days following the provision |
| 4 | Party A finishes optical modification and lithographic blocks | Q2, 2017 (Note) | 30,000,000 | To be paid within 90 days following the provision |
| 5 | Party A provides Design Manual/SPICE Model | Q3, 2017 (Note) | 20,000,000 | To be paid within 90 days following the provision |
| 6 | Party A finishes Good Electrical Die on Wafer and provides relevant technology information | Q2, 2018 (Note) | 20,000,000 | To be paid within 90 days following the provision |
| 7 | Party B's wafer yield and reliability for dynamic random-access memory (DRAM) reach the success level for R&D | Q4, 2018 (Note) | 20,000,000 | Party B produces 3 batches of wafer for dynamic random-access memory (DRAM), yield of each batch reaches 40%, and through 240 hours HTOL, it is to be paid within 90 days following the realization |
| Total | | | 200,000,000 | |

Note: Temporarily fixed time is preliminarily estimated by both parties on condition that Special R&D Equipment has been fully installed on October 31, 2016. If it is unable to fully install Special R&D Equipment on October 31 of 2016 for any reason, temporarily fixed time for Items 4-7 will be postponed to time starting from the moment when Special R&D Equipment is fully installed based on the Agreement (T), i.e. T+2 quarters, T+3 quarters, T+6 quarters and T+8 quarters. In principle, temporarily fixed times for Items 2-7 (including postponed temporarily fixed time) are respectively provided with one quarter grace period, but total grace period shall be subject to one year.

Appendix 2

Time Schedule for Payment of R&D Fund for 32S Nanometer Technology

|   | Terms of Payment | Temporarily Fixed Time (Note) | Amount (Unit: USD) | Time of Payment/Remarks |
|---|---|---|---|---|
| 1 | Party A provides a list of manufacturing equipment for 32S nm | Q4, 2017 | 40,000,000 | To be paid within 90 days following the provision |
| 2 | Party A provides a manufacturing process for 32S nm | Q1, 2018 | 40,000,000 | To be paid within 90 days following the provision |
| 3 | Party A finishes optical modification and lithographic blocks | Q4, 2018 | 40,000,000 | To be paid within 90 days following the provision |
| 4 | Party A provides Design Manual/SPICE Model | Q3, 2019 | 30,000,000 | To be paid within 90 days following the provision |
| 5 | Party A finishes Good Electrical Die on Wafer and provides relevant technology information | Q2, 2020 | 30,000,000 | To be paid within 90 days following the provision |
| 6 | Party B's wafer yield and reliability for dynamic random-access memory (DRAM) reach the success level for R&D | Q4, 2020 | 20,000,000 | Party B produces 3 batches of wafer for dynamic random-access memory (DRAM), yield of each batch reaches 40%, and through 240 hours HTOL, it is to be paid within 90 days following the realization |
| Total |  |  | 200,000,000 |  |

Note: Temporarily fixed time is preliminarily estimated by both parties on condition that Special R&D Equipment has been fully installed on October 31, 2016. If it is unable to fully install Special R&D Equipment on October 31 of 2016 for any reason, temporarily fixed time for Items 1-6 will be postponed to time starting from the moment when Special R&D Equipment is fully installed based on the Agreement (T), i.e. T+4 quarters, T+5 quarters, T+8 quarters, T+11 quarters, T+14 quarters and T+16 quarters. In principle, temporarily fixed times (including postponed temporarily fixed time) are respectively provided with one quarter grace period, but total grace period shall be subject to one year.

714
D-0000668

[Page Blank in Source]

D-0000669