**UNREDACTED VERSION OF JINHUA'S
OPPOSITION TO USA MIL 1 [ECF 274]**

JACK P. DICANIO (SBN 138782)
Jack.DiCanio@skadden.com
EMILY REITMEIER (SBN 305512)
Emily.Reitmeier@skadden.com
JAEWOOK (JERRY) LEE (SBN 333054)
Jerry.Lee@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
525 University Avenue
Palo Alto, California 94301
Telephone:     (650) 470-4500
Facsimile:     (650) 470-4570

MATTHEW E. SLOAN (SBN 165165)
Matthew.Sloan@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071-3144
Telephone:     (213) 687-5000
Facsimile:     (213) 687-5600

*Attorneys for Defendant*
FUJIAN JINHUA INTEGRATED CIRCUIT CO., LTD.

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                          Plaintiff,<br><br>          v.<br><br>UNITED MICROELECTRONICS CORPORATION, *et al.*,<br><br>                          Defendants. | CASE NO.: 3:18-cr-00465-MMC<br><br>**DEFENDANT FUJIAN JINHUA INTEGRATED CIRCUIT CO., LTD.'S OPPOSITION TO THE GOVERNMENT'S MOTION *IN LIMINE* NO. 1 TO ADMIT STATEMENTS OF AGENTS PURSUANT TO FEDERAL RULE OF EVIDENCE 801(d)(2)(D); DECLARATION OF MATTHEW E. SLOAN AND ATTACHED EXHIBITS**<br><br>Judge: The Honorable Maxine M. Chesney<br>Trial Date: February 14, 2022 |

1

## **TABLE OF CONTENTS**

TABLE OF CONTENTS..............................................................................................................i

TABLE OF AUTHORITIES .................................................................................................... iii

ARGUMENT AND AUTHORITIES .........................................................................................1

    I.        INTRODUCTION ...........................................................................................1

    II.       BACKGROUND ...............................................................................................2

          A.       JT Ho, Ray Guo, and Neil Lee...................................................5

                 1.       JT Ho..............................................................................5

                 2.       Ray Guo .........................................................................6

                 3.       Neil Lee .........................................................................7

          B.       Jennifer Wang .............................................................................8

          C.       Stephen Chen ..............................................................................8

    III.      ARGUMENT .....................................................................................................9

          A.       Statements of JT Ho, Neil Lee, and Ray Guo are Not Admissible under Rule 801(d)(2)(D). ..........................................................9

                 1.       JT Ho, Neil Lee, and Ray Guo Were Not Jinhua Employees at the Time of their Statements to the Taiwanese Authorities. ......10

                 2.       JT Ho was Not an Agent of Jinhua at the Time of His Statements ....................................................................12

                 3.       The Statements of Neil Lee, Ray Guo, and JT Ho Are Inadmissible Because They Do Not Concern Matters Within the Scope of the Individual's Alleged Relationship with Jinhua. ..........................................................................13

          B.       Statements of Jennifer Wang are Not Admissible under Rule 801(d)(2)(D) Because She is Not an Agent of Jinhua. ..............................14

                 1.       Ms. Wang was Never An Agent of Jinhua. ...................................15

                 2.       Ms. Wang was Not an Agent of Jinhua at the Time of Her Statements at Issue in this Motion. .................................15

          C.       Statements of Stephen Chen are Not Admissible under Rule 801(d)(2)(D)...............................................................................16

                 1.       Mr. Chen was Not an Agent for Jinhua Prior to February 2017.............................................................................16

2.    The Statements Are Inadmissible Because They Do Not Concern the Scope of Mr. Chen's Alleged Relationship with Jinhua. ........................................................................................... 17

D.    Statements by All UMC Employees Working on Project M Are Not Admissible Against Jinhua Under Rule 801(d)(2)(D). ............................. 18

E.    Statements of Que Liangwu, Chen Shiyan, Hero Lo, Xiao Xinhuang, and You Zhenfu are Not Admissible Under Fed. R. Evid. 801(d)(2)(D). ........................................................................................ 19

IV.    CONCLUSION .......................................................................................... 22

1

# <u>TABLE OF AUTHORITIES</u>

2

**CASES**

3

*Brulay v. United States*,
    383 F.2d 345 (9th Cir. 1967) ................................................................................. 18

4

*Crawford v. Washington*,
    541 U.S. 36 (2004)............................................................................................... 18

5

6

*Jones v. Royal Administration Services, Inc.*,
    887 F.3d 443 (9th Cir. 2018) ............................................................................... 11

7

*Mavrix Photographs, LLC v. Livejournal, Inc.*,
    873 F.3d 1045 (9th Cir. 2017) ............................................................................. 10

8

9

*Nekolny v. Painter*,
    653 F.2d 1164 (7th Cir. 1981) ............................................................................. 16

10

*United States v. Allen*,
    864 F.3d 63 (2d Cir. 2017)..............................................................................20-21

11

12

*United States v. Bonds*,
    608 F.3d 495 (9th Cir. 2010) ....................................................................... passim

13

*Weil v. Citizens Telecom Services Co.*,
    922 F.3d 993 (9th Cir. 2019) ............................................................................... 16

14

15

**RULES**

16

Fed. R. Evid. 801(d)(2)(D) .......................................................................................... passim

17

Fed. R. Evid. 804(b)(1)(B)........................................................................................... 12, 13

18

**OTHER AUTHORITIES**

19

Hsing Fa [Code of Criminal Procedure], art. 183 ............................................................ 2, 3

20

U.S.-Taiwan Mutual Legal Assistance Agreement, art. 9, para. 4 ...................................... 3

21

22

23

24

25

26

27

28

**JINHUA'S OPP. TO MOTION *IN LIMINE* NO. 1
RE: AGENT STATEMENTS**
               **CASE NO.: 3:18-cr-00465-MMC**

# ARGUMENT AND AUTHORITIES

## I.   INTRODUCTION

As explained in more detail in Jinhua's own motions in limine, the government's case against Jinhua is built on speculation and innuendo. *See, e.g.*, Jinhua Motion in Limine No. 6 (ECF No. 248) ("MIL No. 6"). The government asks the trier of fact to conclude that Jinhua conspired with United Microelectronics Corporation ("UMC") to steal and use alleged trade secrets purportedly stolen from Micron Technology, Inc. ("Micron") based on little more than evidence that (1) Jinhua entered into a technology cooperation agreement with UMC (a well-established and capable Taiwanese semi-conductor foundry) to develop new DRAM technology; (2) two *UMC* employees (Kenny Wang and JT Ho) brought alleged trade secrets with them when they left Micron and allegedly referenced some of those documents in their work *at UMC*; (3) at *UMC's* request, Jinhua supplemented the income of certain *UMC employees* (hired from Micron and several other DRAM companies in Taiwan, Korea and Japan) to help attract and retain engineers; and (4) Jinhua eventually hired a UMC employee, Stephen Chen, to be its president. The government has not identified a single email, text or other document or found a single witness who would testify (or provide evidence) that Jinhua knew that UMC employees had allegedly brought Micron documents from their former employer or allegedly looked at them in the early stages of the development process, much less that Jinhua conspired with UMC to misappropriate Micron's trade secrets as the government alleges.

