JACK P. DICANIO (SBN 138782)
Jack.DiCanio@skadden.com
EMILY REITMEIER (SBN 305512)
Emily.Reitmeier@skadden.com
OSAMA ALKHAWAJA (SBN 334404)
Osama.Alkhawaja@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
525 University Avenue
Palo Alto, California 94301
Telephone:     (650) 470-4500
Facsimile:     (650) 470-4570

MATTHEW E. SLOAN (SBN 165165)
Matthew.Sloan@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071-3144
Telephone:     (213) 687-5000
Facsimile:     (213) 687-5600

*Attorneys for Defendant*
FUJIAN JINHUA INTEGRATED CIRCUIT CO., LTD.

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>UNITED MICROELECTRONICS CORPORATION, *et al.*,<br><br>Defendants. | CASE NO.: 3:18-cr-00465-MMC<br><br>**DEFENDANT FUJIAN JINHUA INTEGRATED CIRCUIT CO., LTD.'S NOTICE OF ERRATA**<br><br>Judge: The Honorable Maxine M. Chesney<br>Trial Date: February 28, 2022 |

**TO PLAINTIFFS AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that Defendant Fujian Jinhua Integrated Circuit Co., Ltd. ("Jinhua") files this Notice of Errata to Amend Certain Trial Transcript cites included in Defendant Fujian Jinhua Integrated Circuit Co., Ltd.'s Motion For Judgment Of Acquittal Pursuant To Fed. R. Crim. P. 29; and Memorandum Of Points And Authorities In Support Thereof.  Volume 19 of the Trial Transcript contained a transposed page number at the beginning of the transcript which led to incorrect pagination for volumes 19 and 20 of the transcript.  A corrected transcript has now been provided by the court reporter with the correct pagination.  Attached to this Notice is an Amended and Corrected Motion For Judgment Of Acquittal Pursuant To Fed. R. Crim. P. 29; and Memorandum Of Points And Authorities In Support Thereof which corrects the citations referring to the original, incorrectly paginated transcript.  For the convenience of the Court, the following corrections were made in the Motion:

| Page 4:10 | Trial Tr., Vol. XIX, at 3657:03-3657:24 |
|---|---|
| Page 5:10 | Trial Tr., Vol. XIX, at 3585:10-3586:06 |
| Page 5:14-15 | Trial Tr., Vol. XVI, at 3017:15-3017:18, Vol. XIX, at 3580:02-3580:06 |
| Page 5:16 | Trial Tr., Vol. XX, at 3835:15-3835:23 |
| Page 7:5 | Trial Tr. Vol. XVII, at 3209:23-3226:03, Vol. XIX, at 3548:21-3548:24, Vol. XVIII, at 3468:01-3469:04 |
| Page 7:18 | Trial Tr., Vol. XIX, at 3644:16-3644:21; P0709T |
| Page 11:2 | Trial Tr., Vol. XX, at 3723:22-3731:11; P0561 |
| Page 11:22 | Trial Tr., Vol. XVIII, at 3455:06-3456:18; Vol. XVI, at 3016:01-3016:13; Vol. XIX, at 3533:03-3543:18; D3061 |
| Page 12:1 | Vol. XIX, at 3547:05-3547:14; D3162; D3162 |
| Page 33:11 | Trial Tr., Vol. XIX, at 3615:16-3616:10 |

**DEFENDANT FUJIAN JINHUA INTEGRATED CIRCUIT CO., LTD.'S NOTICE OF ERRATA**

**CASE NO.: 3:18-cr-00465-MMC**

1  DATED: April 7, 2022

2                              SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

3

4

5                              By:  _____/s/ Jack P. DiCanio_____
                                              Jack P. DiCanio

6                                        Attorneys for Defendant
                                   FUJIAN JINHUA INTEGRATED CIRCUIT CO., LTD.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DEFENDANT FUJIAN JINHUA INTEGRATED CIRCUIT CO., LTD.'S**          **CASE NO.: 3:18-cr-00465-MMC**
**NOTICE OF ERRATA**

# Amended and Corrected
# Motion For Judgment Of Acquittal Pursuant To Fed. R. Crim. P. 29

JACK P. DICANIO (SBN 138782)
Jack.DiCanio@skadden.com
EMILY REITMEIER (SBN 305512)
Emily.Reitmeier@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
525 University Avenue
Palo Alto, California 94301
Telephone:      (650) 470-4500
Facsimile:      (650) 470-4570

MATTHEW E. SLOAN (SBN 165165)
Matthew.Sloan@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071-3144
Telephone:      (213) 687-5000
Facsimile:      (213) 687-5600

*Attorneys for Defendant*
FUJIAN JINHUA INTEGRATED CIRCUIT CO., LTD.

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                          Plaintiff,<br><br>          v.<br><br>UNITED MICROELECTRONICS<br>CORPORATION, *et al.*,<br><br>                          Defendants. | CASE NO.: 3:18-cr-00465-MMC<br><br>**DEFENDANT FUJIAN JINHUA INTEGRATED CIRCUIT CO., LTD.'S MOTION FOR JUDGMENT OF ACQUITTAL PURSUANT TO FED. R. CRIM. P. 29; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF;**<br><br>Judge: The Honorable Maxine M. Chesney<br>Trial Date: February 28, 2022 |

1

## <u>TABLE OF CONTENTS</u>

2
Page

3

TABLE OF AUTHORITIES ................................................................................................. iii

4

MEMORANDUM OF POINTS AND AUTHORITIES ....................................................... 1

5
    I.       INTRODUCTION ........................................................................................ 1

6
    II.      FACTUAL BACKGROUND ....................................................................... 2

7
         A.     The Indictment ................................................................................. 2

8
         B.     The Evidence At Trial ...................................................................... 4

9
              1.     Background ........................................................................... 4

10
              2.     The Alleged Conspiracy to Steal Micron Trade Secrets ..... 6

11
                    (a)    Initiation of The Alleged Conspiracy ................... 6

12
                    (b)    UMC Devices ........................................................ 7

13
                    (c)    Project M ............................................................... 9

14
                    (d)    Law Enforcement Involvement ........................... 12

15
               3.     Defendant Jinhua ............................................................... 12

16
               4.     Post-Indictment .................................................................. 16

17
    III.     ARGUMENT ............................................................................................. 17

18
         A.     The Governing Legal Standard ...................................................... 17

19
              1.     Rule 29 and Insufficiency of the Government's Evidence ........... 17

20
              2.     An Entity Can Be Held Responsible Only for Criminal Acts
                      of Its Agents Committed Within the Scope of Their Authority

21
                      And of Which It Had Knowledge ................................... 18

22
          B.     The Court Should Enter a Judgment of Acquittal on Counts I and II
              Because the Government Has Failed to Prove the Existence of a

23
               Conspiracy to Which Jinhua was a Party .................................... 20

24
          C.     The Court Should Enter a Judgment of Acquittal As To All Counts
               Because the Government Has Failed to Prove a Crime or Knowledge

25
               of an Individual that Can Be Imputed to Jinhua ......................... 29

26
              1.     Stephen Chen ..................................................................... 30

27

28

(a)     The government failed to show that Mr. Chen committed any criminal acts or had knowledge of the commission of criminal acts ............................................... 30

(b)     The government failed to show that Mr. Chen was Jinhua's agent during the relevant times ........................... 34

(c)     The government failed to show that Mr. Chen's alleged knowledge of, or participation in, the conspiracy occurred in the scope of his purported Jinhua authority ............................................................ 37

2.     JT Ho, Neil Lee, and Ray Guo ....................................................... 39

D.     The Court Should Enter a Judgment of Acquittal As To All Counts Because the Government Has Neither Alleged Nor Proved That "An Act In Furtherance of The Offense Was Committed In The United States," And Extraterritorial Application of §§ 1831 and 1832 Would Also Violate Due Process .......................................................... 42

1.     The Indictment is Deficient Because It Failed To Charge that "Act In Furtherance of The Offense Was Committed In The United States" ................................................................. 43

2.     The Government Has Failed to Present Evidence Sufficient to Satisfy § 1837(2) .................................................................. 45

3.     Extraterritorial Application of §§ 1831 and 1832 Would Violate Due Process ................................................................... 47

IV.     CONCLUSION ................................................................................... 48

ii

1

### TABLE OF AUTHORITIES

2

### CASES

3

*Associated Aircraft Parts, Inc. v. Lockheed Corp.,*
    959 F.2d 239 (9th Cir. 1992) ................................................................................. 29

4

*Beijing Neu Cloud Oriental System Technology Co. v. IBM,*
    21 Civ. 7589 (AKH), 2022 WL 889145 (S.D.N.Y. Mar. 25, 2022) ................................... 43

5

*Barnhart v. New York Life Insurance Co.,*
    141 F.3d 1310 (9th Cir. 1998) .............................................................................. 35

6

7

*Basura v. U.S. Home Corp.,*
    98 Cal. App. 4th 1205 (2002) .............................................................................. 40

8

*Blue Circle Atlantic, Inc. v. Hill Top Developers, Inc.,*
    30 F.3d 139 (9th Cir. 1994) ................................................................................. 28

9

10

*Board of Trustees of Western Conference of Teamsters Pension Trust Fund v. H.F.*
    *Johnson, Inc.,*
    830 F.2d 1009 (9th Cir. 1987) .............................................................................. 27

11

12

*Briceno v. Scribner,*
    555 F.3d 1069 (9th Cir. 2009) .............................................................................. 31

13

*C.I.T. Corp. v. United States,*
    150 F.2d 85 (9th Cir. 1945) ................................................................................. 37

14

15

*In re ChinaCast Education Corp. Securities Litigation,*
    809 F.3d 471 (9th Cir. 2015) ................................................................... 19, 37, 41

16

*Connor v. Great W. Savs. & Loan Ass'n,*
    69 Cal. 2d 850, 863 (1968) ................................................................................. 27

17

18

*Cooper Industries, Inc. v. Leatherman Tool Group, Inc.,*
    532 U.S. 424 (2001) ........................................................................................... 19

19

*Curley v. United States,*
    160 F.2d 229 (D.C. Cir. 1947) ....................................................................... 17, 18

20

21

*Curtis, Collins & Holbrook Co. v. United States,*
    262 U.S. 215 (1923) ..................................................................................... 19, 37

22

*Dye v. Tamko Building Products, Inc.,*
    908 F.3d 675 (11th Cir. 2018) ........................................................................ 19, 37

23

24

*El Ranco, Inc. v. First Natural Bank of Nevada,*
    406 F.2d 1205 (9th Cir. 1968) .................................................................. 19, 37, 41

25

*Empire Printing Co v. Roden,*
    247 F.2d 8 (9th Cir. 1957) ............................................................................ 18, 34

26

27

28

*Exxon Shipping Co. v. Baker*,
    554 U.S. 471 (2008) ................................................................................................. 30

*Fontana v. Chef's Warehouse Inc.*,
    16-CV-06521-HSG, 2017 WL 2591872 (N.D. Cal. June 15, 2017) ................................. 40

*Frankfort Marine, Accident & Plate Glass Insurance Co. v. John B. Stevens & Co.*,
    220 F. 77 (9th Cir. 1915) ..................................................................................... 19, 37, 41

*Freeman v. HSBC Holdings PLC*,
    413 F. Supp. 3d 67 (E.D.N.Y. 2019) ................................................................................. 25

*Gold v. Dermouflage, Inc.*,
    100 F.3d 962 (9th Cir. 1996) ............................................................................................ 28

*Gonzales v. Gipson*,
    701 F. App'x 558 (9th Cir. 2017) ..................................................................................... 34

*Gonzalez v. Google LLC*,
    2 F.4th 871 (2021), *rehearing and rehearing en banc denied*,
    21 F.4th 665 (9th Cir. 2022) ............................................................................................. 23

*Hamilton Foundry & Machine Co. v. International Molders & Foundry Workers Union of
    North America*,
    193 F.2d 209 (6th Cir. 1951) ............................................................................................ 40

*Hardwood Package Co. v. Courtney Co.*,
    253 F. 929 (4th Cir. 1918) ................................................................................................ 40

*In re Hellenic Inc.*,
    252 F.3d 391 (5th Cir. 2001) ...................................................................................... 19, 37

*HK China Group, Inc. v. Beijing United Automobile & Motorcycle Manufacturing Corp.*,
    417 F. App'x 664 (9th Cir. 2011) ..................................................................................... 29

*In re Hoag Urgent Care-Tustin, Inc.*,
    No. 21-55452, 2022 WL 486630 (9th Cir. Feb. 17, 2022) ................................................ 29

*Huston v. Procter & Gamble Paper Products Corp.*,
    568 F.3d 100 (3d Cir. 2009) ............................................................................................. 20

*Jackson v. Virginia*,
    443 U.S. 307 (1979) ..................................................................................................... 4, 17

*Kemper v. Deutsche Bank AG*,
    911 F.3d 383 (7th Cir. 2018) ............................................................................................ 25

*Kimbro v. Atlantic Richfield Co.*,
    889 F.2d 869 (9th Cir. 1989) ...................................................................................... 19, 37, 41

*Kolstad v. ADA*,
    527 U.S. 526 (1999) ......................................................................................................... 19

*Lee v. United States,*
106 F.2d 906 (9th Cir. 1939) ....................................................................................... 46

*Levin v. United States,*
5 F.2d 598 (9th Cir. 1925) ........................................................................................... 27

*Luminati Networks Ltd. v. BIScience Inc.,*
2:18-CV-00483-JRG, 2019 WL 2084426 (E.D. Tex. May 13, 2019) ................................. 45

*Martinez v. Gonzalez,*
878 F.2d 1438 (9th Cir. 1989) ..................................................................................... 28

*Motorola Solutions, Inc. v. Hytera Communications Corp. Ltd.,*
436 F. Supp. 3d 1150 (N.D. Ill. 2020) ........................................................................... 47

*Nationwide Mutual Insurance Co. v. Darden,*
503 U.S. 318 (1992) ..................................................................................................... 35

*New York Central & Hudson River Railroad Co. v. United States,*
212 U.S. 481 (1909) ............................................................................................. 18, 41

*Pacey v. McKinney,*
125 F. 675 (9th Cir. 1903) ........................................................................................... 40

*Pac. Mut. Life Ins. Co. v. Haslip,*
499 U.S. 1 (1991) ......................................................................................................... 19

*PCS Sales (USA), Inc. v. Nitrochem Distribution Ltd.,*
128 F. App'x 817 (2d Cir. 2005) ................................................................................... 40

*Phillips v. United States,*
356 F.2d 297 (9th Cir. 1965) ....................................................................................... 31

*Rehaif v. United States,*
139 S. Ct. 2191 (2019) ................................................................................................. 42

*Resolution Trust Corp. v. BVS Development, Inc.,*
42 F.3d 1206 (9th Cir. 1994) ....................................................................................... 27

*RJR Nabisco, Inc. v. European Cmty.,*
579 U.S. 325 (2016) ..................................................................................................... 42

*Ruberoid Co. v. Roy,*
240 F. Supp. 7 (E.D. La. 1965) ..................................................................................... 39

*Russell v. United States,*
369 U.S. 749 (1962) ............................................................................................... 43, 44

*Sleight v. United States,*
82 F.2d 459 (D.C. Cir. 1936) ....................................................................................... 27

*Stone v. First Wyoming Bank,*
625 F.2d 332 (10th Cir. 1980) ..................................................................................... 27

*United States v. Ansani,*
   138 F. Supp. 454 (N.D. Ill. 1956), *aff'd,* 240 F.2d 216 (7th Cir. 1957) ............................... 27

*United States v. Automated Medical Laboratories, Inc.,*
   770 F.2d 399 (4th Cir. 1985) ............................................................................................... 38

*United States v. Bank of New England,*
   821 F.2d 844 (1st Cir. 1987)......................................................................................... 19, 37

*United States v. Beusch,*
   596 F.2d 871 (9th Cir. 1979) ....................................................................................... 18, 38

*United States v. Bibbero,*
   749 F.2d 581 (9th Cir. 1984) ............................................................................................... 22

*United States v. Blankenship,*
   970 F.2d 283 (7th Cir. 1992) ............................................................................................... 22

*United States v. Carll,*
   105 U.S. 611 (1881)....................................................................................................... 43, 44

*United States v. Cassese,*
   428 F.3d 92 (2d Cir. 2005)................................................................................................... 17

*United States v. Castillo,*
   406 F.3d 806 (7th Cir. 2005) ............................................................................................... 45

*United States v. Cecil,*
   608 F.2d 1294 (9th Cir. 1979) ............................................................................................. 44

*United States v. Cincotta,*
   689 F.2d 238 (1st Cir. 1982) ............................................................................................... 38

*United States v. Davis,*
   506 F. App'x 612 (9th Cir. 2013) ........................................................................................ 31

*United States v. Davis,*
   905 F.2d 245 (9th Cir. 1990) ............................................................................................... 47

*United States v. Debrow,*
   346 U.S. 374 (1953)............................................................................................................. 43

*United States v. Delgado,*
   357 F.3d 1061 (9th Cir. 2004) ............................................................................................. 18

*United States v. Demauro,*
   581 F.2d 50 (2d Cir. 1978)................................................................................................... 38

*United States v. Dotterweich,*
   320 U.S. 277 (1943)............................................................................................................. 18

*United States v. Espinoza-Valdez,*
   889 F.3d 654 (9th Cir. 2018) ......................................................................................... 24, 25

*United States v. Gipe,*
    672 F.2d 777 (9th Cir. 1982) ............................................................ 42

*United States v. Glenn,*
    312 F.3d 58 (2d Cir. 2002)................................................................ 18

*United States v. Gold,*
    743 F.2d 800 (11th Cir. 1984) .......................................................... 38

*United States v. Hector,*
    474 F.3d 1150 (9th Cir. 2007) .......................................................... 45

*United States v. Hooker,*
    841 F.2d 1225 (4th Cir. 1988) .......................................................... 44

*United States v. Hughes Aircraft Co.,*
    20 F.3d 974 (9th Cir. 1994) ............................................................. 18

