STEPHANIE M. HINDS (CABN 154284)
United States Attorney

THOMAS A. COLTHURST (CABN 99493)
Chief, Criminal Division

LAURA VARTAIN HORN (CABN 258485)
NICHOLAS WALSH (CABN 314290)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    Laura.Vartain@usdoj.gov
    Nicholas.Walsh@usdoj.gov

NICHOLAS O. HUNTER (DCBN 1022355)
STEPHEN MARZEN (NYBN 2007094)
Trial Attorneys, National Security Division

    950 Pennsylvania Ave., NW
    Washington, DC 20530
    Tel: (202) 353-3434
    Fax: (202) 233-2146
    Nicholas.Hunter@usdoj.gov
    Stephen.Marzen@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 18-CR-00465 MMC |
|     Plaintiff, | UNITED STATES' THIRD STATUS REPORT REGARDING DIPLOMATIC CORRESPONDENCE |
|   v. | |
| FUJIAN JINHUA INTEGRATED CIRCUIT CO., LTD., | The Honorable Maxine M. Chesney<br>Courtroom 7, 19th Floor |
|     Defendant. | |

The United States writes to inform the Court of certain recent developments in advance of the upcoming Status Hearing in this matter set for June 6, 2022, at 10:00 a.m. In light of those developments, which essentially reveal that the Court has successfully waited out the COVID-19 lockdowns, the United States respectfully requests that the Court require Defendant Fujian Jinhua Integrated Circuit Co., Ltd. ("Jinhua") to produce its witnesses in-person at trial on June 21, 2022, or to explain how the changed landscape described below warrants remote testimony for any witness who still requests it.

## STATUS REPORT

### I.    Conditions in the People's Republic of China Have Materially Improved

The government draws the Court's attention to recent news reports that indicate the COVID-19 Pandemic situation in the People's Republic of China ("PRC") has materially improved since Jinhua first indicated that it could not produce its witnesses for trial two and a half months ago on March 22, 2022. *See* Dkt. 407. Those news reports indicate that as of June 1, 2022, the largest Chinese city, Shanghai, had ended its COVID "lockdown" and the city's "skyscrapers lit up, roads filled with traffic, and young people drank and danced in the streets as fireworks boomed overhead." Nectar Gan, *Shanghai is Finally "Reopening," but the Trauma of Lockdown Lives On*, at https://edition.cnn.com/2022/06/01/china/shanghai-lockdown-reopening-intl-hnk-mic/index.html, June 1, 2022 (accessed June 1, 2022). That reopening has apparently also been implemented elsewhere in the PRC, at least in part: "Beijing, the nation's capital, further eased restrictions Tuesday in some districts. The city imposed limited lockdowns, but nothing near a citywide level, in a much smaller outbreak that appears to be on the wane. Beijing recorded 18 new cases on Monday." Associate Press, National Public Radio, *Shanghai Eases into Gradually Reopening from its COVID-19 Lockdown*, at https://www.npr.org/2022/05/31/1102095716/shanghai-eases-into-gradually-reopening-from-its-covid-19-lockdown, May 31, 2022 (accessed June 1, 2022).

These news reports also indicate that air travel in and out of Fujian Province, where Jinhua's fact witnesses reside and work, has opened further as well. For example, Juneyao Airlines, a Shanghai-based carrier, "resumed its round-trip flights that connect Shanghai Pudong International Airport and Longyan of Fujian Province last week." China Global Television Network, *More Carriers Resume Domestic Flights from Shanghai*, https://news.cgtn.com/news/2022-05-28/More-carriers-resume-domestic-flights-

from-Shanghai--1ap7SAfBiTu/index.html, May 28, 2022 (accessed June 1, 2022); *see also* Global Times, *Airlines in Shanghai to Resume Services Amid Declining Number of COVID-19 Infections*, at https://www.globaltimes.cn/page/202205/1265711.shtml, May 16, 2022 (accessed June 1, 2022).

These reports are in congress with what Jinhua has already represented to the Court: that its witnesses are no longer blocked from travelling from Fujian Province due to government-imposed travel lockdowns. As long ago as April 25, 2022, Jinhua acknowledged that "we were told this morning that [the lockdown in Jinjiang, Fujian Province] has been lifted," and that at least one of the proposed witnesses then had a "green" code on his phone, indicating travel was permitted. Dkt. 472 at 9-10 (Transcript of April 25, 2022 Status Hearing).

