JACK P. DICANIO (SBN 138782)
Jack.DiCanio@skadden.com
EMILY REITMEIER (SBN 305512)
Emily.Reitmeier@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
525 University Avenue
Palo Alto, California 94301
Telephone:     (650) 470-4500
Facsimile:     (650) 470-4570

MATTHEW E. SLOAN (SBN 165165)
Matthew.Sloan@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071-3144
Telephone:     (213) 687-5000
Facsimile:     (213) 687-5600

*Attorneys for Defendant*
FUJIAN JINHUA INTEGRATED CIRCUIT CO., LTD.

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO.: 3:18-cr-00465-MMC |
| Plaintiff, | **DEFENDANT FUJIAN JINHUA INTEGRATED CIRCUIT CO., LTD.'S OPPOSITION TO THE GOVERNMENT'S MOTION TO SET A DATE FOR CLOSING ARGUMENT** |
| v. | |
| UNITED MICROELECTRONICS CORPORATION, *et al.*, | Judge: The Honorable Maxine M. Chesney |
| Defendants. | Trial Date: February 28, 2022 |

1

## <u>TABLE OF CONTENTS</u>

2  Table of Contents ................................................................................................ i

3  Table of Authorities ........................................................................................... iii

4  Preliminary Statement .........................................................................................1

5  Argument ..............................................................................................................1

6      I.     The Witnesses' Proposed Testimony Will be Both Competent and Relevant ........3

7            A.    Lu Wensheng ...........................................................................3

8                  1.    Formation of Jinhua, the Framework Agreement, and the
9                          Technology Cooperation Agreement ...............................3

10                 2.    Jinhua's Good-Faith Reliance on UMC's Experience ....................4

11                 3.    UMC's Contractual Obligations and Stephen Chen's Role ............5

12                 4.    Jinhua's Knowledge ........................................................7

13                 5.    Talent Retention Bonus Program ....................................7

14           B.    Wu Kunrong ...........................................................................8

15                 1.    Jinhua's Reliance on UMC's Technical Capabilities ....................8

16                 2.    Development and Transfer of Technology ......................9

17                 3.    Stephen Chen's Role at Jinhua ....................................10

18                 4.    JT Ho .....................................................................11

19           C.    Wu Junsheng .........................................................................12

20                 1.    Talent Retention Bonus Program ..................................12

21                 2.    Tool Vendors ..........................................................13

22                 3.    Stephen Chen's Role at Jinhua ....................................14

23           D.    You Zhenfu ...........................................................................14

24                 1.    Hiring at UMC ........................................................14

25                 2.    Stephen Chen ........................................................14

26                 3.    Talent Retention Bonus Program ..................................15

27                 4.    CASPA and Tool Vendor Visits ...................................15

28           E.    Prof. Jiang Ying .....................................................................15

i

II.    The Testimony of the Witnesses Can Probably be Obtained if the
Continuance is Granted.........................................................................16

III.   Jinhua Acted Diligently to Obtain the Attendance of the Witnesses....................18

A.    The Witnesses Who Are Unable to Travel for Health Reasons................19

B.    Jinhua Was Diligent in Ascertaining the Requirements under ICJAL. .....20

C.    COVID-19 Lockdowns and Travel Restrictions Do Not Evidence a
Lack of Diligence.....................................................................................21

IV.   The Cases the Government Cites are Distinguishable. ..........................................23

Conclusion ...........................................................................................................................24

## <u>TABLE OF AUTHORITIES</u>

PAGE(S)

### CASES

*Chambers v. Mississippi,*
    410 U.S. 284 (1973) ................................................................................................ 24

*Moses v. Payne,*
    555 F.3d 742 (9th Cir. 2009) ................................................................................. 24

*Pennsylvania v. Ritchie,*
    480 U.S. 39 (1987) ................................................................................................. 24

*Prostar Wireless Group, LLC v. Domino's Pizza, Inc.,*
    360 F. Supp. 3d 994 (N.D. Cal. 2018), *aff'd,* 815 F. App'x 117 (9th Cir. 2020) ................... 4

*SA Luxury Expeditions, LLC v. Latin America for Less, LLC*, Case No. C,
    14-04085 WHA, 2015 WL 4941792 (N.D. Cal. Aug. 19, 2015) ........................................ 18

*U.S. v. Croft,*
    124 F.3d 1109 (9th Cir. 1997) ............................................................................... 23

*U.S. v. Flynt,*
    756 F.2d 1352 (9th Cir. 1985) ......................................................................... 18, 19

*United States v. Hoyos,*
    573 F.2d 1111 (9th Cir. 1978) .............................................................................. 1, 2

*United States v. Lim,*
    984 F.2d 331 (9th Cir. 1993) ................................................................................. 24

*United States v. Nguyen,*
    230 F. App'x 686 (9th Cir. 2007) ......................................................................... 23

*United States v. Trout,*
    633 F. Supp. 150 (N.D. Cal. 1985) ....................................................................... 18

*Washington v. Texas,*
    388 U.S. 14 (1967) ................................................................................................. 24

1

2

**OTHER AUTHORITY**

3

4
CNN, China to Hold 20th Communist Party Congress from October 16
(Aug. 30, 2022, 8:43 AM EDT), https://www.cnn.com/2022/08/30/asia/china-20th-communist-party-congress-intl/index.html ........................................................................................................ 17

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PRELIMINARY STATEMENT**

Jinhua appreciates this Court's patience and understanding despite the numerous hurdles relating to Jinhua's witnesses that have arisen during this case—a global pandemic, witnesses in lockdown, and Jinhua's attempts to navigate the People's Republic of China's ("PRC") new laws relating to judicial assistance.  This has been an extraordinary case.  Jinhua has been in a difficult position.  It has witnesses ready and willing to testify regarding the critical issues in the case, but it cannot access that testimony unless and until the PRC gives the witnesses permission to do so.

In light of these unique and unprecedented circumstances, the Court should reject the government's efforts to push this case to a premature conclusion.  Denying the government's Motion to Set a Date for Closing Argument ("Motion") will serve the interests of justice because it will allow Jinhua the opportunity to exercise its constitutional right to present a defense.  It will also allow the Court to hear the full facts, from witnesses with first-hand knowledge of Jinhua's conduct (something that has been lacking from the trial thus far).  In asking for this case to be set for closing, the government seeks to prevent the Court from hearing the material testimony of Jinhua's witnesses— testimony which fundamentally undermines the government's allegations that Jinhua engaged in a massive conspiracy with UMC to steal trade secrets from Micron.  The court should deny the government's Motion and allow for Jinhua's witnesses to be heard.

**ARGUMENT**

A court has broad discretion to grant or deny a continuance.[1]  *United States v. Hoyos*, 573 F.2d 1111, 1114 (9th Cir. 1978).  There is no formulaic test a district court must use when determining whether to grant or deny a continuance.  However, on appellate review, such a decision will not be disturbed absent clear abuse of that discretion.  *Id.*  The Ninth Circuit uses a multi-part test to review whether granting a continuance to obtain witness testimony is an abuse of discretion:

> When a continuance is sought to obtain witnesses, the accused must show **who they are**, **what their testimony will be**, that the testimony will be **competent and relevant**, that the witnesses **can probably be obtained** if the continuance is granted, and **due**

---

[1]    While the government's Motion asks the Court to set a date for closing, it is, in essence, seeking a denial of any further continuance of the trial.

1

**diligence** has been used to obtain their attendance on the day set for trial.

*Hoyos*, 573 F.2d at 1114 (emphasis added).

