Pages 1 - 26

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE MAXINE M. CHESNEY, JUDGE, JUDGE

```
UNITED STATES OF AMERICA,        )
                                 )
            Plaintiff,           )
                                 )
   VS.                           )  No. 18-cr-00465-MMC
                                 )
UNITED MICROELECTRONICS CORP.,   )
et al.,                          )
                                 )
            Defendants.          )  San Francisco, California
_____)
```

Friday, March 3, 2023


**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**  (By Zoom Webinar)


```
For Plaintiff:          STEPHANIE M. HINDS
                        United States Attorney
                        450 Golden Gate Avenue, 11th Floor
                        San Francisco, California  94102
                    BY: LAURA VARTAIN HORN
                        NICHOLAS WALSH
                        ASSISTANT UNITED STATES ATTORNEY

                        U.S. DEPARTMENT OF JUSTICE
                        National Security Division
                        950 Pennsylvania Avenue, N.W.
                        Washington, D.C.  20530
                    BY: NICHOLAS O. HUNTER
                        STEPHEN MARZEN
                        TRIAL ATTORNEYS
```


Reported By:  **BELLE BALL, CSR 8785, CRR, RDR**
              Official Reporter, U.S. District Court

(Appearances continued, next page)

**APPEARANCES, CONTINUED**:


For Defendant:             SKADDEN ARPS SLATE MEAGHER & FLOM LLP
                           525 University Avenue
                           Suite 1100
                           Palo Alto, California  94301
                      BY:  **JACK P. DICANIO, ESQ.**
                           **EMILY A. REITMEIER, ESQ.**


                           SKADDEN ARPS SLATE MEAGHER & FLOM LLP
                           300 South Grand Avenue
                           Los Angeles, California  90071
                      BY:  **MATTHEW E. SLOAN, ESQ.**

**Friday - March 3, 2023**                                **10:01 a.m.**

**P R O C E E D I N G S**

**THE COURTROOM DEPUTY:**  Calling Criminal Case

No. 18-465, United States versus Fujian Jinhua Integrated

Circuit.

Will counsel please state your appearances for the record,

starting with government counsel.

**MR. WALSH:**  I believe Ms. Vartain is intending to

enter.  I wonder if she's in the waiting room.

**THE COURT:**  Ms. Geiger?

**THE COURTROOM DEPUTY:**  No, she is not.

**MR. WALSH:**  All right.  At's any rate, Nicholas Walsh,

Stephen Marzen and Nic Hunter for the United States.  And

Ms. Vartain I believe will be signing in momentarily.

**THE COURT:**  Okay.

**MR. DiCANIO:**  Good morning, Your Honor.  Jack DiCanio,

Matt Sloan and Emily Reitmeier for the defendant.

**THE COURT:**  Very good.  Thank you.

Well, all right.  So we have this other communication

that's come in from the Ministry of Justice at the People's

Republic of China.  And I think before we talk about this

response that we got, at least we're getting communication back

and forth with these people, after months of silence, if you

will.

But did you have a chance, Mr. DiCanio, to look further

1    into what the conversations were that the two witnesses had,

2    and how that was presented to whoever inquired from the

3    Ministry as to their preferences, if you will?

4        **MR. DiCANIO:**  I did, Your Honor.  And it was as I

5    indicated the last time, which was they were asked two

6    questions.  The first question was:  Are you willing to

7    testify?  And they said yes.  And they said, do you have a

8    preference for testifying remotely or in person?  And they

9    said, preference for remote.  But we did follow up with them

10   separately, and they both are very willing to travel and

11   testify live.

12       And my understanding, as part of this process by the MOJ,

13   they probably will be re-questioned about that, and they are

14   prepared to say -- they're prepared to travel to the United

15   States to testify.

16       **THE COURT:**  Okay.  Why do you think they will be

17   questioned again?

