THOMAS A. COLTHURST (CABN 99493)
Attorney for the United States
Acting under Authority Conferred by 28 U.S.C. § 515

MATTHEW YELOVICH (NYBN 4897013)
Acting Chief, Criminal Division

LAURA VARTAIN HORN (CABN 258485)
NICHOLAS WALSH (CABN 314290)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    Laura.Vartain@usdoj.gov
    Nicholas.Walsh@usdoj.gov

NICHOLAS O. HUNTER (DCBN 1022355)
STEPHEN MARZEN (NYBN 2007094)
Trial Attorneys, National Security Division

    950 Pennsylvania Ave., NW
    Washington, DC 20530
    Tel: (202) 353-3434
    Fax: (202) 233-2146
    Nicholas.Hunter@usdoj.gov
    Stephen.Marzen@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> FUJIAN JINHUA INTEGRATED CIRCUIT CO., LTD, <br><br> Defendant. | CASE NO. 18-CR-00465 MMC <br><br> UNITED STATES'S CORRECTED MEMORANDUM OF LAW ON POST-CLOSING ISSUES: RATIFICATION, EXTRATERRITORIALITY, AND DUAL AGENCY (CORRECTING DOCKET 641) <br><br> The Honorable Maxine M. Chesney <br> Courtroom 7, 19th Floor <br> [No Hearing] |

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................... 1

LIMITED PROCEDURAL HISTORY ........................................................................................ 2

ARGUMENT .................................................................................................................................. 4

    I.   Because Jinhua Is Not Charged with any Substantive Offense Prior to Joining the Ongoing Conspiracies, the *Pinkerton* Rule Is Inapplicable ............................................... 4

    II.  The Economic Espionage Act Applies Extraterritorially to Jinhua Because the Offenses Furthered by Acts in the United States Involved Conduct that Jinhua Joined ................. 8

    III. Applicable Law Permits an Agent to Serve More than One Principal in the Same Matter and Stephen Chen and J.T. Ho Were Dual Agents of UMC and Jinhua ............................ 9

CONCLUSION ............................................................................................................................. 12

# TABLE OF AUTHORITIES

Page(s)

Cases

*Fernandez v. United States*,
 329 F.2d 899 (9th Cir. 1964) ........................................................................................... 6
*Glasser v. United States*,
 315 U.S. 60, 62 S.Ct. 457 (1942) .................................................................................... 8
*Hernandez v. United States*,
 300 F.2d 114 (9th Cir. 1962) ...................................................................................... 7, 8
*Jordan v. United States*,
 428 F.2d 7 (9th Cir. 1970) .............................................................................................. 7
*Nye & Nissen v. United States*,
 168 F.2d 846 (9th Cir. 1948) .......................................................................................... 8
*Pinkerton v. United States*,
 328 U.S. 640 (1946) ................................................................................................... 4, 6
*Reisman v. United States*,
 409 F.2d 789 (9th Cir. 1969) .......................................................................................... 8
*United States v. Covelli*,
 738 F.2d 847 (7th Cir. 1984) .......................................................................................... 6
*United States v. Dunn*,
 564 F.2d 348 (9th Cir. 1977) .......................................................................................... 8
*United States v. Little*,
 753 F.2d 1420 (9th Cir. 1984) ........................................................................................ 8
*United States v. Smith*,
 600 F.2d 149 (8th Cir. 1979) .......................................................................................... 9

Statutes

18 U.S.C. § 1831(a)(5) ........................................................................................................ 10
18 U.S.C. § 1832(a)(5) ........................................................................................................ 10
28 U.S.C. § 515 ................................................................................................................... 14
18 U.S.C. § 1837 ............................................................................................................. 2, 8

## INTRODUCTION

In this memorandum of law,[1] the government addresses two new legal rules raised by Defendant Fujian Jinhua Integrated Circuit Co., Ltd. ("Jinhua") for the first time at closing argument (ratification and dual agency) and one question raised by the Court that concerns the extraterritorial application of the Economic Espionage Act to the conduct at issue in this case.