Lacking any first hand evidence, the government has announced in its Motion *in Limine* No. 1 (ECF No. 236) (the "Motion"), that it intends to rely on several out-of-court statements at trial in an attempt to prove the existence of a conspiracy, including statements by purported employees or agents of Jinhua which were (1) provided to Taiwanese agents during an investigation by the Taiwan Ministry of Justice Investigation Bureau ("MJIB") or (2) made during depositions in a related civil matter, *Micron v. UMC et al.*, Case No. 3:17-cv-06932-MMC (N.D. Cal.). These statements are classic hearsay, but the government contends they are admissible under the "employee-agent" hearsay exclusion, Fed. R. Evid. 801(d)(2)(D). For the reasons set forth below, the government will not be able to show that this exclusion applies to either category of statement. In addition, there are significant questions regarding whether the statements taken during interrogations by the MJIB were

1  fully voluntary and taken with the same procedural safeguards that would be accorded to witnesses

2  and suspects in a U.S. criminal proceeding.  Accordingly, the government's Motion should be denied

3  and the government should be precluded from introducing these statements.

4  **II.     BACKGROUND**

5    **A.     Interrogation Records**

6     The government seeks to introduce into evidence statements made by a handful of Jinhua

7  employees and three UMC employees (JT Ho, Ray Guo, and Neil Lee) during interrogations by the

8  MJIB.  The government asserts that these "interviews" can be admitted as statements of agents or

9  employees.  The government states that these "Interrogation Records" were not custodial and that

10  they were preceded by advisements, including the right to remain silent and have an attorney present.

11  (Mot. at 1:26-2:2.)  The government thus implies that these were run-of-the-mill statements by

12  witnesses, protected by all the rights that exist under U.S. law, and that as a result, the "Interrogation

13  Records" should be admitted.  It is far from clear, however, whether any of the witnesses at issue

14  here had a "right" to have an attorney present under Taiwanese law.  To the contrary, though not

15  experts in Taiwanese law, Jinhua's counsel did not see anything in the Taiwan Code of Criminal

16  Procedure which provides witnesses (as opposed to an accused) with the right to an attorney in

17  interrogations such as these.  *See* Hsing Fa [Code of Criminal Procedure],

18  https://law.moj.gov.tw/ENG/LawClass/LawAll.aspx?pcode=C0010001.

19     Moreover, it is unclear whether these witnesses had a "right" to refuse to testify, akin to

20  witnesses' right to remain silent under the Fifth Amendment to the U.S. Constitution.  The

21  "Interrogation Records" reference an advisement being provided under Article 181 of the Code of

22  Criminal Procedure.  (*See, e.g.*, Ex. D to the Mot. at 1.)  While Article 181 states that a witness can

23  refuse to testify if it would subject him or her to criminal prosecution or punishment, Article 183

24  appears to limit the exercise of that right.  Article 183 states that: "A witness who refuses to testify

25  shall clearly state the reason for such refusal, provided that if one of the circumstances specified in

26  Article 181 exists, such witness may be ordered to make an affidavit in lieu of stating the reason.

27  Approval or disapproval of a refusal to testify shall be by order of a public prosecutor during the

28  stage of investigation or by the ruling of a presiding or commissioned judge during the stage of trial."

2

*See* Hsing Fa [Code of Criminal Procedure], art. 183, https://law.moj.gov.tw/ENG/LawClass/LawAll.aspx?pcode=C0010001.  It is thus far from clear that the witnesses had an absolute right to refuse to testify.  Moreover, the Interrogation Records note that very few individuals, except for JT Ho and a handful of current Jinhua employees, had an attorney present.  And even then, the record often does not identify who the defense counsel was and how, if at all defense counsel could participate or did participate in the interrogation.  (*See, e.g.* Ex. H to the Mot. at 1.)  More concerning is that several of these interrogations were allegedly conducted pursuant to the U.S. government's request under the U.S.-Taiwan Mutual Legal Assistance Agreement ("MLAA") and were conducted after the indictment was returned.  Under the MLAA, even if a party makes a claim of self-incrimination, "the evidence, including all items requested, shall nonetheless be taken."  MLAA, art. 9, para. 4.

Jinhua wrote a letter to the Government raising concerns about these interrogations in December 2018 (Declaration of Matthew Sloan ("Sloan Decl.") Ex. 1.)  Jinhua's counsel stated that using a foreign government to conduct compulsory interrogations of individuals, without the right to an attorney, and without the right to refuse to testify about incriminating matters, when there is a pending U.S. criminal case, raised serious questions about whether these interrogations can and should be introduced into evidence at all in a U.S. trial.  *Id.* ("We further understand that the individuals are compelled to attend these interviews, cannot be accompanied by lawyers in these interviews because Taiwanese authorities have characterized them these individuals as 'witnesses,' and cannot refuse to answer any question other than on the ground that the answer would be directly self-incriminatory.").

UMC's counsel raised similar concerns about the summonses issued to the UMC employees, including J.T. Ho, Ray Guo and Neil Lee.  In particular, UMC's counsel noted that she had "significant concerns about the propriety of these interviews given the posture of the case, in which an indictment already has been returned and the MLAT request was made only following that event."

1  (Sloan Decl. Ex. 2 at 2).[1] First, UMC's counsel noted that if these interrogations were conducted in

2  the United States, "it is highly unlikely that the FBI would be able to conduct post-indictment

3  interviews without going through the employee's individual counsel." *Id.* Second, UMC noted that

4  "unlike in the United States, **these interviews are compulsory**. If the individuals do not appear,

5  they will be subject to a penalty and the Taiwanese authorities likely will issue arrest warrants to

6  compel them to attend." *Id.* (emphasis added). Third, UMC's counsel noted that "these individuals

7  cannot be accompanied by counsel and will not have the benefit of advice of counsel in considering

8  whether a question might elicit a response that is self-incriminatory, and must answer questions even

9  if the interviewee would be able to claim 'immunity, incapacity or privilege.'" *Id.* Notwithstanding

10 these concerns, and the potential constitutional concerns these raised (*see id.* at 2 citing *United States*

11 *v. Allen*, 864 F.3d 63 (2d Cir. 2017)), the United States apparently caused these interrogations to

12 proceed, apparently with an FBI agent and a prosecutor from the U.S. Department of Justice on sight

13 (or nearby) in Taiwan to assist.

14     **B.     Overview of Individuals Subject to this Motion**

15         The United States has alleged that Jinhua, along with UMC and employees of UMC,

16 conspired to steal trade secrets from Micron and use those trade secrets to help UMC and Jinhua

17 develop DRAM technology. In its Motion, the government asserts that certain UMC employees

18 were "dual" employees of Jinhua and UMC and that other UMC employees were "agents" of Jinhua.

19 These contentions are neither factually nor legally correct. To orient the Court, Jinhua sets forth

20 below a brief summary of the relevant facts as they relate to each of the UMC employees that are

21 subject to this Motion.

22

23

24

25

---

26    [1] UMC counsel's letter noted that "We further understand that representatives of the U.S. government, including [the AUSA] and an FBI agent assigned to this case, will attend the interviews

27 in person." *Id.* at 1. Although the "transcripts" of the interrogations do not reflect that the AUSA or the FBI special agent were in the room when the interviews were conducted, Jinhua understand

28 that they were in Taiwan and were likely available to be consulted by the Taiwanese authorities.