*United States v. Josleyn,*
    206 F.3d 144 (1st Cir. 2000) ................................................. 19, 37, 41

*United States v. Kaplan,*
    554 F.2d 958 (9th Cir. 1977) ............................................................ 47

*United States v. Keith,*
    605 F.2d 462 (9th Cir. 1979) ............................................................ 44

*United States v. Klimavicius-Viloria,*
    144 F.3d 1249 (9th Cir. 1998) .......................................................... 48

*United States v. Kurka,*
    818 F.2d 1427 (9th Cir. 1987) .......................................................... 44

*United States v. Lennick,*
    18 F.3d 814 (9th Cir. 1994) ............................................................. 25

*United States v. Leonard,*
    777 F. Supp. 2d 1025 (W.D. Va. 2011) ............................................. 22

*United States v. Loveland,*
    825 F.3d 555 (9th Cir. 2016) ............................................................ 24

*United States v. Magallon-Jimenez,*
    219 F.3d 1109 (9th Cir. 2000) .......................................................... 17

*United States v. Mann,*
    389 F.3d 869 (9th Cir. 2004) ............................................................ 45

*United States v. McDonald,*
    576 F.2d 1350 (9th Cir. 1978) .......................................................... 31

*United States v. Melchor-Lopez,*
    627 F.2d 886 (9th Cir. 1980) ..................................................... 21, 40

*United States v. Morrison,*
536 F.2d 286 (9th Cir. 1976) ............................................................................... 43

*United States v. Narum,*
577 F. App'x 689 (9th Cir. 2014) ........................................................................ 47

*United States v. Nevils,*
598 F.3d 1158 (9th Cir. 2010) ............................................................................. 21

*United States v. Omer,*
395 F.3d 1087 (9th Cir. 2005) ............................................................................. 44

*United States v. One Parcel of Land Located at 7326 Highway 45 North, Three Lakes,*
*Oneida County, Wisconsin,*
965 F.2d 311 (7th Cir. 1992) ............................................................................... 38

*United States v. One Parcel of Real Estate Consisting of Approximately 4,657 Acres,*
*Located in Martin County, Fla.,*
730 F. Supp. 423 (S.D. Fla. 1989) ................................................................. 19, 37

*United States v. Perez,*
962 F.3d 420 (9th Cir. 2020) ............................................................................... 44

*United States v. Perlaza,*
439 F.3d 1149 (9th Cir. 2006) ............................................................................. 43

*United States v. Pernillo-Fuentes,*
252 F.3d 1030 (9th Cir. 2001) ............................................................................. 43

*United States v. Piepgrass,*
425 F.2d 194 (9th Cir. 1970) ............................................................................... 41

*United States v. Pierce,*
224 F.3d 158 (2d Cir. 2000) ................................................................................ 27

*United States v. Read,*
918 F.3d 712 (9th Cir. 2019) ............................................................................... 53

*United States v. Richmond,*
700 F.2d 1183 (8th Cir. 1983) ................................................................. 32, 34, 35

*United States v. Rios,*
449 F.3d 1009 (9th Cir. 2006) ......................................................................... 45, 47

*United States v. Rosenblatt,*
554 F.2d 36 (2d Cir. 1977) .................................................................................. 32

*United States v. Salman,*
378 F.3d 1266 (11th Cir. 2004) ........................................................................... 27

*United States v. Spinner,*
180 F.3d 514 (3d Cir. 1999) ................................................................................ 44

*United States v. Townsend*,
    924 F.2d 1385 (7th Cir. 1991) ................................................................. 32

*United States v. Triumph Capital Group, Inc.*,
    544 F.3d 149 (2d Cir. 2008)..................................................................... 28

*United States v. Ulbricht*,
    31 F. Supp. 3d 540 (S.D.N.Y. 2014)....................................................... 34

*United States v. Wood*,
    259 F. App'x 48 (9th Cir. 2007) .............................................................. 47

*Vendavo, Inc. v. Price f(x) AG*,
    No. 17-cv-06930-RS, 2018 WL 1456697 (N.D. Cal. Mar. 23, 2018) ................................. 43

*Windsor v. United States*,
    384 F.2d 535 (9th Cir. 1967) ................................................................... 30

*World-Wide Volkswagen Corp. v. Woodson*,
    444 U.S. 286, 297 (1980)......................................................................... 48

*Yates v. United States*,
    354 U.S. 298 (1957)................................................................................. 45

**STATUTES AND RULES**

18 U.S.C. § 1831 ...........................................................................................*passim*

18 U.S.C. § 1832 ................................................................................................ 42, 47

18 U.S.C. § 1837 ...........................................................................................*passim*

Fed. R. Crim. P. 18 .......................................................................................... 44

Fed. R. Crim. P. 29 .......................................................................................... 17

**OTHER AUTHORITIES**

Addition of An Entity to the Entity List, Nat'l Archives Fed. Reg. (Oct. 30, 2018),
    https://www.federalregister.gov/documents/2018/10/30/2018-23693/addition-of-an-entity-to-the-entity-list ................................................ 1

*Agency Law Inside the Corporation: Problems of Candor and Knowledge*,
    71 U. Cin. L. Rev. 1187 (2003) .............................................................. 19

*Create*, Merriam-Webster.com (2022),
    https://www.merriam-webster.com/dictionary/create........................... 32

J. William Callison & Maureen A. Sullivan, *Partnership Law & Practice: General & Limited Partnerships*, § 14:7 (2021-2022)........................................... 27

*Oliver Wendell Holmes, The Path of the Law*,
    10 Harv. L. Rev. 457 (1897) ..................................................................... 30

Prosser, Torts, 352 (2d ed. 1955) ......................................................................... 38

Restatement (Second) of Agency § 217C (Am. L. Inst. 1958) ............................. 19

Restatement (Second) of Agency § 217D (Am. L. Inst. 1958) ............................. 19

Restatement (Third) of Agency § 1.01 (Am. L. Inst. 2006) ...................... 35, 36, 37

Restatement (Third) of Agency § 5.03 (Am. L. Inst. 2006) ................................. 20

Restatement (Third) of Agency § 7.07 (Am. L. Inst. 2006) ................................. 35

Ryan Lucas, *The Justice Department is ending its controversial China Initiative*, NPR
    (February 23, 2022), https://www.npr.org/2022/02/23/1082593735/justice-
    department-china-initiative ................................................................................ 1

The United States Department of Justice, *Attorney General Jeff Sessions Announces New
    Initiative to Combat Chinese Economic Espionage* (Nov. 1, 2018),
    https://www.justice.gov/opa/speech/attorney-general-jeff-sessions-announces-new-
    initiative-combat-chinese-economic-espionage ...................................................... 1

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.      <u>INTRODUCTION</u>**

The prosecution of Jinhua did not arise in a vacuum. On November 1, 2018, then-Attorney General Jeff Sessions announced the "China Initiative"—a Department of Justice project designed to "stand[] up to the deliberate, systematic, and calculated threats posed, in particular, by the communist regime in China, which is notorious around the world for intellectual property theft." The United States Department of Justice, *Attorney General Jeff Sessions Announces New Initiative to Combat Chinese Economic Espionage* (Nov. 1, 2018), https://www.justice.gov/opa/speech/attorney-general-jeff-sessions-announces-new-initiative-combat-chinese-economic-espionage. He called out Jinhua, boasting of "an indictment alleging economic espionage on the part of a Chinese state-owned, government owned, company . . . to steal trade secrets from Micron, an Idaho-based semi-conductor company." *Id.* The U.S. government placed Jinhua on the "Entity List" the day before this announcement, banning U.S. companies from exporting parts to Jinhua. (Trial Tr., Vol. XVI, at 2944:20-2944:25.) *See* Addition of An Entity to the Entity List, Nat'l Archives Fed. Reg. (Oct. 30, 2018), https://www.federalregister.gov/documents/2018/10/30/2018-23693/addition-of-an-entity-to-the-entity-list.

However, after the change in administrations—and, ironically, just days before this trial commenced—the DOJ announced "that it [was] scrapping its China Initiative." Ryan Lucas, *The Justice Department is ending its controversial China Initiative*, NPR (February 23, 2022), https://www.npr.org/2022/02/23/1082593735/justice-department-china-initiative. The prejudgment of the China Initiative is borne out by the failure of the government's proof at trial against Jinhua. There was no Chinese government-led nefarious scheme to steal trade secrets from a United States company. At most, the government has proved crimes by individual employees of a Taiwanese company. <u>The prosecution introduced no evidence that Jinhua had any knowledge of, or participated in, the alleged theft of trade secrets by the Taiwan nationals working for UMC.</u>

Despite a cooperation agreement with UMC, the government lacked any percipient witness who could testify directly about the wrongful acts the prosecution seeks to impute to Jinhua. Instead,

the government has stretched hearsay exceptions to the breaking point to marshal a patchwork of documents, some without an identified author, and many with no testimony about their meaning from a party to the communication. This Airmail approach presumes the Court will fill in the blanks and draw speculative inferences in the prosecution's favor. The strategy would be questionable even in a civil case where the burden is to prove a scenario was more likely than not. It has fallen far short of the criminal law standard of proof beyond a reasonable doubt.

Pursuant to Federal Rule of Criminal Procedure 29, the Court should enter a judgment of acquittal because no rational factfinder could conclude beyond a reasonable doubt that Jinhua is guilty of **any of the charges**. The government failed to prove that:

- There was a conspiracy—a criminal agreement—to which Jinhua was a party.
- Jinhua and UMC were in a joint venture or, even if they were, that Jinhua could be held responsible for UMC's employees' actions.
- Stephen Chen committed or knew about any unlawful acts.
- Criminal acts could be imputed to Jinhua based its employment of Mr. Chen.
- Any other UMC employee, including JT Ho, Neil Lee, and Ray Guo, were ever Jinhua agents or, alternatively, that their alleged criminal acts could be imputed to Jinhua.
- An act in furtherance of each of the crimes charged was committed in the United States or that extraterritoriality would comport with due process.

## II.     FACTUAL BACKGROUND

### A.     The Indictment

The Indictment alleged a conspiracy among United Microelectronics Corporation ("UMC"), a Taiwan semiconductor foundry; Defendant Fujian Jinhua Integrated Circuit, Co., Ltd. ("Jinhua"), a purported state-owned enterprise of the People's Republic of China; and three Taiwan nationals: Stephen Chen, JT Ho, and Kenny Wang, involving the theft of Micron Technology Inc.'s trade secrets. The Indictment alleged that UMC hired Mr. Chen to be a senior vice president, and that Mr. Chen recruited and hired several Micron employees, including Mr. Ho and Mr. Wang, to work for UMC. (Indictment (ECF 1), at ¶¶ 22–23.) Prior to leaving UMC, Mr. Ho allegedly stole Micron trade

1    secrets and used them to support UMC's design of DRAM technology. (*Id.* at ¶ 24.) Mr. Ho also

2    allegedly communicated with Mr. Wang, who was still working for Micron, to obtain additional

3    Micron trade secrets. (*Id.* at ¶ 25.) Mr. Wang also allegedly downloaded trade secrets belonging to

4    Micron, attempted to mask his theft of trade secrets, quit his job at Micron, began working for UMC,

5    and used those trade secrets to help develop UMC's DRAM technology. (*Id.* at ¶¶ 26–30.)

6        The Indictment alleged very little linking Jinhua to the unlawful conduct. The Indictment

7    alleged that "the PRC formed and funded Jinhua for the purpose of developing, designing, and mass-

8    producing advanced DRAM technology," and that Jinhua and UMC entered into an agreement for

9    Jinhua to provide funding to UMC for the development of DRAM technology that would be

10    transferred to Jinhua for Jinhua to manufacture. (*Id.* at ¶¶ 19–20, 36.) The Indictment also alleged

11    that "Chen, UMC, Jinhua, and government officials from the PRC attended a Jinhua/UMC recruiting

12    fair in the Northern District of California to recruit employees from the United States with semi-

13    conductor experience to work for both companies in either the research and development or sales or

14    marketing division," that "Chen and others from UMC and Jinhua, including the mayors from the

15    PRC cities of Jinjiang and Quanzhou, also visited several semiconductor equipment-manufacturing

16    companies in the Northern District of California to facilitate its DRAM production process," and that

17    "Chen, UMC, and Jinhua had obtained and were in the continuous control of stolen Micron trade

18    secrets" while in California. (*Id.* at ¶¶ 31, 46–47.) The Indictment further alleged that "UMC and

19    Jinhua filed five patents and a patent application concerning DRAM technology that contained

20    information that was the same or very similar to technology described in" Micron trade secrets. (*Id.*

21    at ¶ 32, 45.) Finally, the Indictment alleged that in February 2017, Mr. Chen "assumed the post of

22    President of Jinhua." (*Id.* at ¶ 34.)

23        The Indictment failed to allege facts showing that Jinhua had any knowledge of or

24    participated in the theft of Micron trade secrets by Mr. Ho and Mr. Wang. Nor did the Indictment

25    allege a required element for the offenses charged against Jinhua—that "an act in furtherance of

26    [each] offense was committed in the United States." 18 U.S.C. § 1837(2). Nonetheless, the

27    Indictment alleged three counts against Jinhua:

28

**JINHUA'S INTEGRATED CIRCUIT CO., LTD.'S MOTION FOR JUDGMENT      CASE NO.: 3:18-cr-00465-MMC**
**OF ACQUITTAL PURSUANT TO FED. R. CRIM. P. 29**

Count One: Conspiracy to Commit Economic Espionage, in violation of 18 U.S.C. § 1831(a)(5).

Count Two: Conspiracy to Commit Theft of Trade Secrets, in violation of 18 U.S.C. § 1832(a)(5).

Count Seven: Economic Espionage (Receiving and Possessing Stolen Trade Secrets), in violation of 18 U.S.C. §§ 1831(a)(3) and 2.

As set forth below, the Court should enter a judgment acquitting Jinhua on all three counts.

## B.   The Evidence At Trial[1]

### 1.   Background

Computers contain both logic and memory semiconductor chips. (Trial Tr., Vol. IV, at 685:03-685:05.) Memory stores digital bits, and logic processes those bits in various electronics. (Trial Tr., Vol. XIX, at 3657:03-3657:24.) "DRAM is effectively the main memory that's used in almost every application . . . from refrigerators to cars to televisions, to . . . computers and phones." (Trial Tr., Vol. VII, at 1148:08-1148:11.) There are at least hundreds, sometimes thousands, of steps, called a "process flow," that describe at a high level how a semiconductor wafer will be processed into DRAM chips. (*Id.* at 1141:21-1142:04, 1143:03-1143:10.) A wafer contains hundreds of chips. A fabrication plant ("fab"), or foundry, manufactures chips—that is, it processes the wafer into DRAM chips. (Trial Tr., Vol. IV, at 686:15-686:17.) Each DRAM semiconductor chip is cut from the wafer and then packaged into an integrated circuit that can be used in computers, phones, etc. (Trial Tr., Vol. VII, at 1166:04-1168:04.)

Micron Technology was a memory semiconductor manufacturing company headquartered in Boise, Idaho. (Trial Tr., Vol. I, at 62:08-62:21.) Micron Memory Taiwan ("MMT") was a subsidiary of Micron Technology located in Taichung City, Taiwan. (*Id.*) Relevant to this case, two other memory semiconductor companies were Elpida Memory, Inc., a Japanese company, and Powerchip Technology Corporation, a Taiwanese company. (*Id.* at 66:03-66:19.) Sometime before 2007, Elpida and Powerchip formed Rexchip as a Taiwanese joint venture to operate a DRAM fab. (*Id.* at 66:21-

---

[1] The evidence is presented "in the light most favorable to the prosecution," as is currently required. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

*(cont'd)*

67:04.) Elpida transferred its DRAM design to Rexchip to manufacture chips in Taiwan, including DRAM chip designs at the 25-nanometer node.[2] (Trial Tr., Vol. XVIII, at 3426:23-3427:03.) Stephen Chen was a senior vice president at Powerchip. (Trial Tr., Vol. XVI, at 3066:18-3066:23.) In March 2007, Mr. Chen was named the general manager of Rexchip. (Trial Tr., Vol. I, at 86:11-86:21, 125:01-125:02; Vol. XVI, at 3066:18-3066:23.)

Micron had attempted but failed to design DRAM chips at the 25-nanometer node. (Trial Tr., Vol. VIII, at 1398:03-1398:09.) On July 31, 2013, Micron acquired Rexchip and Elpida, and as a result, acquired Elpida's 25-nanometer DRAM process—the DRAM process that is at issue in this case. (Trial Tr., Vol. XVIII, at 3426:23-3427:01.) Micron subsequently used Elpida's 25-nanometer process. (Trial Tr., Vol. XIX, at 3585:10-3586:06.) As part of the acquisition, it also acquired Rexchip and Elpida's fabs. Notably, the former Rexchip site in Taiwan became MMT's "Fab 16." (Trial Tr., Vol. I, at 65:14-65:25, 194:25–195:05, Vol. XVIII, at 3426:03-3426:22.) As a result of the acquisition, only three companies in the world produced the vast majority of advanced DRAM technology—Micron, Samsung, and Hynix. (Trial Tr., Vol. XVI, at 3017:15-3017:18, Vol. XIX, at 3580:02-3580:06.) But Micron's 25-nanometer technology was a generation behind the 20-nanometer leading edge technology at the time.[3] (Trial Tr., Vol. XX, at 3835:15-3835:23.)

After the acquisition, Mr. Chen became the site director for MMT's Fab 16. (Trial Tr., Vol. I, at 83:08–84:16.) Sandy Kuo assisted Mr. Chen with communications. (*Id.* at 87:13-87:25.) Four of the engineers allegedly working at the site were Neil Lee, JT Ho, Kenny Wang, and Ray Guo. (*Id.* at 95:16–102:06.)

On July 31, 2015, Stephen Chen left MMT and, several months later, was employed by UMC as a senior vice president. (Trial Tr., Vol. I, at 124–125, Vol. XVII, at 3093:15-3093:17.) UMC was a Taiwanese company and one of the leading foundries in the world. (Trial Tr., Vol. IV, at 686:17-

---

[2] A node is a common industry term used to refer to a different generation of process technology—it is based on "the smallest feature on the silicon wafer." (Trial Tr., Vol. VII, at 1143:17-1144:04.)