**II.     The Diplomatic Notes Between the United States and the People's Republic of China**

As described in the United States' First and Second Status Reports Regarding Diplomatic Correspondence, *see* Dkts. 476 and 482, the United States and the PRC have exchanged four diplomatic notes on the potential remote testimony of five witnesses tendered by Jinhua from within Mainland China. The four diplomatic notes are summarized in the Declarations of Michael J. Gilles filed at Dkt. 479 and Dkt. 482-1 and are referenced below where relevant.

As of the date and time of this filing, the undersigned prosecutors have received no response from the PRC to the United States' most recent Diplomatic Note, which was delivered on May 24, 2022.

**DISCUSSION**

First, given the apparent reduction in COVID infections in and easing of travel restrictions by the PRC, the United States asserts that Jinhua should now be able to bring all, or at least some, of its witnesses to San Francisco to testify. Jinhua's prior representations and declarations submitted to the Court are now stale. If Jinhua continues to press that it is unable to produce its witnesses, despite reporting about the PRC that suggests otherwise, Jinhua should be required to file new declarations updating the Court as to the current status of each of its witnesses. To the extent that certain witnesses complained that they could not travel due to lockdowns and the inconvenience of long delays on returning to the PRC, those concerns appear to no longer be an excuse for failure to appear at trial.

Second, the PRC's second Diplomatic Note asserted that remote testimony to a United States court from within its territory is prohibited under its domestic law unless authorized by its competent

authority, did not consent to the remote testimony of Jinhua's witnesses, and instead directed that an MLAA request be sent to the PRC's Central Authority to obtain the required consent. *See* Agreement between the Government of the United States of America and the Government of the People's Republic of China on Mutual Legal Assistance in Criminal Matters, U.S.-P.R.C., June 19, 2000, 2000 U.S.T. LEXIS 144 (the "U.S.-PRC MLAA"). The diplomatic correspondence—which attached declarations of Jinhua's Jinfu Zheng—made clear that the five witnesses would testify voluntarily on behalf of Jinhua and at Jinhua's request. Yet the PRC did not yet give consent in its second Diplomatic Note.

In principle, this Court would seem to have three ways forward, as described below.

**I.  The Court Could Require In-Person Testimony Now that the Court has Successfully Waited Out the COVID-19 Lockdowns in the PRC**

*First*, and preferably in the government's view, the Court could order Jinhua to tender its witnesses in person in this Court and resume the bench trial on June 21, 2022. This approach makes sense for the following reasons:

- As the United States has pointed out in prior filings and the Court knows well, the default rule is that testimony is taken in person. *See* FED. R. CRIM. P. 26 ("In every trial the testimony of witnesses must be taken in open court, unless otherwise provided by statute or by rules adopted under 28 U.S.C. §§ 2072-2077.").

- As noted above, travel has resumed within the PRC, and in particular from Fujian Province (to the extent it ever stopped). The defense witnesses can therefore fly to San Francisco. Jinhua could also consider chartering a flight. If Jinhua chartered a flight, it could fly all of its fact witnesses and avoid the allegedly limited seats on commercial flights. *See* Dkt. 459-1 (detailing parade of horribles about travel to the United States).

- To the extent that any of Jinhua's witnesses objected to travelling because of the allegedly long duration of travel, it would also appear that the new circumstances have significantly shortened the amount of time any witness would be away from the PRC, making appearances possible. *See id.* This fact in particular applies to defense witness Lu Wensheng, who it was alleged was too important to leave the PRC for an extended period of time. *See* Dkt. 407.

- Further, two of the five witnesses – Wu Kunrong (Albert Wu) and You Zhenfu (Jeff You) –

   are Taiwanese nationals. To the extent there remains any travel restrictions from the PRC to the United States, both Taiwanese nationals can fly from the PRC to Taiwan. Indeed, You Zhenfu already flew to Taiwan to handle a death in his family. From Taiwan, those two witnesses can fly from Taipei to San Francisco and back non-stop, as six Taiwanese witnesses in this case already have and as the government's labor-law expert had tickets to do. As of May 3, 2022, the United States understands that the return quarantine requirement in Taiwan dropped from 14 days to 7 days.