A review of the *Hoyos* factors weighs heavily in favor of providing Jinhua additional time to secure authorization for its witnesses to testify.  *First,* the witnesses will provide exculpatory evidence, including direct testimony about what Jinhua knew (or did not know) about UMC's development efforts.  This testimony shows the reasonableness of Jinhua's actions and reactions to the events as they unfolded—in other words, Jinhua's good faith—and goes directly to the "knowing" aspect of the charged offenses.  These witnesses will also testify that JT Ho was not a Jinhua employee, a fact-specific determination that is far more complicated to make than simply "review[ing]" the contract, as the government contends.  (*See* Mot. at 25:1-3.)  Finally, the witnesses can put in context the government's evidence as it relates to Stephen Chen, something Lu Wensheng, the current Chairperson of Jinhua's board, knows intimately.

*Second*, Jinhua will likely be able to secure the witnesses' testimony if the court grants a reasonable continuance.  It is common for responses to letters rogatory to take six months or more.  And given the prior communications and level of interaction between the PRC government and the US government, as well as this Court, there is ample reason to think that the PRC government will grant the letters rogatory request if a further continence is granted.

*Third*, Jinhua was diligent in obtaining permission for its witnesses to testify.  No one wants its witnesses to be available to testify more than Jinhua itself.  Jinhua attempted to navigate the recently enacted PRC law, the International Criminal Judicial Assistance Law ("ICJAL"), without the benefit of any implementing regulations or other official guidance from the Chinese government.  Jinhua consulted local, provincial, and central government officials, as well as Chinese counsel, and based on this, filed its first application for permission to allow testimony in March 2021—almost a year before trial started.  And when the PRC Ministry of Justice informed Jinhua of the additional process that was required, Jinhua acted promptly to file requests for letters rogatory and satisfy those

2

1 | requests.  That Jinhua may have got it wrong in the first instance is not grounds to find that Jinhua
2 | was not diligent.

3 |       For these reasons, and those below, this Court should deny the government's Motion, and
4 | continue this case at least six months after the last letters rogatory was delivered to the PRC.

5 | **I.**      **The Witnesses' Proposed Testimony Will be Both Competent and Relevant.**

6 |       The testimony of Jinhua's five witnesses will be both competent and relevant.  The four
7 | Jinhua employees—Lu Wensheng, Wu Junsheng, Wu Kunrong (Albert Wu), and You Zhenfu (Jeff
8 | Yu)— all have first-hand, personal knowledge of the matters about which they will testify and will
9 | provide relevant and exculpatory information, so their testimony is clearly relevant and material to
10 | the Court's consideration.  *See* Fed. R. Evi. 602.  Similarly, Prof. Jiang Ying, an expert on Chinese
11 | labor law and practice, will provide valuable information to the Court about Chinese labor practices,
12 | including the factors which establish an employer-employee relationship.

13 |       **A.**      **Lu Wensheng**

14 |       Lu Wensheng is the former president of Jinhua, preceding Stephen Chen, and is the current
15 | chairperson of the Board of Directors of Jinhua.  Jinhua anticipates that he will testify, among other
16 | things, to the following facts and events:

17 |             1.      Formation of Jinhua, the Framework Agreement, and the Technology
18 |                  Cooperation Agreement

19 |       Mr. Lu was directly involved in the early discussions about this project with UMC and the
20 | Fujian provincial government.  He has direct knowledge about the negotiation of the Project
21 | Cooperation Framework Agreement ("Framework Agreement") (P1023)—the earlier agreement to
22 | which Jinhua was not a party—and the later Technology Cooperation Agreement (P1193), which
23 | Mr. Lu will affirm was the controlling agreement between Jinhua and UMC.  Mr. Lu will testify that
24 | the Framework Agreement had to be submitted for approval to the Taiwanese authorities to become
25 | effective.  (*See* P1023 at Section 14.2.)  It also required investment by an investor chosen by UMC.
26 | (*See id.* at Section 3.2(C); 3.3.)  None of these things happened.  Mr. Lu will explain, with direct

27 |
28 |

**DEFENDANT'S OPP. TO GOVERNMENT'S MOTION TO**
**SET A DATE FOR CLOSING ARGUMENT**

**CASE NO.: 3:18-cr-00465-MMC**

1   knowledge of the events, why UMC wanted to pivot and sign the Technology Cooperation

2   Agreement (P1193) directly with Jinhua.

3       Mr. Lu will testify that the Technology Cooperation Agreement—the agreement to which

4   Jinhua was a party—is the operative and controlling agreement between UMC and Jinhua.  In this

5   agreement, UMC was a service provider; Jinhua was a customer.  Mr. Lu will testify, based on his

6   knowledge as Jinhua's former president and now chairperson, that the relationship between UMC

7   and Jinhua is not a joint venture.  Mr. Lu will also testify that UMC and Jinhua never shared profits

8   and losses, which is required for a joint venture.[2]  This testimony directly rebuts the government's

9   argument that the Framework Agreement still controls; that the relationship between UMC and

10  Jinhua was a joint venture; and that Jinhua should be liable for the acts of all UMC Project M

11  employees.  (*See, e.g.*, Tr. XIII at 2435:18-2436:4.)

12              2.      Jinhua's Good-Faith Reliance on UMC's Experience

13      The government claims that Jinhua had to have known that UMC was using stolen trade

14  secret information because (1) there is no way UMC could develop a new node "from scratch" in

15  two years, and Jinhua would have known that, and (2) there is no way UMC could develop two nodes

16  for $700 million.  Mr. Lu will directly contradict these allegations. Mr. Lu will testify that UMC told

17  Mr. Lu that it could meet the milestones set forth in the Technology Cooperation Agreement.

18  Moreover, Mr. Lu will testify that Jinhua, in connection with discussions with UMC about the

19  project, determined the price was reasonable.  UMC told Mr. Lu that the DRAM they were seeking

20  to develop under the Technology Cooperation Agreement was not new, leading-edge technology; it

21  was legacy or lagging-edge technology that would be easier and cheaper to develop because many

22  of the manufacturing techniques and specifications were publicly known or could be developed

23  through reverse engineering.  Mr. Lu will further testify that he thought this seemed reasonable

24

25      [2]      *See Prostar Wireless Grp., LLC v. Domino's Pizza, Inc.*, 360 F. Supp. 3d 994, 1008
26  (N.D. Cal. 2018), *aff'd*, 815 F. App'x 117 (9th Cir. 2020) ("[t]he essential element of a joint venture
    is an undertaking by two or more persons to carry out a single business enterprise jointly for profit . . .
27  A joint venture agreement may be informal or oral . . . but [i]t requires an agreement under which
    the parties have (1) a joint interest in a common business, (2) an understanding that profits and losses
28  will be shared, and (3) a right to joint control.") (citations omitted).

4

1 because UMC was a well-respected semiconductor company with over 40 years of experience.  He

2 had been informed that UMC's experience in logic technology, as well as its prior experience in

3 DRAM, would give it a significant head start in developing its own DRAM technology.  This

4 testimony will directly refute the government's allegations that Jinhua knowingly joined a conspiracy

5 and/or that Jinhua knowingly possessed Micron trade secrets.  (ECF 309 (Disputed Jury Instructions)

6 at 33-46; ECF 308 (Agreed Jury Instructions) at 40.)