18       **MR. DiCANIO:**  It's from the letter that was sent,

19   Your Honor.  The letter talks about their two conditions.  And,

20   the second condition being that the witnesses are willing to

21   travel back to testify.

22       **THE COURT:**  I don't know who ought to convey that, in

23   the first instance.  In other words, should they be getting

24   back to the Ministry in some fashion?  Or should they be

25   waiting?  And -- well, let's look for a minute at the rest of

 1   this.

 2        And I'm aware -- you know, their answer to Question 2 was

 3   the wrong answer.  And it's not just a question of

 4   truthfulness, if they actually thought about what the rulings

 5   were, and that their only choice was to come in person unless

 6   there was some legal ground to base a request to testify

 7   remotely.  They should have said "We prefer to be there in

 8   person."

 9        In any event, when they go on here, they've got all kinds

10   of concerns.  Assuming that these people are willing to come to

11   the U.S., are they going to get prosecuted?  Can they be forced

12   to testify; something else?  Can they get held up and

13   extradited while they're going through some other country while

14   arriving here or going home?  What's the duration of any

15   assurances they have as to being prosecuted, et cetera.

16        Ms. Vartain has now appeared also in the hearing.

17        So, who would be conveying this information?  How would it

18   be conveyed to the Ministry?  They have all these questions.

19   You got any idea on that, Mr. DiCanio?

20        **MR. DiCANIO:**  I do, Your Honor.  The way that I

21   interpreted it, I think they were looking for a response from

22   the Court.  However, obviously, these are representations that

23   the government has made to Jinhua in the form of the safe

24   passage agreement.

25        And so what I would think, Your Honor, is they're looking

1    for the Court to advise them on the responses, but I would

2    imagine that whatever response the Court were inclined to

3    respond, it would have to be:  This is the representation of

4    the U.S. government.

5         **THE COURT:**  Well, we could attach the agreement to

6    anything.

7         **MR. DiCANIO:**  (Nods head)

8         **THE COURT:**  But I don't know if the agreement makes

9    any reference to any action that would be taken or could be

10   taken to get their hands on him, or either of those witnesses

11   while they're in route, one way or the other.

12        What's that all about, by the way?

13        **MR. DiCANIO:**  So Your Honor, this is how I interpret

14   it, because I do believe they have a copy of the safe passage

15   agreement that the government and Jinhua entered into, I

16   believe even before the trial started.

17        I interpret these questions as them trying to understand

18   the scope of that agreement, and maybe what it means.  Because

19   these questions relate to the things that aren't specifically

20   addressed in the safe passage agreement.

21        So for instance, they understand that the government has

22   agreed not to arrest the individuals when they're in the United

23   States.  So they ask:  Okay, well what if they were to travel

24   to London on their way back to China?  Will you seek their

25   arrest in London?

1   It's kind of clarifying questions, as I interpret the

2   questions.  That's what I think is happening.

3       **THE COURT:**  Well, I cannot -- I'm not going to try and

4   interpret this safe passage agreement.  I wonder if it can be

5   -- whether there can be a supplement to address that from the

6   government, if they're willing to do that.  To state that --

7   you know, what would happen if, like, for example, if they

8   thought one of these people committed perjury?

9       I don't envision anybody getting prosecuted for perjury.

10  But, just assume for a moment the government thought that that

11  was something they wanted to do, as opposed to just holding it

12  over someone's head so that they are more likely not to lie.

13      And so the government would go:  Okay.  We can arrest him

14  here in the U.S., our agreement says we can do that if they

15  commit perjury, and they got away from here -- because I think

16  that's correct, isn't it?  Your agreement doesn't hold them

17  harmless from a perjury arrest, does it?

18      **MR. DiCANIO:**  Correct, Your Honor.

19      **MS. VARTAIN HORN:**  That's correct.

20      **THE COURT:**  Okay.  So let's say, oh, they got away

21  from us, and now they're in some country they can be extradited

22  from.  Could they do that, as the government perceives this

23  agreement?