*Ratification.* – Jinhua joined the ongoing conspiracy among Stephen Chen, J.T. Ho, Kenny Wang, Neil Lee, their employer United Microelectronics Corporation ("UMC"), and others when it appointed defendants Chen, Ho, and unindicted co-conspirator Lee respectively as its president (no later than January 6, 2017) and technical directors (no later than July 1, 2016). Jinhua's supplemental "ratification" instruction, electronically filed without notice at 7:54 pm Pacific time the evening before closing arguments (Dkt. 635), embodies an aspect of the familiar *Pinkerton* Rule, which does not apply here. The *Pinkerton* Rule holds that a conspirator is liable for the substantive crimes committed by his co-conspirators in furtherance of the conspiracy *after* he joins the conspiracy, but he is not liable for substantives crimes committed *before* he joined the conspiracy, even if he "ratifies" those prior crimes. The *Pinkerton* Rule does not apply to this prosecution because the conspiracies were ongoing and the indictment (Dkt. 1) does not charge Jinhua for any prior substantive offenses. The only substantive offense with which Jinhua is charged occurred is the receipt, buying and possession of stolen trade secrets, which occurred when and after it joined the conspiracy. Specifically, Jinhua possessed the trade secrets first through Ho's possession of them beginning July 1, 2016 and also through technology transfers of Micron trade secrets, which Ho, Lee and Chen knew were the product of Micron's trade secrets.

*Extraterritoriality Timing.* – Although the government submits that Jinhua joined the conspiracy no later than July 1, 2016, through technical directors Ho and Lee, Jinhua is nonetheless criminally liable for violating the Economic Espionage Act even if it joined the conspiracy on January 6, 2017 through Stephen Chen, which date is after the conspirators' solicitation of skilled workers at CASPA and customized semiconductor equipment from KLA, AMAT, and LAM, both of which acts are in

---

[1] This document corrects Docket 641 to remove the footnote numbers on page 7 that did not in fact include footnote text, and to add this explanatory footnote. There are no other changes.

UNITED STATES'S POST-CLOSING SUPPLEMENTAL
18-CR-00465 MMC                                                1

furtherance of the conspiracy and both of which occurred in this district in October 2016. By its terms, the Economic Espionage Act "applies to ***conduct*** occurring outside the United States if – . . . (2) an act in furtherance of the offense was committed in the United States." 18 U.S.C. § 1837 (emphasis added). Acts in furtherance of the conspiracies occurred in October 2016 in this district. Accordingly, the conduct to which the Economic Espionage Act applies includes those conspiracies and substantive crimes in furtherance of those conspiracies. Because the Economic Espionage Act applies to "conduct," and Jinhua joined that conduct, the Act applies even if Jinhua joined on January 6, 2017, when it formally appointed Stephen Chen as its president, rather than when Chen was acting as *de facto* President as of October 19, 2016, or when J.T. Ho became an agent on July 1, 2016.

*Dual Agency*. –Stephen Chen and J.T. Ho (among others) served both UMC and Jinhua at the same time and in the same venture – namely, Project M. Contrary to Jinhua's contention – made for the first time in its closing argument and only admitted after its new argument was caught (09/21/2023 vol. 32 Tr. 5392:9-5393:11) – an agent may act for two principals in the same venture. *See* RESTATEMENT (THIRD) OF AGENCY § 3.14 ("Agents with Multiple Principals") & § 3.16 ("Agent for Coprincipals"). The trial evidence proved beyond a reasonable doubt that Stephen Chen served both UMC and Jinhua from no later than January 6, 2017 to September 2018. The trial evidence also proved beyond a reasonable doubt that J.T. Ho expressly served both UMC and as Jinhua's technical director from July 1, 2016 to sometime in the fall of 2018. Both Chen and Ho were Jinhua agents as well as UMC agents and therefore both principals are criminally liable under the doctrine of *respondeat superior*.