*(cont'd)*

JINHUA'S OPP. TO MOTION *IN LIMINE* NO. 1                    CASE NO.: 3:18-cr-00465-MMC
RE: AGENT STATEMENTS

1                    1.      JT Ho, Ray Guo, and Neil Lee

2          The government asserts that JT Ho, Ray Guo, and Neil Lee were so-called "dual" employees

3   of Jinhua and UMC.  (Mot. at 10:1-22.)  They were not.[2]  The evidence at trial will show that these

4   individuals were *UMC* employees who participated in an "R&D Talent Retention" program funded

5   by Jinhua.  Under this program, *at UMC's request,* Jinhua provided additional compensation to UMC

6   engineers recruited from other DRAM manufactures in order to attract and retain them by

7   supplementing their UMC salaries to make their total compensation commensurate with what they

8   would have received at UMC's competitors.  UMC, like some other Taiwanese companies, did not

9   pay competitive salaries compared to the salaries paid by Japanese, Korean and other Taiwanese

10  companies, like Micron.  The evidence at trial will show that UMC wanted to recruit skilled DRAM

11  engineers for its project, and thus, was looking at engineers from Japan and Korea.  These engineers

12  were often unwilling to work at UMC for the salary UMC offered, so UMC asked Jinhua to provide

13  additional funding to help recruit and retain them.  (This was in addition to the $700 million budget

14  cited in the Technology Cooperation Agreement.)  Jinhua agreed and offered to supplement the

15  salary of some newly recruited UMC engineers.  UMC, as their employer, paid their salary and

16  benefits; they reported solely to UMC; and Jinhua exercised no control over them.  The evidence

17  will show, moreover, that neither UMC, Jinhua nor these new UMC recruits ever intended to create

18  an employer-employee relationship between these UMC employees and Jinhua.  (*See generally*

19  Declaration of Yu Chen Fu in Support of Jinhua's Opposition to Motions in Limine Nos. 1 and 2

20  ("Yu Chen Fu Decl.").)

21                    (a)     JT Ho

22          J.T. Ho was an employee of Micron's Taiwanese subsidiary, Micron Microelectronics of

23  Taiwan ("MMT").  He left MMT to join UMC in November 2015 as a "technical manager."  (Sloan

24  Decl. Ex. 3 (JT Ho Depo.) at 41:18-20; 64:11-18.)  He then held various engineering roles at UMC,

25

─────────────────────

26      [2]      Mr. Lee and Mr. Guo later left UMC and were hired by Jinhua.  (Yu Chen Fu Decl.,
    ¶¶ 4–5.)  The statements from Mr. Lee and Mr. Guo that the government seeks to introduce here pre-
27  date their employment at Jinhua, and thus are not admissible under Rule 801(d)(2)(D).  For the
    purposes of this Motion, Jinhua is addressing and discussing their work and status at the time he
28  made the statements at issue, well before they joined Jinhua as employees.

finally becoming a "yield enhancing engineer." (*Id.* at 64:19-66:10.) The government contends that because Mr. Ho signed an agreement with Jinhua, he was a Jinhua employee. (Mot. at 14:17-20; Ex. H to the Mot. at 13-21.) But simply signing a form agreement with Jinhua did convert him into a Jinhua employee. In fact, Mr. Ho did not believe he was a Jinhua employee who received a salary. Rather, he identified the payment from Jinhua as a "bonus" or "incentive," not as a salary received by an employee. (Sloan Decl. Exs. 4-5 (JT Ho Interrogation, D-000200) at D-000243.) UMC also did not consider these individuals, including Mr. Ho, to be Jinhua employees. Indeed, in UMC's sentencing memorandum, UMC states that "During the relevant period . . . JT Ho [was a] UMC employee[]." (ECF No. 144 at 4:25-26.)

Neither Jinhua nor Mr. Ho viewed Mr. Ho's receipt of additional funding from Jinhua as creating an employer-employee relationship. Jinhua did not impose any requirements on Mr. Ho or the other UMC employees who participated in the R&D Talent Retention program. For example, Jinhua did not set any requirements on their working hours, locations, or responsibilities. There were no attendance requirements imposed—the individuals did not need to request vacation or leave of absence from Jinhua. They were not supervised by anyone from Jinhua. They did not report to anyone at Jinhua. They were not disciplined by, and did not receive performance reviews from, Jinhua. They did not have Jinhua employee numbers, employee cards, or offices. They did not have Jinhua email accounts. And Jinhua did not provide any of the 'social insurances' that employees are entitled to under Chinese labor law (including the "five insurances," namely medical insurance, pension, unemployment insurance, work injury insurance, reproductive insurance, and "one stipend," namely housing stipend). (*See generally* Yu Chen Fu Decl., ¶ 3.) In short, the government has not met its burden to show that JT Ho is an employee of Jinhua.

(b)    Ray Guo

Ray Guo previously worked at MMT, and left MMT for UMC in 2016. (Sloan Decl. Exs. 6-7 (D-0000714) at D-0000715.) The Government contends that Mr. Guo was a joint employee based

1   on: (1) a draft contract in UMC's email files (which is not attached to the Motion)[3] and (2) statements

2   from another UMC employee—JT Ho—that he travelled with Neil Lee and Ray Guo to China to

3   open an account at a bank there so that Jinhua could deposit money into it.  (Mot. at 17:4-14.)  This

4   falls far short of showing there was any agreement between Mr. Guo and Jinhua that Mr. Guo would

5   become a Jinhua employee, that there was any payment to Mr. Guo from Jinhua pursuant to that

6   agreement, or that Mr. Guo was Jinhua's agent or employee.  And, as set forth in Jinhua's MIL No.

7   6 and above, even if Mr. Guo did sign such a consulting contract, the purpose of those contracts was

8   to pay a stipend to help UMC retain engineering talent, not to create an employment relationship

9   with Jinhua.  As noted above, Mr. Guo later left UMC and was hired by Jinhua as an employee in

10  approximately March 2020.  (Yu Chen Fu Decl. ¶ 5.)  But the statements from Mr. Guo that the

11  government seeks to introduce here pre-date Mr. Guo's employment at Jinhua, however, and thus

12  are not admissible under Rule 801(d)(2)(D).

13                              (c)      Neil Lee

14          Neil Lee left MMT in late 2015 to join UMC, and worked in UMC's PM2 NBD department

15  as a "deputy director of the etching engineering department."  (Sloan Decl. Exs. 8-9 (D-0000790) at

16  D-0000791.)  The government does not attach to its motion any signed contract between Mr. Lee

17  and Jinhua.  Rather, as with Mr. Guo, it relies on the fact there was a draft agreement provided by

18  Sandy Kuo from UMC (which again, is not attached to the Motion), and that Mr. Lee told the

19  Taiwanese authorities that he received payments from Jinhua.  (Mot. at 16:20-17:2.)  But again, the

20  government fails to present any other evidence that would establish that Mr. Lee was a Jinhua

21  employee at the time he was interrogated by the Taiwanese authorities in December 19, 2018.  (Sloan

22  Decl. Exs. 8-9 (Neil Lee Interrogation, D-000790) at D-000790.)  As stated above, Jinhua did not

23  treat these individuals as employees.  Moreover, Mr. Lee did not self-identify as a Jinhua employee.

24  When Neil Lee was asked if he was a Jinhua employee, based on one "consulting" contract he signed

25  with Jinhua in February 2017 to obtain this additional renumeration, he said he was not.  (Sloan Decl.

26  _____

27          [3]      The government includes as an exhibit to its Motion a cover email which transmits
    so-called "employment contracts" of Ray Guo, JT Ho, and Neil Lee, but does not attach the "draft"
28  contracts attached to the email.  (See Ex. M to Motion; Mot. at 17:5-6.)