[3] "Leading edge" is an industry term used to describe the "most advanced technology capability node"—such a node requires the most time and effort to develop. (Trial Tr., Vol. VIII, at 1408:23-1409:09.)

686:25.) UMC had previously been involved in the DRAM business, but transitioned to mostly working on logic. (*Id.* at 689:01-689:23, 699:24-700:10.) Then, around 2016, an industry consensus emerged that there were many opportunities in DRAM. (*Id.* at 700:24-701:02.) As a result, "everybody in the industry tried to get into DRAM." (*Id.* at 700:22-700:23.)

Because semiconductors play a central and important role in the economy, the government's expert explained that any large country would want to be competitive in the semiconductor industry. (Trial Tr., Vol. XVI, at 2901:04-2901:13.) China is no exception. (*Id.* at 2901:14-2901:21.) In fact, China has set forth an official policy of increasing its domestic production of semiconductor chips to 70 percent by 2025. (*Id.* at 2908:02-2908:07.)

2.   The Alleged Conspiracy to Steal Micron Trade Secrets

(a)   Initiation of The Alleged Conspiracy

Much of the government's evidence consists of printed email exchanges, primarily from the period of Mr. Chen's transition from Micron to UMC. The government relies heavily on references in some of these emails to purported confidential—but non-trade secret—Micron (and some Samsung and Hynix) DRAM information. For example, on September 14, 2015, Tanaka Yoshinori sent a document that bears no Micron logo and no confidential marking—that the government contends is based on a non-trade secret Micron diagram comprising a Micron DRAM roadmap—to an email address allegedly belonging to Mr. Chen. (Trial Tr., Vol. XVI, at 3044:02–3060:20; P1046T.) Two days later, Mr. Chen allegedly forwarded this email to Bowen Huang, a UMC employee. (P1046T.) And that same day, Mr. Huang sent an email to UMC's chairman, copying Mr. Chen, with a presentation that included a similar version of the diagram sent by Mr. Tanaka. (Trial Tr., Vol. XVI, at 3061:06–3063:18; P0707T.) There was also testimony that later UMC DRAM documents incorporated elements from the forwarded document. (Trial Tr., Vol. XVI, at 3044:09–3044:16, 3054:21-3056:04.)

In October of 2015, Mr. Ho and Mr. Lee left Micron, and, shortly thereafter, joined UMC. (P0406T; P0417T.) In November of 2015, Mr. Ho sent Mr. Chen various emails containing non-trade secret information from established DRAM manufacturers, including Micron, Samsung, and

6

1   Hynix. (Trial Tr., Vol. XVII, at 3172:23-3182:25.) The government argues from some of the emails

2   that UMC intended to use Elpida's existing DRAM chip (subsequently, Micron's) as the

3   "benchmark" for its DRAM chip, although other evidence indicates that UMC intended to use

4   Samsung's DRAM chip as the "benchmark" for its DRAM chip. (Trial Tr. Vol. XVII, at 3209:23-

5   3226:03, Vol. XIX, at 3548:21-3548:24, Vol. XVIII, at 3468:01-3469:04.) The government also

6   introduced additional emails from Mr. Ho to Mr. Chen, and argued that these emails contained trade

7   secrets that mostly matched UMC's eventual final DRAM design. However, these emails contained

8   technical information, but notably bore no indicia of a competitor's trade secret information. (*Id.* at

9   3226:21-3229:06, 3241:12-3253:03; P0720; P0731T.)

10      On November 20, 2015, Mr. Chen sent an email to Mr. Ho which stated: "I am thinking to

11   build a core team from UMC, modules+integration~ 10 members to work with you guys." (P0889T.)

12   Mr. Ho's response copied Mr. Lee, and stated: "We got it. (Neil's computer is not ready yet, but

13   already inform him." (*Id.*) Also on November 20, 2015, Mr. Chen emailed UMC's CEO and

14   explained that he intended "[t]o start preparation for project development," and provided his plan for

15   moving forward. (Trial Tr., Vol. XI, at 1916:13-1916:22; P0730.0001.) In response, the CEO

16   suggested giving the project "the name of Project M (meaning Memory and Mainland China)." (Trial

17   Tr., Vol. XI, at 1918:25-1919:02; P0730.0001.) Project M's stated goal was to create a 25-nanometer

18   DRAM process technology "from scratch." (Trial Tr., Vol. XIX, at 3644:16-3644:21; P0709T.)

19                              (b)      UMC Devices

20      Around the time that Mr. Ho and Mr. Lee arrived at UMC, various computer-device

21   authorizations were obtained. On November 3, 2015, a secretary submitted an application for a

22   personal computer for a new hire in Fab 12A, a UMC facility in Tainan Science Industrial Park.

23   (Trial Tr., Vol. III, at 462:16-470:02; P1075T.0003-P1075T.0007.) After several IT employees

24   approved the request, Mr. Chen—to whom the request was sent as the project supervisor—denied

25   the request for "change in specifications." (*Id.*) After the request was resubmitted, Mr. Chen

26   approved it on November 19, 2015. (*Id.*) After further approval by another individual, the computer

27   was eventually delivered. (*Id.*) On November 20, 2015, another application for a personal computer

28

7

1  was submitted—this one specified that it was for Mr. Lee. (Trial Tr., Vol. III, at 457:06-462:15;

2  P1075T.0009-P1075T.0011.) After IT declined the request, it was resubmitted, and approved by IT.

3  (Trial Tr., Vol. III, at 457:06-462:15.) Mr. Chen then approved the request, it was further approved

4  by another individual, and eventually the requested computer was allegedly delivered to Fab 12A.

5  (*Id.*) At UMC, all requests from vice presidents and higher positions were treated as urgent VIP

6  requests. (*Id.* at 480:10-480:24.) The applications were treated as "urgent." (P1075T.0003;

7  P1075T.0009.)

8       That same month, applications for Mr. Ho and Mr. Lee to receive USB access for specific

9  computers were filled out by a secretary. (*Id.* at 553:02-554:22, 561:09-561:25.) There was no

10  testimony about why this request was made or who initially requested that access be provided. Mr.

11  Lee's application was approved by the applicant supervisor, and then by Mr. Chen, as Mr. Lee's

12  higher level supervisor, and Mr. Ho's application was approved by Mr. Chen, as Mr. Ho's direct

13  supervisor. (*Id.* at 555:13-555:19, 565:07-565:11.)

14       On December 4, 2015, UMC's IT department received a request to reformat hard drives. (*Id.*

15  at 567:16-567:20.) Because requests to reformat hard drives were uncommon, JC Cho, a UMC IT

16  department employee, decided to look at the USB log to determine the USB actions performed by

17  the users of the computers. (*Id.* at 568:01-568:03.) The initial cause for concern was the potential

18  leakage of data from UMC's servers. (*Id.* at 537:08-537:17.) The government has introduced

19  evidence that this log indicated that the hard drives that were reformatted were used by Mr. Ho and

20  Mr. Lee and that, between November 16, 2015, and December 4, 2015, USBs were used to access

21  files with names that corresponded to alleged Micron trade secrets. (Trial Tr., Vol. X, at 1663:12-

22  1667:22, Vol. XI, at 1959:08-1962:18.) There is no evidence that Mr. Chen ever saw or was told

23  about this log. The government has also introduced evidence from which it argues that Mr. Ho and

24  Mr. Lee accessed Micron trade secrets numerous times on various devices. (Trial Tr., Vol. IX, at

25  1546:21-1618:22.) Emails sent by Mr. Ho during this timeframe also contained alleged trade secrets.

26  (Trial Tr., Vol. XVII, at 3183:01-3194:20; P0890.)

27

28

**JINHUA'S INTEGRATED CIRCUIT CO., LTD.'S MOTION FOR JUDGMENT**       **CASE NO.: 3:18-cr-00465-MMC**
**OF ACQUITTAL PURSUANT TO FED. R. CRIM. P. 29**

1   That same day, applications were submitted by a secretary for Fab 12A for two solid state

2   hard disks. ("SSD").[4] (Trial Tr., Vol. II, at 417:04-423:08, Tr., Vol. III, at 451:04-457:05; P1147;

3   P1151.) The applications were eventually approved, and the SSDs were allegedly delivered. (*Id.*)

4   Jinhua does not presently dispute the government's evidence that these SSDs were replacement hard

5   drives for Mr. Ho and Mr. Lee's computers. There is no evidence that Mr. Chen approved or even

6   knew about the SSDs. No trade secrets were found on these SSDs.[5] (Trial Tr., Vol. X, 1760:16-

7   1761:17.)

8   Also on December 4, 2015, an application for two public computers to be delivered to Fab

9   12A was submitted and approved, and eventually the computers were delivered to the IT VIP liaison

10  at Fab 12A. (Trial Tr., Vol. III, at 470:03-476:16; P1146T.) The application, however, did not state

11  for whom the computers were sought, and the application was not delivered to Mr. Chen for approval.

12  (*Id.*) There is some circumstantial evidence, which for present purposes Jinhua does not dispute, that

13  one of these computers was used by Mr. Ho and that trade secrets were found on the computer. At

14  UMC, it was not unusual for departments to request public laptops. (Trial Tr., Vol. III, at 481:13-

15  481:15.) All departments, including IT, used public laptops. (*Id.* at 482:13-18.)

16  Sometime in December 2015, Mr. Chen met with UMC IT employees CS Chang and JC Cho,

17  and he asked about UMC's policy regarding using a personal computer or USB at work. (*Id.* at

18  589:04-589:21.) Mr. Chen also inquired whether a record would be made if information was

19  transferred manually from one computer to another. (*Id.* at 590:15-590:23.)

20  (c)   Project M

21  On December 6, 2015, SF Tzou, a UMC employee, sent an email to various other UMC

22  employees, including Messrs. Ho, Lee, and Chen, with the subject "Create process flow for 'Project

23  M.'" (Trial Tr., Vol. XI, at 1963:03-1963:18; P0742.0004.) The email explained that there was a

24  "need to create a full process flow steps for 'Project M,'" and that there would be a meeting on

25

26  [4] An SSD is a more "modern type of laptop hard drive." (Trial Tr. Vol. IX, at 1546:13-
27  1546:18.)

28  [5] The government never even discussed or produced one of the SSDs.

9

December 7, 2015, to do so. (*Id.*) Mr. Chen responded, "I am not available to join tomorrow." (Trial Tr., Vol. XI, at 1968:03-1968:09; P0741.0001.) The government has introduced what it purports to be minutes contained in an Excel spreadsheet from the subsequent meetings, emailed by Mr. Lee to himself, and has presented evidence indicating that Mr. Ho and Mr. Lee were present at meetings in which Micron trade secrets—in the form of a so-called Rexchip process flow that was included in the last tab of the Excel spreadsheet—were allegedly used to create the process flow for Project M. (Trial Tr., Vol. XI, at 1993:12-2004:16, Vol. XV, at 2681:12-2752:07; P0482T.) However, despite UMC's cooperation agreement, the government has not provided any testimony from any individual who attended the December 7 meeting as to whether the Rexchip flow was displayed or provided to the attendees, and, in fact, the so-called "minutes" of the meeting do not mention the Rexchip flow being displayed or disseminated.

On each of December 8, 9, and 10, Mr. Tzou sent an email to a group of UMC employees, not including Mr. Chen, referencing a meeting held that day and attaching what purported to be the process flow "created today." (Trial Tr., Vol. XV, at 2786:07-2789:25, 2798:24-2799:03; P1526T.0001; P1527T.0001; P1528T.0001.) The government's expert explained that the attached process flows had "no more Micron information." (Trial Tr., Vol. XV, at 2801:11-2801:12.) According to the expert, the "UMC DRAM steps [were] extracted from the Micron document that they were constructed in and put into a separate document where you don't have all that Micron information." (*Id.* at 2801:17-2801:21.)

On December 28, 2015, Mr. Chen sent an email to Mr. Ho, Mr. Lee, and Mr. Tzou, attaching a "Development milestone" presentation that included slides from the presentation sent by Mr. Tanaka. (Trial Tr., Vol. XI, at 2012:01-2013:07; P0570T.) In the cover email, Mr. Chen described a timeline for the development of the two nodes over four years. (*Id.* at 2007:17-2007:20.) Mr. Lee replied to the email on December 29, 2015, attaching follow up items from a meeting that presumably occurred that day. (*Id.*) The Project M team then exchanged a series of emails in the first half of January 2016, discussing "milestones," DRAM development, and a roadmap. (Trial Tr., Vol. XI, at

10

1   2005:19-2049:03.) Some emails included timelines which the government's expert testified were, in
2   his opinion, unrealistic. (Trial Tr., Vol. XX, at 3723:22-3731:11; P0561.)

3       On February 19, 2016, according to evidence introduced by the government, UltraMemory
4   Inc. ("UMI"), a design company founded by Mr. Adachi, a former Elpida employee, provided Project
5   M with design rules for a chip even though a design normally comes after a process flow is
6   completed. (Trial Tr., Vol. XI, at 1898:18–1898:21, Vol. XVII, at 3257:08-3262:02.) On February
7   14, 2016, Mr. Chen was cc'd on an email in which a UMI employee stated that a design file could
8   be sent in the coming days. (Trial Tr., Vol. XVII, at 3262:05-3265:12; P0641.) The government
9   expert alleged that the UMI design was similar to an Elpida design. (Trial Tr., Vol. XVII, at 3267:15-
10  3270:04.)

11      In addition to introducing evidence that Mr. Ho and Mr. Lee accessed devices containing
12  Micron trade secrets from the end of 2015 through the beginning of 2017, the government also
13  introduced evidence concerning Mr. Wang's alleged theft of trade secrets. On March 30, 2016, for
14  example, Mr. Ho received an email from a Lawrence Huang at UMC asking for advice on wafer
15  type. (P0834.0003.) That same day, Mr. Ho inquired via LINE chat to Mr. Wang, who was still
16  working at Micron, "What is our wafer type?" (P0270.0020.) Mr. Wang provided answers, which
17  Mr. Ho allegedly provided to others at UMC. (*Id.*) Mr. Wang eventually quit Micron and accepted
18  an offer to work for UMC. (P0270.0007; P0270.0013.)

19      Other emails and documents showed that other Project M participants, including Mr. Chen,
20  sought to reverse engineer competitors' DRAM technology, including from Samsung and Hynix,
21  and were looking at the construction of those companies' products. (Trial Tr., Vol. XVIII, at 3455:06-
22  3456:18; Vol. XVI, at 3016:01-3016:13; Vol. XIX, at 3533:03-3543:18; D3061.) For example, on
23  January 8, 2016—after Mr. Ho and Mr. Lee purportedly copied Micron's process flow—Mr. Chen
24  asked Bowen Huang to obtain Samsung and Hynix reverse engineering reports. (Trial Tr., Vol.
25  XVIII, at 3452:05-3453:15; D4812.) Mr. Chen indicated in an email that he understood Samsung
26  and Hynix to be the benchmark for Project M. (*Id.* at 3456:19-3457:20; D4812.) And in another
27  email sent to Mr. Chen, a picture of a DRAM cell was labeled "Reference: SAMSUNG," and stated
28

1   the source was TechInsights. (Vol. XIX, at 3547:05-3547:14; D3162; D3162.) Other Project M

2   participants were also seemingly unaware of Messrs. Ho, Lee, and Wang's copying of the Micron

3   process flow. On March 3, 2016, Mr. Tzou sent an email in which he stated that UMC had purchased

4   Samsung and Hynix reverse engineering reports, but not Micron's. (Trial Tr., Vol. XVIII, at 3464:08-

5   3466:08; D4817.)

6                      (d)      Law Enforcement Involvement

7          In the summer of 2016, Micron informed the FBI in Taiwan that Mr. Wang had left the

8   company, had taken information related to its DRAM technology, and had begun working at UMC.

9   (Trial Tr., Vol. X, at 1769:11-1770:06.) Micron also informed the FBI about other individuals whom

10  it suspected of having also gone to work at UMC. (*Id.* at 1770:06-1770:07.) In the course of the FBI's

11  investigation, it was discovered that Mr. Wang had downloaded alleged Micron trade secrets before

12  quitting his job there. (*Id.* at 1781:17-1808:09.)

13         In August 2016, Micron also reported the alleged trade secret theft to the Taiwanese Ministry

14  of Justice Investigation Bureau ("MJIB"). (Trial Tr., Vol. V, at 737:01-737:12.) On February 7, 2017,

15  the MJIB executed a search warrant for Mr. Wang's cubicle at UMC, his residence, and any other

16  associated addresses. (*Id.* at 738:23-739:02, 739:18-739:23.) On February 14, 2017, the MJIB

17  executed a second search warrant that included authorization to search Mr. Ho's cubicle at UMC.

18  (*Id.* at 739:03-739:09.) The MJIB also seized an undated "labor contract" that was purportedly signed

19  by Mr. Ho and Jinhua from an office outside Mr. Ho's cubicle. (*Id.* at 838:13-839:20.) Various

20  electronic devices were seized in the searches, and for purposes of this motion, Jinhua does not

21  dispute the government's evidence that alleged trade secrets were found on these devices. Jinhua

22  notes, however, with regard to Mr. Ho, some of the trade secrets were downloaded to devices

23  attributed to him before he joined UMC and before Jinhua was even formed. (Trial Tr., Vol. X, at

24  1758:01-1760:11.)

25                 3.      Defendant Jinhua

26         On February 19, 2016, Fujian Electronics & Information Industry Business Startup

27  Investment Partnership, Jinjiang Energy Investment Group Company Limited, and UMC entered

28
                                                    12

1   into a Project Cooperation Framework Agreement ("Framework Agreement"). (P1023T.0001.) The

2   agreement provided that UMC's two counterparties would "set up [a] project company . . . as the

3   principal for construction, operation and research and development" of a "semiconductor chip

4   enterprise." (P1023T.0003.) A "strategic investor recommended by" UMC was to "make a capital

5   contribution of fifty million US dollars." (P1023T.0005.) UMC and the strategic investor were to

6   hold 30 percent of the shares in the project company. (*Id*.) And the Framework Agreement further

7   provided that the "project company" and UMC would "execute a Technical Cooperation

8   Agreement." (P1023T.0004.) However, the Framework Agreement provided that it was only "legally

9   binding upon the approval or authorization by competent authorities of the parties." (P1023T.0012.)