- Lastly, Jinhua's labor-law expert (Professor Jiang Ying) is the only Jinhua witness with a genuine medical condition contraindicating international long-haul travel. The United States again suggests that the expert and the government's rebuttal expert (Professor Yu-Fan Chiu) testify through their reports and disclosures as permitted by Criminal Rule 26.1.

By a combination of in-person fact and written expert testimony, Jinhua can present its defense without taking remote testimony from within PRC territory.

## II. The Court Could Take Remote Testimony from the PRC Without the PRC's Consent, But Comity Counsels Against Doing So

*Second*, this Court has authority to take testimony from witnesses within PRC territory without further communication or consent from the PRC. Aside from the various reasons that the United States has previously raised to prefer in-person testimony, in light of the lack of consent, the Executive Branch does not recommend exercising that authority for reasons of international comity. Such an act could undermine the diplomatic position of the United States, including the United States' demand for reciprocal respect of its territorial integrity.

In its second Diplomatic Note, the PRC did not consent to the remote testimony of Jinhua's witnesses, and instead directed that a MLAA request be sent to the PRC's Central Authority to obtain the required consent. The U.S.-PRC MLAA provides a process for government-to-government assistance; it is not a vehicle to facilitate defense efforts to obtain evidence such as the voluntary testimony of Jinhua's five witnesses.[1] Consistent with its position in other cases, the Executive Branch therefore declines to

---

[1] Article 1, paragraph 3, of the Agreement between the Government of the United States of America and the Government of the People's Republic of China on Mutual Legal Assistance in Criminal Matters, U.S.-P.R.C., June 19, 2000, 2000 U.S.T. LEXIS 144, states: "This Agreement is intended solely

invoke the MLAA process in this case. Even if the U.S.-PRC MLAA applied and a request were submitted, that process offers no assurance that remote testimony of Jinhua's witnesses would be secured within a meaningful time or ever. *See, e.g.*, *In re Sealed Case*, 932 F.3d 915, 937-38 (D.C. Cir. 2019) (50 MLAA requests to PRC for bank records over the past decade, with no responsive records in 35 cases and "inadequate or untimely" responses in the remaining 15 cases; of 10 recent PRC MLAA requests, "at most one response").

### A. This Court Has Authority to Allow the Remote Testimony of Jinhua's Witnesses

The Executive Branch acknowledges and respects this Court's authority to take remote video testimony of witnesses from within the territory of the PRC. This Court has jurisdiction over the subject matter and jurisdiction over the defendant. The question is whether the Court should exercise its authority to take remote testimony as a matter of international comity under the precise circumstances of this case. *United States v. First National City Bank*, 396 F.2d 897, 901 (2d Cir. 1968) ("Where, as here, the burden of resolution ultimately falls upon the federal courts, the difficulties are manifold because the courts must take care not to impinge upon the prerogatives and responsibilities of the political branches of the government in the extremely sensitive and delicate area of foreign affairs. *See, e.g.*, *Chicago & Southern Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948).").

---

for mutual legal assistance between the Parties. The provisions of this Agreement shall not give rise to a right on the part of any private person to obtain, suppress, or exclude any evidence, or to impede the execution of a request."

Courts construe similar text in mutual legal assistance agreements (MLAAs) and treaties (MLATs) to reserve the process for government-to-government requests and not for the use of private litigants such as Jinhua. *See, e.g.*, *United States v. McLellan*, 959 F.3d 442, 476 (1st Cir. 2020) ("We conclude, therefore, that the district court does not have the authority to compel the government to issue MLAT requests. Nor is the 'onus' on the government in this case to 'make it possible' for the defendant to obtain, via an MLAT request, evidence that he cannot establish is favorable to his case.") (citation omitted); *United States v. Sedaghaty*, 728 F.3d 885, 917 (9th Cir. 2013) ("The express terms of the MLAT [between the United States and Egypt] preclude [the defendant's] reliance on it as a source of discovery"); *United Kingdom v. United States*, 238 F.3d 1312, 1317 (11th Cir. 2001) ("There is no provision [in the Treaty Between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland on Mutual Legal Assistance in Criminal Matters] for private parties, such as individual criminal defendants in the English (or American) courts, to request the production of information.") (citation omitted); *United States v. Jefferson*, 594 F. Supp. 2d 655, 674 (E.D. Va. 2009) ("It is thus clear that defendant, as a private party, is not entitled to use the [U.S.-Nigeria] MLA Treaty process himself or force the government to use the treaty on his behalf.").