7        3.   <u>UMC's Contractual Obligations and Stephen Chen's Role</u>

8      Mr. Lu will also testify about UMC's contractual obligations under the Technology

9 Cooperation Agreement (P1193) and related agreements entered into by UMC and Jinhua.  For

10 example, Section 3.1 of the Technology Cooperation Agreement provides that UMC would provide

11 technology and consulting services to Jinhua throughout the project.  Mr. Lu will testify that the

12 activities which the government contends show that Stephen Chen was Jinhua's president before

13 January 2017 (*e.g.*, meeting with potential recruits and meeting with tool vendors) were actually just

14 consultancy services that were part of UMC's obligations to Jinhua pursuant to the Cooperation

15 Agreement.  Remember, Jinhua was a new company that was not incorporated until 2016.  UMC had

16 experience as to what type of engineers Jinhua might need.  Jinhua wanted to tap into UMC's years

17 of experience to help it recruit and hire the people it needed to succeed.  As you will hear from Mr.

18 Lu, that's why the parties included Section 3.1 in the Technology Cooperation Agreement.

19      The government has also alleged that Stephen Chen was a Board Member of Jinhua, or, at a

20 minimum, that his attendance at Jinhua Board meetings was somehow evidence of a joint venture

21 between UMC and Jinhua.  (*See* Tr. I at 45:17-18; ECF 475 (Opp. To Rule 29 Mot.) at 18:3-19:10.)

22 But Mr. Lu, who attended Jinhua's board meetings and is currently the Chairman of Jinhua's board,

23 will testify that Mr. Chen was <u>never</u> a board member of Jinhua.  Mr. Lu will also explain that Mr.

24 Chen's attendance at Jinhua board meetings stemmed from UMC's contractual obligation to report

25 on its status to Jinhua's board and the consultancy services UMC was contractually obligated to

26 provide pursuant to the Technology Cooperation Agreement.  (P1193, ¶¶2.3; 3.1.)  Nothing more,

27 nothing less.

28

Relatedly, the government proffered several arguments about when Mr. Chen became president of Jinhua. The government's theory is that Mr. Chen "was" Jinhua from the start, and thus Jinhua is responsible for Mr. Chen's actions. (*See* Tr. XX at 3910:21-3911:2; ECF 475 (Opp. To Rule 29 Mot.) at 19:27-20:9.) That is simply not true. Mr. Lu was the president who preceded Mr. Chen. As such, Mr. Lu has direct knowledge as to when Mr. Chen formally became president of Jinhua. Mr. Lu will testify that, from Jinhua's perspective, Mr. Chen did not assume that position until January 2017 at the earliest. Mr. Lu will give the Court the full timeline of events leading up to Mr. Chen's appointment, including that there were discussions at Jinhua in October 2016 about its intent to appoint Mr. Chen as Jinhua's president at some point in the future, as evidenced in written meeting minutes and resolutions.

> Meeting agenda: Deliberation on the motion for personnel appointment - Mr. Chen Zhengkun
>
> After research and deliberation by the Board of Directors of the company, the following resolutions were made:
>
> The Board of Directors intends to appoint Mr. Chen Zhengkun, Senior Vice President of United Microelectronics Corporation, as the general manager of Jinhua Company. This proposal is passed at the meeting in principle, and is reported it to Fujian Electronics & Information Group. After referring to the relevant regulations, the appointment will be made by the Jinhua Board of Directors.

(*See* D4878T at 1 (not yet admitted); *see also* D4877 (not yet admitted).)

Jinhua's board documents also show, consistent with Mr. Lu's testimony, that Mr. Chen was appointed president in January 2017.

> **Resolution of Board of Directors of**
> **Fujian Jinhua Integrated Circuit Co., Ltd.**
>
> Time of Meeting: January 6, 2017
>
> Place of Meeting: Conference Room, First Floor, Chuangke Street, Sanchuang Park, Jinjiang
>
> Attendants: Shao Yulong, Lu Wensheng, Shi Mei, Xiao Jinshu, Chen Weiyong
>
> Topic: Deliberation on the removal and appointment of the president of JHICC
>
> Upon consideration, the Board of Directors hereby makes the following resolution:
>
> To remove Lu Wensheng from the position of president of JHICC and appoint Chen Zhengkun[1] as the president of JHICC.
>
> The above resolution is adopted by all directors by voting.

1    (D3866T (not yet admitted); *see also* D3865 (not yet admitted).)

2         Mr. Lu will thus directly refute one of the government's main theories of the case: namely,

3    that Mr. Chen was Jinhua's agent from before Jinhua was formally incorporated in February 2016

4    and thus Jinhua should be held liable for all of Project M's and Mr. Chen's actions.

5              4.    Jinhua's Knowledge

6         For Jinhua to be found criminally responsible for Count VII (Economic Espionage), the

7    government must show that Jinhua knowingly possessed Micron trade secrets.  (*See* ECF 308 at 40;

8    ECF 309 at 49.)  Mr. Lu will testify directly about Jinhua's knowledge of any potential wrongdoing

9    at UMC.  First, Mr. Lu will testify about conversations he had with a senior executive at UMC and

10   *Stephen Chen directly* who told him that (1) senior management at UMC did not know about the

11   alleged offenses until after the raids by the Taiwanese authorities in February 2017; (2) Stephen Chen

12   did not know about the alleged offenses until after those raids; and (3) UMC was acting to remove

13   any Micron information from the final technology package before it was transferred to Jinhua in

14   September 2018.  Mr. Lu will testify that UMC's senior management also told him that UMC had

15   hired independent experts and had performed a second check of the process technology shortly before

16   it was transferred to Jinhua to ensure that any potentially confidential information derived from

17   Micron was removed.

18             5.    Talent Retention Bonus Program

19        The government alleges that JT Ho is Jinhua's agent because Mr. Ho signed a labor contract

20   with Jinhua.  But that is not the whole story.  Mr. Lu will testify that UMC and Jinhua created the

21   "Talent Retention Bonus" program, which paid supplemental compensation to certain UMC

22   employees who were recruited from outside companies, in order to bring the compensation package

23   of those engineers to market levels.  The program was conceived and proposed by UMC, not Jinhua.

24   The Talent Retention Bonus Program came about because some prospective UMC engineers who

25   worked in other countries and other companies before UMC, had a certain expectation of what their

26   compensation should be if they joined UMC. They did not want to take a pay cut to work at UMC.

27   But UMC could not pay all the potential new employees enough to encourage them to join UMC,

28

and did not want to have a two-tier compensation system where some engineers got paid substantially more by UMC than others, which could potentially breed discontent in the ranks.  So UMC asked Jinhua to help.  For those employees who had a higher expectation for compensation, Jinhua agreed to fund the Talent and Retention Bonus Program and to pay additional compensation to certain UMC employees who were selected by UMC.

Mr. Lu has first-hand knowledge about the program above.  He was party to conversations about the program.  Mr. Lu will testify that Jinhua looked at this as another expense of the project. It wanted the DRAM project with UMC to succeed, so Jinhua agreed that the best and brightest talent should work on the project at UMC.  Mr. Lu will testify that is why Jinhua signed a contract with JT Ho.  Jinhua never intended to make him an employee of Jinhua; it only signed an agreement with him so that it could supplement his income as a UMC employee, *as UMC had requested Jinhua to do*.  Having some sort of contract was required by Jinhua's internal procedures so that Mr. Ho could get paid by Jinhua.  Mr. Lu (as well as Wu Junsheng and You Zhenfu, whose anticipated testimony is discussed below) can fill this dearth of information about this program which is essential to understanding Mr. Ho's role in the matter.  Mr. Lu will thus help demonstrate that Mr. Ho was never a Jinhua employee or agent.  Therefore, Jinhua cannot be held responsible for his conduct.