24      I'm not sure.  Let's check with Ms. Vartain.

25      **MS. VARTAIN HORN:**  Yes.

1          **THE COURT:**  Okay.  Her idea is if they got away but

2     there's somewhere they can get their hands on them, they would

3     do it.  I guess they can't be extradited from China, right?

4          **MS. VARTAIN HORN:**  Correct.

5          **THE COURT:**  Okay.  But if they got off and spend

6     overnight in Heathrow or something, I guess they could ask for

7     them to be picked up.

8          So this is something that I -- I would hesitate, though,

9     to make any representation about that.

10         So that's the third country idea, tied to perjury.

11         They also wanted some -- they thought what would be fair

12    as to how long they would be free of any kind of arrest or

13    detention, except for perjury, that it would last, they said,

14    from, you know, the time they came in until they leave, or 15

15    days from the time they complete their testimony.

16         In other words, if they stuck around here, and they didn't

17    leave, and 15 days had gone by and they -- in the interval

18    there, they could not be prosecuted.  Maybe they were trying to

19    get their flight squared away or something.

20         But then after that, if they were still here, then they

21    could, I guess -- what?  Be prosecuted or arrested for

22    something other than perjury?

23         Or, how broad is the current agreement?  I don't have it

24    immediately in front of me.  Maybe it's --  this.

25         **MR. DiCANIO:**  Yes, so Your Honor, and I think this is

 1    something that the MOJ understands.  And that is:  The

 2    agreement doesn't cover any crime that would be committed while

 3    they're in the United States.  Meaning something new.

 4         **THE COURT:**  Okay.

 5         **MR. DiCANIO:**  And so that would include perjury; that

 6    would include anything else they might do when they're here.

 7         When we were discussing this with the government,

 8    obviously -- and I understand why -- the government didn't want

 9    a situation where they just stay indefinitely in the United

10    States, so there needed to be a return date.  I forget now what

11    we had in the safe passage agreement.  But --

12         **MS. VARTAIN HORN:**  (Inaudible)

13         **MR. DiCANIO:**  But I believe, Your Honor, that what

14    they're talking about is what you identified, which is:  What

15    happens if there's some type of delay in getting them back?

16    Maybe they get sick, or maybe the flights get canceled and

17    there's some disruption.  That they're not disadvantaged by

18    circumstances beyond their control.

19         **THE COURT:**  Well, actually, if it runs from the time

20    they come until the time they leave, then the 15 days is

21    actually narrowing it.  Because if it took a month to get them

22    out of here, they would be protected from any prosecution for

23    any past behavior, except for -- and then any new crimes, as

24    you say, including perjury.

25         They could be prosecuted -- you know, if they trash their

1  hotel room.  They're not going to do that, but, you know, if

2  they did.  Anyway, the government wouldn't be prosecuting them

3  for that.  That would be a state malicious mischief or

4  something.

5      So that's why I don't have your agreement right here.  If

6  it just runs from the time you get here until the time you

7  leave, that's broader than 15 days from the time you testify.

8  It's until you get out of here.

9          **MS. VARTAIN HORN:**  I'm --

10         **THE COURT:**  Maybe I have it -- do I have it in this

11  filing that's kind of a detached thing that got filed with no

12  cover sheet or anything?  Just says "Exhibit 1"?

13         **MS. VARTAIN HORN:**  Yes, Your Honor.  I think,

14  anticipating that this would be the subject matter of today's

15  court hearing, we did deliver a chambers copy of what is Docket

16  546-1.

17     And it's -- Exhibit B is the in-effect safe passage

18  agreement.

19         **THE COURT:**  Okay.  Yeah, the government isn't going to

20  do any of these things.

21     Three days -- oh, this one is three days after the witness

22  leaves the stand.  So they, they wanted -- so this is not from

23  the time you show up to the time you leave.  This is from the

24  time you show up until three days after you testify.  Whereas,

25  it looks like they would like -- the Ministry would like from

1    the time you arrive until they -- 15 days after you testify.