## LIMITED PROCEDURAL HISTORY

On January 7, 2022, the parties filed jury instructions. *See* Dkt. 308 (agreed instructions) & Dkt. 309 (disputed instructions). Among the disputed instructions, the government discussed a "corporation's subsequent adoption or approval (ratification) of the agent's conduct," using the word "ratification" three times. Dkt. 309, at 22, 25. After Jinhua waived its right to trial by jury, the parties converted the jury instructions into statements of governing law on July 31, 2023 and August 11, 2023. *See* Dkt. 602, at 2. All three filings reference "ratification" by name. *See, e.g.*, Dkt. 602, at 41, 52, 58, 59.

From the submission of jury instructions on January 7, 2022 (Dkt. 309, at 52-53), through the Rule 29 briefs (Dkt. 449, at 37-39; Dkt. 485, at 5-8.), and until shortly before closing arguments (Dkt.

602, at 74-77), Jinhua consistently contended that it did not know what its agents knew – namely, that they conspired to and did steal Micron's trade secrets to mass-produce DRAM in the PRC. Jinhua argued the law limits a principal's (Jinhua's) knowledge to that acquired *after* the agents became Jinhua's officer and employees.

As the government has explained since December 2021 and most recently in submissions to the Court before the defense case (*see* Dkt. 602, at 64-73), for at least the past 90 years, "[t]he great weight of judicial authority" (3 RESTATEMENT (SECOND) OF AGENCY § 276, at 471 (1958)) has held that a principal knows what his agent knows relevant to the agency, regardless of when the agent acquired his knowledge. That black-letter law reflects the sound policy that principals generally want their agents to use what they know to effect the agency and the reality that human brains are not compartmentalized. Jinhua's position that it can only be responsible for knowledge its agents acquired after joining Jinhua was based on state court decisions handed down shortly after the Civil War. *See* Dkt. 602, at 69 n. 1.

During Jinhua's case and while testifying in the United States, Jinhua's witness Wu Junsheng admitted that Stephen Chen worked for both UMC and Jinhua. Tr. Vol. 28 at 5018:17-19 (Wu Junsheng). After asking for additional time for their next witness to recover from the long flight, Jinhua presented in direct testimony of Jeff Yu that Stephen Chen worked for both UMC and Jinhua until September 2018. Tr. Vol. 29 at 5066:2-15 (Jeff Yu).

The Court heard nothing of Jinhua's pre-agency-amnesia theory during closing argument. Instead, on the eve of closing argument, without notice, Jinhua filed a supplemental instruction that Jinhua cannot "ratify" a prior criminal act and that criminal intent must exist at the time the crime is committed. *See* Dkt. 635, at 2, 4, 5-6.

After the government finished its principal closing argument, and during the defense closing argument, Jinhua slipped in a second new purported legal principle – namely, that an agent may serve only one principal in a single matter. Jinhua closing PowerPoint slide failed to cite the actual *Restatement (Third) of Agency*. The comments it cites, when put in context, are consistent with the applicable law that an agent may serve two principals in the same transaction.

After closing arguments, at which the government asked for permission to file responses to Jinhua's latest legal theories raised in closing, the Court gave permission for the parties to brief Jinhua's

UNITED STATES'S POST-CLOSING SUPPLEMENTAL
18-CR-00465 MMC                                                    3

new-for-closing arguments on ratification and dual agency and asked for briefing on its timing question on extraterritoriality regarding the parties' dispute over the timing of Stephen Chen's service as Jinhua's president (either *de jure* on January 6, 2017 or as a *de facto* officer by October 2016). *See* 09/21/2023 Vol. 32 Tr. 5489:1-7.

## ARGUMENT

**I. Because Jinhua Is Not Charged with any Substantive Offense Prior to Joining the Ongoing Conspiracies, the *Pinkerton* Rule Is Inapplicable**

Jinhua is guilty of Counts One and Two because it joined ongoing conspiracies through its agents. It is guilty of Count Seven because it bought, received, and possessed Micron's trade secrets, which it knew through Ho, Lee and Chen's knowledge, to be stolen.