Exs. 8-9 (Neil Lee Interrogation, D-000790) at D-000794.)  Mr. Lee later left UMC and was hired by Jinhua as an employee in approximately December 2019.  (Yu Chen Fu Decl. ¶ 4.)  The statements from Mr. Lee that the government seeks to introduce here pre-date Mr. Lee's employment at Jinhua by years, however, and thus are not admissible under Rule 801(d)(2)(D).

### 2. Jennifer Wang

The government also seeks to introduce statements made during a civil deposition of Jennifer Wang, who is, and during the relevant time period was, a Human Resources Manager *for UMC*.  The government does not allege that Ms. Wang signed any sort of so-called "dual employee" agreement or that she was a Jinhua employee.  (Mot. at 3:19.)  Rather, the government seeks a finding that Ms. Wang she was an "agent" of Jinhua because: (1) she travelled to a job fair with her colleagues from UMC in 2016; (2) at the job fair, she helped recruit engineers to apply for positions at Jinhua; (3) ¶ she attended this job fair at Stephen Chen's direction (who at the time, was a UMC employee); (4) the government contends that Mr. Chen was secretly working as an agent of Jinhua at the time; and therefore (5) Ms. Wang is also an agent of Jinhua's. As discussed in more detail below, this "agent of an agent" theory has no basis in the law, and ignores the applicable facts.  Ms. Wang was not *hiring* Jinhua employees at this event, and there is nothing in the record suggesting she had the authority to hire anyone at this event.  Rather, she was simply recruiting individuals to *apply* for a position at Jinhua (and interestingly, to the best of Ms. Wang's knowledge, no one was hired at this event).  Simply because Ms. Wang was looking to find potential candidates for Jinhua at a single hiring event (Ms. Wang admits that UMC did not help Jinhua in recruiting in any other way), at an event which she attended with UMC employees, at the request of Stephen Chen, who, at the time, was an UMC employee, does not form an agency relationship with *Jinhua*.  (*See* Ex. A to the Mot. at 32:10-12.)

### 3. Stephen Chen

Stephen Chen was the former President of Micron Memory Taiwan ("MMT"), Micron's DRAM business in Taiwan.  (Indictment (ECF No. 1) ¶ 7.)  He then was hired by UMC in September 2015 as the "Senior Vice President and Fabrication Director."  (*Id.*)  Mr. Chen was an UMC employee from September 2015 until early 2017, when he was hired as the president of Jinhua, a

8

1   role he still serves in today.  (Sloan Decl. Ex. 10 (Stephen Chen Depo. Tr., USD-0351510) at 46:11-

2   47:11 (stating that he become an employee of Jinhua in February 2017, but did not begin receiving

3   payment from Jinhua until the second half of 2017.))

4       The government contends that Mr. Chen was an "agent" of Jinhua from some undisclosed

5   time up and until he was hired as president in early 2017.  As support for this argument, the

6   government points out that Mr. Chen attended Jinhua board meetings and received updates from

7   Jinhua—all events consistent with the cooperation agreement the parties had entered.  (*See* Mot. at

8   7:9-12.)  Moreover, as the government notes, Chen communicated using his *UMC* address—not a

9   Jinhua address—and even if he was a "point person" to certain vendors, the government does not

10  provide evidence sufficient to show that Mr. Chen was subject to Jinhua's control, which is the

11  touchstone to determine whether Mr. Chen was a Jinhua employee, or that Mr. Chen was authorized

12  to act on Jinhua's behalf (*i.e.*, to enter into contracts on behalf of Jinhua).  The government has not

13  provided evidence in is Motion to support its contentions about acts that Mr. Chen purportedly took

14  on behalf of Jinhua, nor evidence to support the delegation of authority from Jinhua for these acts.

15      Simply because Mr. Chen worked alongside individuals from Jinhua, when he was employed

16  by UMC, as would be expected given that the parties have signed a "Cooperation Agreement" does

17  not make him an agent of Jinhua.  Moreover, as discussed in more detail below, the statements the

18  government seeks to introduce from Mr. Chen's deposition are not admissible because they are not

19  on a matter relating to Mr. Chen's employment at *Jinhua*—rather, they are statements relating to his

20  employment at *UMC*.

21  **III.   ARGUMENT**

22      **A.   Statements of JT Ho, Neil Lee, and Ray Guo are Not Admissible under Rule
23          801(d)(2)(D).**

24      The government seeks to introduce statements made by Ray Guo, JT Ho, and Neil Lee during

25  interrogations conducted by the Taiwan authorities.  Specifically, the government contends that these

26  individuals were agents or employees of Jinhua at the time these statements were made, and that the

27  statements are thus admissible under Rule 801(d)(2)(D).  In most instances, however, these

28  individuals were not (and never became) Jinhua employees, and, even if they were, the statements

9

1  were not made during employment, and were not on a matter within the scope of the individuals

2  alleged *Jinhua* employment.

3          Statements of agents or employees are admissible against their employer or principle when

4  they concern "a matter within the scope of that relationship" and are made during the individual's

5  employment or agency.  Fed. R. Evid. 801(d)(2)(D).  The Ninth Circuit has held that a court "must

6  'undertake a fact-based inquiry applying common law principles of agency'" when deciding whether

7  an individual is an employee or agent for purposes of Fed. R. Evid. 801(d)(2)(D).  *United States v.*

8  *Bonds*, 608 F.3d 495, 504 (9th Cir. 2010) (citation omitted).  Here, because these so-called employees

9  were allegedly employed by Jinhua, a Chinese company, the relevant analysis is whether an

10 employment relationship was formed under Chinese law.  At trial, Jinhua will proffer expert

11 testimony from Professor Jiang Ying, who will explain why these individuals were not employees

12 under Chinese law.  (Sloan Decl. Ex. 11 (Jiang Report) at 12-16.)[4]

13          1.    <u>JT Ho, Neil Lee, and Ray Guo Were Not Jinhua Employees at the Time</u>
14                <u>of their Statements to the Taiwanese Authorities.</u>

15         To the extent that the government asserts that Mr. Ho, Neil Lee, and Mr. Guo, who allegedly

16 received payments from Jinhua through its "R&D Talent Retention Fund" were Jinhua employees,

17 the government is mistaken.  *See* Section II.B, *supra*, and Jinhua's MIL No. 6, both discussing the

18 "R&D Talent Retention Fund."  These individuals were not Jinhua employees, and, in the case of

19 Mr. Guo and Mr. Lee, the government has produced scant evidence showing that there was any

20 contractual or payment relationship between Jinhua and Mr. Lee or Mr. Guo.  Simply because JT Ho

21 signed an agreement with Jinhua does not make him Jinhua's employee.  As noted above, Mr. Ho

22 identified the payments as an "incentive," not "salary."  (Sloan Decl. Exs. 4-5 (JT Ho Interrogation,

23 D-000200) at D-000243.)  UMC did not consider Mr. Ho to be a Jinhua employee.  (ECF No. 144 at

24 4:25-26.)

25

26         ────────────────────

27         [4]      The government has submitted an expert report from its purported labor law expert,
   Dr. Yu-Fan Chiu, opining that (1) Taiwan law should apply and (2) under Taiwan law, there was an
   employment relationship between Mr. Ho and Jinhua.  But as Jinhua's expert Prof. Jiang will explain
28 further at trial, Chinese law should apply, there was no employment relationship Mr. Ho
   and Jinhua, and Dr. Chiu's report relies on several mistaken factual premises.