10  This was because the Taiwanese government had to approve UMC's proposed DRAM development

11  project. (Trial Tr., Vol. XI, at 2566:14-2566:19.)

12          Shortly thereafter, on February 26, 2016, Defendant Fujian Jinhua Integrated Circuit Co.,

13  Limited, was established. Various emails and documents show that UMC employees, including

14  Bowen Huang, were involved in Jinhua's establishment. (P1040T.0001; P1033T.0001.) There is no

15  evidence that UMC or a strategic investor contributed any funds to Jinhua or owned any shares in

16  Jinhua, as required by the Framework Agreement.

17          On May 13, 2016, Jinhua entered into a Technological Cooperation Agreement ("TCA") with

18  UMC. Under the TCA, Jinhua was to provide hundreds of millions of dollars in funding to UMC for

19  the completion of two production lines capable of manufacturing 12-inch DRAM wafers in exchange

20  for UMC transferring "the technological achievements from the cooperative research and

21  development . . . to [Jinhua] in their entirety." (P1193T.0001.) The TCA provided that it

22  "constitute[d] the complete consensus of the two parties with respect to the matters agreed upon in

23  the agreement and supersede[d] all previous oral and written agreements and other covenants."

24  (P1193T.0006.) Indeed, the TCA was the only agreement submitted for approval to the Taiwanese

25  government. (Trial Tr., Vol. XI, at 2566:20-2568:14.)

26          The government focused on Mr. Chen's conduct during this early time period in Jinhua's

27  existence, wherein Mr. Chen allegedly performed certain activities. Mr. Chen's activities during this

28

time were when Jinhua was in its nascent phases, and were in accordance with § 3.1 of the TCA, which required UMC provide to Jinhua "with all necessary technical consulting and professional manpower." (P1193T.0003.) For example, on June 2, 2016, Sandy Kuo sent an email to Bowen Huang in which she stated that Mr. Chen "will soon offer the hiring and duty assumption of Jinhua senior executives." (Trial Tr., Vol. XIII, at 2301:04-2305:25; P1099T.0001.) Mr. Chen was also purportedly involved in choosing Jinhua's logo. (Trial Tr., Vol. XIII, at 2312:01-2313:01; P0816.) A June 26, 2016, document envisioned Mr. Chen reporting to the Jinhua Board of Directors about patent applications. (Trial Tr., Vol. XIII, at 2323:24-2324:07; P1030T.0003.)

On September 2, 2016, an email containing three contracts—one each for Messrs. Ho, Lee, and Guo—was sent to Sandy Kuo. (P1089T.0001.) These contracts provided that the individuals would work in "Tainan, Taiwan," in a research and development role related to DRAM, (P1089T.0003; P1089T.0018; P0272.0003), and also envisioned that they would work concurrently for, and receive a salary from, UMC Taiwan. (P1089T.0006; P1089T.0021; P0272.0007.) The government has not provided a fully executed contract for Mr. Lee or Mr. Guo. While Mr. Ho's contained a signature, it was undated. (P272T.0009.) And while the contract stated that its term commenced on July 1, 2016, Mr. Ho's contract was sent to Ms.  Kuo on September 2, 2016, and, one week later, the chats between Mr. Ho and Mr. Wang indicated that Mr. Ho believed he had not signed the contract. (P0270.0034.)

On October 23, 2016, Mr. Chen attended the Chinese American Semiconductors Professional Association's ("CASPA") 25th annual conference at the Santa Clara Convention Center in California. (Trial Tr., Vol. IV, at 616:18-616:22; P0256.) As Mayor Barry Chang of Cupertino explained, CASPA connected "both companies and individuals to each other involved in the semiconductor industry." (P0255.0010.) The CASPA conference "was a weekend-long event," and UMC was a "Platinum" sponsor of the event. (Trial Tr., Vol. IV, at 662:03-662:06, 666:18-666:22.) One subevent at the three day long CASPA conference was a job recruitment fair. (*Id.* at 617:01-617:03.) Jinhua made a presentation during the fair, and its main speaker was Albert Wu, who was

1  introduced as Jinhua's general manager. (*Id.* at 633:14-633:25.) Mr. Wu told the audience that UMC

2  was developing DRAM and that Jinhua would manufacture it. (*Id.* at 636:07-639:15.)

3  According to the testimony of FBI Special Agent Letitia Wu, Mr. Wu also informed the

4  audience that Mr. Chen could answer additional questions about potential jobs. (*Id.* at 645:15-

5  645:17.) Mr. Chen then allegedly spoke for about five minutes. (*Id.* at 645:07-645:13.) In his

6  remarks, Mr. Chen purportedly expressed confidence in UMC's technology. (*Id.* at 645:17-645:24,

7  646:07-646:12.) Agent Wu said that Mr. Chen also explained that, "while Jinhua was in its nascent

8  stages," he was "the head of two divisions, which were the sales and marketing divisions and one of

9  the operations divisions at Jinhua." (*Id.* at 647:14-647:25.) When Agent Wu approached Mr. Chen

10  after his remarks, however, he gave her a UMC business card listing him as a UMC senior vice

11  president. (*Id.* at 648:01-648:08.) Albert Wu's business card listed him as vice general manager of

12  Jinhua. (*Id.* at 659:20-660:03.)

13  On October 24, 2016, Stephen Chen attended a meeting in Milpitas, California with KLA-

14  Tencor, a process control instrument provider for the semiconductor industry. (Trial Tr., Vol. XVII,

15  at 3087:21-3087:23, 3096:02-3096:04, 3098:25-3099:01.) The purpose of the meeting was for Jinhua

16  to introduce itself, learn about KLA's products, and provide status updates on its products. (*Id.* at

17  3096:06-3096:11.) At the meeting, Mr. Chen bestowed a gift on behalf of Jinhua to KLA, and

18  presented information about Jinhua. (*Id.* at 3107:18-3111:17; P1376; P1382; P1381; P1379.) At or

19  around this time, Brian Trafas of KLA allegedly learned of UMC and Jinhua's "joint relationship."

20  (Trial Tr., Vol XVII, at 3093:04-3093:07.) After the meeting, the parties continued negotiations—

21  Mr. Chen was involved in each of KLA's respective negotiations with UMC and Jinhua. (*Id.* at

22  3122:15-3123:13.) At some point in 2017, Jinhua purchased tools from KLA, though KLA was

23  unable to fulfill the services due to Jinhua's placement on the Department of Commerce's Entity

24  List. (*Id.* at 3134:09-3134:11.)

25  At some point in late 2016, Mr. Chen purportedly assumed the position of Jinhua's president.

26  Minutes from a December 6, 2016, Jinhua meeting referred to Mr. Chen as "President"—though the

27  minutes also explained that Mr. Chen would remain in Taiwan and that he delegated certain, limited

28

**JINHUA'S INTEGRATED CIRCUIT CO., LTD.'S MOTION FOR JUDGMENT OF ACQUITTAL PURSUANT TO FED. R. CRIM. P. 29**        **CASE NO.: 3:18-cr-00465-MMC**

signatory authority to Mr. Wu. (P0613T.0002.) In around late 2016 or early 2017, Mr. Chen informed Mr. Trafas at KLA that he would be transitioning to running Jinhua's facility in China as its CEO. (Trial Tr., Vol. XVII, at 3125:09-3126:06.) On January 11, 2017, Mr. Chen received an email containing a revised Jinhua organizational chart listing him as president. (P1103T.0002.) And by mid-2017, Mr. Trafas understood Mr. Chen to be Jinhua's CEO. (Trial Tr., Vol. XVII, at 3132:15-3132:23.)

### 4.   Post-Indictment

The allegations in the Indictment essentially conclude with the February 2017 MJIB raids of UMC and Mr. Chen's assumption to the Jinhua presidency. (Def't's Mot. to Exclude Evidence Materially Different from the Facts Alleged in the Indictment (ECF 381).) After the Indictment was returned, in October of 2020, UMC entered into a plea agreement with the government. (Plea Agreement (ECF 148).) The agreement included a provision requiring UMC to cooperate with the government. (*Id.* at ¶ 9.)

In the months leading up to trial, pursuant to this agreement, the government learned about two alleged transfers of technology from UMC to Jinhua. At trial, the government introduced evidence of a March 2017 document that circumstantially appeared to have been prepared by UMC to provide Jinhua with a process flow. (Trial Tr., Vol. XVI, at 2950:25-2969:24.) The government also introduced evidence of a September 2018 technology transfer from UMC to Jinhua that contained alleged Micron trade secrets. (*Id.* at 2971:12-3018:03.) Mr. Chen supposedly approved this transfer on Jinhua's behalf.[6] (Trial Tr., Vol. XVII, at 3319:14-3319:20.)

*     *     *

The government's case may be sufficient to send to the trier of fact the question of whether there were offenses committed by Messrs. Ho, Lee, and Wang. But the government's evidence utterly failed to establish Jinhua's responsibility for any such misdeeds. Jinhua's funding from the Chinese

---

[6] From this post-indictment timeframe, the government also introduced an August 9, 2018, email from Mr. Chen to a Jinhua email account attaching an allegedly confidential—but non-trade secret—Micron document titled "Mass Market Roadmap DRAM Components." (Trial Tr., Vol. XIV, at 2497:07-2497:19; P1422.)

16

1  government may have fit the then-prevailing profile for targets of programmatic prosecution. But a

2  profile does not suffice to establish criminal liability. Nor does the fact that Mr. Chen worked for

3  UMC and later joined Jinhua.

4  **III.     ARGUMENT**

5       **A.     The Governing Legal Standard**

6            1.     Rule 29 and Insufficiency of the Government's Evidence

7       Rule 29(a) of the Federal Rules of Criminal Procedure provides that, upon motion by the

8  defendant following the close of the prosecution's case-in-chief, the court "must enter a judgment of

9  acquittal for any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim.

10 P. 29.[7] Under this Rule, "the relevant question is whether, after viewing the evidence in the light

11 most favorable to the prosecution, *any* rational trier of fact could have found the essential elements

12 of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). That is,

13 "[i]f the evidence is such that [a] reasonable [factfinder] must necessarily have [reasonable] doubt,

14 the judge must require acquittal." *Curley v. United States*, 160 F.2d 229, 232 (D.C. Cir. 1947); *see*

15 *also Jackson*, 443 U.S. at 318 n.11 (adopting the *Curley* standard).

16       Although the government "need not negate every theory of innocence," <u>when "the evidence</u>

17 <u>viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial</u>

18 <u>support to a theory of guilt and a theory of innocence, then a reasonable [factfinder] must necessarily</u>

19 <u>entertain reasonable doubt</u>," and an acquittal must be granted. *United States v. Triumph Cap. Grp.,*

20 *Inc.*, 544 F.3d 149, 158–59 (2d Cir. 2008) (emphasis added) (cleaned up); *see also United States v.*

21 *Cassese*, 428 F.3d 92, 103 (2d Cir. 2005) (affirming district court's grant of Rule 29 motion where

22 the prosecution's evidence "was characterized by modest evidentiary showings, equivocal or

23 attenuated evidence of guilt or a combination of the three"). Therefore, viewing the evidence in the

24 light most favorable to the government, "<u>when there is an innocent explanation for a defendant's</u>

25 <u>conduct as well as one that suggests that the defendant was engaged in wrongdoing, the Government</u>

26

27       [7] The standard under Rule 29(a) "applies to both jury and bench trials." *United States v.*
   *Magallon-Jimenez*, 219 F.3d 1109, 1112 (9th Cir. 2000); *see also United States v. Salman*, 378 F.3d
28 1266, 1267–68 n.3 (11th Cir. 2004); *United States v. Pierce*, 224 F.3d 158, 164 (2d Cir. 2000).

17

1    must produce evidence that would allow a rational jury to conclude beyond a reasonable doubt that

2    the latter explanation is the correct one." *United States v. Delgado*, 357 F.3d 1061, 1068 (9th Cir.

3    2004) (emphasis added) (overruled on other grounds); *see also Curley*, 160 F.2d at 233 ("[I]f, upon

4    the whole of the evidence, a reasonable mind must be in balance as between guilt and innocence, a

5    verdict of guilt cannot be sustained."); *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002) ("[I]f

6    the evidence viewed in the light most favorable to the prosecution gives 'equal or nearly equal

7    circumstantial support to a theory of guilt and a theory of innocence,' then 'a reasonable jury must

8    necessarily entertain a reasonable doubt.'" (citations omitted)).

9           2.    <u>An Entity Can Be Held Responsible Only for Criminal Acts of Its Agents</u>
                   <u>Committed Within the Scope of Their Authority And of Which It Had</u>

10                      <u>Knowledge</u>

11         "Generally speaking the doctrine of respondeat superior has no application in criminal law."

12   *Empire Printing Co v. Roden*, 247 F.2d 8, 17 (9th Cir. 1957) (citations omitted). However, in *New*

13   *York Cent. & Hudson River R.R. v. United States*, 212 U.S. 481 (1909), the Supreme Court

14   established that a corporation can be held criminally liable for "an act done while an authorized agent

15   of the company is exercising the authority conferred upon him." *Id.* at 494; *see also United States v.*

16   *Dotterweich*, 320 U.S. 277, 281 (1943); *United States v. Hughes Aircraft Co.*, 20 F.3d 974, 979 (9th

17   Cir. 1994).

18         But because a corporation "can only act through its agents and officers," the Court explained

19   that it can only be punished based on "the knowledge and intent of its agents to whom it has intrusted

20   authority to act in the subject-matter of [the criminal conduct], and whose knowledge and purposes

21   may well be attributed to the corporation for which the agents act." *Hudson River*, 212 U.S. at 495;

22   *see also United States v. Beusch*, 596 F.2d 871, 877 (9th Cir. 1979) ("The acts of an agent may be

23   imputed to the principal, but only if it is the agent's purpose to benefit the principal, thus bringing

24   his acts within the scope of his employment." (citations omitted)).

25         To show that an agent's knowledge and purpose can be "attributed to the corporation for

26   which the agents act," *Hudson River*, 212 U.S. at 495, "[t]he person whose knowledge is to be

27   imputed must have some relationship to the company—whether director, officer, agent, or

28

**JINHUA'S INTEGRATED CIRCUIT CO., LTD.'S MOTION FOR JUDGMENT**       **CASE NO.: 3:18-cr-00465-MMC**
**OF ACQUITTAL PURSUANT TO FED. R. CRIM. P. 29**

1    employee—which allows the person to obtain the knowledge <u>in the course of the engagement with</u>
2    <u>the company and within the scope of his or her authority</u>," *United States v. Josleyn*, 206 F.3d 144,
3    159 (1st Cir. 2000) (emphasis added); *see also Curtis, Collins & Holbrook Co. v. United States*, 262
4    U.S. 215, 222 (1923) ("The general rule is that a principal is charged with the knowledge of the agent
5    acquired by the agent in the course of the principal's business."); *In re ChinaCast Educ. Corp. Sec.*
6    *Litig.*, 809 F.3d 471, 477 (9th Cir. 2015) ("[A]ll information known by the agent, at least when
7    received within the scope of authority, is deemed known by the principal." (quoting Donald C.
8    Langevoort, *Agency Law Inside the Corporation: Problems of Candor and Knowledge*, 71 U. Cin.
9    L. Rev. 1187, 1214 (2003))); *see also El Ranco, Inc. v. First Nat'l Bank of Nev.*, 406 F.2d 1205, 1214
10   n.13 (9th Cir. 1968) ("The general rule is that the principal is chargeable with and bound by the
11   knowledge of his agent received while the agent is acting within the scope of his authority and which
12   is in reference to a matter over which his authority extends."); *Kimbro v. Atl. Richfield Co.*, 889 F.2d
13   869, 876 (9th Cir. 1989); *Frankfort Marine, Accident & Plate Glass Ins. Co. v. John B. Stevens &*
14   *Co.*, 220 F. 77, 79 (9th Cir. 1915) ("The general rule is that notice communicated to, or knowledge
15   acquired by, officers or agents of corporations when acting in their official capacity, or within the
16   scope of their agency, becomes notice to or knowledge of the corporation."); *In re Hellenic Inc.*, 252
17   F.3d 391, 395 (5th Cir. 2001) ("An agent's knowledge is imputed to the corporation where the agent
18   is acting within the scope of his authority and where the knowledge relates to matters within the
19   scope of that authority."); *Dye v. Tamko Bldg. Prods., Inc.*, 908 F.3d 675, 685 (11th Cir. 2018);
20   *United States v. Bank of New England*, 821 F.2d 844, 856 (1st Cir. 1987); *United States v. One Parcel*
21   *of Real Est. Consisting of Approximately 4,657 Acres, Located in Martin County, Fla.*, 730 F. Supp.
22   423, 426–27 (S.D. Fla. 1989).[8]

23

24   [8] Neither the Supreme Court nor the Ninth Circuit has provided firm guidance on when
     respondeat superior applies in the context of corporate criminal liability. When it comes to
25   respondeat superior for punitive damages, however, the Supreme Court has adopted the Restatement
     of Agency's limitations. *See Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 542–43 (1999) (quoting
     Restatement (Second) of Agency § 217C). And the Supreme Court has labeled punitive damages
26   "quasi-criminal." *Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 432 (2001)
     (quoting *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 19 (1991)). Therefore, Jinhua preserves the
27   argument that it can only be held criminally liable "for the act of an advisory or managerial person
     acting in the scope of employment." Restatement (Second) of Agency § 217D (Am. L. Inst. 1958).
28

19

"[T]o justify imputation, the knowledge must also be material—i.e., important or significant—to the employee's duties to the employer." *Huston v. Procter & Gamble Paper Prods. Corp.*, 568 F.3d 100, 107 (3d Cir. 2009). "In other words, the employee's knowledge of facts may be imputed to the employer only if that knowledge is important to the function the employee is employed to perform." *Id.*

And "when a statute imposes criminal liability on a corporation itself, the relevant personal knowledge is that of the individual who took the action that the statute criminalizes, or, in appropriate circumstances, the personal knowledge of the individual who directed or ratified the action taken." Restatement (Third) of Agency § 5.03 cmt. d(7) (Am. L. Inst. 2006). Therefore, a corporate defendant like Jinhua can be held criminally liable only when: (1) an agent knowingly commits a criminal act (*i.e.*, conspiracy to commit economic espionage, conspiracy to commit trade theft, or economic espionage); and (2) the act is committed within the agent's scope of authority to benefit the corporation.