UNITED STATES' THIRD STATUS REPORT
18-CR-00465 MMC                           5

### B. Despite that Authority, Comity Counsels Against Taking Remote Testimony from within PRC Territory Without the PRC's Consent in this Case

Principles of international comity do not question this Court's authority. Comity is not about authority, but the judicious exercise of authority. The United States Supreme Court described the concept of international comity as "due regard" to "international duty and convenience":

> "Comity," in the legal sense, is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws.

*Hilton v. Guyot,* 159 U.S. 113, 163-164 (1895). "Since comity varies according to the factual circumstances surrounding each claim for its recognition, the absolute boundaries of the duties it imposes are inherently uncertain." *Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 937 (D.C. Cir 1984) (Wilkey, J.) (footnote omitted). "Mechanical or overbroad rules of thumb are of little value; what is required is a careful balancing of the interests involved and a precise understanding of the facts and circumstances of the particular case." *First National City Bank,* 396 F.2d at 901.

The international comity balance in this case counsels against the taking of remote video testimony from witnesses within the territory of the PRC without the PRC's consent. The PRC states by formal diplomatic note that its International Criminal Judicial Assistance Law ("ICJAL") bars a United States Court from arranging the remote testimony of witnesses within its territory in a foreign criminal case absent the approval of its competent authority. It is United States policy to respect the territorial integrity of foreign states, including in the exercise of jurisdiction and functions that are exclusively reserved to the authorities of foreign states by domestic law, so as to help ensure that foreign states similarly respect the sovereignty of the United States. *See Laker Airways Ltd.*, 731 F.2d at 937 ("the central precept of comity teaches that, when possible, the decisions of foreign tribunals should be given effect in domestic courts, since recognition fosters international cooperation and encourages reciprocity….").

The interest in territorial integrity is an important sovereign interest. "Courts should understand that assertions of 'judicial sovereignty' often incorporate legitimate notions of territorial integrity – a reluctance to permit foreign litigants to invade one's borders, literally *or figuratively*, for the purpose of

UNITED STATES' THIRD STATUS REPORT
18-CR-00465 MMC                                6

seizing evidence." Brief for the United States and the Securities and Exchange Commission as *Amicus Curiae* in *Société Nationale Industrielle Aérospatiale v. United States District Court for the Southern District of Iowa* 22-23 (Aug. 22, 1986) (emphasis added); *see id*. at 25 ("foreign assertions of 'judicial sovereignty' – to the extent that they embody legitimate concerns about territorial integrity and prevention of evidential extravagance – may also merit accommodation from United States courts. . . . Ordering that a foreign citizen be deposed on a foreign nation's soil obviously works a greater affront to that nation's 'territorial integrity' . . . .").

Comity balances the potentially conflicting interests of sovereign states, not the private interests of litigants. *See Société Nationale Industrielle Aérospatiale v. United States District Court for the Southern District of Iowa*, 482 U.S. 522, 543-44 (1987) ("the concept of international comity requires in this context a more particularized analysis of the respective interests of the foreign nation and the requesting nation") (footnote omitted). In this case, the sovereign interests do *not* conflict because the interests of both affected sovereigns counsel *against* non-consensual remote testimony contrary to domestic law. To be sure, foreign litigants often adopt the interest of foreign sovereigns for their private purposes, such as a foreign litigant's adoption of a foreign blocking statute to resist providing documents for use in a United States judicial proceeding at the request of a domestic United States litigant. But the foreign litigant's private interest is not itself a sovereign interest that has weight in the comity balance. RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 442, at 351 cmt. c (1987) ("In making this determination, *the court* or agency *will look*, inter alia*, to expressions of interest by the foreign state, as contrasted with expressions by the parties*; to the significance of disclosure in the regulation by the foreign state of the activity in question; and to indications of the foreign state's concern for confidentiality prior to the controversy in connection with which the information is sought.") (emphasis added) [Hereinafter, RESTATEMENT THIRD].[2]