**B.**   **Wu Kunrong**

Wu Kunrong (Albert Wu) is the vice president of operations at Jinhua.  He worked at Powerchip (another DRAM company) for approximately 20 years, and thus will provide relevant and exculpatory evidence on technical issues.  He will testify to the following facts and events:

1.   Jinhua's Reliance on UMC's Technical Capabilities

Mr. Wu will testify, in more detail, about the reasonableness of Jinhua's reliance on UMC's representations about the timing and development of the DRAM technology.  Mr. Wu has years of experience and expertise in developing DRAM from his decades at Powerchip, and can testify about his understanding of UMC's experience in logic technology and why he believed it was reasonable that UMC could develop a non-leading edge DRAM node in two years.  First, Mr. Wu will discuss the difference between "leading edge" and "non-leading edge" or "mature" technology, and explain

1    that he believed non-leading edge technology, which UMC was trying to develop here, would be

2    vastly cheaper and faster to develop.   This is because of the ability for UMC to use reverse

3    engineering reports and UMC's prior logic and DRAM experience to its benefit.

4            Mr. Wu will also testify about Jinhua's view of the cost of the technology—that the $200

5    million for the first node was reasonable, in large part, because it did not include (1) tools required

6    for research and development, (2) costs to set up the fabrication plant (which is the single most

7    expensive part of the start-up costs of a new company), (3) costs of tools or materials needed to run

8    the fab, (4) the cost for outside design consultants, (5) costs of bonuses paid to UMC employees

9    under the Talent and Retention Bonus program to help supplement their salaries, or (6) the costs of

10   further R&D after UMC transferred the DRAM technology to Jinhua, which would be necessary to

11   increase the yield to a level sufficient for mass-market production.[3]

12                    2.    Development and Transfer of Technology

13           Mr. Wu will also testify about what information was communicated to Jinhua regarding the

14   development of the technology by UMC, as well as the transfer of the technology from UMC to

15   Jinhua.   Mr. Wu can testify that he was told (and was provided documents showing) that UMC was

16   following a Samsung approach.   He knew Samsung was the current market leader at the time, and

17   was using a 3x2 DRAM structure, which could be used in later generations as well.   (*See e.g.*,

18   D3885T at 6 (not yet admitted).)

19

20

21   _____

22           [3]      The Court viewed a semiconductor wafer, a large round object that looked like a big
     compact disc, during the government's opening statement.  A wafer consists of hundreds or more of
23   individual chips.  Yield is a measure of the quality of the semiconductor manufacturing process.  The
     yield is the percentage of chips on a wafer that function as intended.  As the manufacturing process
24   is further refined, the yield will increase, as more chips will be free of defects.  Typically, companies
     wait until the yield is at a certain level to start large-scale manufacturing.  Otherwise, the process
25   will lead to too much waste and erode any profits.  Mr. Wu will testify that the technology UMC was
     to transfer to Jinhua would be transferred at a relatively low yield—lower than what would be mass
26   market manufacturing ready.  It would be up to Jinhua to keep refining the manufacturing process to
     bring it up to mass market standards.    Thus, Mr. Wu will testify that UMC's research and
27   development costs would be lower than necessary for UMC to develop a new operational node for
     its own use, since it got to stop the development process long before the new DRAM node was ready
28   for mass market sales to customers.

                                                        9

1
2
3
4
5
6
7
8
9
10
11



12    Mr. Wu received reports created by UMC regarding UMC's development efforts.  (*See*
13 D3885, referenced above.)  These reports showed, at a high level, the development of the DRAM,
14 and any issues UMC was encountering at the time.  Nothing about these reports caused Mr. Wu to
15 question whether UMC was self-developing the technology.  Mr. Wu will testify that he never, at
16 any time prior to the Taiwanese raids, had any reason to suspect that UMC may have improperly
17 based its DRAM design on information from Micron.

18    Further, Mr. Wu will testify that before September 2018[4], Jinhua did not receive any sort of
19 process flow from UMC.  He will also testify that he had no reason to believe that the technology
20 Jinhua received in September 2018 contained any Micron trade secret information.   This is
21 exculpatory evidence and goes directly to Jinhua's knowledge of any wrongdoing.

22        3.    Stephen Chen's Role at Jinhua

23    Mr. Wu attended the CASPA event in 2016 and the meetings with tool vendors in California.
24 Mr. Wu will testify, based on his direct knowledge, what was said at the events, and explain why

25

26    [4]    The government has alleged that there was a transfer of technology to Jinhua in March
27 2017 based on a document it found (without any evidence that the document was actually sent).  Mr.
   Wu will testify that, to the best of his knowledge, no such technology transfer occurred in March
28 2017.

1    Mr. Chen, who was UMC's senior vice president, attended Jinhua-related events.  As for CASPA,

2    Mr. Wu will explain that CASPA was a recruiting fair for Jinhua.  That said, Jinhua was newly

3    formed and did not have a functional human resources department at the time.  Thus, pursuant to the

4    consultancy services UMC was obligated to provide pursuant to the Technology Cooperation

5    Agreement, UMC helped Jinhua with the event.

6         The FBI agent who attended the CASPA event, Letitia Wu, testified that Mr. Wu said that

7    Jinhua had already received UMC's technology as of the event in October 2016 (Tr. IV at 640:9-17.)

8    This testimony was based on her notes and recollection, as she recorded some of the CASPA event,

9    but not this portion.  Mr. Wu will testify that Jinhua had not received the formal transfer of any

10   DRAM technology from UMC at the time, and that Mr. Wu did not say that, or anything like it, at

11   the CASPA presentation.  Special Agent Wu also testified that Mr. Chen stated at the CASPA

12   meeting that he had a role at Jinhua.  (Tr. IV at 647:14-25.)  Again, Mr. Wu will testify that, at the

13   time of CASPA, Mr. Chen was not employed by Jinhua, and that Mr. Chen did not state that he was

14   the head of any department at Jinhua or in any way involved in making hiring decisions at Jinhua.

15        Mr. Wu will also explain why Mr. Chen was attending meetings with tool vendors.  Both

16   UMC and Jinhua needed tools: UMC to help develop the technology and test chips, and Jinhua to

17   manufacture the technology.  Mr. Wu will clarify that Mr. Chen's role at the meetings with the tool

18   vendors in October 2016 was mostly that of a relationship manager—to introduce Jinhua, a new

19   company, and its chief technologist, Mr. Wu, to the tool vendors, with whom UMC had a well-

20   established relationship.

21        Finally, Mr. Wu will testify specifically about the minutes of a December 6, 2016 Jinhua

22   internal meeting referring to Mr. Chen as "president."  (*See* P0613.)  Mr. Wu will explain his

23   understanding of that reference, and confirm that Mr. Chen did not become Jinhua's president until

24   at least January 2017.

25             4.    JT Ho

26        Mr. Wu also will provide direct evidence about the role of Mr. Ho at Jinhua.  Mr. Wu was

27   the lead technologist at Jinhua.  He supervised all engineers at Jinhua.  He will testify that JT Ho was

28

1  never an employee of Jinhua.  He never supervised Mr. Ho, never assigned Mr. Ho any projects,

2  never saw Mr. Ho in Jinhua's offices, never attended any meeting at Jinhua where Mr. Ho attended,

3  and was unaware of any work reports provided to anyone at Jinhua by Mr. Ho.

4       **C.**    <u>**Wu Junsheng**</u>

5       The testimony of Wu Junsheng is more limited, but no less important.  Mr. Wu is the director

6  of finance at Jinhua.  He will testify to the following facts and events:

7            1.    <u>Talent Retention Bonus Program</u>

8       Mr. Wu will testify about the talent retention bonus program from the financial side,

9  providing detail that Mr. Lu cannot.  Mr. Wu can corroborate Mr. Lu's testimony that the Talent

10  Retention Bonus Program was conceived by UMC as a way for UMC engineers to receive additional

11  compensation.  As Director of Finance, Mr. Wu can testify that JT Ho participated in this program,

12  and that any money paid from Jinhua to Mr. Ho was pursuant to that program.