2    So a couple weeks more, it's a little less than a couple weeks

3    more.  I don't know that that would be a particular problem.

4        Let me just read this (As read):

5            "The government agrees not to serve, arrest,

6            detain or otherwise take any action that

7            would prevent a Jinhua witness from freely

8            leaving the United States for his or her

9            conduct that occurred prior to their entry."

10    Okay.  So the immunity from prosecution essentially is for

11    anything you did before you came here, and that's good for up

12    to three days after the witness's testimony is completed, at

13    which point, if -- if -- the government felt that the witness

14    had done something they want to prosecute them for and they're

15    here after that, I guess they could do it.  But maybe that

16    could be extended if the Ministry wanted another 12 days or

17    something.

18        But right now, this agreement is not in accord with what

19    they are asking for.  And we don't want to get into a

20    bargaining thing with them over that kind of a cutoff.

21        So -- I don't think the government, at least at this time,

22    has any knowledge of any crimes that these people have

23    committed, other than whatever their participation was in

24    getting this technology, which is a past behavior.  So you

25    could talk about that, and whether you want to amend in some

 1   way this -- if this letter reflects the agreement, then it

 2   could be amended, unless the government is just digging in

 3   their heels on that part.

 4       So I don't think you're going to try to turn these people

 5   into witnesses, are you, in some other prosecution?

 6       Ms. Vartain?

 7       **MS. VARTAIN HORN:**  Your Honor, obviously the

 8   government can't speak to what other government entities are

 9   going to do, aside from the representations we made in this

10   letter.

11       At the time that we drafted this letter, we did

12   specifically carve out the ability to serve them with a trial

13   subpoena in the government's case-in-chief.  But as everyone

14   knows, the government's case-in-chief is now complete.

15       **THE COURT:**  Can you commit to your office not trying

16   to call them as a witness in some other case while they're

17   here?  Item No. 2 in their list, on Page 1 of their letter says

18   (As read):

19               "Without the prior consent of the China side

20               and the witnesses, whether the witnesses,

21               after entering the United States as

22               requested, could be forced to testify in any

23               other cases, for any party involved in this

24               case other than Jinhua or on any other matter

25               not stated in the letter rogatory."

1    So they seem to think someone can make them testify in our

2    case which, again, nobody is trying to do.  And they just don't

3    seem to get that point.

4    I don't care.  I mean, I'm interested in hearing them.

5    But I have no power to force them to testify right now.

6    So, have you thought of any case that your office would

7    want to try and use these people in, while they're here?

8    **MS. VARTAIN HORN:**  No, the government can commit to my

9    office.

10   **THE COURT:**  Got it.  You just don't know what some

11   other agency or office would do.  But, would they even know

12   these people are here?

13   You're not going to send any more letters out saying: By

14   the way, in case you're worried, we're having these people

15   here.

16   **MS. VARTAIN HORN:**  No.

17   **THE COURT:**  They're not even going to know they're

18   here.  Right?  Who would know?

19   **MR. DiCANIO:**  And Your Honor, I will tell you that

20   when we were discussing the safe passage -- obviously, I

21   understand the limitations that Ms. Vartain is talking about.

22   The only thing that we asked is that if the government was

23   aware of any other agency, --

24   **THE COURT:**  Let --

25   **MR. DiCANIO:**  -- to let us know, in good faith.  If

1    they're not aware, we would accept their representation.  And I

2    do recall them making that representation before the trial

3    started.  And I would accept that.

4        I think what maybe the Ministry of Justice is wondering

5    is:  Okay, we understand that the U.S. Attorney's office and

6    certain agencies have agreed, but what ability does that have

7    to bind other agencies?

8        And I think we just need to make that clear to them, that

9    it doesn't.