In its supplemental instruction, Jinhua asserts that a defendant cannot ratify another's criminal act and that criminal intent must exist at the time of the crime is committed. To the extent that Jinhua's statements are limited to ***prior substantive*** crimes, the government agrees. So limited, Jinhua's "ratification" instruction does no more than restate the *Pinkerton* Rule that a late-joining conspirator is liable for the conspiracy and subsequent substantive offenses but not prior substantive offenses committed before the late-comer joined the conspiracy. To the extent that Jinhua suggests that a late comer cannot join an existing conspiracy or cannot form the requisite criminal intent after the conspiracy started, however, Jinhua's suggestion would overrule the United States Supreme Court's decision in *Pinkerton*, finds no support even in its own authorities, and has no limiting principle.

The question principally presented in *Pinkerton v. United States*, 328 U.S. 640 (1946), was whether a conspirator is liable for his co-conspirator's substantive crimes in furtherance of the conspiracy, *see id*. at 645. The theory on which the trial judge instructed the jury, and which the government defended the conviction in the U.S. Supreme Court—and which the Supreme Court accepted—was that "[a] conspirator is responsible for criminal acts committed pursuant to the conspiracy or as a natural consequence of the conspiracy, *so long as he was a party to the conspiracy when the criminal acts were committed*." Brief for the United States, *W. Daniel Pinkerton and Walter G. Pinkerton v. United States*, No. 45-719, at 37 (bold-facing omitted; emphasis added); *see id*. at 39, 40. The italicized portion of the government's brief emphasized that although a conspirator is liable for substantive

offenses committed in furtherance of a conspiracy *after* he joins, he is not responsible for substantive offenses committed by his co-conspirators *before* he joined:

> We, of course, recognize that the doctrine cannot be extended to fasten liability for the commission of the substantive offense upon one who joins the conspiracy after the commission of the offense. An individual's **ratification** of another's criminal act cannot form the basis of criminal liability. He must be criminally liable, if at all, at the time when the crime takes place. On the other hand, in the case where a substantive offense is committed pursuant to the conspiracy by one of the conspirators, those who were then associated with him may be held responsible because their bringing about the crime resulted in a concurrence of act and criminal intent on their part. No different principle is involved even in conspiracy prosecutions by the application of the doctrine that one who joins a conspiracy after its inception is bound by the acts and declaration of his co-conspirators notwithstanding they occur prior to his association with the conspiracy. The guilt as a conspirator of the latter participant does not flow from the fact that the earlier participants may have committed criminal acts, since the gist of the offense is the agreement to commit a crime and not the crime itself; the later participant becomes criminally responsible because, with the requisite knowledge and intent, he associates himself with an existing combination to commit crime; the prior acts and declarations are utilized to establish the illegal character of the combination.

*Id*. at 45-46 (citations omitted; "ratification" emphasized).

Jinhua quotes the government's *Pinkerton* brief in its supplemental instruction (Dkt. 635, at 6). But Jinhua's edit of the government's brief omits that it extends only to prior substantive offenses. By omitting mention of prior substantive offenses, Jinhua incorrectly suggests that a person cannot join an ongoing conspiracy and have the necessary criminal intent to be criminally responsible for that conspiracy and subsequent substantive crimes committed in furtherance of the criminal venture. That is contrary to the the U.S. Supreme Court's decision in *Pinkerton* and settled Circuit law on late-joining conspirators like Jinhua.[2]

---

[2] Jinhua's suggestion is also contrary to its own authorities, which merely echo the *Pinkerton* Rule that a late-joining conspirator of liable for substantive crimes after he joined but not before. *See*, for example, *United States v. Covelli*, 738 F.2d 847 (7th Cir. 1984), which is the first authority on which Jinhua relies. The few words that Jinhua quotes are in italics (*id*. at 858-59; citations omitted):

> Under *Pinkerton,* "[o]nce the conspiracy and the defendant's knowing participation in it have been established beyond a reasonable doubt, the defendant will be vicariously liable for the substantive acts committed in furtherance of the conspiracy by his coconspirators." The government argues that, since Frederick and Murray's participation in the conspiracy has been established, they can be held vicariously liable for the transportation of the stolen goods from Illinois. However, "[t]o convict on this basis would be to establish criminal guilt by **ratification**, which ***is not a criminal-law doctrine***. "R. Perkins & R. Boyce, *Criminal Law* 704-05 (3d ed. 1982). We have previously stated the distinction that "[a]lthough joining a conspiracy subjects the late joiner to some of the consequences of earlier activity by others in furtherance of the conspiracy, ... an individual `cannot be held criminally liable for substantive offenses committed by members of the conspiracy before that individual had joined or after he had withdrawn from the conspiracy....'"Thus, in order for Frederick and Murray to be liable for the transportation from