1  Most importantly, Mr. Ho was not "subordinate" to Jinhua—that is, he was not under Jinhua's

2  control.  As Jinhua will set forth in more detail at trial through the testimony of its Chinese labor law

3  expert, Professor Jiang, an employment relationship is formed when an employee is "subordinate"

4  to his or her employer—personally, organizationally, and economically.  (Sloan Decl. Ex. 11 (Jiang

5  Report) at 12-16.)[5]   For example, for personal subordination, an employer should control the

6  individual's behavior in the workplace, through things like conducting performance evaluations;

7  disciplining the employee; and supervising the work performed.  (*Id.* at 7-8.)   Organizational

8  subordination includes controlling when the employee works, through things like requirements

9  regarding working hours or locations and controlling vacation and other absences.  (*Id.* at 9.)

10  Economic subordination means that the worker receives income mainly or solely from the hiring

11  entity, and the hiring entity bears the operational risks (e.g., provides tools for the work).  (*Id.* at 10-

12  11.)

13  Here, the evidence will show that Jinhua did not control Mr. Ho and that there was no

14  "subordination" in any of the three ways set forth above.  Jinhua did not impose any requirements

15  on his working hours, locations, or responsibilities.  There were no attendance requirements imposed

16  by Jinhua—he did not need to request vacation or leave of absence from Jinhua.  He was not

17  supervised by anyone from Jinhua.  And he did not report to anyone at Jinhua.  (*See generally* Yu

18  Chen Fu Decl., ¶ 3.)   In short, the government has not met its burden to show that JT Ho is an

19  employee of Jinhua.

20  The evidence with respect to Mr. Guo and Mr. Lee is even weaker.  All the above facts are

21  also true as they relate to Mr. Guo and Mr. Lee, and the government has not produced *any* signed

22  agreements between Jinhua and Mr. Guo or Mr. Lee, nor any evidence that they actually received

23  some money from Jinhua at some point in time.  Rather, the government rests its entire case on draft

24  agreements and bank accounts that may or may not have been opened.  This falls far short of showing

25  

26  [5]   The government has submitted an expert report from its purported labor law expert,
Dr. Yu-Fan Chiu, opining that (1) Taiwan law should apply and (2) under Taiwan law, there was an

27  employment relationship between Mr. Ho and Jinhua.  But as Jinhua's expert Prof. Jiang will explain
further at trial, Chinese law should apply, there was no employment relationship between Mr. Ho

28  and Jinhua, and Dr. Chiu's report relies on several mistaken factual premises.

*(cont'd)*

11

1    that these individuals had an employment agreement with Jinhua, let alone that they were

2    "subordinate" to Jinhua or were under Jinhua's control.[6]

3            2.      <u>JT Ho was Not an Agent of Jinhua at the Time of His Statements</u>[7]

4         Apparently recognizing the weakness in its "employee" argument, the government claims

5    that it does not matter if Mr. Ho was an employee, because he was "plainly an agent." (Mot. at

6    15:25-26.) In doing so, the government looks to the agreement signed by Mr. Ho and Jinhua, and

7    claims that because JT Ho "was employed to work for Jinhua, paid a salary to do so, expected to

8    abide by company polices, and received other benefits" makes him an agent. (*Id.* at 16:1-2.) But

9    this is insufficient to show that Mr. Ho was an agent of Jinhua's. (*See* Mot. at 15:13-19.)

10         The crux of an agency relationship is assent, control, and instruction. The Ninth Circuit has

11    stated that "an agency relationship exists only if both the provider and the recipient have manifested

12    assent that the provider will act subject to the recipient's control and instruction." *Bonds*, 608 F.3d

13    at 507; *see also Mavrix Photographs, LLC v. Livejournal, Inc.*, 873 F.3d 1045, 1054 (9th Cir. 2017)

14    (as amended) ("Agency is the fiduciary relationship that arises when one person (a 'principal')

15

16        [6]      The UMC employees who received these Jinhua bonuses would not be considered
17    agents or employees of Jinhua under U.S. law either. Courts in the United States typically examine
     the factors set forth in the Restatement of Agency (Second) when determining whether an
18    employee/agency relationship exists, or whether the declarant is an independent contractor. *See*
     *Bonds*, 608 F.3d at 504. Such factors that this Court should examine are: (1) the control exerted by
19    the employer, (2) whether the one employed is engaged in a distinct occupation, (3) whether the
     work is normally done under the supervision of an employer, (4) the skill required, (5) whether the
20    employer supplies tools and instrumentalities, (6) the length of time employed, (7) whether payment
     is by time or by the job, (8) whether the work is in the regular business of the employer, (9) the
21    subjective intent of the parties, and (10) whether the employer is or is not in business. *Id.* When
     examining these factors, the Court "will look to the totality of the circumstances, but the 'essential
22    ingredient . . . is the extent of control exercised by the employer.'" *Id.* (quoting *NLRB v. Friendly*
     *Cab Co.*, 512 F.3d 1090, 1096 (9th Cir. 2008)).

23         Here, there is no evidence that Jinhua has ever controlled, or exerted any type of control over,
24    Mr. Ho or the UMC employees who participated in this program. Further, the UMC employees,
     provided their own instrumentalities—Jinhua did not provide them with office space, a computer, or
25    any equipment. Moreover, the UMC employees did not work under the supervision of anyone at
     Jinhua, or work at Jinhua's direction. They, at all times, answered to UMC. Accordingly, the totality
26    of the circumstances as they relate to the factors outlined within the Restatement of Agency,
     demonstrate that the employees who participated in this program were not agents or an employee of
27    Jinhua. (*See generally* Yu Chen Fu Decl., ¶¶ 2–3.)

28        [7]      The government has not argued that Ray Guo or Neil Lee are agents, but should they
     decide to do so on reply, that argument fails for the same reason.

1  manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and

2  subject to the principal's control, and the agent manifests assent or otherwise consents so to act."

3  (quoting Restatement (Third) of Agency § 1.01 (Am. Law Inst. 2006))); *Jones v. Royal Admin.*

4  *Servs., Inc.*, 887 F.3d 443, 448 (9th Cir. 2018) (same).  Both parties must be aware of, and assent to,

5  creating an agency relationship.  "To form an agency relationship, both the principal and the agent

6  must manifest assent to the principal's right to control the agent."  *Bonds*, 608 F.3d at 506.

7  　　　　Simply because Jinhua agreed, at UMC's request, to supplement the salary of Mr. Ho, or

8  because a contract says that Mr. Ho agreed to abide by Jinhua's policies, or that he "received other

9  benefits" (which the government does not define) does not make him an agent.  The government has

10  not presented any proof of the actual workings of the relationship between Mr. Ho or Jinhua, nor of

11  their intent in entering into the agreement.  The government has not proved that Jinhua exercised any

12  control over Mr. Ho sufficient to make him Jinhua's agent and thus, has not provided sufficient

13  evidence to show that either Jinhua or Mr. Ho assented to the formation of an agency relationship.

14  　　　　　　　3.　　The Statements of Neil Lee, Ray Guo, and JT Ho Are Inadmissible

Because They Do Not Concern Matters Within the Scope of the

15  　　　　　　　　　Individual's Alleged Relationship with Jinhua.

16  　　　　To be admissible as statements of an agent or employee, the statements must concern "a

17  matter within the scope of that relationship."  Fed. R. Evid. 801(d)(2)(D).  Even if the government

18  could establish that JT Ho, Ray Guo, or Neil Lee were agents or employees of Jinhua when they

19  were interrogated by the MJIB (which it cannot), the statements that the govt seeks to elicit are not

20  admissible because they were not made within the scope of their alleged relationship with Jinhua.