**B.   The Court Should Enter a Judgment of Acquittal on Counts I and II Because the Government Has Failed to Prove the Existence of a Conspiracy to Which Jinhua was a Party**

Jinhua is charged with two conspiracy counts: conspiracy to commit theft of trade secrets and conspiracy to commit economic espionage. But the government's proof failed to prove beyond a reasonable doubt that there was a criminal conspiracy to which Jinhua was a party.

The Court's role in assessing the sufficiency of the evidence of conspiracy is crucial here given the manner in which the government has tried to prove a criminal agreement involving Jinhua. The government's case lasted five weeks. During that time, it called expert witnesses, tool vendors, Micron employees, and UMC IT employees. None of these witnesses, however, had any percipient knowledge of an agreement by Jinhua to commit a crime. The government also introduced various written agreements without calling any witnesses who negotiated, executed, or implemented those agreements. And the government relied on hearsay exception after hearsay exception to introduce hundreds of emails and other documents that it argues prove a conspiracy. But the documents cannot speak for themselves. Indeed, the Court spent countless hours parsing documents trying to infer what

20

1  particular documents meant, to whom they were sent, who received them, and what could be inferred.

2  But the binders of emails and glossy PowerPoint presentations, at most, prove misconduct by

3  individual UMC employees. Without proof of a conspiratorial agreement with Jinhua, the

4  government seeks to convict Jinhua based solely on speculation that it was a party to the wrongdoing

5  of others. But "evidence is insufficient to support a verdict where mere speculation, rather than

6  reasonable inference, supports the government's case, or where there is a 'total failure of proof of [a]

7  requisite' element[]." *United States v. Nevils*, 598 F.3d 1158, 1167 (9th Cir. 2010) (en banc) (first

8  alteration in original) (citations omitted).

9      A criminal conspiracy requires "an agreement to accomplish an illegal objective coupled with

10  one or more overt acts in furtherance of the illegal purpose and the requisite intent necessary to

11  commit the underlying substantive offense." *United States v. Melchor-Lopez*, 627 F.2d 886, 890 (9th

12  Cir. 1980). The law is settled that "there can be no conviction for guilt by association, and it is clear

13  that mere association with members of a conspiracy, the existence of an opportunity to join a

14  conspiracy, or simple knowledge, approval of, or acquiescence in the object or purpose of the

15  conspiracy, without an intention and agreement to accomplish a specific illegal objective, is not

16  sufficient to make one a conspirator." *Id.* at 891.

17      Jinhua is a legitimate Chinese company that spent considerable sums to develop and produce

18  the DRAM technology and chips needed for everyday devices by Chinese consumers. Jinhua faces

19  this prosecution with the presumption of innocence due all defendants. Yet the government wants to

20  infer the existence of a criminal conspiracy involving Jinhua from Jinhua's ordinary business

21  contacts with UMC and Messrs. Ho, Lee, Guo, and Chen (to the extent those contacts even exist).

22  Specifically, the government has offered proof of Jinhua and UMC's business agreement, Jinhua's

23  alleged decision to provide a "labor contract" to Messrs. Ho, Lee, and Guo; Jinhua's alleged retention

24  of Mr. Chen to help with hiring and negotiating for tools; Jinhua's eventual hiring of Mr. Chen as

25  president; and alleged transfers of technology from UMC to Jinhua on March 20, 2017, and in

26  September 2018. In the government's telling, Jinhua's efforts to conduct legitimate business

27  somehow add up to a criminal conspiracy. But the government cannot connect these dots. The

28

21

1    evidence does not support—let alone prove beyond a reasonable doubt—a coherent narrative in

2    which Jinhua's business activities crossed the line from a manufacturing venture to a criminal

3    conspiracy. To infer a criminal agreement from these circumstances—with no percipient witness

4    and no incriminating Jinhua document—is simply too far a leap.

5         *First*, UMC and Jinhua's agreement to the TCA on May 13, 2016, is insufficient to establish

6    a criminal conspiracy. A "conspiracy" requires the participants to reach an agreement on a "common

7    purpose." *United States v. Bibbero*, 749 F.2d 581, 587 (9th Cir. 1984). For example, in *United States*

8    *v. Rosenblatt*, 554 F.2d 36 (2d Cir. 1977), the court held that even where two defendants "agreed" to

9    commit criminal offenses, but they subjectively agreed on committing different offenses, they could

10   not be convicted of conspiracy. *Id.* at 39–40; *see also United States v. Leonard*, 777 F. Supp. 2d

11   1025, 1037 (W.D. Va. 2011) (same). "By definition, market transactions—whether in legal or illegal

12   markets—benefit both parties, but we do not assume, *ab initio*, that they carry with them the excess

13   baggage of conspiracy," absent proof of knowledge. *United States v. Townsend*, 924 F.2d 1385, 1392

14   (7th Cir. 1991); *see also United States v. Richmond*, 700 F.2d 1183, 1190 (8th Cir. 1983) ("[B]usiness

15   association *without more* is insufficient to establish the existence of or participation in a conspiracy."

16   (collecting cases)). "If it were otherwise, companies that sold cellular phones to teenage punks who

17   have no use for them other than to set up drug deals would be in trouble, and many legitimate

18   businesses would be required to monitor their customers' activities." *United States v. Blankenship*,

19   970 F.2d 283, 285 (7th Cir. 1992).

20        UMC is one of the leading independent semiconductor foundries in Asia, and it had

21   previously produced DRAM technology. Jinhua wanted to manufacture DRAM. Jinhua's agreement

22   with UMC therefore made perfect business sense. The synergy of Jinhua's funding with UMC's

23   technological capacity provided a logical path toward realizing legitimate business goals.[9] No

24   witness or document suggests that Jinhua embarked on this path with a criminal objective. Jinhua

25

26        [9] Notably, Applied Materials—a manufacturer of machines or "tools" that process wafers
     into semiconductor chips—reviewed UMC's DRAM development plan in 2016 and had no concerns
27   that UMC would acquire the DRAM technology by theft or other nefarious means. (Trial Tr., Vol.
     IX, at 1527:11-1528:04.)
28

22

1  did not—and could not—have had knowledge of the alleged plan of several UMC engineers to use

2  stolen trade secrets to fulfill UMC's obligation under the TCA. Jinhua had only been formed a couple

3  of months prior to the execution of the TCA, and there is not a scintilla of evidence that any agent of

4  Jinhua obtained knowledge of the conspiracy in the course of performing duties on behalf of Jinhua.

5  Even under the government's theory of the case, Mr. Ho did not become Jinhua's agent until, at the

6  earliest, July 1, 2016. *But see infra* § III.C.2. Even viewing the evidence in the light most favorable

7  to the government, as discussed below in § III.C.1(b), the absolute earliest that an inference of Jinhua

8  controlling Mr. Chen can be drawn is October 2016, and, there is no admitted evidence that Mr. Chen

9  was considered Jinhua's president until, at the earliest, December 2016. Any other attempts to allege

10  that Mr. Chen was acting on Jinhua's behalf is rank speculation and does not satisfy the stringent

11  standard required for proof in a criminal case. Because the government has not shown that Jinhua's

12  "actions were motivated by anything other than economic self-enrichment"—it legitimately sought

13  to contract with one of the leading independent semiconductor foundries in Asia to design a new

14  DRAM chip—the TCA provides no support for finding that Jinhua conspired with UMC. *Gonzalez*

15  *v. Google LLC*, 2 F.4th 871, 900 (9th Cir. 2021); *see also United States v. Ulbricht*, 31 F. Supp. 3d

16  540, 554 (S.D.N.Y. 2014).

17     *Second*, Messrs. Ho, Lee, and Guo's purported labor contracts with Jinhua do not either

18  suffice to establish that Jinhua joined any criminal conspiracy. There is no evidence that the

19  purported labor contracts were some sort of agreement to commit economic espionage or theft of

20  trade secrets. At best, by their terms, the most the government can allege is that the labor contracts

21  were for a role with Jinhua, and they provided that Messrs. Ho, Lee, and Guo would work

22  concurrently for, and receive a salary from, UMC Taiwan. (P1089T.0006; P1089T.0021;

23  P0272.0007.) There is no evidence that the labor contracts were actually an agreement by Jinhua to

24  have Messrs. Ho, Lee, and Guo commit economic espionage and theft of trade secrets in their

25  concurrent UMC roles. For example, in prosecutions for conspiracy to distribute narcotics, "[a]

26  relationship of mere seller and buyer, with the seller having no stake in what the buyer does with the

27  goods, shows the absence of a conspiracy, because it is missing the element of an agreement for

28

23

1  redistribution." *United States v. Loveland*, 825 F.3d 555, 562 (9th Cir. 2016). Similarly, an agreement

2  between Jinhua and Messrs. Ho, Lee, and Guo for the individuals to be involved in research and

3  development is missing an agreement for them to commit economic espionage and theft of trade

4  secrets in their UMC jobs. *See United States v. Espinoza-Valdez*, 889 F.3d 654, 657–58 (9th Cir.

5  2018) ("Despite the evidence of Espinoza-Valdez's presence with two unknown men in a known

6  drug-smuggling corridor close to the Mexican border near what appeared to be a camp for drug

7  trafficking scouts, as well as the seizure of items that were suspicious in this context, there was

8  insufficient evidence for a jury to find beyond a reasonable doubt that Espinoza-Valdez entered into

9  a conspiratorial agreement to import or distribute marijuana."). Indeed, between the signing of the

10 TCA and Messrs. Ho, Lee, and Guo's purported labor contracts with Jinhua—which, accepting the

11 government's contentions, took effect on July 1, 2016—the government has not shown that any

12 Jinhua agent obtained knowledge of the alleged conspiracy through their Jinhua position.[10]

13      *Third*, even accepting that Jinhua retained Mr. Chen to help with hiring at the October 2016

14 CASPA job fair and to negotiate for tool purchases, no reasonable inference of a criminal agreement

15 by Jinhua can be drawn. We address in detail at § III.C. below the government's several efforts to

16 infer criminal knowledge on the part of Mr. Chen and to impute Messrs. Chen, Ho, Lee, and Guo's

17 purported knowledge to Jinhua; those efforts are unavailing. Neither Jinhua nor Mr. Chen, therefore,

18 knew about the alleged trade secrets when they reached an agreement. In any event, according to the

19 government's evidence, Jinhua engaged Mr. Chen to hire Jinhua employees and purchase tools for

20 Jinhua's future facility. This alleged agreement was separate from alleged conspiracy to commit

21 economic espionage and theft of trade secrets occurring contemporaneously at UMC's Taiwan

22 facility. Mr. Chen's limited engagement does not demonstrate an "agreement to commit a crime."

23

24

25      [10] Moreover, as for Count I, there is also no evidence that Messrs. Ho, Lee, and Guo had any
26 knowledge of Jinhua's alleged association with the Chinese government. Indeed, they allegedly
   began stealing and using trade secrets before Jinhua was even formed. Therefore, even if there is
27 evidence of an agreement between Jinhua and Messrs. Ho, Lee, and Guo to commit trade secret theft,
   there is no evidence of an agreement to "benefit any foreign government, foreign instrumentality, or
28 foreign agent." 18 U.S.C. § 1831(a).

1 *United States v. Lennick*, 18 F.3d 814, 819 (9th Cir. 1994); *see also Espinoza-Valdez*, 889 F.3d at

2 657–58.

3        *Fourth*, even crediting the government's allegation that Jinhua entered into an agency

4 relationship with Mr. Chen when he became Jinhua's president (which, drawing every inference in

5 the government's favor, was, at the earliest, in December 2016), this relationship did not create a

6 criminal agreement by Jinhua based on Mr. Chen's purported prior acts and prior mental state. The

7 government still has failed to call a witness or introduce a document showing that Jinhua and Mr.

8 Chen reached an agreement to commit economic espionage or theft of trade secrets. The

9 government's evidence of Mr. Chen assuming the Jinhua presidency is based on various contextless

10 emails and documents making reference to Mr. Chen's purported position. But no witness has

11 testified about this relationship, and there are no documents spelling out Mr. Chen's role. There

12 simply is not enough evidence to assume that Jinhua's agreement with Mr. Chen for him to become

13 Jinhua's president also contained an agreement that he would commit the charged offenses. *See*

14 *Richmond*, 700 F.2d at 1190 ("The government did not produce any direct evidence, e.g., statements

15 or admissions of the appellants, which would indicate a common plan or agreement."); *Espinoza-*

16 *Valdez*, 889 F.3d at 658–59 ("Given the dearth of evidence of an agreement to import or distribute

17 marijuana between Espinoza-Valdez and the two unknown men observed on the mountain—or

18 anyone else—the government has not met its burden of proving his participation in a conspiracy

19 beyond a reasonable doubt. . . . While it is possible, perhaps even probable, that Espinoza-Valdez

20 was on the mountaintop to act as a scout for drug traffickers, a reasonable suspicion or probability

21 of guilt is not enough."); *Freeman v. HSBC Holdings PLC*, 413 F. Supp. 3d 67, 88 (E.D.N.Y. 2019)

22 ("Even assuming Defendants knew of Iran's myriad ties to, and history of, supporting terrorist

23 organizations, including Hezbollah, the Court cannot infer from this fact that Defendants agreed to

24 provide illegal financial services to Iranian financial and commercial entities . . . ."). Nor is there

25 evidence that Jinhua knew about the alleged unlawful acts when it made Mr. Chen president.

26        *Fifth*, once Mr. Chen became Jinhua's president, the government has not shown any act

27 affirmatively joining Jinhua to the alleged conspiracy. **"[O]ne cannot join a conspiracy through**

28

1   **apathy . . . .**" *Kemper v. Deutsche Bank AG*, 911 F.3d 383, 395 (7th Cir. 2018) (emphasis added).

2   This principle "is especially important in business dealings." *Id.* Putting aside that the government

3   has not shown that Mr. Chen participated in, or even had knowledge of, the use of Micron trade

4   secrets in designing UMC's DRAM technology (or that he obtained any such knowledge in his role

5   as Jinhua's president), *see infra* § III.C.1., there is also no evidence that Mr. Chen took any

6   affirmative steps once he was Jinhua's president to join Jinhua to the alleged conspiracy. The only

7   evidence about Jinhua's actions concerning trade secrets after Mr. Chen's assumption of the Jinhua

8   presidency is Jinhua—through unidentified agents—accepting the transfers of technology from

9   UMC. But merely continuing to comply with an economically beneficial agreement signed before

10  Mr. Chen became Jinhua's agent does not demonstrate that Jinhua (through an agent) reached an

11  agreement with UMC (or any individual) to join the conspiracy, or even that Jinhua obtained

12  knowledge of the conspiracy. Nor could Mr. Chen wear his Jinhua hat to reach an agreement with

13  Mr. Chen wearing his UMC hat. Therefore, there is insufficient evidence from Mr. Chen's role as

14  Jinhua president to hold Jinhua liable for the conspiracy counts.

15       *Sixth*, the government cannot establish a conspiratorial agreement by Jinhua by virtue of an

16  alleged joint venture between Jinhua and UMC. (*See, e.g.*, United States' Opp. to Def.'s Mot. to

17  Exclude Hearsay Statements in the "Meeting Minutes" Contained in Ex. P0482 (ECF 395), at 9–10.)

18  According to the government, "[i]n a joint venture, the corporate venturers are partners and thus

19  principals and agents of each other and liable for each other's acts and statements during the course

20  or and in furtherance of the joint venture." (*Id.* at 9.) Therefore, the government insists that "Jinhua

21  is liable for the acts and statements of UMC . . . in furtherance of Project M," which encompasses

22  the acts and statements of all of UMC's agents, including Messrs. Chen, Ho, Lee, Guo, and Wang.

23  (*Id.* at 10.) However, the government's argument is meritless because: (1) a party to a joint venture

24  is only criminally liable for its co-venturer's actions when it has knowledge of the act; and (2) there

25  was no joint venture between Jinhua and UMC.

26       A joint venturer is criminally liable only if it had knowledge of its co-venturer's criminal

27  conduct. As the government has noted, "[a]s a general rule the substantive law of partnerships is

28

26

1   applicable in determining the rights and liabilities of joint venturers." *Bd. of Trs. of W. Conf. of*

2   *Teamsters Pension Tr. Fund v. H.F. Johnson, Inc.*, 830 F.2d 1009, 1015 (9th Cir. 1987) (quoting

3   *Stone v. First Wyoming Bank*, 625 F.2d 332, 340 (10th Cir. 1980)). But while the government has

4   argued that partners are liable for each other's acts and statements made during and in the furtherance

5   of the partnership, that is not the law. In fact, while partners have "joint liability for contract, tort,

6   and other civil liabilities . . .[, p]artners are not liable for the criminal acts of their co-partners unless

7   they possess guilty knowledge of the criminal act." J. William Callison & Maureen A. Sullivan,

8   *Partnership Law & Practice: General & Limited Partnerships*, § 14:7 (2021-2022); *see Levin v.*

9   *United States*, 5 F.2d 598, 603 (9th Cir. 1925) ("It is true that one partner cannot be prosecuted for

10  crime committed by his copartner; but if a partnership, with the knowledge of all its members

11  engaged in an unlawful enterprise or business, all are equally guilty . . . ."); *see also Sleight v. United*

12  *States*, 82 F.2d 459, 461 (D.C. Cir. 1936) ("A partner is not liable for the criminal acts of a copartner

13  unless he possesses guilty knowledge of the criminal act of his copartner or is an accessory thereto

14  either before or after the fact. The liability of copartners in civil cases, for the acts of each other,

15  respecting partnership affairs, does not attach to criminal transactions."); *United States v. Ansani*,

16  138 F. Supp. 454, 460 (N.D. Ill. 1956) ("It is well settled law that a partner, although liable for his

17  partner's torts committed in the course of the partnership's business, is not liable for the criminal

18  acts of a co-partner unless he possesses guilty knowledge of the criminal act of his co-partner or is

19  an accessory thereto either before or after the fact."), *aff'd* 240 F.2d 216 (7th Cir. 1957). And, as

20  explained below, when Jinhua entered into the TCA (and, in fact, at all relevant times), it lacked

21  knowledge of the alleged criminal acts perpetrated by agents of UMC. *See infra* § III.C. Therefore,

22  the government's joint venture theory fails.