---

[2] "In weighing the interests of a foreign state, a court in the United States may take into account indications of national interest by the foreign government .. . through a diplomatic note . . . . Correspondingly, a court may take into account declarations of United States interest in official statements or records of the Executive Branch. For instance, in a private antitrust suit, a court may give weight to a decision by the Department of Justice that the United States interest in having its antitrust laws applied to a given transaction or activity was not sufficiently strong to outweigh the possible adverse effects on the foreign relations of the United States." RESTATEMENT THIRD § 403, at 251 reporter's note 6.

In this case, Jinhua is not subject to conflicting sovereign demands. The foreign sovereign here, the PRC, can immediately authorize the remote testimony of Jinhua's five witnesses simply by sending a diplomatic note stating its consent. Conversely, if the PRC competent authority withholds consent, as it has in its latest diplomatic note, we do not understand the legal basis for a PRC state-owned entity to demand that a United States Court take a judicial act in PRC territory in violation of PRC law. Because Jinhua is not subject to conflicting sovereign demands, the cases listed in Jinhua's declaration (Dkt. 457-1 (Declaration of Emily Reitmeier)), in which courts address the conflict between foreign blocking statutes and United States discovery demands, are not relevant. The *Restatement (Fourth) of Foreign Relations Law* categorizes Jinhua's cases as "foreign-state compulsion." RESTATEMENT (FOURTH) OF FOREIGN RELATIONS LAW § 442 Reporters' Notes (2018). Unlike the foreign-compulsion cases, Jinhua is not subject to conflicting demands. The PRC has not consented to remote video testimony and the Executive Branch respects that determination in the absence of any other sovereign interest counseling in favor of reaching into the territory of the PRC to take testimony contrary to the PRC's domestic law. Many cases implicating the interests of comity require the complex balancing of competing interests. This case does not.

### III. The Court Could Give Jinhua a Further Continuance to Obtain Consent from the PRC to Take Remote Testimony

*Third*, if there is no response from the PRC to the United States' most recent Diplomatic Note by June 21, 2022, the Court could give more time for (a) the PRC to respond to the Diplomatic Note and (b) Jinhua to obtain consent through its own offices.

Considering the PRC's prompt replies to the United States' April 29 Diplomatic Note, and the PRC's investment in Jinhua, it also remains possible that the Court will receive the PRC's consent on or shortly before the resumption of trial on June 21, 2022, which would allow Jinhua to present its defense witnesses by remote testimony.

### CONCLUSION AND THE UNITED STATES' REQUESTS

By the time of the June 6, 2022 status conference, two months will have passed since the last day of testimony on April 6, 2022, and two and a half months since Jinhua first suggested it could not produce its witnesses at trial, back on March 22, 2022. Extended delay is prejudicial to the United States.

At the hearing on May 19, 2022, the Court inquired whether Jinhua had looked recently into whether travel might be more easily arranged. *See* Dkt. 481 at 8 (Transcript of May 19, 2022 Status Hearing). Jinhua did not then and has not yet responded to the Court's inquiry. *See id.* In light of the changed circumstances described above, it seems likely that some or all of the proposed defense witnesses can appear in person on June 21, 2022. Requiring in-person testimony comports with Federal Rule of Criminal Procedure 26 and international principles of comity. To the extent Jinhua has certain witnesses who maintain that they cannot be in court on June 21, 2022, the Court should inquire as to those reasons and ensure that they are sufficient to counterbalance the other interests at play.

For the foregoing reasons, the United States requests that the Court: (1) maintain the trial date of June 21, 2022; (2) require Jinhua to explain how the changed landscape warrants remote testimony for any witness who still requests it; and (3) require testimony in person or otherwise consistent with international comity.

Dated: June 2, 2022

Respectfully submitted,

STEPHANIE M. HINDS
United States Attorney

_____/s/_____
LAURA VARTAIN HORN
NICHOLAS WALSH
Assistant United States Attorneys

NICHOLAS O. HUNTER
STEPHEN MARZEN
Trial Attorneys, National Security Division