13       Mr. Wu also has first-hand knowledge as to why a labor contract was used instead of a

14  consultancy contract.  Mr. Wu had direct conversations with management at UMC who suggested

15  using a labor contract so that UMC's employees who participated in the program could receive the

16  most favorable tax benefits. And again, the Court need not take Mr. Wu's word for it—the documents

17  support his testimony.

| | |
|---|---|
| **From:** | sandy_ps_kuo@umc.com [sandy_ps_kuo@umc.com] |
| **Sent:** | 8/2/2016 1:57:12 PM |
| **To:** | Xing Fan [31539802@qq.com] |
| **Subject:** | Re: Re: consultant contracts |
| **Attachments:** | Labor Contract_He Jianting [1] _08012016.doc; Labor Contract_Li Fuzhe [2] _08012016.doc; Labor Contract_Guo Fengming[3]_08012016.doc |

Hi, Junsheng,

We intend to change the three R&D directors' contracts to salary-based contracts, paid on a monthly basis, and hope to get refund of the portion of the individual income tax retained by the local government.

25  (*See* D3893T at 1 (not yet admitted).)

26       Rather than have days of attorney testimony about what a document means, Mr. Wu, who

27  received and authored emails in this exhibit, can explain what they meant as a percipient witness.

28                               12

1   Mr. Wu can also testify that Jinhua never categorized Mr. Ho as an employee.  (As reflected in
2   D3893T, Mr. Wu also used the Chinese name Xing Fan)  As support for his testimony, Mr. Wu can
3   discuss D3892, which are minutes of a December 2016 internal meeting at Jinhua.  These minutes,
4   made at the time of the meeting, show that Jinhua referred to JT Ho as a consultant—not as an
5   employee.

| He Jianting | 567.6 | Taiwanese Consultant, no need to pay social and medical insurance in the mainland China |
| Guo Fengming | 567.6 | Taiwanese Consultant, no need to pay social and medical insurance in the mainland China |
| Li Fuzhe | 567.6 | Taiwanese Consultant, no need to pay social and medical insurance in the mainland China |

10  (D3892T at 1 (not yet admitted).)

11              2.    Tool Vendors

12      Mr. Wu also has relevant percipient knowledge about Jinhua's and UMC's interactions with
13  tool vendors.  Exhibit D3872 is an agreement between Jinhua and UMC governing the roles and
14  responsibilities with respect to tool procurement signed by Mr. Wu.  The agreement states that UMC
15  will find and compare tool vendors for Jinhua.

> II.  Selection of supplier
>
> 1. UMC shall be responsible for comparing and selecting suppliers of the Special R&D Tools at the early stage.
>
> 3. With respect to the main tools, UMC shall comprehensively consider the tool specifications, technical applicability, price, after-sale services, business reputation of the suppliers and other related factors to make a full evaluation of the responsive documents submitted by the suppliers, prepare a Price Inquiry Result Form and a Score Sheet, and decide on the recommended supplier candidates. With respect to the accessory tools and hook-ups, UMC shall comprehensively consider the tool specifications, technical applicability, price, existing cooperative suppliers of UMC and other related factors to make a full evaluation of the responsive documents provided by the suppliers, convene a Procurement Approval Meeting and keep a record of the meeting, decide on the recommended supplier candidates.
>
> 5. JHICC shall, within three (3) working days upon receipt of the list of supplier candidates and relevant materials from UMC, respond with its comments, and negotiate with UMC to determine the final suppliers and the procurement conditions. However, JHICC has a final say on the suppliers of the Special R&D Tools.

(D3872T at II(1), (3), and (5) (not yet admitted).)

13

1    Mr. Wu will testify that the agreement was structured like this because UMC had deep

2    experience with tool vendors and could better assess the types of tool vendors Jinhua would need.

3    While the ultimate decision of which company to engage and which tools to purchase was up to

4    Jinhua, UMC would have a role in helping Jinhua, a new company, find appropriate tool vendors

5    with which to work.  This further explains Mr. Chen's role at the tool vendor meetings in October

6    2016.  He was not "Jinhua," but was helping Jinhua gather information about tool vendors.

7              3.    Stephen Chen's Role at Jinhua

8    Finally, Mr. Wu can provide additional detail about Mr. Chen's role at Jinhua and the timing

9    of Mr. Chen being named President of Jinhua.  Mr. Wu attended some Jinhua board meetings.  Like

10   Mr. Lu, Mr. Wu will testify that Mr. Chen was never a member of Jinhua's board.  Rather, Mr. Chen

11   attended Jinhua board meetings to discuss the DRAM project.

12        **D.    You Zhenfu**

13   You Zhenfu (Jeff Yu) is the last percipient witness.  He is the only individual of the five who

14   worked at both UMC and Jinhua, and is the current director of human resources at Jinhua.  He will

15   testify to the following facts and events:

16              1.    Hiring at UMC

17   Mr. You was involved in hiring efforts at UMC.  Mr. You will testify that UMC did not target

18   Micron employees specifically, and that it actually intended to recruit primarily from its internal

19   ranks.  In several instances, UMC actually sought to hire Samsung and SK Hynix employees, not

20   Micron employees.  (*See* P0772T.006 (not yet admitted).)  This helps negate the government's

21   argument that the entire project was an illegal conspiracy from the start.  Mr. You can testify that the

22   ramping up of the project, from a hiring standpoint, was normal and appropriate.

23              2.    Stephen Chen

24   Mr. You will also testify that, according to UMC's internal procedures, Mr. Chen was unable

25   to work on behalf of Jinhua until he was released from his non-compete provisions, which did not

26   occur until February 2017.

27

28
                                  14

3.   Talent Retention Bonus Program

Mr. You can also corroborate the testimony of Mr. Lu and Mr. Wu, and provide additional details on the talent retention bonus program.  Mr. You was working at UMC when this program was conceived, and was included in early discussions about it.  He will corroborate the testimony from the other witnesses that the program was created to pay additional compensation to certain UMC engineers, and that there was no intent on behalf of UMC to have anyone participating in the program become a joint UMC/Jinhua employee.

Moreover, as head of HR at Jinhua, Mr. You will testify that Mr. Ho was never a Jinhua employee.  Mr. You has first-hand knowledge that Mr. Ho never had a Jinhua employee ID, never had a Jinhua employee number, never had a Jinhua email account, never had access to Jinhua's computer systems, never had access to Jinhua's offices, and never received any Jinhua equipment.  Moreover, Jinhua never obtained a work permit for Mr. Ho, which would be needed for him to work for a PRC company, because Jinhua did not consider him to be a Jinhua employee.  In fact, Mr. You had the Jinjiang City government pull its list of work permits for Jinhua, and noted that Mr. Ho did not appear on that list.  (*See* D3891 (not yet admitted).)

4.   CASPA and Tool Vendor Visits

Mr. You also attended the CASPA event in October 2016 and the meetings with tool vendors.  Mr. You will testify, based on his direct knowledge, what was said at those events, and his understanding of why Stephen Chen attended those events.  As for CASPA, Mr. You will corroborate Albert Wu's testimony—that UMC had to provide consulting services and assistance to Jinhua and that was why Mr. You and Mr. Chen were attending the CASPA event.  Mr. You will also testify that UMC did not hire any employees at the CAPSA event.  Finally, he will testify that he does not recall Mr. Chen stating that he was the head of any department at Jinhua or that he was involved in making hiring decisions at Jinhua.