10        **THE COURT:**  I don't know that they really are focusing

11   this question -- in other words, that they already know what

12   the government can do, because they -- you've shown them, I

13   guess, this letter?  Or not?

14        **MR. DiCANIO:**  I did, Your Honor.  We did.

15        **THE COURT:**  And they may say:  There are certain

16   things that are not spoken of directly, and we would like to

17   know what they are.

18        And my thought in that regard is that if you and

19   Ms. Vartain -- in other words, the defense and the

20   government -- can agree to reassure the Ministry as to what the

21   government is agreeing to in this case, and to make clear if

22   you want, anywhere, that -- but be careful that you don't

23   emphasize it too much, with the idea that somebody's waiting in

24   the wings to pounce on them.

25        If it's made clear that at least the government at this

1   time is not aware of anybody else within the U.S. who has any

2   interest in these people, let alone an interest in using them

3   as witnesses, it may be that you can get either a new letter or

4   a supplement regarding this letter, or clarification regarding

5   this letter.

6        Then, it would seem to me, that if you wanted me to

7   respond as opposed to your simply submitting this to the

8   Ministry -- because if you can get something that you can use

9   from Ms. Vartain at all here, then I would suggest that, at a

10  minimum, that that be given to the Ministry.  If you feel like

11  they're looking at something from me, as opposed to your just

12  answering their questions -- let's see how it starts.

13       I've already sent one letter.  I don't have it in front of

14  me, unfortunately.  I've got whatever -- the means of

15  salutation, a few things in there that can be cleared up -- I

16  mean that I already know now, so I don't have to ask about

17  that.  As far as the guts of it, I would indicate that we've

18  met in an effort to clarify, and that there's been this

19  modification to make certain things clear.

20       And if you can think of any phrasing of trying to let

21  these people know that I am not ordering them to be here, my --

22  my ruling -- we can call it a ruling, maybe, instead of an

23  order.  But, my ruling is that if they wish to testify, that

24  like all witnesses, they need to testify in person, unless a

25  health reason or some other -- it's primarily health -- unless

1  there's a health reason or some other legal reason why they

2  can't be here, you know.

3    **MR. DiCANIO:**  (Nods head)

4    **THE COURT:**  Such as lockdown, national lockdown,

5  something like that.  So that they understand, I'm not forcing

6  them to come.  They've said they want to be here.  But, all

7  witnesses have to be treated equally.  And we could just

8  indicate that the law requires that all witnesses be here,

9  absent certain exceptions.

10    And there may be language that, having spoken to these

11  people or at least heard what they've said, you think would be

12  a good way to convey that, in which case I'm happy to receive

13  any suggestions from anybody in that regard.  I could make

14  something up that might be okay, but I don't want to confuse

15  them again.  So -- but anyway, that's what I'm thinking, that,

16  it does require some amount of delay.

17    And Ms. Vartain has stated from the get-go, and I'm sure

18  she would want to put on the record that she doesn't want to

19  delay any further.  But, given that we are engaged in this

20  conversation with the Ministry, I don't think it would be

21  appropriate to just stop now and say: Well, you have a date and

22  you didn't meet it, so you're stuck.

23    We can always take the first two, to get moving.

24    All your stuff is in the courtroom.  I keep having trials,

25  and explaining to other juries that it's not the fault of the

 1    lawyers in that particular case that the Court has all this

 2    stuff in it that's kind of cluttering up.  And not to think

 3    that somebody's going to try and put all of these boxes of

 4    evidence in front of them to be read.

 5         But, anyway, that -- you're all there.  You're very close

 6    to me.  I have all your papers that were filed in the

 7    government's case.  They're sitting there behind me, right next

 8    to me, on the bench.  So, near and dear to my heart.  I have

 9    all this material.

10         So, anybody want to suggest a plan of action?  Even if you

11    object, Ms. Vartain, I feel like I have to give them a chance

12    to respond.  So if there is an objection, it's --

13         **MS. VARTAIN HORN:**  Okay.