1    Consistent with the U.S. Supreme Court's *Pinkerton* decision, 328 U.S. at 646-648, the Ninth Circuit has repeatedly held that late comers can join a conspiracy and are criminally responsible for the conspiracy and substantive offenses committed in furtherance of the conspiracy after they join. *See, e.g.*, *Fernandez v. United States*, 329 F.2d 899, 905 n.12 (9th Cir. 1964) ("It is recognized that one may be convicted as a co-conspirator though he joined the conspiracy after its inception, his part was minor, he was not aware of all of the details of the conspiracy, he did not participate in an alleged overt act, and he did not know the part other conspirators were to play, or even who all of them were."); *Hernandez v. United States*, 300 F.2d 114, 122 (9th Cir. 1962) ("Once it is found that the defendant was connected with the conspiracy, he is equally liable with those who originated and dominated the common scheme, though he joined it after its inception and his part was minor and subordinate.") (footnote omitted); *see also Jordan v. United States*, 428 F.2d 7, 10 (9th Cir. 1970) (admitting against late-joining conspirator a co-conspirator's statement before the late comer joined the conspiracy: "Such testimony is admissible where, as here, the defendant subsequently joins the conspiracy.").

For all the reasons explained in the government's closing argument, Jinhua joined the conspiracy through its agents, including Chen and Ho, who had been conspiring since on or about September 2015. Chen had a new job to start at UMC on September 16, 2015. Chen pumped Tanaka-san for Micron's product roadmap for three technology nodes (25 nm, 20 nm, and 1X nm) a few days before Chen started at UMC. *See* P1046T.0003. At about the same time, Ho downloaded the process flows for the same three technology nodes (25 nm, 20 nm, and 1X nm). *See* P0377; Gov't Closing Slide 158. When Chen showed up for his first day of work, he had a business plan that featured him leading a new project to mass-produce DRAM in the PRC. *See* P707T.0038. The source of the DRAM was not UMC, whose last technology node was 90 nm. *See* W. Lu, Tr. Vol. 25, 4772:7-17; *see also* Gov't Closing Slide 151 (additional record citations). The source was not buying or licensing DRAM technology – the business plan said those avenues were too expensive. *See* P0709T.0008 (Oct. 12, 2015 revision of September 16, 2015 business plan); *see also* M. Durcan, Tr. Vol. 19, 3588:18-3591:16; 3594:1-20 (PRC SOEs tried to buy Micron and license Micron's DRAM, but Micron declined because of risk of trade secret "leakage").

---

Illinois to the other states involved, the government must show that they joined or were involved in the conspiracy sometime prior to the Washington flight of the Covelli brothers on January 2, 1982.

UNITED STATES'S POST-CLOSING SUPPLEMENTAL
18-CR-00465 MMC                                    6

According to the business plan, the source of the technology was euphemistically labeled "Team Building." P0709T.0008.

Substantial trial evidence proved that Jinhua joined the conspiracy, as detailed in closing argument. Circuit law makes clear that only modest circumstantial evidence may be sufficient to join a late comer to an ongoing conspiracy.[3] Jinhua joined the conspiracies through its agents, and it further demonstrated its participation by continually funding, equipping, and learning the Project M manufacturing process based on the stolen Micron trade secrets and possessing and receiving the transfer of that technology in the PRC. Jinhua persisted in Project M despite raids by Taiwan law enforcement and indictments by Taiwan and the United States and going through the risible motions of asking the conspirator Stephen Chen and his UMC boss Stan Hung if they stole Micron trade secrets and taking their word that they conducted an audit by people that Jinhua didn't know, using a methodology that couldn't work (because the auditors didn't know what Micron trade secrets to look for), and in an audit report that they never saw. No more eloquent evidence of Jinhua's eagerness to acquire advanced DRAM technology no matter how "contaminated" is that the conspirator-in-chief remains Jinhua chief executive officer to this day. "The applicable law is well recognized . . . that [a] coconspirator may even become a member of the conspiracy without being in on it at its inception. One need only knowingly contribute his efforts in furtherance of it." *United States v. Smith*, 600 F.2d 149, 151 (8th Cir. 1979) (citations omitted).