21  Indeed, many of the statements that the government seeks to introduce here concern the declarant's

22  *UMC* or *Micron* employment, not their purported *Jinhua* employment.  For example, the government

23  seeks to introduce statements Mr. Ho made to Taiwanese investigators, including statements about

24  his employment at UMC and his use of electronic devices there.  (*See, e.g.*, Ex. J to the Mot. at 2-3;

25  4; Ex. K to the Mot. at 3.)  Even if Mr. Ho was ever employed by Jinhua (which he was not), these

26  statements relate to his employment at UMC, and thus do not relate to a "matter within the scope"

27  of his purported employment or agency *relationship* with Jinhua.

28

13

1    Accordingly, these statements, and the others like these, are not admissible under Federal

2    Rule of Evidence 801(d)(2)(D).  Because the government cannot satisfy its burden to show that these

3    individuals were employees of Jinhua, and to the extent they were not speaking on matters within

4    the scope of any purported employment relationship at Jinhua when they made the relevant

5    statements, the hearsay exclusion in Rule 801(d)(2)(D) does not apply, and the statements in Exhibits

6    J, K, L, and O, constitute inadmissible hearsay, and should not be admitted.[8]

7    **B.      Statements of Jennifer Wang are Not Admissible under Rule 801(d)(2)(D)
              Because She is Not an Agent of Jinhua.**

8

9    The government's attempt to introduce the deposition testimony of Jennifer Wang, an

10   employee in UMC's human resources department, on the grounds that she was purportedly an

11   "agent" of Jinhua under Rule 801(d)(2)(D) are unavailing.[9]  First, as discussed above, Ms. Wang

12   never worked at Jinhua, never reported to anyone at Jinhua, never received any compensation from

13   Jinhua, and never signed anything that could even arguably be called an employment agreement with

14   Jinhua.  She was, at all times, an employee of UMC.  The government contends, however, that Ms.

15   Wang is an agent of Jinhua through a fanciful "agent of an agent" theory which is utterly unsupported

16   in the law.  Specifically, the government argues that because Ms. Wang attended a recruiting event

17   in California in 2016 at the direction of Mr. Chen and because Mr. Chen was an authorized agent of

18   Jinhua at the time, that therefore, Ms. Wang's was an agent of Jinhua as well.  This argument goes

19   too far, and stretches the bounds of Rule 801(d)(2)(D) as to leave it virtually meaningless.

20

---

21   [8]      Jinhua assumes the government only seeks to introduce the highlighted excerpts of
     Exhibits A-B; D-L, and O.  To the extent the government seeks to introduce additional portions of
22   these documents, the issue is not presented to the Court because the Court does not have the full
     excerpts to consider.  Jinhua reserves all its rights to object to any use of additional excerpts from
23   these documents, should the government seek to introduce them at trial.

24   [9]      To the extent that the government seeks to introduce Ms. Wang's deposition
     testimony as prior testimony under oath, pursuant to Rule 804(b)(1), it is not admissible because at
25   the time that the depositions were taken in the civil case (June-July 2018), Jinhua had not yet
     appeared in the case, so Jinhua did not have an opportunity and motive to cross examine the identified
26   deponents (*e.g.*, J.T. Ho, Jennifer Wang, and Stephen Chen).  *See, e.g.*, *Micron v. UMC et al.*, Case
     No. 3:17-cv-06932-MMC (N.D. Cal.), ECF Nos. 98-107 (indicating that Jinhua's first appearance in
27   the civil action was not until October 2, 2018).  *See* Fed. R. Evid. 804(b)(1)(B) (providing that prior
     deposition testimony of deponent is excluded from hearsay rule where the deponent is "unavailable"
28   and the party against which the testimony is offered had "an opportunity and similar motive to
     develop" the witnesses' testimony through direct or cross- examination).

1           1.      Ms. Wang was Never an Agent of Jinhua.

2           Rule 801(d)(2)(D) is not only a rule about hearsay, it is a powerful rule of attribution.  It takes

3    ordinary hearsay and makes the statement attributable to the employer or principal.  At the heart of

4    the rule is the law of agency, and the touchstone of agency is the consent of the principal and agent.

5    An agent is one who "act[s] on the principal's behalf and subject to the principal's control."  *Bonds*,

6    608 F.3d at 506 (alteration in original) (quoting Restatement (Third) Agency § 1.01).  As stated

7    above, "[t]o form an agency relationship, both the principal and the agent must manifest assent to

8    the principal's right to control the agent."  *Id.*

9           Here, the government has presented no evidence that either Ms. Wang or Jinhua intended to

10   form an agency relationship.  Simply because she was looking to find potential candidates for Jinhua

11   at a single hiring event in 2016 (Ms. Wang admits that UMC did not help Jinhua in recruiting in any

12   other way), at an event which she attended with UMC employees, at the request of Mr. Chen, who,

13   at the time, was an UMC employee, does not form an agency relationship with *Jinhua*.

14           2.      Ms. Wang was Not an Agent of Jinhua at the Time of Her Statements at
15                   Issue in this Motion.

16           Even assuming *arguendo* that Ms. Wang was an agent of Jinhua in connection with the

17   recruiting fair in 2016, there is no evidence that she was an agent of Jinhua at the time she made the

18   statements the government seeks to introduce in this Motion.  For a statement of an agent to be

19   admitted pursuant to Rule 801(d)(2)(D), the individual must be the agent of the principal against

20   whom the statement is admitted *at the time the statement is made*.

21           The government seeks to introduce statements Mr. Wang made at a deposition in July *2018*.

22   But the government bases its agency arguments on one recruiting fair Ms. Wang attended in *2016*.

23   Even if Ms. Wang was an agent of Jinhua for the purposes of the recruiting fair in 2016—which she

24   was not—the government has made no showing that Ms. Wang was a Jinhua agent *at the time of her*

25   *deposition* in July 2018.  There is no evidence that Mr. Chen, or others at Jinhua, had asked Ms.

26   Wang to do anything on behalf of Jinhua after the recruiting fair, and certainly not in or around July

27   2018. In fact, Ms. Wang testified that she only helped Jinhua with its recruiting efforts this one time.

28   (Ex. A to the Mot. at 32:10-12.)  For this reason alone, the government's Motion as it relates to

15

1   admitting statements from the deposition of Jennifer Wang, as set forth in Exhibit A, should be

2   denied.

3       **C.      Statements of Stephen Chen are Not Admissible under Rule 801(d)(2)(D).**

4       The government also seeks to introduce statements made by Stephen Chen during his

5   deposition in the same related civil matter, *Micron v. UMC et al.*, Case No. 3:17-cv-06932-MMC

6   (N.D. Cal.).  The government contends that Mr. Chen was an employee of Jinhua at the time of his

7   deposition in July 2018, and that, as a result, his testimony is admissible.  The government also

8   contends that Mr. Chen was an agent of Jinhua prior to being appointed president of Jinhua, and that

9   statements by Mr. Chen are therefore admissible for this reason as well.  While Mr. Chen was an

10  employee of Jinhua as of his July 2018 deposition, Mr. Chen was not an agent or employee of Jinhua

11  prior to his employment at Jinhua in February 2017.