23      What is more, Jinhua and UMC were never co-venturers. "A joint venture exists when there

24  is an 'agreement between the parties under which they have a community of interest, that is, a joint

25  interest, in a common business undertaking, <u>an understanding as to the sharing of profits and losses,</u>

26  <u>and a right of joint control</u>.'" *Resolution Tr. Corp. v. BVS Dev., Inc.*, 42 F.3d 1206, 1214 (9th Cir.

27  1994) (quoting *Connor v. Great W. Savs. & Loan Ass'n*, 69 Cal. 2d 850, 863 (1968)) (emphasis

28

1  added); *see also Gold v. Dermouflage, Inc.*, 100 F.3d 962 (9th Cir. 1996) (table); *Martinez v.*

2  *Gonzalez*, 878 F.2d 1438, 1989 WL 76928, at *1 (9th Cir. 1989) (table).

3       However, the TCA did not provide for profit sharing. The TCA required Jinhua to allocate a

4  $300 million equipment, freight, and installation budget and to provide UMC with $400 million for

5  research and development, and provided that once UMC completed two production lines capable of

6  manufacturing 12-inch DRAM wafers, "the technological achievements from the cooperative

7  research and development by the two parties shall be transferred to [Jinhua] in their entirety," with

8  Jinhua "bear[ing] the relevant shipping costs." (P1193T.0001, P1193T.0002, P1193T.0003.)

9  Nowhere did the TCA provide for UMC to receive profits from Jinhua's use of the production lines,

10  or for UMC to cover any associated losses. Nor did the TCA title itself a joint venture agreement.

11  Therefore, because the TCA did not contemplate UMC "participat[ing] or intend[ing] to participate

12  in any profits or losses . . . as a matter of law no joint venture existed." *Blue Circle Atl., Inc. v. Hill*

13  *Top Devs., Inc.*, 30 F.3d 139, 1994 WL 399713, at *3 (9th Cir. 1994) (table); *see also Martinez*, 878

14  F.2d 1438, 1989 WL 76928, at *2.[11]

15       Moreover, the single invocation of the phrase "joint venture" by the presumably Chinese and

16  Taiwanese drafters of the Framework Agreement (or at least the translators of the agreement) in

17  relation to the envisioned future agreement is irrelevant.[12] (P1023T.0007.) The provisions of the

18  Framework Agreement—executed before Jinhua even existed—differed drastically from reality. The

19  ───────────────

20  [11] Although evidence of UMC and Jinhua acting jointly has no bearing on whether their
    relationship matched the legal definition of "joint venture," such actions were merely fulfilling
21  obligation under the arms' length contractual negotiation that resulted in the TCA. Evidence that the
    parties jointly contracted for chip design services from UMI merely shows that compliance with the
22  TCA's provision that "the two parties will jointly select a competent design services company" so
    as "[t]o ensure a complete integration of the design and manufacturing technology for the [DRAM]
23  wafer." (P1193T.0002.) The parties jointly meeting with semiconductor equipment manufacturers
    reflects the understanding in the TCA that the technology would be produced by UMC and then
24  transferred to Jinhua. (P1193T.0001.) The parties jointly filed patents because they each bargained
    for the right to "jointly acquire all patent rights." (P1193T.0004.) Evidence that UMC employees,
25  including Mr. Chen, performed work for UMC merely shows UMC complying with its obligation to
    provide "professional manpower." (P1193T.0003.) There was nothing nefarious about Jinhua and
26  UMC's collaboration.

27  [12] The one other reference to a "joint venture" referred to Jinhua itself—not the envisioned
    TCA in which Jinhua was to enter with UMC once it was formed. (P1023T.0015.)

28                                                        *(cont'd)*
                                    28
    **JINHUA'S INTEGRATED CIRCUIT CO., LTD.'S MOTION FOR JUDGMENT          CASE NO.: 3:18-cr-00465-MMC**
    **OF ACQUITTAL PURSUANT TO FED. R. CRIM. P. 29**

1  involved parties chose not to follow the Framework Agreement. *See In re Hoag Urgent Care-Tustin,*
2  *Inc.*, No. 21-55452, 2022 WL 486630 (9th Cir. Feb. 17, 2022) (explaining that even if parties
3  "initially contemplate[]" a joint venture, the executed agreement is what governs); *see also*
4  *Associated Aircraft Parts, Inc. v. Lockheed Corp.*, 959 F.2d 239, 1992 WL 73164, at *1–2 (9th Cir.
5  1992) (table); *HK China Grp., Inc. v. Beijing United Auto. & Motorcycle Mfg. Corp.*, 417 F. App'x
6  664, 666 (9th Cir. 2011). UMC neither invested in Jinhua, nor controlled Jinhua shares.[13] Thus, the
7  parties chose to only submit the TCA to the Taiwanese government for approval—rendering the
8  Framework Agreement not "legally binding." (Trial Tr., Vol. XI, at 2566:20-2568:14;
9  P1023T.0012.) And, significantly, recognizing the shift, the parties agreed that the TCA—which did
10  not include profit sharing—"constitute[d] the complete consensus of the two parties with respect to
11  the matters agreed upon in the agreement and supersede[d] all previous oral and written agreements
12  and other covenants." (P1193T.0006.) (emphasis added).

13      In sum, the government's novel joint venture theory is unavailing. Jinhua does not presently
14  dispute that the alleged theft and use of trade secrets by individuals UMC employees can be imputed
15  to UMC. But this liability cannot then be imputed to Jinhua based on its contractual relationship with
16  UMC. Jinhua lacked knowledge of the alleged criminal conduct committed by UMC employees,
17  and, in any event, UMC and Jinhua did not have a joint venture relationship.

18      **C.**   **The Court Should Enter a Judgment of Acquittal As To All Counts Because the
19      Government Has Failed to Prove a Crime or Knowledge of an Individual that
       Can Be Imputed to Jinhua**

20      The government has attempted to rely on the actions of several alleged agents—Messrs.
21  Chen, Ho, Lee, and Guo—to impute criminal liability to Jinhua. To do so, the government's burden
22  was to establish that one of these individuals committed each of the elements of the charged offenses,
23  and that: (1) the individual was in an agency relationship with Jinhua at the time of the act; (2) the
24  agent acted within the scope of his authority provided by Jinhua and the act was material to those

25
26  ───────────────
27  [13] It is worth noting that the profit sharing provision in the Framework Agreement envisions
    the parties to the Framework Agreement—not the parties to the eventual TCA—sharing profits.
28  (P1193T.0005.)

duties; and (3) Jinhua, via the agent, had the requisite statutory knowledge. This is a burden the government has hardly addressed in their case in chief, let alone come close to meeting.

### 1. Stephen Chen

The government's attempt to impute liability to Jinhua based on Stephen Chen's conduct is unavailing. The government has failed to prove that Mr. Chen committed or had knowledge of any criminal acts, that he was Jinhua's agent at the time of the alleged acts, or that any alleged knowledge or criminal acts could be imputed to Jinhua. Therefore, Jinhua cannot be convicted based on the evidence introduced about Mr. Chen.

### (a) The government failed to show that Mr. Chen committed any criminal acts or had knowledge of the commission of criminal acts

The government has presented no evidence showing that Mr. Chen was participant or had any knowledge of the alleged use of trade secrets by Mr. Ho, Mr. Wang, or any other contributor to Project M. The government has attempted to cast a cloud over Mr. Chen by introducing various emails which he received or sent that contained Micron information. But the government has not presented any evidence showing that Mr. Chen knowingly received or sent trade secrets.

The sparse evidence showing Mr. Chen receiving and sending non-trade secret Micron information does not demonstrate that he separately did the same with trade secrets. Use of non-trade secrets perhaps shows conduct subject to hindsight criticism—the government might want to label Mr. Chen a "bad man." Oliver Wendell Holmes, *The Path of the Law*, 10 Harv. L. Rev. 457, 461 (1897). But the law is a "prophecy" that tells a "bad man" "that if he does certain things he will be subjected to disagreeable consequences," *i.e.*, that notwithstanding ethics or morality, "in one case and not in the other some further disadvantages, or at least some further consequences, are attached to the act by the law." *Id.*; *see also Exxon Shipping Co. v. Baker*, 554 U.S. 471, 502 (2008). Because the law prohibits the use of trade secrets only, Mr. Chen was not prohibited from using non-trade secret information—even confidential information from competitors. *See Windsor v. United States*, 384 F.2d 535, 535–37 (9th Cir. 1967) (holding that a defendant's "involvement in an unsavory, high-pressure, fly-by-night scheme for the promotion of land sales" was insufficient to establish that "he was a party to or aware of that conduct of his codefendants which elevated this exercise in caveat

---

emptor to the level of an outright swindle"); *United States v. McDonald*, 576 F.2d 1350, 1359 (9th Cir. 1978) (same); *United States v. Piepgrass*, 425 F.2d 194, 199 (9th Cir. 1970) (same). And evidence establishing that Mr. Chen chose to conform to the letter of the law cannot establish that Mr. Chen separately knew that other individuals were crossing the line he may have, viewing the evidence in the light most favorable to the government, chose to toe. Evidence that Mr. Chen possessed, reviewed, or transferred non-trade secret information is a red herring that the Court should discard. *See Briceno v. Scribner*, 555 F.3d 1069, 1079 (9th Cir. 2009) (explaining that the "lack of evidence" as to an "evidentiary link" is fatal to the government's case).

Equally insufficient is evidence of Mr. Chen receiving emails with some information which its expert purportedly compared to Micron trade secrets and opined that some alleged trade secrets were included. (Trial Tr., Vol. XVII, at 3226:21-3229:06, 3241:12-3253:03; P0720; P0731T.) The government cannot rely on information uncovered by its expert blessed with the gift of hindsight and a reason to inquire. The government hired the expert to hunt for references to Micron trade secrets as part of an extensive criminal investigation. Mr. Chen cannot be deemed to have learned everything that the expert trolled for years after the emails in question. Even assuming that the government's expert is correct, none of the evidence provides any basis for inferring that Mr. Chen knew that Mr. Ho (and Mr. Lee and Mr. Wang) incorporated trade secrets—as opposed to confidential information—into the process flow shared with him. *See Phillips v. United States*, 356 F.2d 297, 303 (9th Cir. 1965) ("[S]o-called 'constructive' notice or knowledge of a circumstance, based upon the actual knowledge of a co-conspirator, agent of employee, has no tendency, circumstantially or otherwise, to prove criminal intent."); *see also United States v. Davis*, 506 F. App'x 612, 613 (9th Cir. 2013) (holding that "mere involvement" in insufficient to establish knowledge of the conspiracy). Indeed, after the December 7, 2015, meeting that Mr. Chen did not attend, the subsequent versions of UMC's process flow contained "no more Micron information." (Trial Tr., Vol. XV, at 2801:11-2801:12.) There is no hint that Mr. Chen was on notice of illegal conduct, so he had no reason or duty to conduct the examinations and analyses undertaken by the government's expert.

**JINHUA'S INTEGRATED CIRCUIT CO., LTD.'S MOTION FOR JUDGMENT OF ACQUITTAL PURSUANT TO FED. R. CRIM. P. 29**          **CASE NO.: 3:18-cr-00465-MMC**

1    Nor does evidence that Mr. Chen approved USB access for Mr. Ho and/or Mr. Lee establish

2    that he knew the improper purpose for which they allegedly used that access. As a supervisor of Mr.

3    Ho and Mr. Lee, Mr. Chen received the applications as a matter of course. He approved the

4    applications, but there is no indication that he knew what Mr. Ho and Mr. Lee intended. Indeed, Mr.

5    Chen was not the only person who had to approve the applications. Approving a procedural request,

6    innocent on its face, does not provide any basis for finding that Mr. Chen knew about Mr. Ho and

7    Mr. Lee's use of stolen trade secrets. The government's expert himself explained that "it's not

8    unusual in the industry for engineers" to take home confidential information on USB devices,

9    including a copy of the process flow, and that some companies, in fact, "encourage" it so that

10   employees can work from home.[14] (Trial Tr., Vol. XVIII, at 3431:19-3433:05.) DRAM engineers

11   could have other legitimate reasons for using USBs, including vendor meetings, outside

12   presentations, and sharing information with customers. (Trial Tr., Vol. I, at 177:16-178:04.)

13   Likewise, the evidence about the public computers proves nothing about Mr. Chen. There was no

14   evidence indicating that he knew about or approved the computers. And public computers were

15   commonly used by various UMC departments. (Trial Tr., Vol. III, at 480:25-484:18.)

16   The government incorrectly claims that Mr. Chen should have been aware that Project M's

17   timeline for the development of DRAM technology was infeasible or skipped certain steps. The

18   suggested inference is strained at best and insufficient to establish Mr. Chen's knowledge of his

19   subordinates' wrongdoing. The government's argument assumes that UMC began developing the

20   process flow in the December 2015 meetings. Their only evidence for that, however, is a translated

21   email from Mr. Tzou stating the "need to create a full process flow steps for 'Project M.'" (Trial Tr.,

22   Vol. XI, at 1963:03-1963:18; P0742.0004.) And the definition of "create" is "to bring into

23   existence"—not to initiate. *Create*, *Merriam-Webster.com* (2022), https://www.merriam-

24   webster.com/dictionary/create. There is no evidence that UMC employees had not begun developing

25

26   [14] Evidence of an email from Mr. Tzou to Mr. Chen suggesting that he save a particular file
     because Mr. Ho told him "that his computer is going to format" utterly fails to show that Mr. Chen

27   knew or had any reason to know the alleged nefarious reason for Mr. Ho to reformat his computer.
     (P0738T.0001.) To the contrary, Mr. Tzou's matter of fact manner of delivering the information

28   indicates a belief that the reformatting was a routine, innocuous IT matter.

1 the process flow well before December 2015, and the meetings held in December 2015 were merely

2 to build off the prior work and bring the process flow into existence.

3      In any event, Mr. Chen was a high-level supervisor; although there is some evidence of him

4 responding to isolated technical questions via email, he was not in the trenches developing the

5 process flow. He did not even attend the December 7, 2015, meeting at which Mr. Ho and Mr. Lee

6 purportedly used Micron's process flow to develop UMC's. (Trial Tr., Vol. XI, at 1968:03-1968:09;

7 P0742.0004.) Moreover, while Mr. Chen was knowledgeable about DRAM technology, he had never

8 previously sought to create a process flow—indeed, Rexchip did not even conduct research and

9 development. (Trial Tr., Vol. VII, at 1206:12-1207:20.) And he knew that Project M was seeking to

10 develop a "lagging" 25-nanometer node—the leading technology was 20-nanometer nodes—which

11 was "easier to do." (Trial Tr., Vol. XIX, at 3615:16-3616:10.) The government reaches too far in

12 arguing that there is sufficient evidence to conclude that Mr. Chen knew that Project M's DRAM

13 development timelines were unfeasible without the use of trade secrets. Criminal liability cannot be

14 imputed to Mr. Chen based only on rank speculation as to his state of mind.

15      In fact, Mr. Chen's lack of knowledge or participation is evidenced by the government's lack

16 of evidence showing that Mr. Chen in any way initiated the alleged theft of trade secrets. Mr. Ho and

17 Mr. Wang downloaded many of the alleged trade secrets before they or Mr. Chen were employed at

18 UMC. As early as May 2014—almost a year and a half before Mr. Chen began working at UMC—

19 the forensic data indicates that Mr. Ho copied one of the alleged trade secrets to his personal USB.

20 (Trial Tr. Vol. X, at 1759:14-1760:16.) Other trade secrets were allegedly placed on devices in Mr.

21 Ho and Mr. Wang's possession in early 2015. (P0377; P0359; P0365; P0375.) This evidence shatters

22 the government's theory of the case. Mr. Chen did not take the UMC job, and then ask Mr. Ho and

23 Mr. Wang to steal trade secrets to help UMC build DRAM. For whatever reason—perhaps to further

24 their own careers—Mr. Ho and Mr. Wang had saved Micron trade secret information while at Micron

25 that they took with them, and then accessed once in their UMC roles, and then, viewing the evidence

26 in the light most favorable to the government, they allegedly worked together to obtain more of the

27

28

33

1  alleged trade secret documents once Mr. Ho began work on Project M. But the government cannot

2  show that Mr. Chen was anything but an unknowing bystander to Mr. Ho and Mr. Wang's actions.

3       In sum, Mr. Chen hired talented engineers with whom he had previous relationships, but there

4  is no support—and certainly not enough support to infer criminal liability—for finding beyond a

5  reasonable doubt that he encouraged, was a participant, or even knew of the misdeeds allegedly

6  perpetrated by those engineers. The government seeks to pile weak inference upon weak inference

7  to reach the conclusion that Mr. Chen knew about the trade secrets. *See Gonzales v. Gipson*, 701 F.