**E.   Prof. Jiang Ying**

Prof. Jiang Ying is a distinguished professor at China University of Labor Relations.  She will provide expert testimony about Chinese labor practices, including the factors which establish an

1   employer-employee relationship.  Prof. Jiang's expert opinion on this subject will be helpful and

2   relevant to the fact-finder's ability to determine whether Mr. Ho was ever a Jinhua employee whose

3   actions could be imputed to Jinhua.  Among other things, Prof. Jiang's testimony will explain the

4   elements necessary to form an employer-employee relationship under Chinese employment law and

5   practice, and apply those elements to the facts in this case.

6          Without any evidence that Jinhua or its management conspired with UMC or even knew

7   about the conduct of the select UMC employees whose conduct is at issue, the government seeks to

8   convict Jinhua on the tenuous theory, unsupported by evidence, that Mr. Ho was dually employed

9   by Jinhua.  To rebut this argument, Prof. Jiang will provide information about Chinese labor law and

10  employment practices, the intent required to establish a labor relationship under Chinese law and

11  labor practice, and the acts that are consistent and inconsistent with a labor relationship.  Prof. Jiang

12  will testify that a contract is not controlling in determining whether a labor relationship is created.

13  A trier of fact must look to the actual function of the relationship between the parties to see if there

14  are indicia of a labor relationship present.  This rebuts the government's argument that all the Court

15  needs to do is "look" at Mr. Ho's contract to convict Jinhua.  Doing so would be inconsistent with

16  Chinese labor law and be contrary to the intent of the parties.

17  **II.    The Testimony of the Witnesses Can Probably be Obtained if the Continuance is**
        **Granted.**
18

19         The government claims that Jinhua's witnesses will likely never appear, arguing that these

20  witnesses are not willing—and were never willing—to travel to the United States to testify.  This is

21  incorrect and contrary to sworn statements by the witnesses.  You Zhenfu (Jeff Yu) and Wu Junsheng

22  are the two witnesses who intend to travel to the U.S. to testify (*i.e.*, the witnesses without health

23  issues).  Both have stated, under oath, that they are willing to travel to the United States for testimony

24  once "formal approval is granted through the diplomatic process" or when there are "further

25  assurances by the local ministry of justice in the Fujian province that [they] have permission to travel

26  to the United States to testify."  (ECF 505-2, ¶5 (You Zhenfu); s*ee also* ECF 505-3, ¶5 (Wu

27  Junsheng).)  In anticipation of travelling, Mr. You obtained permission through the Taiwan Visa

28

1    Waiver System (ESTA) to travel, and Mr. Wu obtained a visa to travel to the United States.  (ECF
2    505-2 ¶3 (You Zhenfu); ECF 505-3 ¶3 (Wu Junsheng).)  Both witnesses are ready, willing, and able
3    to travel to the United States once the letters rogatory are approved.

4         The United States also claims that it is unlikely that the witnesses' testimony can be obtained
5    because the letters rogatory will not be granted.  The government contends that Jinhua has
6    expressed—"with no basis other than hope"—that the letters rogatory will be granted.  (Mot. at
7    23:13-14.)  But unlike any of the cases cited by the government, the circumstance here suggest a
8    high probability that the letters rogatory will be granted.  For example, unlike the cases cited by the
9    government, it is Jinhua, a Chinese company (as opposed to the United States or another foreign
10   government) that is asking the Chinese authorities for permission to call its own witnesses at trial.
11   Moreover, a senior official from the PRC Ministry of Justice provided the Court with two written
12   declarations explaining the Ministry of Justice's interpretation of the relevant PRC law and its basis
13   for requesting the letters rogatory.  Further, in the first declaration, the senior official noted that the
14   Ministry of Justice had not yet received the first letters rogatory request, but asked that it be
15   transmitted promptly "so that we can respond promptly upon receipt."  (ECF 526-1 at 3.) This reflects
16   both an attention to the situation and a likely intention to respond positively to the letters rogatory.

17        It is likely that the timing of the PRC's response to the letters rogatory has been negatively
18   impacted by the visits by U.S. representatives to Taiwan.  Unfortunately, that action appears to have
19   increased the already heightened geopolitical tensions between the countries, and prompted the PRC
20   to, among other things, suspend all requests for criminal judicial assistance between the countries.
21   Tere is a Communist Party Congress and election scheduled to commence on October 16, 2022,
22   however.  CNN, China to Hold 20th Communist Party Congress from October 16 (Aug. 30, 2022,
23   8:43 AM EDT), available at https://www.cnn.com/2022/08/30/asia/china-20th-communist-party-
24   congress-intl/index.html.  We believe that there will likely be more clarity relating to the Chinese
25   government's response to the letters rogatory after the conclusion of the party congress.

26        Finally, the government itself notes that the timeframe for compliance for letters rogatory to
27   the PRC "is generally no sooner than six months and often takes as long as a year or more."  (Mot.

28

1    at 23:21-22.)  China is anything but special in its response time to letters rogatory requests from U.S.

2    Courts.  *See e.g. United States v. Trout,* 633 F. Supp. 150, 151 (N.D. Cal. 1985) ("An official in the

3    American embassy in **Brazil** informed Trout's counsel, however, that the procedure for the letters

4    rogatory may take as long as **six months**") (emphasis added); *SA Luxury Expeditions, LLC v. Latin*

5    *Am. for Less, LLC*, Case No. C 14-04085 WHA, 2015 WL 4941792, at *2 (N.D. Cal. Aug. 19, 2015)

6    ("The international service representative responsible for transmitting the letters rogatory herein

7    averred that service in **Peru will take 6–18 months**, but could take up to three years") (emphasis

8    added).

9         The U.S. government has not, and cannot, say that such requests are never granted.  Rather,

10   it appears more likely that the PRC government has a process it must follow, and that this process

11   takes time—sometimes six months or more.  This cautions in favor of waiting until at least six months

12   have passed since the second letters rogatory was delivered before issuing any order to proceed to

13   closings.  Even without considering all of the unique circumstances in this case, it is simply too early

14   to conclude that the letters of request here will not be approved by the PRC.

15   **III.    Jinhua Acted Diligently to Obtain the Attendance of the Witnesses.**

16        The government finally contends that Jinhua was not diligent in obtaining testimony of its

17   witnesses, so the Court should move immediately to closing arguments without waiting for the PRC

18   to act on the letters rogatory.  The government has two primary arguments relating to Jinhua's

19   diligence.  First the government claims that Jinhua "should have known the health conditions of its

20   witnesses" prior to when it alerted the Court to this information during trial.  (Mot. At 16:22-24.)

21   Second, the government claims that Jinhua did not exercise due diligence in obtaining approval under

22   the ICJAL.  (Mot. at 18:12-13.)

23        The level of diligence a party exercises does not have to be perfect.  In *U.S. v. Flynt,* 756 F.2d

24   1352, 1360 (9th Cir. 1985), the court "recognize[d] that appellant might have exercised greater

25   diligence than he did.  We do not intend to suggest that the degree of diligence demonstrated by

26   appellant would necessarily be adequate under other circumstances.  However, where, as we later

27   conclude to be the case here, the continuance would have served a useful purpose, granting the

28

18

1    request would not have inconvenienced the court, the other party or any witnesses, and appellant has

2    suffered severe prejudice as a result of the denial of his motion, we find the degree of diligence to

3    have been sufficient." *Id.* at 1360.  Here, Jinhua took reasonable steps, particularly given the global

4    pandemic, the COVID lockdowns, and the uncertainty attendant to the recently enacted PRC laws

5    relating to judicial assistance with foreign nations, to secure the attendance of its witnesses.