14         **MR. DiCANIO:**  Your Honor -- if I can, Your Honor, we

15    did make a proposal to the government yesterday when we got the

16    letter.  They haven't had a chance to get back to us.

17         But what we would propose is that Skadden would take a

18    first effort at drafting a response consistent with our

19    discussions in the past, frankly, and our discussion today.  We

20    would endeavor to try to get that over to the government, if

21    not today, then over the weekend.

22         And I'm pretty sure, based upon the questions, that

23    they're not controversial responses.  At least, I don't think

24    so.  And my guess is we could align on some proper phraseology.

25    And if we do that, then perhaps on Monday we would jointly

1    present to the Court kind of our proposed response with

2    language that we would agree on for the Court's consideration.

3         And then if the Court got comfortable with the response,

4    then we would endeavor to get it translated and get it over,

5    you know, back to the Ministry of Justice, and really try to

6    accomplish this in just a few days.

7              **THE COURT:**  Yeah.  I'm thinking that rather than my

8    just saying this is what the parties told me they agree to,

9    that it would be better if we had a clarification from the

10   government, itself, which, you could give them the proposed

11   language, and see if they're willing to write another letter or

12   however it should be done.

13        For example, right now you have a letter from the

14   government to you.  Okay.  I don't know if that's the best

15   format or not, but I think there should be something where the

16   government, itself, signs off on it.  Because they're asking:

17   What is the government willing to do?  And we have something

18   that's written already.

19        And it sounds like they just want to know how broadly --

20   you know, what's the breadth of this?  And are there exceptions

21   and things?  It's a little bit -- if somebody said: Okay,

22   here's a letter of recommendation, can you sign off on it?  I

23   mean, you can give them the language and see if they can live

24   with it.  That might be good.  And not to say that it -- my,

25   then, responding to this letter is -- wouldn't happen.  It's

1  just, I would say that as -- this is what they've said, and if

2  -- this is what they've told me it means.  If you want me to

3  reiterate it, you can give me some language.  As I say, I'm

4  happy to take it and take a look at it.

5      Mostly, you have more of a feel for what these people want

6  to hear and how it ought to be stated.  And I'm a little

7  worried, since everything gets translated, no matter how

8  carefully I am in framing something that would sound great to

9  English speakers, that -- how certain words might get

10  translated.  Like, I don't know, "little house with a garden

11  around it" or whatever they -- I can't read -- they're

12  pictures.  Okay?

13      And I just -- I think that if there's any way that you've

14  come to know, or you can ask the firm you've been working with

15  that's based in China if they've got somebody who does

16  translations, how that would come out, and whether that would

17  be a good word to use or not, just in a real effort not to open

18  us up to misinterpretation, that's what I think we should do.

19      And the timing of all this, and whether you want to

20  wait -- for example, Ms. Vartain, would you want to have the

21  two people that have been approved testifying, I don't know, in

22  their bathrobe or whatever they're going to do over there, and

23  then wait to see what the Ministry says about the other two?

24  Or do you want to just wait and do them all together?

25          **MS. VARTAIN HORN:**  Your Honor, I think what I -- what

1  the government would like to do at this juncture is identify an

2  answer to the recent correspondence, get that out the door as

3  quickly as possible, and not yet confront the question of

4  whether the -- I think it's three witnesses who have agreed to

5  testify, and the PRC has agreed may testify remotely.

6      I think I'd like not to answer -- I'd like to defer

7  answering the question as to how to handle the split between

8  the three and the two at this moment, please.

9          **THE COURT:**  That's fine.  That's fine.  So should we

10  set some kind of a date?  Just kind of taking guidance from you

11  at this point.

12      **MR. DiCANIO:**  Your Honor, one of the things -- I'm

13  sorry.  One of the things that I noticed is it does seem like

14  they're responding before the hearings.  Which is a good thing.