---

[3] *See United States v. Dunn*, 564 F.2d 348, 357 (9th Cir. 1977) ("Once the existence of a conspiracy is established, evidence establishing beyond a reasonable doubt a connection of a defendant with the conspiracy, even though the connection is slight, is sufficient to convict him with knowing participation in the conspiracy."); *United States v. Little*, 753 F.2d 1420, 1448 (9th Cir. 1984) ("Once the conspiracy was established, only slight evidence was required to establish [the late-joiner's] connection with the conspiracy."; participation at meeting "more than satisfied the minimal quantum of proof necessary to prove the connection"); *Reisman v. United States*, 409 F.2d 789, 792 (9th Cir. 1969) ("Once the existence of the common scheme is established, very little is required to show that defendant became a party.") (citation omitted); *Hernandez*, 300 F.2d at 121-122 ("Under the general law of conspiracy, the common course of conduct between defendant and the third person need not be based upon express agreement — tacit understanding is enough. Neither the existence of the common scheme nor the fact of defendant's participation in it need be proved by direct evidence; both may be inferred from a 'development and collocation of circumstances.' *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457 (1942). Once the existence of the common scheme is established, very little is required to show that defendant became a party — 'slight evidence may be sufficient to connect a defendant with it.' *Nye & Nissen v. United States*, 168 F.2d 846, 852 (9th Cir.1948), affirmed 336 U.S. 613, 69 S. Ct. 766, 93 L.Ed. 919.") (footnotes omitted).

Jinhua's supplemental instruction that "a principal can only be held liable for an agent's pre- or *post- agency conduct* if the principal ratifies the conduct after it occurs" (Dkt. 635, at 7 (emphasis added)) is thus contradicted by settled Circuit law.

Without Jinhua's capital and double mega-fab, the principal object of the conspiracy – mass production of advanced DRAM in the PRC – would not have been possible.

## II. The Economic Espionage Act Applies Extraterritorially to Jinhua Because the Offenses Furthered by Acts in the United States Involved Conduct that Jinhua Joined

"[A]ct[s] in furtherance" of the ongoing conspiracies were committed in the United States by conspirator Stephen Chen even if Chen was only a UMC agent in October 2016 and not also a Jinhua agent. (He was an agent of both by this time, given that Jinhua had already started the process of making him its President. *See* D4878.) As a result, Section 1837 applies the Economic Espionage Act to the "*conduct* occurring outside the United States." 18 U.S.C. § 1837 (emphasis added).[4] *Black's Law Dictionary* defines "conduct" as "[p]ersonal behavior, whether by action or inaction, verbal or nonverbal; the manner in which a person behaves; collectively, a person's deeds." BLACK'S LAW DICTIONARY 358 (10th ed. 2014). At a minimum, the "conduct" to which the Economic Espionage Act applies includes the economic espionage conspiracy in Count One and the trade-secret misappropriation conspiracy in Count Two, because they were the precise "offense[s]" "further[ed]" "in the United States by the visit of Stephen Chen and his UMC-Jinhua-PRC delegation to CASPA and the three major semiconductor equipment vendors.

What is more, the conduct to which the Economic Espionage Act applies also includes the substantive economic-espionage offense in Count Seven. Both conspiracies included a conspirator doing "any act to effect the object of the conspiracy." 18 U.S.C. §§ 1831(a)(5), 1832(a)(5). An object of the conspiracies was to "mass-produc[e] advanced DRAM technology" in the PRC. Indictment, Dkt. 1, ¶ 19; *see also id.* ¶ 52 ("The objects of the conspiracy were carried out, in part, as alleged in Paragraphs 18 through 34 above."). Because the substantive economic espionage offense in Count Seven (Jinhua's receipt, purchase, and possession of the stolen trade secrets) was committed pursuant to and in furtherance of the conspiracies in Counts One and Two, the substantive count against Jinhua is also conduct to which the Economic Espionage Act applies.