12          1.      Mr. Chen was Not an Agent for Jinhua Prior to February 2017.

13      The government argues that Mr. Chen is an agent of Jinhua, so that statements he made "while

14  an agent of Jinhua and concerning the TCA are admissible at trial against Jinhua."  (Mot at. 14:4-5.)

15  But the government makes this argument in a vacuum, and does not identify which statements it is

16  seeking to introduce under this theory.  The only statement from Stephen Chen submitted in support

17  of the Motion is his July 2018 deposition, but by that time, he was an employee of Jinhua, not an

18  agent.  Jinhua is unsure what statements, if any, the government seeks to introduce under the theory

19  that Stephen Chen was an "agent" of Jinhua.  The Court should not issue a broad order *in limine* that

20  all statements made by Mr. Chen "while [he was] an agent of Jinhua and concerning the TCA are

21  admissible" in a vacuum.

22      Regardless of what statements they may point to at trial, however, the government has not

23  proffered sufficient evidence to show Mr. Chen was an agent of Jinhua prior to becoming president

24  of Jinhua in 2017.  As stated above, an agent is one who "act[s] on the principal's behalf and subject

25  to the principal's control."  *Bonds*, 608 F.3d at 506 (alteration in original) (quoting Restatement

26  (Third) Agency § 1.01).  "To form an agency relationship, both the principal and the agent must

27  manifest assent to the principal's right to control the agent."  *Id.*  Here, the government has failed to

28  present any admissible evidence that Mr. Chen was an agent of Jinhua.  Attending Jinhua board

16

1   meeting and receiving updates from Jinhua is consistent with the cooperation agreement the parties

2   had entered into.  Because of the cooperation agreement, employees of both parties would necessarily

3   work together in a variety of settings.  It does not mean they entered into an agency relationship.

4   Moreover, as the government notes, Chen communicated using his *UMC* address—not a Jinhua

5   address—and even if he was a "point person" to certain vendors, the government does not provide

6   evidence sufficient to show that Mr. Chen was subject to Jinhua's control or that Mr. Chen was

7   authorized to act on Jinhua's behalf (*i.e.*, to enter into contracts on behalf of Jinhua).

8        The government claims that Mr. Chen "hired for Jinhua."  (Mot. at 13:27-14:1.)  The evidence

9   the government cites in support of his "hiring" role are statements by various witnesses that they

10  spoke to Mr. Chen about a job at Jinhua before being hired, and that they did not interview with

11  anyone else.  (Mot. at 9:9-26.)  But that is not "hiring" for Jinhua.  For example, the government

12  does not provide any evidence that Mr. Chen entered into contracts with these individuals on Jinhua's

13  behalf prior to February 2017.  The government also claims that Mr. Chen "entered into business

14  contracts for Jinhua at the time of the recruiting fair" and thus, as a result, was an "authorized agent

15  for Jinhua."  (Mot. at 13:26-14:1.)  The government provides no detail about what these "business

16  contracts" may be.  The fact he attended a single hiring event (Ms. Wang admits that UMC did not

17  help Jinhua in recruiting in any other way) looking to find potential candidates to simply *apply to*

18  Jinhua—not to hire them—at an event which he attended with UMC employees does not form an

19  agency relationship with *Jinhua*.  To do so would stretch the bounds of the agency relationship and

20  open the flood gates to potential hearsay to be admitted.

21        2.   <u>The Statements Are Inadmissible Because They Do Not Concern the
             Scope of Mr. Chen's Alleged Relationship with Jinhua.</u>

22

23        Rule 801(d)(2)(D) requires more than simply showing an individual is an employee or agent

24  at the time of the statement at issue, however.  The statement must also be about the scope of the

25  employment of the entity against whom it is offered.  *See* Fed. R. Evid. 801(d)(2)(D).  Here, some

26  of Mr. Chen's statements in his deposition, as identified by the government, relate to his employment

27  with *UMC*, not *Jinhua*.  (*See, e.g.*, Ex. B to the Mot. at 52:16-22 (discussing UMC's equipment);

28  77:21-78:10 (discussing activities he took at the time he was an employee of UMC).)  Thus, these

1  statements are not admissible against Jinhua.  The government's order is overbroad, seeking to admit

2  statements that clearly outside of the scope of Rule 801(d)(2)(D).

3      **D.**      **Statements by All UMC Employees Working on Project M Are Not Admissible**

4                        **Against Jinhua Under Rule 801(d)(2)(D).**

5        Finally, the government argues for a blanket catch-all order that statements of any UMC

6  employee "working under Stephen Chen" can be admissible against Jinhua under Rule 801(d)(2)(D)

7  because "all of these employees reported to Stephen Chen at UMC, who wore dual hats with Jinhua."

8  (Mot. at 17:16-20.)  The government contends that Jinhua therefore had control over these employees

9  through Stephen Chen.  (*Id.*)  The government does not ask the Court to make any order with respect

10  to these unnamed employees, as it notes that "the Court may benefit from the evidence at trial on the

11  fact intensive inquiry on this category of statements" and then offers "to lay a foundation at trial that

12  certain UMC employees were agents of Jinhua . . . and to seek a ruling after laying necessary

13  foundation through evidence presented at trial."  (Mot. at 17:20-24.)

14        Jinhua, therefore, will also defer its full argument on this issue until the government proffers

15  such evidence at trial, but notes that such an extension of Rule 801(d)(2)(D) renders the rule

16  meaningless.  The Court should be guided by the principles underlying this rule: That agents typically

17  would not make statements damaging against their principal, and thus, these statements and sufficient

18  indicia of reliability to justify an exception from the traditional hearsay rules.  *See Nekolny v. Painter*,

19  653 F.2d 1164, 1172 (7th Cir. 1981); *Weil v. Citizens Telecom Servs. Co.*, 922 F.3d 993, 1000 (9th

20  Cir. 2019).  But when someone is an "agent of an agent"—like the government contends here—the

21  same safeguards are not present.  It is likely that none of these individuals viewed themselves as

22  agents of Jinhua.  And that, in and of itself, causes the government's argument to fail.  An agent is

23  not only one who is subject to the control of a principal, but to form an agency relationship, "both

24  the principal and the agent must manifest assent to the principal's right to control the agent." *Bonds*,

25  608 F.3d at 506.  Here, the government has presented no evidence to show that any of these unnamed

26  UMC employees manifested the intent that they be under Jinhua's control.  Thus, this Court should

27  not issue any order that any UMC employees who were under the control of Jinhua were agents of

28  Jinhua.

**E.**     **Statements of Que Liangwu, Chen Shiyan, Hero Lo, Xiao Xinhuang, and You Zhenfu are Not Admissible Under Fed. R. Evid. 801(d)(2)(D).**

The government has indicated it may try to introduce certain hearsay statements under Rule 801(d)(2)(D) as statements of Jinhua's employees or agents.  Specifically, it seeks to introduce statements made by Jinhua employees Que Liangwu, Chen Shiyan, Hero Lo, Xiao Xinhuang, and You Zhenfu during interrogations conducted by the Taiwan authorities.  (Exs. to the Mot. D-H[10].) Jinhua does not dispute that Chen Shiyan, Hero Lo, Xiao Xinhuang, and You Zhenfu were Jinhua employees at the time of their interrogations by the MJIB.  But Que Liangwu was not a Jinhua employee.  His role was that of part-time accounting consultant.  (Yu Chen Fu Decl. ¶ 7.)  And, at any rate, the government has failed to meet its burden that all thec statements of the so-called employees made were within the scope of the individuals' employment at Jinhua.