8  App'x 558, 561–62 (9th Cir. 2017) (holding that "a speculative and weak chain of inferences" is

9  insufficient to convict). However, a closer look at Mr. Chen's conduct over the years in which he

10  was employed at UMC fails to show any knowledge on his part of the misconduct committed by

11  some of his subordinates. Millions of documents have been produced in this case. The government

12  has received Mr. Chen's UMC custodial file and his email files; yet not a single file or document

13  shows that he knew about the alleged possession and use of trade secrets. Essentially, the

14  government's evidence seeks to impute liability to Mr. Chen by virtue of his proximity with the

15  actual offenders. But "the doctrine of respondeat superior has no application in criminal law." *Empire*

16  *Printing*, 247 F.2d at 17. Therefore, the government has failed to present sufficient evidence of Mr.

17  Chen's knowledge of, or participation in, the charged offenses.

18       (b)   The government failed to show that Mr. Chen was Jinhua's agent
19          during the relevant times

20       The government incorrectly asserts that Mr. Chen was always Jinhua's agent, and, therefore,

21  any of his illegal acts or knowledge of illegal acts could be imputed to Jinhua. However, even if there

22  were evidence of Mr. Chen engaging in, or having knowledge of, illegal activity, an agency

23  relationship still requires assent and control. The government has only shown that, at most, Mr. Chen

24  was Jinhua's limited agent for hiring purposes in October 2016, and has failed to show that Mr. Chen

25  became a full agent of Jinhua before, viewing the evidence in the light most favorable to the

26  government, at the earliest, December 2016.

27       "Agency is the fiduciary relationship that arises when one person (a 'principal') manifests

28  assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to

34

the principal's control, and the agent manifests assent or otherwise consents so to act." Restatement (Third) of Agency § 1.01. That is, "[a] relationship of agency is not present unless the person on whose behalf action is taken has the right to control the actor." *Id.* § 1.01 cmt. (f)(1). Some relevant factors for determining whether the purported agent is controlled by the principal are

> [1] the skill required; [2] the source of the instrumentalities and tools; [3] the location of the work; [4] the duration of the relationship between the parties; [5] whether the hiring party has the right to assign additional projects to the hired party; [6] the extent of the hired party's discretion over when and how long to work; [7] the method of payment; [8] the hired party's role in hiring and paying assistants; [9] whether the work is part of the regular business of the hiring party; [10] whether the hiring party is in business; [11] the provision of employee benefits; and [12] the tax treatment of the hired party.

*Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323–24 (1992) (citation omitted); *see also Barnhart v. New York Life Ins. Co.*, 141 F.3d 1310, 1312–13 (9th Cir. 1998); Restatement (Third) of Agency § 7.07 cmt. f.

Prior to Jinhua's formation in February 2016, no agency relationship could have existed between Mr. Chen and Jinhua. A nonexistent entity can neither manifest assent nor exercise control. And between Jinhua's formation and the minimal evidence, accepted by Jinhua for present purposes, of Mr. Chen assuming the Jinhua presidency in December 2016, the government has also failed to show the existence of an agency relationship.[15] To be sure, the government has shown that Mr. Chen had some involvement in Jinhua's operations during this timeframe. But this evidence falls well short of establishing that Mr. Chen and Jinhua assented to an agency relationship under which Jinhua controlled Mr. Chen.

Under the TCA, UMC was obligated to provide Jinhua "with all necessary technical consulting and professional manpower." (P1193T.0003.) Evidence that Mr. Chen performed tasks like commenting on Jinhua's logo merely shows that Mr. Chen, as a senior vice president at UMC, was fulfilling UMC's obligations under the TCA.

---

[15] The government has at time indicated that Mr. Chen was a Jinhua board member during this timeframe. However, the government introduced no evidence to support this claim. In any event, "directors are neither the shareholders' nor the corporation's agents." Restatement (Third) of Agency § 1.01 cmt. (f)(2).

35

1    Likewise, to perform the obligations under the TCA, after a meeting attended by Jinhua and

2 UMC, recognizing the "extreme shortage of talent in the IC field and fierceness in the competition,"

3 at an August 16, 2016, Jinhua meeting, Mr. Chen was authorized "to conduct initial evaluation of

4 the qualifications and salary levels" for prospective employees . (P1026T.0004.)

5    Understood with this context, Mr. Chen's attendance at the CASPA job fair two months after

6 this authorization does not establish a general agency relationship with Jinhua for all purposes.

7 CASPA "was a weekend-long event, and the Jinhua recruiting event was just one portion of it." (Trial

8 Tr., Vol. IV, at 662:03-662:06.) UMC, however, was a "Platinum" sponsor of the event. (*Id.* at

9 666:18-666:22.) Mr. Chen attended the job fair. And because Mr. Chen was overseeing a significant

10 project at UMC for which Jinhua was an important client, and had agreed to help out with hiring,

11 Mr. Chen attended and supported Jinhua's presentation at the job fair. Indeed, Mr. Chen handed

12 attendees <u>UMC</u> business cards, while Albert Wu, who was introduced as Jinhua's general manager,

13 had Jinhua business cards. (*Id.* at 633:14-633:25, 648:01-648:07, 656:24-657:10, 668:15-668:19.)

14    To be sure, Agent Wu testified that Mr. Chen described himself as Jinhua's "head of two

15 divisions, which were the sales and marketing divisions and one of the operations divisions," and

16 that "he would be the division head and the hiring decider for people that were interested in working

17 for Jinhua." (*Id.* at 647:14-647:18.) And KLA understood Mr. Chen to be working for both UMC

18 and Jinhua. (Trial Tr., Vol. XVII, at 3127:16-3128:03.) However, there was no evidence presented

19 that Jinhua had any right to control Mr. Chen. *See* Restatement (Third) of Agency § 1.01 cmt. f(1)

20 ("A relationship of agency is not present unless the person on whose behalf action is taken has the

21 right to control the actor."). To the contrary, Agent Wu's testimony was that Mr. Chen was merely

22 helping out "while Jinhua was in its nascent stages." (Trial Tr., Vol. IV, at 647:14-647:18.) And this

23 testimony was in accord with Mr. Chen's role that was spelled out in the August 16, 2016, meeting.

24    In any event, at most, any October 2016 agency relationship was limited to Jinhua retaining

25 Mr. Chen for a limited purpose, as described by Agent Wu. "People often retain agents to perform

26 specific services." Restatement (Third) of Agency § 1.01 cmt. c. And "[i]t is the function delegated

27 to the corporate officer or agent which determines his power to engage the corporation in a criminal

28

36

1   transaction." *C.I.T. Corp. v. United States*, 150 F.2d 85, 89 (9th Cir. 1945). Therefore, even if there

2   were a limited agency relationship between Mr. Chen and Jinhua in October 2016, Jinhua could only

3   potentially be held responsible for Mr. Chen's illegal acts and knowledge while he was acting as

4   Jinhua's agent for hiring and potentially for negotiating for tools—not for all his activities as UMC's

5   agent.

6          Finally, once Mr. Chen assumed the Jinhua presidency, Jinhua does not presently dispute that

7   he was a Jinhua agent. *See* Restatement (Third) of Agency § 1.01 cmt. c ("The elements of common-

8   law agency are present in the relationships between employer and employee, corporation and

9   officer . . . ."). But, as explained above, the government has failed to show that Mr. Chen took any

10  action in his role as Jinhua's president sufficient to link Jinhua to the criminal conduct. *See supra*

11  § III.B.

12              (c)   <u>The government failed to show that Mr. Chen's alleged knowledge
                      of, or participation in, the conspiracy occurred in the scope of his</u>

13                    <u>purported Jinhua authority</u>

14         Even if Mr. Chen was a member of the alleged conspiracy at UMC and was Jinhua's agent

15  prior to his appointment as Jinhua's president, his knowledge of, or involvement in, the conspiracy

16  <u>still</u> cannot be imputed to Jinhua because at no point during Jinhua's alleged agency relationship

17  with Mr. Chen, did he obtain knowledge of the alleged conspiracy or commit a criminal act "in the

18  course of [his] engagement with [Jinhua] and within the scope of his . . . authority." *Josleyn*, 206

19  F.3d at 159; *see also Curtis*, 262 U.S. at 222 ("The general rule is that a principal is charged with the

20  knowledge of the agent acquired by the agent in the course of the principal's business."); *In re*

21  *ChinaCast.*, 809 F.3d at 477; *El Ranco*, 406 F.2d at 1214 n.13; *Kimbro*, 889 F.2d at 876; *Frankfort*,

22  220 F. at 79; *In re Hellenic Inc.*, 252 F.3d at 395; *Dye*, 908 F.3d at 685; *Bank of New England*, 821

23  F.2d at 856; *One Parcel of Real Est.*, 730 F. Supp. at 426–27.

24         The government has argued that Mr. Chen purportedly initiated the conspiracy upon

25  assuming his role with UMC in September 2015—months before Jinhua was formed in February

26  2016. The government has alleged that Mr. Chen was consistently kept in the loop by the Project M

27  team. But this alleged criminal knowledge and acts all occurred while he was acting in his position

28

1    as a senior vice president at <u>UMC</u>. There is no evidence that Mr. Chen received knowledge of the

2    alleged conspiracy, or joined the conspiracy, while committing an act <u>Jinhua</u> "authorized [him] to

3    perform, occur[ing] substantially within the authorized limits of time and space, and . . . actuated at

4    least in part, by a desire to serve [Jinhua]." *United States v. Demauro*, 581 F.2d 50, 54 n.3 (2d Cir.

5    1978) (quoting Prosser, Torts, 352 (2d ed. 1955)); *see also United States v. Gold*, 743 F.2d 800, 823

6    (11th Cir. 1984); *United States v. Cincotta*, 689 F.2d 238, 241 (1st Cir. 1982); *United States v.*

7    *Automated Med. Labs., Inc.*, 770 F.2d 399, 406 (4th Cir. 1985). And "where an agent obtains

8    knowledge while acting outside the scope of his agency . . . the court will not impute the agent's

9    knowledge to the corporation," *United States v. One Parcel of Land Located at 7326 Highway 45*

10   *North, Three Lakes, Oneida County, Wisconsin*, 965 F.2d 311, 316 (7th Cir. 1992), and an act outside

11   the scope of the agent's authority cannot be imputed to the principal, *see, e.g.*, *Beusch*, 596 F.2d at

12   877.

13          Moreover, even if Mr. Chen knew about the criminal conduct, was Jinhua's agent, and gained

14   material knowledge in the scope of his Jinhua duties, that knowledge also could not be imputed to

15   Jinhua under the "adverse-interest exception" to the ordinary rule that an agent's knowledge is

16   imputed to the principal. When an agent gains knowledge material to their scope of duties, under the

17   "adverse-interest exception," "notice of a fact that an agent knows or has reason to know is not

18   imputed to the principal if the agent acts adversely to the principal in a transaction or matter,

19   intending to act solely for the agent's own purposes or those of another person." Restatement (Third)

20   of Agency § 5.04.

21          Despite elements of cooperation between UMC and Jinhua envisioned in the TCA—

22   necessary when one party develops technology and the other implements and commercializes it—

23   UMC was still fundamentally the seller, and Jinhua the buyer. Any seller has adverse interests to the

24   buyer. This is particularly so where, as here, a seller sells stolen technology to an unwitting buyer.

25          Jinhua entered into an agreement with UMC to lawfully develop DRAM technology. Under

26   the agreement, Jinhua paid UMC hundreds of millions of dollars to develop the technology.

27   Unbeknownst to Jinhua, however, UMC engineers—for present purpose, assuming Mr. Chen as

28

1   well—decided to take an unlawful shortcut. Whether they took the shortcut to lower UMC's costs

2   or, as the government has intimated, to further their own career prospects, this shortcut was directly

3   adverse to Jinhua's interest. According to the government, money was not an issue for Jinhua—it

4   had the financial backing of the Fujian province. Jinhua's interest was being able to produce

5   semiconductor chips using DRAM technology. As this proceeding, the Taiwanese criminal

6   proceeding, the related civil cases, and Jinhua's placement on the Department of Commerce's Entity

7   List demonstrate, taking a shortcut was <u>not</u> in Jinhua's interest. Jinhua has lost the substantial sums

8   it invested in the project and has not been able to develop DRAM technology. It cannot even purchase

9   tools from American companies. Even if Mr. Chen were a member of the conspiracy or knew about

10  the conspiracy, his dual agency with UMC and Jinhua meant that his UMC interest was adverse to

11  Jinhua and rebuts any presumption that he reported UMC's unlawful conduct to Jinhua. Mr. Chen

12  was compensated by UMC for his work on Project M, and he owed duties of confidentiality to UMC.

13  He plainly had interests adverse to Jinhua. His knowledge thus cannot be imputed to Jinhua. *See*

14  *Ruberoid Co. v. Roy*, 240 F. Supp. 7, 10 (E.D. La. 1965) ("Greene not only acted in his own monetary

15  interest, but acted adversely to the interest of his principal by perpetrating a scheme which eventually

16  would result in the loss of a customer and generate a significant amount of ill will towards his

17  principal.").

18          2.    <u>JT Ho, Neil Lee, and Ray Guo</u>

19        The government incorrectly argues that Messrs. Ho, Lee, and Guo were Jinhua's agents, and

20  accordingly, their knowledge of, and participation in, the trade secret theft can be imputed to Jinhua.

21  In support, the government argues that Messrs. Ho, Lee, and Guo each signed labor contracts with

22  Jinhua. However, for several reasons, the government's argument is meritless.

23        First, the contract purporting to be Mr. Guo's provides that "[t]his contract is established after

24  being sealed or signed by both parties," (P1089T.0006) and Mr. Lee's provides that "[t]his contract

25  shall take effect following the Parties' signature or seal." (P1089T.0018.) But neither contract is

26  signed. Therefore, the government has failed to show the existence of a binding contract between

27

28

1    Jinhua and either Mr. Lee or Mr. Guo.[16] *See Fontana v. Chef's Warehouse Inc.*, 16-CV-06521-HSG,

2    2017 WL 2591872, at *3 (N.D. Cal. June 15, 2017) ("When it is clear . . . that the proposed written

3    contract would become operative only when signed by the parties[ ], the failure to sign the agreement

4    means no binding contract was created." (quoting *Basura v. U.S. Home Corp.*, 98 Cal. App. 4th 1205,

5    1216 (2002))); *see also Pacey v. McKinney*, 125 F. 675, 680 (9th Cir. 1903); *Hardwood Package

6    Co. v. Courtney Co.*, 253 F. 929, 931 (4th Cir. 1918) ("But it is equally well settled that an unsigned

7    contract cannot be enforced by either of the parties, however completely it may express their mutual

8    agreement, if it was also agreed that the contract should not be binding until signed by both of

9    them."); *Hamilton Foundry & Mach. Co. v. Int'l Molders & Foundry Workers Union of N. Am.*, 193

10   F.2d 209, 213 (6th Cir. 1951); *PCS Sales (USA), Inc. v. Nitrochem Distrib. Ltd.*, 128 F. App'x 817,

11   818 (2d Cir. 2005).

12        Second, even if the contracts were all valid, the government has failed to establish that

13   Messrs. Ho, Lee, or Guo were ever Jinhua's agents. Even accepting that the "labor contracts" were

14   agreed to by Messrs. Ho, Lee, and Guo, there is no evidence that Jinhua was entitled to exercise any

15   control by virtue of the labor contracts. The purported contracts provided that Messrs. Ho, Lee, and

16   Guo would work in "Tainan, Taiwan"—not at a Jinhua facility in China. (P1089T.0003;

17   P1089T.0018; P0272.0003.) They also envisioned that Messrs. Ho, Lee, and Guo would work

18   concurrently for, and receive a salary from, UMC Taiwan. (P1089T.0006; P1089T.0021;

19   P0272.0007.) The contracts were perhaps intended to supplement Messrs. Ho, Lee, and Guo's UMC

20   salaries in order to further Jinhua's significant investment in UMC's DRAM production. Without

21   percipient witness testimony, there is no indication that Jinhua retained any right to control these

22   individuals.

23        Third, Mr. Ho's contract is undated. And there is significant uncertainty as to when it was

24   actually signed. The contract states that its term commenced on July 1, 2016. (P0272.0001.) Yet the

25   ──────────────

26   [16] The government has also introduced virtually no evidence tying Mr. Guo to the alleged
     conspiracy. Besides being the recipient of emails similar to some of those received by Mr. Chen and

27   purportedly working closely with Mr. Ho and Mr. Lee, there is no evidence that he joined the
     conspiracy. Once again, the government appears to be relying on "mere association with members

28   of a conspiracy" to establish liability. *Melchor-Lopez*, 627 F.2d at 891.

                                                    40

email purportedly containing the three unsigned contracts for Sandy Kuo to acknowledge was sent on September 2, 2016. (P1089T.0001.) But on September 9, 2016, Mr. Ho indicated that he had not signed the contract. According to LINE chat messages introduced by the government, Mr. Ho told Mr. Wang: "Today the big boss spoke to me about signing the contract. Still the same, have to sign for four years." (P0270.0034.) Therefore, the government's evidence fails to establish <u>when</u> Mr. Ho actually signed the labor contract and allegedly became Jinhua's agent.

Fourth, even if Messrs. Ho, Lee, and Guo signed the labor contracts, their knowledge of the trade secret theft and their participation in such theft could not be imputed to Jinhua. None of these individuals gained knowledge about the trade secret theft or committed the charged offenses while acting "within the scope of [their] authority" with Jinhua. *In re ChinaCast*, 809 F.3d at 477 (citation omitted); *see also Hudson River*, 212 U.S. at 495; *Josleyn*, 206 F.3d at 159; *El Ranco*, 406 F.2d at 1214 n.13; *Kimbro*, 889 F.2d at 876; *Frankfort*, 220 F. at 79. Their knowledge and participation while the labor contracts purportedly existed was not within the scope of authority provided by the labor contracts—it was within their UMC roles. By their terms, however, the labor contracts were for separate activities—the contracts provided that Messrs. Ho, Lee, and Guo could "work concurrently and a receive a salary from UMC Taiwan, although such arrangement in the aforementioned unit shall not affect . . . [the] completion of the work for [Jinhua]." (P1089T.0006; P1089T.0021; P0272.0007.) And the government has not shown any knowledge of the theft of trade secrets or commission of the charged offenses in the scope of authority provided by the Jinhua labor contracts. In fact, because of the government's trial-by-email approach, the only evidence about Messrs. Ho, Lee, and Guo's purported relationship with Jinhua is from the documents purporting to be labor contracts. Therefore, Messrs. Ho, Lee, and Guo's criminal knowledge and participation in the alleged offenses cannot be attributed to Jinhua by virtue of the labor contracts.