6          **A.      The Witnesses Who Are Unable to Travel for Health Reasons**

7          The government claims that Jinhua "should have known the health conditions of its

8    witnesses" prior to when it alerted the Court to this information during trial. (Mot. at 16:22-24.)  The

9    government questions the timing of the doctor's notes for the witnesses who cannot travel to the

10   United States to testify and the timing in which Jinhua alerted the Court to these issues.

11         None of the medical issues which created the heightened risk of travel during rising COVID-

12   19 rates were readily apparent to Jinhua or its counsel.  It therefore was assumed that the witnesses

13   would have raised any issues to Jinhua or its counsel as soon as that might impact their ability to

14   travel. And the witnesses ultimately did just that.  Based on their individual health issues *combined*

15   *with* the current COVID-19 situation in both China and the United States, the imminent nature of

16   their need to travel to the United States, and the fact that a witness for the government, despite being

17   masked in the courtroom, contracted COVID-19, the witnesses raised their health issues once they

18   became concerned travel would no longer be advisable based on their own personal situations. (*See*

19   Tr. XV 2559:12-2660:5.)

20         As previously set forth, Jinhua believed that it had taken timely and appropriate steps to

21   secure the attendance of the witnesses.  Before trial, Jinhua also negotiated a safe passage agreement

22   with the government to further secure the attendance of all the witnesses. The mere fact that Jinhua

23   did not affirmatively ask their witnesses whether COVID-19 could potentially impact their personal

24   health conditions, and thereby their ability to travel, does not render its overall diligence inadequate

25   and should not result in categorically barring Jinhua's witnesses from testifying.

26

27

28

19

1

**B.** <u>**Jinhua Was Diligent in Ascertaining the Requirements under ICJAL.**</u>

2      The government next claims that Jinhua failed to exercise diligence in obtaining authority for

3 remote testimony.  This is not true.  Rather, as discussed below, Jinhua aggressively pursued advice

4 from international law firms, the Chinese government, and an independent legal expert.  While the

5 advice Jinhua and this Court has now received from the Bureau of International Cooperation of the

6 Ministry of Justice, and the advice the government has received through diplomatic notes, is contrary

7 to the advice received earlier by Jinhua, that does not evidence a failure of diligence on Jinhua's part.

8      The government claims that "[n]ewness does not excuse Jinhua's inability to ascertain the

9 landscape."  (Mot. at 19:17-20.)  But newness is an integral factor in what happened here.  As Jinhua

10 explained, and the government has not contested, there have been no implementing rules or

11 regulations for the 2018 ICJAL. (ECF 454-1 ¶4.)  And there has been little practical experience with

12 taking witness testimony under the ICJAL.  So there is no guidebook that Jinhua could have looked

13 to in order to determine what it needed to do.

14      In light of that, what did Jinhua do?  First, it had several discussions with various agencies of

15 the local and provincial Chinese government.  (ECF 454-1 ¶4; *see also* ECF 232-2 ¶9.)  Based on

16 that advice, it submitted a written application to the Fujian Electronics & Information Group Co. Ltd.

17 ("FEIG"), who submitted it to the local branch of the Ministry of Justice located in the Fujian

18 Province of China, the Fujian Provincial Justice Department ("FJJD").  Jinhua submitted this

19 application in **<u>March 2021</u>**—almost a year before testimony in this case.  And its request was broadly

20 for "evidence," which Jinhua's ICJAL expert explains, in his opinion, would cover in-person and

21 remote testimony.  (ECF 457-2 ¶¶ 9-10.)

22      The government argues that Jinhua did not exercise diligence because the FJJD is not an

23 enumerated "competent authority" under Article 6 of the ICJAL.  But the government ignores the

24 declaration of Jinhua's expert on the ICJAL who states that approvals follow a level-by-level process.

25 While eventually permission has to be granted from the "competent authority," Jinhua would be

26 expected to, and did, first submit the application through FEIG to the local branch of the MOJ, the

27 Fujian Provincial Justice Department, with the assumption that it would be routed through the levels

28

1    of approval by the PRC government, and would eventually be presented to the relevant authorities.

2    (ECF 457-2 ¶12.)   In fact, in Jinhua's application, Jinhua made it clear that it intended for its

3    application to ultimately be submitted to the Bureau of International Cooperation.  (ECF 454-1 at 17

4    ("[Jinhua] respectively requests the Group Company to forward it to the International Bureau of the

5    Ministry of Justice").)  The fact that approval was ultimately communicated down the chain back to

6    Jinhua through the FJJD to FEIG should not have raised any red flags to Jinhua—Jinhua assumed,

7    based on the practice in China, that the government internally obtained the approvals sufficient to

8    satisfy the ICJAL.

9         Ultimately, as we now know, an official from the Bureau of International Cooperation of the

10   Ministry of Justice has stated that Jinhua needs to submit a letters rogatory request for both live and

11   in person testimony in a foreign criminal case.  But that does not change the fact that Jinhua had a

12   good-faith belief prior to May 2022 that it had permission to proceed.

13        In addition to the many declarations where Jinhua asserted that it believed it had permission

14   for its witnesses to testify (*see, e.g.*, ECF 450-4 ¶19; 454-1 ¶7; *see also* ECF 505-1 ¶¶8-10; 516-1

15   ¶6; 526-3 ¶5), Jinhua's good faith makes common sense.  Jinhua and its witnesses are subject to the

16   laws of the PRC, and have the most to lose should its witnesses not have proper permission to testify.

17   They would not have been willing to proceed with their testimony if they did not believe in good

18   faith that they had permission to do so.

19        Jinhua was diligent.  When the PRC government asked for letters rogatory, Jinhua filed them

20   within days.  The government contends that Jinhua was wrong in its interpretation of the relevant

21   Chinese law, but that is not a lack of diligence.  And the government does not cite a single case in

22   which a court has found a lack of diligence for simply being wrong.

23   **C.    COVID-19 Lockdowns and Travel Restrictions Do Not Evidence a Lack of
24         Diligence.**

25        There is a further reason for Jinhua's witnesses not travelling to the United States which

26   should not be held against Jinhua.  The COVID-19-related lockdowns and travel issues are explained

27   in detail in Jinhua's prior filings on these issues.  (*See* ECF 450; 459; 491.)  First, with respect to the

28

DEFENDANT'S OPP. TO GOVERNMENT'S MOTION TO                    CASE NO.: 3:18-cr-00465-MMC
SET A DATE FOR CLOSING ARGUMENT

1   lockdowns, the witnesses subject to the lockdowns issued sworn declarations that they were restricted

2   from traveling to the U.S. or to a U.S. embassy in China, including a screenshot of the code on their

3   mobile phones showing they were subject to restrictions.  (ECF 450-1 at Ex. A; 450-2 at Ex. A, 450-

4   3 at Ex. A.)  These lockdowns restricted You Zhenfu and Wu Junsheng from travelling to the U.S.

5   in early April when they otherwise would have testified.  Moreover, the fact that China continues to

6   require direct flights to return to China, and that there are limited such flights, is out of Jinhua's

7   control.  Neither factor evidences a lack of diligence on Jinhua's part, but rather unfortunate timing

8   and a once in a lifetime global pandemic.  (*See* ECF 492 at 10:2-21.)