15      So what I would suggest maybe as a good way forward is to

16  set another status conference, where I'd be able to communicate

17  through the client to them that the Court is setting another

18  status conference, we're going to be giving you the responses.

19  And the hope is that you will respond so that we can address

20  the situation at the next status conference.

21      That seems to be working. (Indicating quotation marks)

22          **THE COURT:**  Okay.

23      **MR. DiCANIO:**  The only thing I would ask, Your Honor,

24  is I would think we would need probably about two weeks to make

25  sure that there's enough time so that it's productive.  That

 1   would be the only ask.

 2           **THE COURT:**  All right.  And Ms. Vartain, what's your

 3   thought about this?

 4           **MS. VARTAIN HORN:**  I -- I agree with that.  I think we

 5   should set a date two weeks out.  And the government will --

 6   will talk to Mr. DiCanio and his colleagues about the right way

 7   to go -- handle the back-and-forth on -- and by this, I mean

 8   what's the right way to get a response.

 9       But I do think the Court probably should be the -- I think

10   the government will propose a letter, --

11           **THE COURT:**  Uh-huh.

12           **MS. VARTAIN HORN:**  And the Court should enclose the

13   letter.

14           **THE COURT:**  Yes.  That's what I think.  And I do think

15   it would be good for me to respond so that it looks like -- I

16   don't know, that -- official to official, in a sense.  And I

17   think that shows a certain degree of respect for their process,

18   and country, essentially.

19       But again, as I say, I'm looking -- it doesn't have to be

20   a ghostwriter, but it would help to just have you take a look

21   and see what you think, Mr. DiCanio, might be good language,

22   and of course running it by the government so that they know

23   and have some thoughts about it.  Or you can both take the

24   laboring oar, and just exchange whatever.  But it's probably

25   easier for the defendant to say something first.

1       But after you've agreed on how the letter's going to go,

2  that's the government's -- it's going over their signature, so

3  they have the final word on that.

4          **MR. DiCANIO:**  (Nods head)

5          **MS. VARTAIN HORN:**  I think I'm inclined to draft

6  things that go under our own signature, ourselves.  But as I

7  said, we will --

8          **THE COURT:**  That's fine.

9          **MS. VARTAIN HORN:**  -- off camera.

10         **THE COURT:**  That's fine.  But you guys are going to

11  talk about -- just to make sure you're all clear on what you

12  have agreed to.  Then you write it down, what you've agreed to,

13  and then that's fine.

14      And then, but what I'd like them to do is to the extent

15  that -- and you can also propose, by the way, any language that

16  you want me to use.  Frankly, I was just planning on saying

17  that:  This is their agreement, and it's attached.  And then,

18  if you want me to say that the parties have agreed this is what

19  it means, in some way, in response to these specific questions,

20  if you want me to do that, I can do that.

21      And -- but I really want to be able to make it clear to

22  them.  And this -- both of you can take a shot at it.  The only

23  reason I suggested, at least in the first instance, Mr. DiCanio

24  is because he's working with a firm that -- you know, they have

25  translators; they've got some idea of the niceties of language

1   over there.

2         But, I really want them to understand, nobody here is

3   ordering them to be here.  The government isn't ordering them

4   to be here; I'm not ordering them to be here.  I'm just

5   treating them like all other witnesses.  That -- that's how I'm

6   doing it.

7         **MR. DiCANIO:**  (Nods head)

8         **THE COURT:**  And if we stay away from my ordering

9   anything, you know, I can -- that may be better.

10        So you are suggesting, everybody's suggesting a couple of

11   weeks.  So let's take a look.  I'm in trial right now, but that

12   should be okay.

13        Hang on.  Okay.  So today's the 3rd.  So what's -- is that

14   a holiday?  No.  The 17th, I guess, is -- is that what

15   everybody is thinking, the 17th?

16        **MS. VARTAIN HORN:**  That works for the government.