In determining the extraterritorial application of the Economic Espionage Act, the Court should

---

[4] Section 1837 states in pertinent part:

This chapter also applies to conduct occurring outside the United States if— . . .
**(2)** an act in furtherance of the offense was committed in the United States.

UNITED STATES'S POST-CLOSING SUPPLEMENTAL
18-CR-00465 MMC                                                   8

give effect to Congress's decision to apply the Act to the "conduct" occurring outside the United States and not to limit the extraterritorial application to the "offense" or the offender. Congress was well aware that it could have limited extraterritorial application to the offense or offender, because it triggered extraterritorial application by an act in furtherance of the "offense." That Congress chose to apply the Economic Espionage Act to "conduct" without regard to the precise offenses or offenders involved in the U.S. contacts at the time of those contacts demonstrates that Congress applied the Act to all conduct of which the U.S. contacts were a part. The U.S. contacts were made to obtain skilled workers and custom equipment kit to further the conspiracies to mass-produce advanced DRAM in the PRC. When Jinhua later joined those ongoing conspiracies, it too became subject to the Economic Espionage Act. Moreover, because Jinhua received, bought, and possessed the stolen manufacturing process pursuant to those conspiracies, the subsequent substantive economic espionage offense (Count Seven) is also "conduct" to which the Economic Espionage Act applies. The Act thus applies to Jinhua in Counts One, Two, and Seven even if conspirator Stephen Chen wore only his UMC hat in October 2016 and not his Jinhua hat as well.

### III. Applicable Law Permits an Agent to Serve More than One Principal in the Same Matter and Stephen Chen and J.T. Ho Were Dual Agents of UMC and Jinhua

Jinhua asserts that an agent is legally permitted to serve only one principal in the same matter and that a court must determine which. *See* Defense Closing Slide 120 ("Dual Agents: Controlling Legal Principles"); 09/21/2023 vol. 32 Tr. 5393:16-5394:19).

Contrary to Jinhua's assertion, an agent may by law serve more than one principal in the same matter. Numerous black-letter statements approve the principle of an agent serving more than one principal and detail the responsibilities that run from agent to principals and principals to agent. *See* 1 RESTATEMENT (THIRD) OF AGENCY § 3.14, at 262 (2006) ("Agents with Multiple Principals[.] An agent acting in the same transaction or matter on behalf of more than one principal may be one or both of the following: (a) a subagent, as stated in § 3.15; or (b) an agent for coprincipals, as stated in § 3.16."); *id*. § 3.16, at 296 ("Agent for Coprincipals[.] Two or more persons may as coprincipals appoint an agent to act for them in the same transaction or matter."); *see also id*. § 7.03 cmt. d, at 153 (principals' liability for "[a]gents with multiple principals"); 2 *id*. § 8.06(2), at 323-24 ("An agent who acts for more than one

principal in a transaction between or among them has a duty . . . to disclose to the principal (i) the fact that the agent acts for the other principal or principals, and (ii) all other facts that the agent knows, has reason to know, or should know would reasonably affect the principal's judgment unless the principal has manifested that such facts are already known by the principal or that the principal dues not wish to know them . . . .").

Jinhua quotes the first sentence of *Restatement* Section 3.14 comment b for the principle that an agent may serve only one principle in any particular matter, but the following sentences make clear that agents may have multiple principals. The italicized sentence is quoted by Jinhua:

> *b. General overview. A person with relationships of agency with more than one principal may, in any particular matter, act as an agent on behalf of only one principal.* For example, owners of property, each of whom lists a property for sale with the same real-estate agent, have distinct relationships with the listing agent. In contrast, § 3.15 and 3.16 concern relationships in which an agent acts on behalf of multiple principals in the same transaction or matter.