For example, in the Interrogation Record of Chen Shiyan, attached as Exhibit D to the Motion, the highlighted portion relates to Mr. Chen's discussion of how he was hired at Jinhua, including his prior employment at Micron.  This is outside the scope of his employment at Jinhua, and should not be admitted under Rule 801(d)(2)(D).  Similar statements are highlighted in the Interrogation Record of Hero Lo (Ex. E to the Mot. at 2); Xiao Xinhuang (Ex. F to the Mot. at 2-3); Que Liangwu (Ex. G to the Mot. at 2); and You Zhenfu (Ex. H to the Mot. at 2-3).

Additionally, for the reasons set forth in Section III.F, below, these transcripts should not be admissible as evidence in this case.

**F.**     **This Court should Deny the Government's Request to Introduce the Interrogation "Transcripts" Because of Procedural Deficiencies.**

As discussed in the introduction, there are numerous questions about the procedures and rights afforded to the individuals during their interrogations by the MJIB, including whether a witness had the right to an attorney; whether and to what extent the witnesses were able to invoke a

---

[10]     The government states in its motion it seeks to admit the statements of five employees from Jinhua: Que Liangwu, Chen Shiyan, Hero Lo, Xiao Zinhung, and You Zhenfu, citing to Exhibits D-I. (Mot. at 13:2-7.)  Exhibit I, however, is an Interrogation Record of Wu Kungrong, who the government does not mention in the Motion as one of the employees for whom it is seeking admission of his statements.  It is unclear whether the government is seeking an order admitting the Record in Exhibit I.

1  privilege against self-incrimination; and what if any consequences would ensue if the witness did not

2  sit for an interview.  Indeed, contrary to the government's claims, these "interviews" had many

3  hallmarks of a "custodial" interrogation with few of the protection typically provided in criminal

4  proceedings in the United States.  For example, UMC's counsel expressed her belief that "[i]f the

5  individuals do not appear, they will be subject to a penalty and the Taiwanese authorities likely will

6  issue arrest warrants to compel them to attend."  (Sloan Decl., Ex. 2 at 2.)  Jinhua's counsel raised

7  similar concerns.  (Sloan Decl., Ex. 1 at 2.)    Moreover, to the best of Jinhua's understanding, with

8  the exception of Mr. Ho, who was apparently a target of the Taiwanese investigation, and a few

9  current Jinhua employees, the witnesses were not allowed to be accompanied by counsel and did not

10  have the benefit of advice of counsel in considering whether a question might elicit a response that

11  is self-incriminatory.  (*id.* ("[w]e further understand that the individuals are compelled to attend these

12  interviews, [and] **cannot be accompanied by lawyers in these interviews** because the Taiwanese

13  authorities have characterized these individuals as 'witnesses'") (emphasis added); *see also* Sloan

14  Decl., Ex. 2 at 2. (raising similar concerns)).  Even if counsel did participate, it is unclear whether

15  the witnesses had the right to consult with counsel.  In fact, while some interviews contain a notaion

16  that defense counsel was present, there is no indication *who* this was, and there is no indication of

17  the role, if any that counsel played in the interrogation.  (*See, e.g.,* Ex. H to the Mot. at 1.)  Moreover,

18  even with counsel present, it appears the witness could be compelled to "answer questions even if

19  the interviewee would be able to claim 'immunity, incapacity or privilege.'"  (Sloan Decl., Ex. 2 at

20  2.)  Notwithstanding these concerns, and the potential constitutional concerns these raised, the United

21  States caused these interrogations to proceed, apparently with an FBI agent and a prosecutor from

22  the U.S. Department of Justice on sight (or nearby) in Taiwan to assist.

23        In light of the questions regarding this lack of procedural safeguards, the Court should deny

24  the government's requests to introduce the statements from these interrogations at trial, much less

25  the raw "transcripts" generated by the Taiwanese authorities.  While Jinhua has no constitutional

26  right against self-incrimination under the Fifth Amendment, its employees—as well as those whom

27  the government incorrectly claims are Jinhua's agents or employees—do have Fifth Amendment

28  rights to the extent the government seeks to use their statements against them in criminal proceedings

20

in the United States.  *United States v. Allen*, 864 F.3d 63, 101 (2d Cir. 2017) ("The Fifth Amendment's prohibition on the use of compelled testimony in American criminal proceedings applies even when a foreign sovereign has compelled the testimony.  To be clear, we do not purport to prescribe what the U.K. authorities (or any foreign authority) may do in their witness interviews or their criminal trials.  We merely hold that the Self–Incrimination Clause prohibits the use and derivative use of compelled testimony in an American criminal case against the defendant who provided that testimony."); *see also Brulay v. United States*, 383 F.2d 345, 349 n.5 (9th Cir. 1967) ("[I]f the statement is not voluntarily given, whether given to a United States or foreign officer[ ]— the defendant has been compelled to be a witness against himself when the statement is admitted.")

Given these concerns about the Taiwanese government's lack of procedural safeguards, the Court should exercise its discretionary authority to exclude such statements when the government seeks to use such testimony against a defendant, including a corporate defendant like Jinhua.  This is especially appropriate when, as here, the U.S. government specifically requested the foreign authorities to conduct at least some of the interviews even after the case was indicted and Jinhua and UMC were represented by counsel, and did so over the objections of both UMC's and Jinhua's company counsel.  Put simply, the government should not be able to ask for testimony to be taken by foreign law enforcement in another country—or to benefit from such interrogations—when the witnesses were denied important constitutional protections, designed to ensure the credibility and voluntariness of such statements, that would be afforded if the interviews took place in the United States.

At a minimum, this Court should require the government to call the MJIB agents and prosecutors who were present at these interviews so that they can be cross examined about the accuracy and adequacy of the records, the facts and circumstances surrounding the questioning, and what rights, if any, were afforded to the witnesses.  The U.S. government, as is its right, has decided to prosecute a case in the United States despite pending criminal proceedings relating to the same issues in Taiwan.  But the fact that the Taiwan government may have taken some investigative activities that the U.S. government seeks to use in this case does not absolve the government of its requirement to present trustworthy, credible, admissible evidence under the Federal Rules.

21

IV.     **CONCLUSION**

For the reasons set forth above, this Court should deny the government's Motion to admit hearsay statements that employees of UMC or Jinhua provided to Taiwan law enforcement and in depositions in a civil lawsuit.[11]

Dated: December 22, 2021

SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

By: _____*/s/ Matthew E. Sloan*_____
MATTHEW E. SLOAN
Attorneys for Defendant
FUJIAN JINHUA INTEGRATED CIRCUIT CO., LTD.

---

[11]    If 801(d)(2)(D) does not apply, then these statements are hearsay, and should not be admitted for the truth of the matter asserted.  Jinhua notes the statements made to the Taiwanese MJIB and in the civil depositions because these statements were testimonial in nature and Jinhua did not have an opportunity to cross examine these witnesses, so admission of these statements would violate the Confrontation Clause depending on what other hearsay exception or exclusion may apply. *See Crawford v. Washington*, 541 U.S. 36, 51-52 (2004).  Jinhua reserves its rights to make any and all other objections, including based on the Confrontation Clause, if and when these statements are presented at trial.