41

1      **D.**    <u>**The Court Should Enter a Judgment of Acquittal As To All Counts Because the**</u>
2      <u>**Government Has Neither Alleged Nor Proved That "An Act In Furtherance of**</u>
    <u>**The Offense Was Committed In The United States," And Extraterritorial**</u>
3      <u>**Application of §§ 1831 and 1832 Would Also Violate Due Process**</u>

4          The government has both failed to allege in the Indictment or prove at trial an essential

5  element of §§ 1831 and 1832—that "an act in furtherance of the offense was committed in the United

6  States." 18 U.S.C. § 1837(2). And, moreover, extraterritorial application of §§ 1831 and 1832 in this

7  case based on the evidence introduced at trial would violate due process. Therefore, the Court should

8  dismiss the Indictment or enter a judgment of acquittal as to all counts.

9          The government's case is built on conduct that did not occur here, in the United States. All

10  the alleged acts of theft of Micron's trade secrets, UMC's development of technology allegedly using

11  Micron's trade secrets, and the alleged transfer of that technology to Jinhua, occurred either in

12  Taiwan or China. Indeed, there have already been substantial criminal proceedings in Taiwan—a

13  forum that allowed for percipient witnesses with knowledge of the facts alleged in this case to testify.

14          Section 1837 rebuts the "presumption against extraterritoriality," *RJR Nabisco, Inc. v.*

15  *European Cmty.*, 579 U.S. 325, 335 (2016) (citation omitted), by providing that a foreign defendant

16  can be charged under §§ 1831 and 1832 for conduct occurring outside the United States if "an act in

17  furtherance of the offense was committed in the United States," 8 U.S.C. § 1837(2). Section 1837(2),

18  therefore, is an element of the offenses charged against Jinhua. *See, e.g.*, *United States v. Gipe*, 672

19  F.2d 777, 779 (9th Cir. 1982); *see also United States v. Read*, 918 F.3d 712, 718 (9th Cir. 2019); *cf.*

20  *Rehaif v. United States*, 139 S. Ct. 2191, 2196 (2019).

21          Yet, the government has never so much as cited or otherwise referred to § 1837(2)'s

22  requirement of an "act in furtherance of the offense . . . committed in the United States" at any point

23  during this case, including the Indictment, proposed jury instructions, any motion, or at trial. The

24  government's apparent unawareness of this element has had a massive impact on this case—the

25  Indictment failed to allege this element and the evidence offered at trial failed to establish it. The

26  failure to include this element in the Indictment requires dismissal of the Indictment. And the

27  government's failure to prove this element at trial requires the Court to enter a judgment of acquittal.

28

1.      The Indictment is Deficient Because It Failed To Charge that "Act In Furtherance of The Offense Was Committed In The United States"

"[A]n indictment or information which does not set forth each and every element of the offense fails to allege an offense against the United States." *United States v. Morrison*, 536 F.2d 286, 287 (9th Cir. 1976) (citing *United States v. Debrow*, 346 U.S. 374 (1953)); *see also United States v. Carll*, 105 U.S. 611, 612 (1881). Therefore, "[a]n indictment's failure to recite an essential element of the charged offense is not a minor or technical flaw . . . but a fatal flaw requiring dismissal of the indictment." *United States v. Pernillo-Fuentes*, 252 F.3d 1030, 1032 (9th Cir. 2001) (emphasis added) (internal quotation and citation omitted); *see also United States v. Perlaza*, 439 F.3d 1149, 1153, 1160–61, 1178 (9th Cir. 2006) (reversing convictions because the government did not "allege in the indictment and prove to a jury beyond a reasonable doubt" the required statutory domestic nexus requirement); *cf. Vendavo, Inc. v. Price f(x) AG*, No. 17-cv-06930-RS, 2018 WL 1456697, at *4 (N.D. Cal. Mar. 23, 2018) (holding that the "territorial . . . limits" under § 1837(2) are "foundational to the existence of a viable . . . claim."); *Beijing Neu Cloud Oriental Sys. Tech. Co. v. IBM*, 21 Civ. 7589 (AKH), 2022 WL 889145, at *4–5 (S.D.N.Y. Mar. 25, 2022) (same).

Here, the Indictment failed to allege the element of the charged offenses that "an act in furtherance . . . was committed in the United States." 18 U.S.C. § 1837(2). As is usual, for each count, the Indictment opened by providing a timeframe for the offense, naming the defendants charged, and using "the language of the statute . . . in the general description of an offense." *Russell v. United States*, 369 U.S. 749, 765 (1962). Count I tracked the elements of § 1831(a)(5), Count II tracked the elements of § 1832(a)(5), and Count VII tracked the elements of § 1831(a)(3) and (2). (Indictment (ECF 1), at ¶¶ 17, 51, 63.) But the statutory language used by the Indictment completely failed to include § 1837(2)'s requirement that "an act in furtherance of the offense was committed in the United States." 18 U.S.C § 1837(2).

Indeed, the Indictment does not cite § 1837(2), and it contains the phrase "[i]n furtherance" only once. The single "Overt Acts" paragraph of Count II provides: "In furtherance of the conspiracy and to effect its objects, defendants committed the overt acts alleged in paragraphs 34 through 49, among others, in the Northern District of California and elsewhere." (Indictment (ECF 1), ¶ 53.) But

43

1  this language is not enough to rescue Count II.[17] The charging paragraph of Count II does not include

2  an "in furtherance" element. (*See id.* ¶ 51.) And the lone "in furtherance" mention refers to the

3  "Northern District of California" rather than the "United States." The reference to the "Northern

4  District of California" is plainly an effort to establish proper venue—not some oblique way of

5  satisfying § 1837(2). *See* Fed. R. Crim. P. 18.[18] In any event, "uncertainty or ambiguity" in "set[ting]

6  forth all the elements necessary to constitute the offence intended to be punished" dooms the

7  indictment. *Carll*, 105 U.S. at 612.

8         Moreover, because the elements paragraph of Count II did not include the "in furtherance"

9  requirement, the grand jury could have returned the Indictment based on any one of the twelve overt

10  acts that allegedly occurred in Taiwan and China. The "grand jury was designed to secure" a

11  defendant's right to know "what was in the minds of the grand jury at the time they returned the

12  indictment"—*i.e.*, whether there was probable cause for <u>all</u> elements of the offenses for which an

13  indictment was returned. *Russell*, 369 U.S. at 770. The failure of the Indictment returned against

14  Jinhua to allege that an act in furtherance of each offense occurred in the United States "renders the

15  indictment constitutionally defective," and requires dismissal of the Indictment. *See United States v.*

16  *Kurka*, 818 F.2d 1427, 1431 (9th Cir. 1987) (citation omitted)); *United States v. Keith*, 605 F.2d 462,

17  464; *United States v. Omer*, 395 F.3d 1087, 1088–89 (9th Cir. 2005).[19]

18

19

20  _____

21      [17] Even if the "in furtherance" language of Count II were considered sufficient, it would not

22  save Counts I and VII, where no such language appears. *See, e.g.*, *United States v. Perez*, 962 F.3d 420, 440–41 (9th Cir. 2020); *United States v. Spinner*, 180 F.3d 514, 515–16 (3d Cir. 1999); *United States v. Hooker*, 841 F.2d 1225, 1231 (4th Cir. 1988).

23      [18] The general description paragraphs of Counts I and VII that repeat the applicable elements

24  of § 1831 but do not include mention or citation to § 1837(2)'s requirement that "an act in furtherance of the offense was committed in the United States," open with the phrase: " . . . in the Northern

25  District of California and elsewhere, defendants . . ." (Indictment (ECF 1) ¶¶ 17, 63.) This reference, however, does not set forth the element in § 1837(2) that an act in furtherance of the offense occurred

26  in the United States, and is clearly the government's standard venue provision.

27      [19] Notice of the missing element—from, for example, a "bill of particulars" or "open file discovery"—"cannot save an invalid indictment." *United States v. Cecil*, 608 F.2d 1294, 1296 (9th

28  Cir. 1979) (citation omitted); *Keith*, 605 F.2d at 464 (same).

44

2.   The Government Has Failed to Present Evidence Sufficient to Satisfy
§ 1837(2)

The government also failed to introduce evidence at trial sufficient to satisfy § 1837(2). Because "act in furtherance" is not defined in the statute, courts have "look[ed] to the established common law meaning of 'in furtherance of' when interpreting the extraterritoriality provision" set forth in § 1837(2). *See, e.g.*, *Luminati Networks Ltd. v. BIScience Inc.*, 2:18-CV-00483-JRG, 2019 WL 2084426, at *9 (E.D. Tex. May 13, 2019).

"[T]he natural meaning of 'in furtherance of' is 'furthering, advancing or helping forward.'" *United States v. Hector*, 474 F.3d 1150, 1157 (9th Cir. 2007) (quoting *United States v. Castillo*, 406 F.3d 806, 813–14 (7th Cir. 2005)); *see also United States v. Rios*, 449 F.3d 1009, 1112 (9th Cir. 2006) holding that "act in furtherance" must be "intended to . . . promote or facilitate the [charged crime]."). While an act in furtherance need not "be criminal in character," it must be an "overt act" manifesting "that the conspiracy is at work." *Yates v. United States*, 354 U.S. 298, 334 (1957) (citation omitted), *overruled on other grounds by Burks v. United States*, 437 U.S. 1 (1978). And the overt act cannot be "a project still resting solely in the minds of the conspirators []or a fully completed operation no longer in existence." *Id.* In brief, the government must "show[] a specific 'nexus' between the particular [overt act] and the particular . . . crime at issue." *Hector*, 474 F.3d at 1157. "In practical terms, this means the government must 'present a viable theory as to how the [act] furthered the [offense]." *Id.* (quoting *Castillo*, 406 F.3d at 815). That is, the act must "further[] an independent . . . offense," and the government must exclude the possibility that the act was in furtherance of some "other, perhaps legitimate, purposes." *United States v. Mann*, 389 F.3d 869, 879–80 (9th Cir. 2004) (citation omitted).

The government's evidence at trial established two events that occurred in the United States: the CASPA job fair and the KLA meeting, both in October 2016. Neither event, however, was sufficient to establish that "an act in furtherance of the offense[s] was committed in the United States." 18 U.S.C. § 1837(2). Instead, both events were in furtherance of Jinhua's business activities

45

1  after the completion of the charged offenses—not the allegedly unlawful conduct occurring at

2  UMC.[20]

3  Agent Wu testified that the presentation at CASPA was exclusively a "Jinhua recruitment

4  event"; no job opportunities at UMC were advertised. (Trial Tr., Vol. IV, at 637:02-637:06, 643:09-

5  645:11, 648:19-648:21.) Jinhua's plans discussed at CASPA were purely "aspirational," consisting

6  of a "fab facility to be created in the future," hopefully by 2020. (*Id.* at 637:18-637:22.) Likewise,

7  Jinhua's recruitment plans reflected its projected hiring needs by 2020. (*Id.* at 642:07-642:14.)

8  Similarly, the "purpose" of the KLA meeting was for Jinhua to "introduce themselves" to

9  KLA, "to hear about" KLA's "tool offerings," and to give KLA "a status update on the projects" at

10  Jinhua—there was no UMC aspect to the meeting and no evidence suggests that any Micron

11  technology was discussed, revealed, or relied upon by any participant in the meeting.[21] (Trial Tr.,

12  Vol. XVII, at 3096:06-3096:11.) Like at CASPA, Jinhua's presentation was entirely about its

13  planned future facility that had a projected "move-in" date of July 2018. (*Id.* at 3116:18-3122:04.)

14  The government's evidence about the CASPA job fair and KLA meeting fails to satisfy

15  § 1837(2). Importantly, both events were purportedly about Jinhua's future fab yet to be built.

16  CASPA was about hiring employees to work at the facility, and the KLA meeting was about

17  implementing the tools with which those employees would work. Neither event had anything to do

18  with the alleged trade secret theft and use by UMC Project M employees working at UMC's Taiwan

19  fab. Indeed, the charged offenses were to be completed by the time the tools or employees became

20  _____

21  [20] Additionally, the government has not demonstrated that either of these alleged acts in

22  furtherance of the offenses were committed by someone with knowledge of the offenses. *See Lee v. United States*, 106 F.2d 906, 907 (9th Cir. 1939) ("No evidence discloses that appellant was a party to the formation of the conspiracy, and there is no evidence to show that when he committed the

23  overt acts he had knowledge of such a conspiracy."). As explained above, Mr. Chen was not a participant in the alleged criminal acts and he lacked knowledge of said acts. *See supra* § III.C.1.

24  And the government has not presented any evidence about Albert Wu's knowledge or participation in the charged offenses. The government cannot rely on innocent actions by innocent actors to

25  establish an essential element of the offenses.

26  [21] To be sure, Mr. Trafas testified that he understood there to be "sales opportunities to UMC DRAM in Tainan." (Trial Tr., Vol. XVII, at 3101:14-3101:20.) But while KLA and Mr. Trafas

27  understandably wanted to sell tools to both UMC and Jinhua, the meeting that occurred in the United States was only about the opportunity to sell tools to Jinhua. The UMC negotiations were conducted

28  separately by the "KLA team in Taiwan." (*Id.* at 3123:07-3123:09.)

1    relevant—the latest possible completion of the charged offenses was Jinhua's knowing possession

2    of the alleged trade secrets. 18 U.S.C. §§ 1831, 1832. Therefore, Jinhua's attempt to hire employees

3    at CASPA and purchase tools from KLA were, at most, merely acts "meant to allow [Jinhua] to enjoy

4    the fruits of [its] crime[s]" as alleged in the Indictment—they were not acts in furtherance of the

5    charged offenses. *See United States v. Narum*, 577 F. App'x 689, 691 (9th Cir. 2014) (holding that

6    acts "meant to allow [the defendant] to enjoy the fruits of his crime" were not "in furtherance of his

7    scheme to defraud"); *United States v. Wood*, 259 F. App'x 48, 49–50 (9th Cir. 2007) (holding that a

8    defendant's use of funds stolen in the charged conspiracy was not an act "in furtherance" of the

9    conspiracy); *United States v. Kaplan*, 554 F.2d 958, 965 (9th Cir. 1977). They did not "promote or

10   facilitate" UMC's DRAM development, or, *a fortiari*, the alleged conspiracy or trade secret theft.

11   *Rios*, 449 F.3d at 1112.[22] Therefore, Jinhua is entitled to acquittal because the government cannot

12   establish that any "act in furtherance of the offense was committed in the United States." 18 U.S.C.

13   § 1837(2).

14                    3.    Extraterritorial Application of §§ 1831 and 1832 Would Violate Due Process

15           Even if § 1837(2) were both sufficiently alleged and proved at trial, extraterritorial

16   application of §§ 1831 and 1832 to Jinhua would violate constitutional due process. Every alleged

17   criminal act proven at trial occurred in Taiwan (or, possibly, China). The government reaches too far

18   in seeking to use Jinhua's attendance at a job fair and a meeting about tools as a jurisdictional hook

19   for convicting Jinhua based on the alleged theft of trade secrets that occurred wholly in Taiwan.

20           In addition to the requirement that Congress "make clear its intent to give extraterritorial

21   effect to its statutes . . . , as a matter of constitutional law, . . . application of the statute to the acts in

22   question [cannot] violate the due process clause of the fifth amendment." *United States v. Davis*, 905

23   ──────────────

24       [22] Even in the related civil context, courts have not found § 1837(2) satisfied by domestic acts
     as tenuously connected to the alleged offense as here. Although an "act in furtherance" need not be
25   independently wrongful, in practice, courts have found that § 1837(2) was satisfied only where the
     "act in furtherance" was independently wrongful and a material component of the alleged offense.
26   *See, e.g., Motorola Solutions, Inc. v. Hytera Communications Corp. Ltd.*, 436 F. Supp. 3d 1150, 1165
     (N.D. Ill. 2020) (holding that it was "undisputed throughout trial that Defendants have advertised,
27   promoted, and marketed products embodying the allegedly stolen trade secrets domestically at
     numerous trade shows.").

28

F.2d 245, 248 (9th Cir. 1990) (citation omitted). Due process requires a "sufficient nexus between the defendant and the United States, so that such application would not be arbitrary or fundamentally unfair." *Id*. at 248–49 (citation omitted). This nexus requirement "ensures that a United States court will assert jurisdiction only over a defendant who 'should reasonably anticipate being haled into court' in this country.'" *United States v. Klimavicius-Viloria*, 144 F.3d 1249, 1257 (9th Cir. 1998) (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).

Even if the wrongdoing occurred as the government alleges, Jinhua's connection to the United States is too tenuous to comport with Due Process. While the government has introduced evidence about harm to Micron, it has offered no evidence permitting the conclusion that Jinhua was aware of any harmful effect on Micron in the United States. Even assuming that Mr. Chen knew about the alleged trade secrets, there is no evidence that Mr. Chen understood that the owner of the allegedly stolen trade secrets was Micron Technology—the United States parent company of Micron Memory Taiwan Co. Ltd., that was his former employer. (Trial Tr., Vol. I, at 62:08-62:21.) In any event, Jinhua's participation in CASPA and the KLA meeting occurred before Mr. Chen became its president, at which time there was not even an arguable basis to impute his conduct and knowledge to Jinhua. *See supra* § III.C.1. Therefore, due process requires that the Court enter a judgment of acquittal.

## IV.   **CONCLUSION**

On the record before this Court, no rational trier of fact could find guilty beyond a reasonable doubt as to any of the Counts. Accordingly, this Court should grant Jinhua's motion for a judgment of acquittal and bring this baseless prosecution to an end.

SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP


By: _____*/s/ Jack P. DiCanio*_____
JACK P. DICANIO
Attorney for Defendant
FUJIAN JINHUA INTEGRATED CIRCUIT CO., LTD.