9          The government claims that this all could have been avoided if Jinhua would have had its

10   witnesses travel to the United States in February, when trial started.  The government asked why

11   Jinhua "never explained why it did not endeavor to get witnesses here in the advance of the defense

12   case."  (Mot. at 21:8-9.)  That is a simple explanation.  The government explicitly reserved its right

13   to serve any of Jinhua's witnesses or corporate representatives who were travelling pursuant to the

14   safe passage letter with a trial subpoena in this case.  (Tr. I at 13:14-23.)  Jinhua asked for the clause

15   to be removed, but the government remained steadfast in its inclusion.  Putting aside the burden on

16   these individuals to spend what would have turned out to be months away from their families, Jinhua

17   was not going to bring any of its witnesses or corporate representatives to the United States and open

18   themselves up to a trial subpoena prior to the government resting its case.  (*See id.*)  It was (and is)

19   Jinhua's view that it is the government's burden to prove its case, and the government should not

20   require Jinhua's witnesses to testify in its case-in-chief.  Jinhua intended to (and did) start with

21   testimony from its expert witness in the United States so that its fact witnesses would have time to

22   travel to the United States between the time the government rested and the time they would testify

23   during Jinhua's case in chief.

24          At the start of the trial, moreover, the number of COVID-19 cases was relatively low in

25   China.  And three weeks in—when the government said they were going to rest—there still were no

26   lockdowns in the Jinjiang City area.  The COVID-19 pandemic was, and is, constantly evolving.

27   Jinhua's diligence should not be judged with the benefit of hindsight, knowing that lockdowns did

28

1    eventually occur, and that flights became very limited, all after the government belatedly rested its
2    case.  It is unfortunate, and frustrating, but not a reason for this Court to find that Jinhua failed to
3    exercise diligence.  (*See* Tr. XVI at 2879:15-19 (THE COURT: "But since we couldn't predict, and
4    as it turns out, it's obviously we couldn't have done it then.  It is up.  It is down.  You can't tell.
5    There is a new variant.  It's under control.  Oops, there is another variant.  So we're going to be
6    dealing with this for some time.").)

7    **IV.    The Cases the Government Cites are Distinguishable.**

8          The government cites several cases in its brief, but all of them are distinguishable.  No case
9    cited by the government deals with a once-in-a lifetime global pandemic, an actual letter from the
10   PRC Ministry of Justice Official specifically requesting that the defendant seek letters rogatory, and
11   a good-faith but, according to the PRC, mistaken belief in the requirements under a new Chinese law
12   for which there is little or no guiding regulations or precedent.  The cases cited by the government
13   involve no diligence, open-ended continuances, jury trials, and failures to proffer how witness
14   testimony may be relevant.  None of these situations apply here.

15         For example, in *U.S. v. Croft*, 124 F.3d 1109 (9th Cir. 1997), the defendant sought a last-
16   minute continuance of trial to depose an out of country witness.  *Id.* at 1118.  The Ninth Circuit did
17   not find an abuse of discretion in denying the continuance.  But there, trial had not started yet, and
18   was on the cusp of starting.  As the court noted, "an open-ended continuance would have
19   inconvenienced the court, the government, and its witnesses."  The Court also noted that if the
20   deposition had been introduced in evidence, the court would have instructed the jury that it could
21   consider the fact that the deposition testimony was given under an oath that the United States had no
22   way of enforcing, so its utility to the defense was limited.  But here, Jinhua is not seeking an open-
23   ended continuance.  It is seeking more time to allow the PRC government to act on letters rogatory
24   during the time frame in which the U.S. government has noted it typically takes to act.

25         In *United States v. Nguyen*, 230 F. App'x 686 (9th Cir. 2007), the Ninth Circuit did conclude
26   that the district court did not abuse its discretion in denying the defendant's motion for a continuance.
27   However, the Ninth Circuit's decision was not based solely on of a lack of diligence.  Rather, the
28

**DEFENDANT'S OPP. TO GOVERNMENT'S MOTION TO
SET A DATE FOR CLOSING ARGUMENT**                    **CASE NO.: 3:18-cr-00465-MMC**

1    court also noted that, *inter alia*, "there was no proffer that the informant's testimony would have
2    been favorable to him, and that he failed to show that he would have been able to procure the
3    informant's presence had a continuance been granted" *Id.* at 688.  Here, by contrast, Jinhua has set
4    forth in detail how the witnesses' testimony will be relevant and exculpatory.  Plus, as explained
5    above, Jinhua has acted diligently to secure the testimony of its witnesses.

6         Finally, in *United States v. Lim*, 984 F.2d 331, 337 (9th Cir. 1993), which the government
7    cites for a situation where a defendant "was aware of the problem of securing the attendance of this
8    particular witness" (Mot. at 17:7-10) (which is a line that does not occur in the opinion), the defendant
9    knew about the witnesses but simply failed to confer with his attorney and translator to obtain the
10   witness before his trial date.  The defendant exercised no diligence.  Here, Jinhua was diligent.

11                                    **<u>CONCLUSION</u>**

12        Jianhua seeks additional time so that it can present important witnesses with percipient
13   knowledge of key exculpatory evidence to the Court. Jinhua has a due process right to present these
14   witnesses in its defense.  As the Supreme Court stated:

15            The right to offer the testimony of witnesses . . . is in plain terms the
             right to present a defense, the right to present the defendant's version
16            of the facts as well as the prosecution's to the jury so it may decide
             where the truth lies.  Just as an accused has the right to confront the
17            prosecution's witnesses for the purpose of challenging their
             testimony, he has the right to present his own witnesses to establish a
18            defense.  This right is a fundamental element of due process of law.

19   *Washington v. Texas*, 388 U.S. 14, 19 (1967).  *See also Chambers v. Mississippi*, 410 U.S. 284, 294
20   (1973) ("The right of an accused in a criminal trial to due process is, in essence, the right to a fair
21   opportunity to defend against the State's accusations.  The right[ ] ... to call witnesses in one's own
22   behalf [has] long been recognized as essential to due process.").  Thus, "criminal defendants have ...
23   the right to put before a jury evidence that might influence the determination of guilt." *Pennsylvania*
24   *v. Ritchie*, 480 U.S. 39, 40 (1987) (footnote and citations omitted).

25        While this due process right is not absolute and is "subject to reasonable restrictions, such as
26   evidentiary and procedural rules," *Moses v. Payne*, 555 F.3d 742, 757 (9th Cir. 2009) (internal
27   quotation marks and citation omitted), here, it would be a miscarriage of justice to close the case
28

1  before Jinhua has had a fair opportunity to present its witnesses' testimony.  The government spent

2  a lot of time telling the Court who the participants of a particular communication were, and what it

3  thought a document meant, but through testimony of government counsel, not a percipient witness.

4  As explained above, Jinhua is offering percipient witnesses who not only can explain documents and

5  communication, but who have material, exculpatory evidence.  Jinhua has diligently tried to navigate

6  the PRC laws and internal procedural process to procure the witnesses' testimony.  At this point,

7  forcing the parties to make their closing arguments while waiting some time, but not enough to fall

8  within the general timeframe of when the PRC government has acted in the past, is a miscarriage of

9  justice.  The prejudice that would result from depriving Jinhua of each of its witnesses dwarfs the

10  concerns expressed by the government regarding the passage of time since it closed it case-in-chief.

11  The government will have ample opportunity to refresh recollection during closing, and the question

12  of whether Micron is deserving of any justice as it relates to Jinhua is an open question until the court

13  renders its verdict it the action.  The Court should deny the government's Motion and continue the

14  case until at least six months has passed since the last letters rogatory was delivered so that the

15  Chinese government has sufficient time to act on the Court's letters rogatory.

16          DATED: October 4, 2022          SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

17

18                                          By:     /s/ Jack P. DiCanio
                                                    Jack P. DiCanio
19
                                            Attorneys for Defendant
20                                          FUJIAN JINHUA INTEGRATED
                                               CIRCUIT CO., LTD.
21

22

23

24

25

26

27

28

25