17        **MR. DiCANIO:**  -- celebrate St. Patrick's Day,

18   Your Honor --

19        **THE COURT:**  I don't have this marked with a

20   highlighter, but on the calendar it's showing there -- no,

21   okay, I'm supposed to go to a St. Patrick's Day party.

22        **MR. DiCANIO:**  I'm just laughing, because that's my

23   birthday, Your Honor.

24        **THE COURT:**  Oh, it is?  On St. Patrick's Day?

25        **MR. DiCANIO:**  It is.

 1            **THE COURT:**  Well, DiCanio.

 2            **MR. DiCANIO:**  That's why my middle name is Patrick.

 3            **THE COURT:**  Aha.  Maybe you're an O'DiCanio.  But,

 4    anyway.

 5        All right.  So I'm going to put the matter over, then, for

 6    a status conference to March 17.  And I guess 10:00 worked for

 7    people.  Should we say 10:00 again?

 8            **MR. DiCANIO:**  Yes, Your Honor.

 9            **THE COURT:**  All right.  At 10:00.  I'm not sure what

10    hearing we might have scheduled, or case managements, but we

11    shouldn't be too long.  We're only about five minutes over when

12    my case managements start, and are waiting.

13        Okay.  So --

14            **MS. VARTAIN HORN:**  Your Honor?

15            **THE COURT:**  Yeah.

16            **MS. VARTAIN HORN:**  May I add one more potentially info

17    matter?

18        As you know, the parties for many years have worked many

19    things out, without your assistance.  But to the extent we need

20    the Court, we'll reach out to Ms. Geiger and ask for an interim

21    hearing.

22        I say that because I -- the government is not likely to,

23    in any large way, meaningful, big way, extend -- expand the

24    terms of the safe passage agreement that it negotiated

25    carefully and for a long period of time.

1        I am going to look closely at whether there are things we

2    can do, to further where we're at.  But in case we need the

3    Court, I just wanted to flag that for Your Honor.

4        **THE COURT:**  That's fine.  No, that's fine.  And if you

5    get in touch with her, and you need some date, we can talk

6    about that.  If you needed a hearing but we're close to the

7    status conference, we might just have the status conference and

8    talk about that then.

9        It doesn't sound like you would change much in terms of

10   the core of your agreement.  But, take a look at those three

11   versus 15 days.  Because that's not the biggest deal in the

12   world.  And, given how far they would be coming from, some of

13   the -- just things that have been happening -- frankly, I am

14   delighted that they are just going forward, one way or the

15   other, with this particular case without -- because, I mean,

16   our government and their government have not been on the best

17   of terms in these last weeks, months.  And the fact that they

18   haven't just said: Look, we're not doing anything with you

19   folks really is somewhat encouraging.  So, I really didn't

20   think we were going to hear back from them.

21       So, okay.  We've got the date, March 17.  You can get in

22   touch before that if you need to.  And, okay.  Everybody just

23   keep thinking optimistically, if we can.  And, okay.

24       **THE COURTROOM DEPUTY:**  Your Honor, I just want to

25   confirm that the March 17th hearing is by Zoom.

1          THE COURT:  Oh, yes.

2          THE COURTROOM DEPUTY:  Okay.

3          THE COURT:  Everybody -- I'm not making everybody come

4    out here from far and wide.

5          THE COURTROOM DEPUTY:  Okay.

6          THE COURT:  To talk about this.  So, Zoom again.  All

7    right.  Okay.

8          MR. DiCANIO:  Thank you.

9          THE COURT:  See you in a couple weeks.

10         MR. DiCANIO:  Thank you, Your Honor.

11         THE COURT:  All right.  Thank you.

12         MR. WALSH:  Thank Your Honor.

13      (Proceedings concluded)

14

15

16

17

18

19

20

21

22

23

24

25

<u>**CERTIFICATE OF REPORTER**</u>

I, BELLE BALL, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____
/s/ Belle Ball

Belle Ball, CSR 8785, CRR, RDR

Sunday, April 2, 2023