1 RESTATEMENT (THIRD) OF AGENCY § 3.14, cmt. b, at 262. The comment goes on to discuss subagents and agents for coprincipals. No legal principle limits an agent to one principal in a particular matter. Instead, it is a question of fact whether an agent has coprincipals. In this case, the trial evidence showed as a fact that Stephen Chen and J.T. Ho (among others) served both UMC and Jinhua on Project M. Chen remained in Taiwan to progress the R&D for Jinhua (P0613T) and likewise Ho's place of work remained in Taiwan under a Labor Agreement with Jinhua (P0272.00007 (§ 2.2)).

Jinhua also quotes a sentence that Jinhua reads to require the Court to determine which "hat" an agent who serves multiple principles is wearing. Although Jinhua's PowerPoint slide attributes the sentence to "Restatement (Third) Agency § 3.14 cmt. b," which appears in volume 1 of the *Restatement*, the sentence that Jinhua quotes appears in volume 2 in Section 7.03 comment d. That sentence states that one need determine which "hat" an agent wears when "[o]fficers of interrelated entities" – that is, in the same corporate family – engage in contracts or transactions. The comment expressly disclaims any application to "tortious" conduct or "conduct that violates a statute that proscribes or regulates conduct, particularly conduct outside a transaction context," which would seem to include the criminal conduct at issue here. Again, Jinhua's quotation appears in italics:

> *When the same individuals serve multiple entities as their officers, directors, or employees, it may become necessary to determine the entity to which an individual's conduct should be attributed.* There is a general presumption that contracts and other transactions entered into by a shared officer are attributed to the entity for which the officer purports to be acting. A

UNITED STATES'S POST-CLOSING SUPPLEMENTAL
18-CR-00465 MMC                              10

rationale for this presumption is that the identity of the party who will be bound by a contract or transaction is often material to the other party to the contract or transaction. See § 6.01, Comment *b*. This rationale does not support applying the same presumption when a shared officer's conduct is tortious, especially when the party injured by the conduct has not chosen to engage in a transaction conducted by the shared officer. Moreover, than an officer purports to act on behalf of a particular entity does not create a basis for attribution that corresponds to policies and objectives that underlie contemporary tort law. When harm is caused negligently, these objectives include remedying an injustice that has been inflicted on a plaintiff by a defendant and providing a defendant with appropriate safety incentives. See Restatement Third, Torts: Liability for Physical Harm § 6, Comment *d* (Proposed Final Draft No. 1, 2005). On hard that is caused intentionally, see id. § 5, Comment *a*. Likewise, the contract-based presumption is inapt when a shared officer's conduct violates a statute that proscribes or regulates conduct, particularly conduct outside a transactional context.

2 RESTATEMENT (THIRD) OF AGENCY § 7.03, cmt. d(3), at 156 ("Officers of interrelated entities").

\* \* \* \* \*

Stephen Chen and J.T. Ho were agents of UMC and Jinhua on Project M. Jinhua knew what those conspirators—its agents—knew. Even with that knowledge, Jinhua funded and equipped UMC's Fab 12A in Tainan, which was adapting Micron's stolen trade secrets for mass-production in the PRC. To further its work, Jinhua hired key UMC employees including the conspirators Ho and Lee as Jinhua employees, supervised by Chen at both UMC and Jinhua. It accepted the technology transferred from UMC to Jinhua, which was effectively Chen transferring the R&D he spearheaded to himself at Jinhua. Jinhua persevered through raids, indictments, and trials. And Jinhua continued to employ Stephen Chen as of the date of its witnesses' testimony.

//
//
//
//
//
//
//
//
//
//
//

## CONCLUSION

For the foregoing reasons, and those stated in closing argument, Jinhua should be found guilty of conspiracy to commit economic espionage (Count One), conspiracy to misappropriate trade secrets (Count Two), and economic espionage (Count Seven).

Dated: October 13, 2023

Respectfully submitted,

THOMAS A. COLTHURST
Attorney for the United States
Acting under Authority Conferred by
28 U.S.C. § 515

_____/s/_____
LAURA VARTAIN HORN
NICHOLAS WALSH
Assistant United States Attorneys

NICHOLAS O. HUNTER
STEPHEN MARZEN
Trial Attorneys, National Security Division